**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**Case No. 1:23-cv-23362-CIV-MARTINEZ**

PENROD BROTHERS, INC.,
a Florida corporation,

     *Plaintiff*,

vs.

THE CITY OF MIAMI BEACH,
FLORIDA,
a Florida municipal corporation,

     *Defendant*.

_____/

## FOURTH AMENDED COMPLAINT

     Plaintiff Penrod Brothers, Inc. ("Plaintiff" or "Penrod"), by and through undersigned counsel, brings this action against Defendant the City of Miami Beach, Florida (the "City") and alleges:

### INTRODUCTION

     1.    Equal treatment of all participants in public and competitive bidding for municipal projects is a cornerstone of government procurement. The City's Code and Charter require a public, competitive, closed bid process for the disposition of high-value City leasehold and services rights and contracts. Both the federal and Florida constitutions guarantee procedural and substantive due process to achieve the essential purposes of the Charter and Code requirements. Those specific and mandatory procedures ensure participants' rights of due process and fair consideration, help secure the most favorable bid for taxpayer-funded projects, and protect against favoritism and misconduct.

2.      Penrod sues to safeguard the integrity of competitive bidding for one of the most prominent public projects in the City of Miami Beach, ensure a level playing field for all bidding participants, vindicate its rights to Code-mandated competitive bidding procedures, and force the City to fairly and properly include Penrod in a proper procurement process.

3.      Penrod has been a trusted and valued City partner for more than three decades, operating a world-renowned high-end beach club – Nikki Beach, located at One Ocean Drive – on City property leased to Penrod. Penrod was an early and instrumental force in steering the City's South of Fifth Neighborhood to the global tourist destination it is today, while also enhancing the area as a livable and magnetic space for City residents. The relationship has been remarkably beneficial to both parties and to Penrod's fellow citizens and neighbors, including by providing millions of dollars in rent to the City and millions in investment and improvements at the property made by Penrod. While its lease does not expire for more than two years, Penrod nonetheless looks forward to serving the City, its residents, and visitors for years to come based on its dynamic and innovative vision for this iconic Miami Beach destination.

4.      The City is required by law to submit its multi-million dollar One Ocean Drive project to a formal and public, competitive bidding process with Code-specific procedural rights and guarantees for all participants.

5.      Instead, the City chose to circumvent and contravene those procurement requirements, with the intent and result of excluding Penrod from the project's consideration and ultimately of awarding millions of dollars in public assets to the City's preselected vendor.

6.      *First*, the City, by policy culminating in an April 2023 resolution, negotiated directly with a preferred competitor and attempted a no-bid procedure for that competitor to lease and develop the property. Penrod sued, forcing the City to abandon that procedure.

7.      The City's mid-suit reversal neither cures nor moots Penrod's claims targeting the City's policies and April resolution. The City disputes that it violated Code-mandated procedures. Penrod must secure its rights to equal access and ensure, through declaratory relief, that the City not renege or repeat its prior attempt to bypass competitive procurement requirements. Further, the City's reverse-course does not remedy the harm to Penrod.  That harm, which Penrod already suffered and is ripe for legal remedy, resulted directly from the City's original preferential conduct, and includes, most notably, out-of-pocket financial expenses by Penrod to play catch up to attempt to participate fairly and equally in, regardless of the outcome of, the procurement process.

8.      Accordingly, Penrod asserts claims against the City for violation of procedural and substantive due process, violation of the City Charter and Code, and declaratory relief.

9.      *Second*, the City initiated a bidding process that failed to comply with fundamental Code and Charter requirements. As explained below, the City's process improperly allows alteration to material bid terms post-award, improperly allows for open-bid negotiations among competitors, contains impermissibly anticompetitive timelines, incorporates anti-competitive communications, contains vague criteria preventing an exact comparison of bids, and contains arbitrary criteria that create anti-competitive advantages.

10.     Penrod engaged in administrative protests; the City refused to correct or comply. The City's Code and Florida law authorize bid specification and solicitation protests to allow correction of defective plans and specifications *before* proceeding with a defective procurement process—to protect the government and its taxpayers from the waste and unjust results from improper procurement, and to ensure fair competition and correct results among bidders. The only result of a defective process is a defective outcome that will be invalidated, and at great cost

to the City itself and to all bidders, including Penrod. The City's refusal to adhere to its own Code requirements—most critically, of a closed bid process that prohibits material alteration of bids post-award and open-bid negotiations among competitors—forced Penrod to sue for the City's violations of, and to enforce, the City's Code in accordance with federal and state law.

11.     _Third_, the City refused to accept and consider Penrod's bid, altogether. The City claims that an error in its own third-party electronic submission platform rendered Penrod's bid untimely.

12.     Not only is the City wrong, but its refusal to accept and consider Penrod's bid is merely vindictive and arbitrary, part and parcel of the City's policy to exclude Penrod from fair and equal consideration. While the City's entire procurement process is defective, should be stopped, and will be nullified, Penrod is forced to sue in the alternative _simply to be considered at all_.

13.     _Fourth_, the die being forecast, the City quickly ranked its preferred bidder highest among all bidders (despite that it lacks any objective criteria to merit such ranking), awarded that bidder the RFP, negotiated away further rights and terms in material alteration of the closed bid, and awarded the multi-million dollar project to its preferred bidder—and did so by disguising a ten-plus year lease as a "concession agreement" in order to avoid the required voter referendum. Penrod's suit now challenges those capstones to the City's defective process.

14.     Penrod need not ascribe corrupt motive, and can assume high-minded civic virtue and zeal for realizing a particular view of the best results for the City and its citizens.  Penrod also recognizes that it has no general right to be awarded a government contract. But, regardless of motive, and regardless of outcome, the City cannot violate Code-mandated procedures, and cannot abrogate Penrod's rights to participate on equal footing. Regardless of motive, and

regardless of outcome, the City's conduct has created opportunities for favoritism and impropriety that undermines trust in local government. The City's conduct here is a textbook illustration of why our laws require strict adherence to neutral and competitive procurement procedures: the City preselected a winner, tried to avoid competitive bidding entirely, ran a defective bid process, excluded competition, negotiated away the required voter referendum, and—the result preordained—awarded tens of millions of dollars in public assets and contracts to its preselected winner.

15.     The City must be made to adhere to its Code. The City's procurement process for the multi-million dollar One Ocean Drive property was fatally defective; it and anything resulting from it, including the RFP and contract awards, must be voided. Penrod must be compensated for the costs already borne because of the City's violation of its Code-mandated procedures, and must be afforded fair and equal consideration in a Code-compliant, competitive solicitation, closed-bid, and neutral, procurement process.

**PARTIES**

16.     Plaintiff Penrod Brothers, Inc. is a Florida corporation with its principal place of business in Miami-Dade County, Florida.

17.     Defendant the City of Miami Beach, Florida is a Florida municipal corporation located in Miami-Dade County, Florida.

18.     Plaintiff has standing to assert the claims herein related to the City's solicitation and procurement procedures, specifications, and submissions because, as detailed in the factual and cause-specific allegations, and among other reasons, Plaintiff: was a bidder with a substantial interest in the outcome of the relevant solicitation and procurement; was improperly prevented from bid consideration by the City; is aggrieved by the the City's conduct described

herein; has future rights and interests affected by the City's conduct described herein and the relief sought herein; and was in fact injured by the City's conduct described herein.

19.     Plaintiff has standing to assert the claims herein related to the City's bid and contract awards because, as detailed in the factual and cause-specific allegations, and among other reasons, Plaintiff: is a corporate citizen of the City of Miami Beach and Miami Dade County protected and afforded rights and relief by the municipal charters of same; was a bidder with a substantial interest in the outcome of the proposed and actual awards; was improperly prevented from bid consideration by the City; was affected by the acceptance of awards and contracts materially different than what was solicited and proposed; would have become the successful or next successful bidder or awardee upon proper consideration using proper procedures by the City; is aggrieved by the City's conduct described herein; has future rights and interests affected by the City's conduct described herein and the relief sought herein; was affected by the extraordinary circumstances of the City's broad, multiple, and material violation of required solicitation and procurement procedures described herein; and was in fact injured by the City's conduct described herein.

## JURISDICTION AND VENUE

20.     This is an action for relief pursuant to and for, *inter alia*, 42 U.S.C. § 1983, violation of constitutional rights and municipal code provisions, declaratory relief pursuant to Chapter 86, Fla. Stat., injunctive relief, and damages in excess of $750,000.

21.     Because Defendant removed this case pursuant to 28 U.S.C. § 1441, Plaintiff need not assert a basis for jurisdiction.

22.     Notwithstanding, this Court has subject matter jurisdiction over Plaintiff's claims asserted under 42 U.S.C. § 1983, pursuant to 28 U.S.C. § 1331; and the Court has supplemental

jurisdiction over the balance of Plaintiff's claims as they are related to claims in the action within such original jurisdiction, pursuant to 28 U.S.C. § 1367.

23.     Venue is proper in this District and Miami-Dade County pursuant to § 47.011, Fla. Stat., and 28 U.S.C. § 1391 because the City is located in Miami-Dade County, Florida; the subject property is located in Miami-Dade County, Florida; a substantial part of the events giving rise to all claims took place in Miami-Dade County, Florida; and the causes of action hereafter alleged all accrued in Miami-Dade County, Florida.

24.     All conditions precedent to the maintenance of this action have been waived, excused, performed, or otherwise occurred.

25.     Plaintiff exhausted all administrative remedies to the extent required in connection with initiating this action.

26.     All claims stated herein relate back to, are directed to the same purposes of, and are part of, this lawsuit when initially filed.

## GENERAL ALLEGATIONS

**A.    Penrod's Lease and Successful Operations at the Property**

27.     Penrod operates as "Nikki Beach," located in Pier Park, a City-owned property at One Ocean Drive (the "Property").

28.     The Penrod family of businesses are an internationally recognized leader in the development, operation, and management of high-end beachside hotels, resorts, and beach clubs worldwide. They own and operate numerous hotels, restaurants, clubs, and premium beach clubs in luxurious locations worldwide, including Saint Tropez, Saint Barth, Spain (Marbella, Ibiza, and Mallorca), Monte Carlo (Monaco), Italy (Sardinia and Porto Cervo), Santorini, Koh Samui (Thailand), and Dubai. These world-class facilities include the Nikki Beach brand known worldwide as a premium, upscale beach club. The Nikki Beach club model was invented at the

subject Miami Beach location and has been adopted globally as the standard for premium, destination resort beach clubs.

29.     Nikki Beach's world-renown is a testament to Penrod's longstanding and proud public-private partnership with the City of Miami Beach.

30.     Penrod was an early and instrumental force in steering the City's South of Fifth Neighborhood to the global tourist destination it is today, while also enhancing the area as a livable and magnetic space for City residents.

31.     In the mid-1980s, before first-movers like Penrod made largescale investments to reshape and create the current South of Fifth Neighborhood, South Beach was associated with crime, drugs, resident flight, and economic decline.

32.     The relationship between Penrod and the City started with the execution of a lease agreement ("Lease") entered into on November 7, 1985.

33.     The Lease required Penrod to develop, construct, manage and operate a restaurant and beachfront facility at One Ocean Drive. The Lease had an initial term of twenty (20) years, with two (2) ten-year renewal terms (both ultimately exercised). In addition to rent payments (including a percentage of revenue), the Lease required a minimum $1.5 million investment by Penrod in the leasehold Property. Penrod exceeded its obligations, spending millions of dollars over 37 years in terms of facility construction, maintenance, and upgrades as the Lease required large-scale development of the area. In total, Penrod invested over $4 million on construction and improvements.

34.     Penrod also entered into a Concession Agreement, approved by the City Commission on February 25, 2004 by Resolution No. 2004-25506, allowing Penrod to continue operations of its beachfront operation eastward to the beach. The land granted by the Concession

Agreement abuts the Lease Property and is of little value apart from being an accessory to the Lease Property. The Concession Agreement is coterminous with the Lease's maturity.

35.     The relationship has been remarkably beneficial to both parties and to Penrod's fellow citizens and neighbors. Penrod operated a beach club and restaurant at the Property with exponentially increased success: first as Penrod's, then as Café Nikki, and finally as Nikki Beach. Nikki Beach provides the City millions in rent and related payments and exceptional advertising value for the City's tourism industry locally and internationally. Penrod has also invested millions in the Property.

36.     Because Penrod is invested in this City and not just itself, Nikki Beach has accommodated the City and its neighbors when addressing issues that come with owning and operating a high-end beach establishment off one of the most famous streets in the world. Nikki Beach, a good partner and good neighbor, often modified its business plan and use of the Property over the years to adapt to the changing landscape of the neighborhood. As salient examples, Nikki Beach discontinued playing loud music at the request of neighbors, and more consequently, Nikki Beach embraced an entirely new business model to accommodate the neighborhood's shift in recent needs, transforming its operations into a daytime beach club, and closing at 7 p.m. every night. Despite reducing income to Nikki Beach from operations, Penrod welcomed these changes to make the neighborhood even better for local residents. This stands in sharp contrast to the majority of business owners in South Beach, who chase their bottom line, and lobby and fight against community-enhancing and crime-reducing measures supported by our residents and their representatives.

37.     The Lease is set to expire on May 6, 2026.

**B.      Any Lease, Contract and/or Development in Respect of the Property Requires Competitive, Closed-Bid, and Public Solicitation Procedures Mandated by Specific Charter and Code Provisions**

38.      The City is organized under, and governed and bound by, the Charter of the City of Miami Beach ("Charter").

39.      The City's administration, operation and management is governed by ordinances and provisions within the Code of the City of Miami Beach, Florida ("Code").

40.      The City is organized within and under the Miami-Dade County Home Rule Charter ("County Charter").

41.      The City, and all of its divisions, departments, officers, administration, agents, and employees, are required strictly and completely to abide by the Charter, Code and County Charter in all respects.

42.      The Charter's Bill of Rights provides in section (A): "This government has been created to protect the governed…to promote efficient administrative management, to make government more accountable, and to insure to all persons fair and equitable treatment."

43.      Charter Sec. 1.03(b)(1) provides that "[t]he sale, exchange, conveyance, or lease of ten (10) years or longer (including option periods) of City-owned park, recreation, or waterfront property shall require approval by a majority vote of the voters in a City-wide referendum."

44.      Charter Sec. 1.03(b)(4) provides that "[t]he sale, exchange, conveyance or lease of ten years or longer of all remaining City-owned property . . . shall . . . require approval by a majority 4/7 vote of all members of the Planning Board and 6/7 vote of the City Commission."

45.      County Charter Sec. 7.02 provides that no "neighborhood park may be leased or disposed of unless a majority of the residents residing in voting precincts any part of which is within 1 mile of the park authorize such sale or lease by majority vote in an election."

46.     Code Sec. 82-36 provides that concession agreements are limited to only short-term use agreements for the City's parks.

47.     Code Sec. 82-39 provides that "[t]here shall be no sale or lease of city property unless there has been an advertised public bidding process."

48.     Code Sec. 2-366(a)(1) provides that "the purchase of goods or services in excess of the dollar thresholds established in this subsection shall be made following a formal bid process," with the dollar threshold for "[g]oods and services" set at "$100,000."

49.     Code Sec. 2-369 provides that "[w]hen the amount of a contract is in excess of the amount established by this article for formal bids," that being $100,000 for goods and services, "the city commission shall award the contract to the lowest and best bidder, or may delegate to the city manager the power to award such contract to the lowest and best bidder[.]"

50.     Code Sec. 2-366(f), 2-366(d), and 2-373(a)(2) together provide that a "formal bid process" requires a "competitive bid procedure" that includes "published notice inviting formal bids," which notice must include "general description of the goods or services to be purchased or sold, and shall state where bid documents and specifications may be accessed," submittal of "sealed bids," public "opening" of sealed bids at a designated time, and then "tabulation" and consideration of those sealed bids, upon which consideration the City may award the relevant project or contract.

51.     Code Sec. 2-366(d)(3) and 2-373(a)(2) further require that "[t]he procurement director shall solicit sealed bids from _all_ responsible prospective vendors…" to permit the parties to participate in a "competitive bid procedure."

52.     Code Sec. 2-486 prohibits any communication regarding required requests for proposal between a potential bidder, service provider, bidder, lobbyist or consultant, on the one

hand, and the City Manager, the City's administrative staff, City Mayor and City Commissioners, on the other hand, referred to as the "cone of silence."

53. No waiver or exception exists under the law and facts here to any Charter or Code provision identified here.

54. Thus, any prospective lease(s) and contract(s) for services at the One Ocean Drive property contemplated by the City as relevant here required at, all relevant times, formal, publicly-advertised, competitive bidding; published notice of same and all relevant specifications; closed bid procedures; tabulation and consideration of closed bids; that the project be awarded to the best bidder; and voter referendum; all taking place within the cone of silence.

## C.  City Policy for a No-Bid Solicitation Favoring a Single Competitor and Proposal for the Property

55. Between the summer of 2022 and the spring of 2023, the City, through political and administrative decision-makers, composed and implemented a policy to determine the future leasehold and development of the Once Ocean Drive Property without a competitive bidding process or any neighborhood input (as they had done in the past), and instead, to directly award control over that property and development to a competitor, Boucher.

56. The City's decision to grant the One Ocean Drive property, leasehold, concession, and related rights and interests exclusively to a preferred vendor, Boucher, without the required competitive solicitation process, did not result from the application of established procedures, regulations or ordinance to specific facts, nor was it an administrative decision directed solely at, or in response to an administrative application by, Penrod; rather, it was a policy decision establishing a new and prospective plan for City action impacting every person potentially interested in development and operation of the Property, and every citizen of the City of Miami Beach by its disposition and determination of public finds, a public park and public property.

57.     By the summer or fall of 2022, the City, by its relevant final decision-makers, had determined to pursue a new tenancy, development framework, and services agreement for the Property.

58.     Beginning in the fall of 2022, Penrod attempted to engage with City officials and staff to understand the City's intentions for go-forward investment in the Property. Penrod's engagement was necessary and standard for ongoing landlord-tenant relations. Penrod's attempts at engagement occurred with all required transparency. The City was not receptive to Penrod's attempts at engagement and did not have meetings or conversations with Penrod about the future of the leasehold and services at the Property.

59.     Boucher Brothers Miami Beach, LLC and its principals and affiliates ("Boucher") is a beach services concessionary providing primarily routine management of beach chairs and umbrellas on beaches including in Miami Beach. Boucher has contracts for beach concession services with the City. By virtue of same, Boucher has longstanding relationships with City officials and staff. Boucher has contributed to political campaigns of City officials.

60.     Boucher expressed interest in procuring the contract and tenancy rights to the Property and to operate at and provide services from the Property.

61.     Boucher planned to undertake those contracts, tenancy, operation and services with (by partnership or joint venture) Major Food Group, a hospitality company headquartered in New York, NY with, among other things, restaurants, including Carbone in South Beach.

62.     The leasehold and services interests at the Property are, on the City's repeated admission, extremely valuable, governing millions of dollars in property value, millions of dollars in services and operations; set to generate millions of dollars in rental revenue for the City and its citizens; and set to generate substantial revenue for the tenant and operator.

63.     During this time, Boucher and the City engaged in non-transparent meetings and communications, over a course of months, to develop a preferred proposal for Boucher's management and operation of the Property and to advance that proposal through a no-bid contract exclusively negotiated with Boucher on those preferred terms.

64.     Those communications began with representatives for Boucher, outside of procedures and transparency required by governing rules and regulations, having closed-door meetings and conversations with City political leaders and administrative staff about leasing and developing the Property. Meetings, calls, texts and planning increased and deepened between Boucher and City officials and staff over the ensuing months. Boucher and its supporting City officials and staff were in constant and iterative contact throughout, even during active public meetings.

65.     Those meetings and communications between the City and Boucher were not transparent or public. Those meetings and communications took place while City staff and the City's administration were working to replace the leasehold and services framework at the Property anticipating the Lease's expiration.

66.     With that time, planning, and effort, Boucher and its supporters within the City's final decision-makers developed and reached a policy and arrived at a fully developed proposal to circumvent the City's legally mandated procurement process, first with a direct no-bid contract for Boucher to lease and develop the Property, then, with an exclusively-negotiated letter of intent with Boucher on those same terms, circumventing required bidding procedures, to implement the pre-negotiated Boucher proposal.

67.     On October 26, 2022, more than three years prior to the May 2026 expiration of the Lease, the City Commission approved a referral to the City's Finance and Economic

Resilience Committee ("FERC") to discuss the upcoming expiration date of Penrod's Lease and Concession Agreement. FERC is a committee comprised of four of the six City Commissioners. This item was subsequently discussed at the January 27, 2023 and March 31, 2023 FERC meetings.

68.     At the January 27, 2023 FERC meeting, City Commissioners introduced an agenda item to fast track a process to find a new operator for the Property, which was then set for the April 21, 2023 FERC meeting.

69.     Days before the April 2023 FERC meeting, Boucher and City officials and staff had another closed-door meeting to discuss implementing a no-bid award of the Property leasehold and services to Boucher.

70.     On April 21, 2023, the City Manager issued a memorandum advising the City, as it was legally required, to "follow the formal competitive solicitation process and issue a Request for Proposals (RFP) for the best possible use and viable concepts for the operation and management of this City site," *i.e.*, the One Ocean Drive Property.

71.     During the April 2023 FERC meeting, Boucher and City officials and staff had non-transparent communications to aid and implement the City's policy choice to proceed without a competitive bidding process and instead to cede lease and control of the Property to Boucher.

72.     At the April 21, 2023 FERC meeting, despite the City Manager's memorandum, FERC proposed to the full Commission a resolution requiring the City Manager to negotiate a term sheet exclusively with Boucher for the lease, services, and operation of the Property.  The City did so without notice to prospective bidders, without an opportunity by other bidders to

participate, without an opportunity by other bidders to be heard, and without a public and competitive solicitation process.

**D.     The April 28 Resolution**

73.     FERC's recommendation was initially placed on the City Commission's April 28, 2023 meeting's "consent agenda," from which matters are voted on for approval without public discussion and without Commissioner debate. The Commission never considered any public comment.

74.     During the April 28 Commission meeting, Commissioners conceded that the recommended process (i) was "unorthodox;" (ii) allowed Boucher an opportunity to offer its proposal exclusive to Boucher and without proposals from other prospective bidders, including, specifically, Penrod; (iii) could allow the Boucher proposal to operate as a "stalking horse;" (iv) would eliminate City administrative review and processes; and (v) would (if later approved by Commission) result in an award of the project without competitive bidding.

75.     Subsequently, on April 28, 2023, the City Commission passed Resolution No. 2023-32586 (the "April 28 Resolution") by formal legislative act.

76.     The April 28 Resolution authorized the City's administration, *absent* notice to prospective bidders, *absent* specifications, *absent* closed-bid submission and consideration, *absent* any opportunity to participate or be heard by prospective bidders, and *absent* bid procedures or procurement requirements, to: (a) negotiate a proposed non-binding term sheet, exclusively with Boucher, with respect to the potential management or operation of the Property, to be effective after the expiration of the Lease; (b) recommend accomplishing the contracts contemplated by the term sheet through "amendment to" Boucher's already-existing concession agreement(s) with the City "or as a stand-alone agreement;" (c) to consummate the contract for

lease and services at the Property after review and approval of the term sheet by the Mayor and Commission and *without* any public and competitive solicitation process; and (d) to do same "in accordance with Section 1.03(f) of the City Charter" and, thus, *without* the requisite public referendum.

77.     The April 28 Resolution made explicit that it was so resolving, authorizing, and directing official City activity, "notwithstanding the [City] Administration's recommendation to issue a competitive solicitation with respect to the future use of the property."

78.     The April 28 Resolution reified, allowed the City to promote, and further implemented, the City's policy decision – adopted and reached by final City policy-makers and decision-makers in the preceding months, in the meetings and communications between City officials and staff and Boucher and its representatives, and formalized by and in the April 28 Resolution itself – to avoid competitive procurement requirements and award the public funds, property and rights in the leasehold and services agreement at the Property to Boucher by negotiation exclusively with Boucher and without a public, competitive solicitation process, and to eliminate and circumvent the legally-mandated formal, competitive solicitation process in which Penrod and others could participate.

79.     Leading up to the April 28 Resolution, certain City officials had private communications with Boucher's representatives to discuss, and then, in fact, gain priority access and entertainment at Boucher and Major Food Group locations. Following the City's approval of the April 28 Resolution, Boucher's representatives coordinated to provide certain City officials tens of thousands of dollars' worth of tickets to an event by a Major Food Group venue at Miami's F1 Grand Prix and had further meetings and discussions with the City to carry out the stated objective of the April 28 Resolution.

E.      **Plaintiff Files Suit and the City Reverses Course**

80.     Penrod was forced to file suit on May 12, 2023, with the overarching aim to protect its procedural rights, to ensure its ability for notice of and participation in a public, formal competitive solicitation process, as required by the City's Charter and Code, for management and operations at the Property, to undo harm to Penrod from the absence of that process and from the City's policy to avoid competitive procurement requirements and award the leasehold and services agreement at the Property to Boucher by negotiation exclusively with Boucher and without a public, competitive solicitation process, and to invalidate the April 28 Resolution that allowed exclusive negotiation and proposal for same with Boucher.

81.     Vindicating in relevant part Penrod's lawsuit, on May 17, 2023 the City Commission passed Resolution No. 2023-32612 ("May 17 Resolution"), which rescinded the April 28 Resolution, and instead directed City administration to prepare and issue a request for proposals with an expedited response deadline for the management or operation of a high-end beach establishment and ancillary concession uses at the One Ocean Drive Property.

F.      **Nature of Initial Lawsuit**

82.     The City, in planning, enacting and effectuating its no-bid policy, and in the April 28 Resolution, violated its Charter and Code by, *inter alia*, authorizing direct negotiation exclusively with a preferred prospective bidder and then award to that bidder absent, *i.e.*, formal, publicly-advertised, competitive bidding; published notice of same and all relevant specifications; closed bid procedures; tabulation and consideration of closed bids; project award to the best bidder; and voter referendum.

83.     The City disputes that it violated the Charter or the Code by any of those actions described and disputes that the April 28 Resolution violated the Charter and Code.

84.     Penrod was forced (and continues to be forced) to pay out-of-pocket financial expenses, retain professionals, and expend other considerable effort and resources, to catch up to the substantial head start enjoyed by Boucher, and so that Penrod could properly and equally participate in the procurement process, over and above what Penrod would have been required to expend had the City, as it was required from the start, proceeded by public, competitive solicitation processes.

85.     Those damages to Penrod resulted directly from the City's meetings, communications, planning, policy, and formal resolution all described herein, and from the City's initial policy to award the leasehold and services agreement at the Property to Boucher by negotiation exclusively with Boucher and without a public, competitive solicitation process; but for which City actions and policies, Penrod would not have suffered such damages.

86.     Penrod's suit prior to its amendment here thus aimed to validate its procedural and substantive due process rights, invalidate the April 28 Resolution, and remedy the harm to Penrod (such as out-of-pocket financial expenses) to catch up to the substantial head start enjoyed by Boucher and so that Penrod could properly and equally participate in the procurement process.

87.     Those claims (Counts I to VI) and their relief are not dependent on the outcome of, but are separate and apart from, the procurement process pursuant to the May 17 Resolution. Those claims (Counts I to VI) and their relief do not seek to enjoin the May 17 Resolution or the process it directed. Those claims (Counts I to VI) do not assert that the May 17 Resolution is invalid. Plaintiff is not herein asserting a claim based on a protectable property interest in a future lease with the City. Those claims (Counts I to VI) made no representation about, preserves all claims and interests, and waives no claims or interest, in connection with the process directed

by the May 17 Resolution. August 1 Order dismissing claims initially raised in this action and no longer asserted here (reserving all rights).

**G.      The City Issues a Request for Proposals**

88.     In the May 17 Resolution, the City Commission directed the City Administration to prepare and issue a Request for Proposals, purposed to seek proposals for the management or operation of a high-end beach establishment and ancillary uses on the Property and adjacent concession area, in accordance with all procurement-related requirements of the City Code, City Charter, and other applicable law.

89.     The Commission further directed the Administration to issue the Request for Proposals no later than June 15, 2023, with a deadline for submission of proposals not later than August 15, 2023, in order to make a recommendation for award of the Request for Proposals at a September 2023 City Commission meeting.

90.     On June 14, 2023, under the direction of the May 17 Resolution, the City issued RFP No. 2023-479-KB (the "RFP").

91.     The RFP solicits proposals for the management or operation of a high-end beach establishment and ancillary uses on the Property and adjacent concession area, with any new agreements to take effect after the Lease's expiration on May 6, 2026.

92.     The RFP's initial response deadline was the expedited date of August 15, 2023.

**H.      The RFP Contains Fatally Defective Procedures and Specifications**

93.     The RFP included several fatally defective procedures and specifications.

***1.       The RFP Allows Material Bid Term Alteration Post-Award.***

94.     First, the RFP impermissibly allows the City to first award the bid to an operator and then alter all material terms of the bidder's submission after the termination of the RFP process while excluding all other bidders.

95.     Competitive bidding and non-arbitrary proposal selection as provided in the Code (detailed above) requires that bidders craft and submit proposals based on stated terms that cannot be altered post-bid or post-award.

96.     If bidders and government actors can negotiate-away material terms post-bid or post-award, the bid terms themselves are by definition meaningless; proposals can never be compared on static and equal terms; bidders are incentivized to falsely inflate promises and understate costs to undermine competition, win bids, and then negotiate under-performing and preferred outcomes during post-award exclusivity; selection can be made on favoritism disguised as a falsely inflated and only thus the highest-and-best proposal; and ultimate bid award is necessarily arbitrary. For those reasons, the Code and Florida law prohibit post-bid alteration of material bid terms.

97.     The Negotiations Following Award of RFP and Agreement Approval Process in Section 0100, Sub-Section 13 of the RFP ("Negotiations Criteria") is contrary to law because it allows material alterations to a bidder's proposal after submission of the proposal and after award.

98.     The Negotiations Criteria states in pertinent part:

13.     NEGOTIATIONS FOLLOWING AWARD OF RFP AND AGREEMENT APPROVAL PROCESS. Following selection, the City may enter into negotiations with the selected Bidder(s) <u>to determine financial and other terms and conditions, including without limitation scope of improvements, concept, program and scope of services, insurance/bond requirements, indemnification and other customary terms,</u> as authorized by the City Commission.

(emphasis added). The scope of financial terms (RFP Tab 6), improvements (RFP Tab 4), concept (RFP Tab 4), and program and scope of services (RFP Tab 3) are all material components of the RFP, and each bidder is scored based on the Qualitative Criteria found in Section 0400 of the RFP for those tabs.

99.     Thus, the Negotiations Criteria allows the City to first select a bidder and then, post-selection, negotiate and eliminate the most material terms of the winning proposal in contradiction to the original submission—those material terms being all financial terms and conditions, the scope of any improvements and development, every aspect of the proposed business and operational concepts, all programming, the entire scope of services, and, literally, any "other term and condition" of the proposal.

100.     This transforms what must be a competitive procurement process into a false bid and an illusory ranking system, where prospective bidders can promise the sun, moon, and stars, win the bid, but never deliver—and where the City can select a preferred operator without holding it accountable to any of the material terms—thereby fundamentally destroying the competitive bid process mandated by the Code.

**2.     The RFP's Expedited Time Constraints Is Internally and Externally Arbitrary, and Renders the Submission of Competitive Bids Unfeasible.**

101.     Second, the City's expedited timeline is arbitrary because no relevant factors were considered in setting it; it bears no connection to the actual development lease and timeline for this project; it is anti-competitive due to the intentional advantages it affords to Boucher; and it ultimately prevents any other bidders from being able to prepare a complete and thorough response to the RFP.

102.     The RFP imposed a twenty eight-day issuance and sixty-day response window. The RFP's rushed timeline alters how a bidder must structure its bid response to the RFP and the terms and offers therein.

103.     In reviewing the RFP's imposition of an expedited response deadline on a contract that is years from its expiration, the City must ensure it: (1) has considered all relevant

factors; (2) has given actual good faith consideration to those factors; and (3) has used reason rather than whim to progress from consideration of these factors to its final decision.

104.    Neither the sponsoring Commissioners nor the Commission itself considered any relevant factor in determining the timelines for this process. Rather, the Commission's expressed reasons for timing were: to avoid Code-required procurement process characterized as "heavily bureaucratic and time-consuming;" based on a statement that City could expect to get "no responses" to the RFP; and to allow a decision before the upcoming mayoral and Commission elections and to therefore avoid the public procurement process involving intensive planning, expensive lobbying, and decision-making. Those reasons are in turn unsupported and inappropriate, such that the City imposed arbitrary deadlines.

105.    In any event, the RFP's rushed deadlines are irrationally disconnected from the actual on-the-ground timeline here for lease turnover, development, and services replacement for this specific Property.

106.    There is no need for a twenty-eight-day issuance and sixty-day response window with three years until lease turnover. The RFP calls for multi-million dollar investments, mixed-use property development, and high-end services, over a multi-year timeline all within a world-leading tourist destination and sensitive residential neighborhood. Those complexities support detailed consideration and planning, careful input from community groups, and thus an appropriate timeline for workshopping, solicitation, and bid preparation, not a twenty-eight-day issuance and sixty-day response window. The RFP bid timelines fail to account for the necessary time to complete material requirements for the RFP. Thus on their own terms the RFP's timeline is unsupported and arbitrary.

107.    Finally, the rushed timeline creates an inescapably anti-competitive environment favoring the one bidder who pre-negotiated terms with the City. Despite that the City must create a level playing field with a competitive bidding process, pre-RFP City policies and actions leaders afforded Boucher a protected opportunity to work with the City to develop their vision for One Ocean Drive. The RFP's rushed timeline favors Boucher's inside-track, non-transparent, pre-negotiated proposal, additionally rendering the timeline arbitrary.

### 3.    Anti-Competitive Communications Influenced the RFP Process.

108.    Third, the RFP resulted from anti-competitive communications by a potential bidder violating the underpinnings of the "cone of silence" that protects and ensures competitive solicitation and procurement.

109.    Because this project—lease, development and services for the Property after conclusion of the current Lease—necessarily requires formal competitive solicitation, the City's communications and planning with Boucher before issuance of the RFP avoided and violated Code-imposed cone of silence restrictions.

110.    City announcement of its intention to entertain a new leasehold, services, and development arrangement for the Property took place in and by the summer or fall of 2022.

111.    Because replacement of the current Lease involves multimillion-dollar property and development concerns and services contracts in excess of $100,000, a formal, public, competitive, solicitation process was always required by the City's Code.

112.    The Code prohibits any communication regarding a project requiring a request for proposal between a potential bidder, service provider, bidder, lobbyist or consultant, on the one hand, and the City Manager, the City's administrative staff, City Mayor and City Commissioners, on the other hand.

113.     Thus, the months of iterative communications and planning between the City and Boucher (who was never registered as a lobbyist, as required by law) prior to and outside normal and mandatory public procurement requirements described above violated the cone of silence restrictions. Indeed, those restrictions ensure against the very inside-track, pre-negotiation that took place here.

### 4.     The RFP Contained Vague Criteria Preventing an Exact Comparison of Bids.

114.     Fourth, the RFP contains material terms too vague to allow administration and staff to discretely and definitively compare incoming bids, as required for a competitive solicitation.

115.     All bidders must be afforded an exact comparison of bids to secure fair competition on equal terms. Without reasonably definite plans and specifications, bids cannot in the nature of things be competitive. Specifications must be sufficiently certain and definite to secure a fair basis for competitive bidding, and cannot contain terms that would otherwise prevent or restrict full and free competition.

116.     Section 0100, Sub-Section 3.1 allows each bidder to submit an "Option 1" for up to ten (10) years, and an "Option 2" for up to thirty (30) years.  Each option can include contract extension options, provided no option exceeds the 10 year mark (for Option 1) or the 30 year mark (for Option 2). Additionally, the agreements can be either a lease, concession agreement, or a combination of the two. The City's expansive options here underlie the RFP's lack of a "vision" for the Property, demonstrating the RFP's purpose to select an operator now, and decide that vision later.

117.     Multiple questions were posed to the City about how these varying term lengths or other options would be scored. In response, the City indicated that term length receives no specific score, but will affect various components of the proposal, including, for example, the

design and timeline for improvements and financial terms. (Section 0300, Tab 6, for example, provides qualitative scoring criteria related to the design and timeline and accompanying financial proposals.) This presents an intractable problem preventing bidders from adequately responding to the RFP. The City's vague clarification neither identifies a preference for, or any specific criteria dictating, how the City would compare from a financial perspective a contract with extension options to a fixed contract (under either Option 1 or 2). At bottom, there is no financial formula identified for a bidder to best respond to the City's request as it relates to term length, and the City will seemingly be judging contract lengths (and related extension options) based on unwritten criteria aligning with whatever vision the City determines in the future. This type of review is arbitrary, capricious, and contrary to the requirement proposals be evaluated based on specific criteria contained within an RFP.

> ### 5. The RFP Includes Arbitrary Criteria that Artificially Promote and Align With Boucher's Pre-RFP No-Bid Proposal, Creating an Anti-Competitive Advantage.

118.    Fifth, the RFP criteria provide an anti-competitive advantage to a single bidder, Boucher, as evidenced by the inclusion of arbitrary criteria tailored specifically to Boucher.

119.    In effect (and possibly by design), the instant RFP contains specifications and criteria which, rather than advancing legitimate City goals, ensure successful award to a predetermined preferred bidder, Boucher.

120.    Bid awards are improper where they are contrary to competition, meaning they: (a) create the appearance of and opportunity for favoritism; (b) erode public confidence that contracts are awarded equitably and economically; (c) cause the procurement process to be genuinely unfair or unreasonably exclusive; or (d) are unethical, dishonest, illegal, or fraudulent.

121.    The May 17 Resolution and the RFP (Section 0100, Sub-Section 3) explain that the City is seeking an operator for the "management or operation of a high-end beach establishment and ancillary uses on the Property and adjacent concession area."

122.    As currently written, the minimum eligibility requirements require in pertinent part:

> The Bidder or a principal shall demonstrate at least five (5) years of experience (within the last ten (10) years) in managing or operating a beach establishment, beach concession or a similar operation. Similar operation shall mean a recreational facility or concession whose purpose is to cater to patrons by providing recreational options (e.g., beach/pool access, spa services, etc.) and food/beverage options at a cost.

(emphasis added).  This minimum requirement is scored pursuant to the Qualifications (Tab 2) section.

123.    When questioned about these criteria, the City was unable to define "high-end beach establishment," but knew the supporting Commissioner was aware Boucher was offering a "high-end beach club."  The City was further unaware as to why the City opted to place this special criteria in the RFP.

124.    Tab 2, Section 2.1.2 uniquely allows Boucher to apply its experience managing beach chair and umbrella services in support managing or operating of any future "high-end beach establishment." Setting aside the significant head start afforded to Boucher, the inclusion of the "beach concession or a similar operation" parameters (without any consideration to food and beverage experience) to the defining requirement and concept of a "high-end beach establishment" are arbitrary.  Experience in these areas, while perhaps relevant, are not themselves a sufficient yard-stick for managing a so-called "high-end beach establishment" (which the City cannot in any event define), and such requirements prove anti-competitive by affording Boucher another unfair advantage to qualify for scoring where it would not otherwise

receive points. The City cannot legitimately justify crafting the minimum eligibility requirements to allow Boucher maximum insurance and flexibility in independently qualifying for the RFP, including for reasons insufficiently tethered to actually managing and operating a "high-end beach establishment."

125.    The arbitrary requirements and timing of the RFP have thus made it exceedingly difficult for bidders other than Boucher – even an incumbent as eminently qualified as Penrod – to fairly compete in the procurement process.

**I.      Plaintiff's First Protest, and the City's Admission of Defects**

126.    On July 31, 2023, Penrod protested, timely and in compliance with all relevant law, the specifications and procedures in the RFP.

127.    Penrod's submission to the City explained, with all factual and legal bases, the five categories of defects described above.

128.    Penrod sought a stay of bid solicitation during consideration of the protest; rescindment of the RFP to correct the various defective criteria and issuance of a new request for proposals consistent with Code and Florida law, and alternatively issuance of an addendum correcting the defective criteria and extending the RFP deadlines by 90 days to allow all potential bidders a fair opportunity to compete for the future of One Ocean Drive.

129.    On August 4, 2023, the City granted in part and denied in part Penrod's protest and specifications challenge, admitted to certain errors in the originally-issued request and specifications, and reissued the RFP with certain amendments and addenda, as well as an extension of the submission deadline to August 29, 2023.

130.    More specifically, the City acknowledged that the RFP is governed by the Code procedures identified above (e.g., requiring competitive solicitation and a closed bid process), and agreed that Code-mandated procurement procedures prohibit the alteration of material bids

post-award. The City therefore granted in relevant part Penrod's protest and issued an addendum that, the City claimed, would clarify that the RFP would only "allow[] for standard negotiation of detailed terms and conditions that are not necessarily required in a bidder's proposal," and was reserving only the City's right "to negotiate with the selected (i.e. successful) bidder such contract provisions that are more favorable to the City based on wholistic consideration of the selected bidder's entire proposal."

131.    While stating a denial of Penrod's challenge at the RFP's timing and deadlines, the City nevertheless extended the submission deadline.

132.    The City otherwise denied Penrod's protest and refused to correct the defects Penrod had identified.

**J.      Re-Issued RFP Maintains, and Contain Additional, Defects**

133.    On August 4, 2023 and August 11, 2023, the City re-issued the RFP, with Addendums 5 and 6.

134.    Addendum 5 was stated to address the error identified by Penrod to which the City acceded.

135.    The RFP as reissued maintained the timing, cone of silence, vagueness and arbitrariness defects previously identified by Penrod; did not correct the material alteration issue; and injected addition defects into the procurement process.

*1.      Addendum 5 Still Allows Material Bid Term Alteration Post-Award.*

136.    Despite admitting that the RFP could only allow the City and the ultimately successful bidder post-award to negotiate and alter *non*-material terms (in the City's words, "terms and conditions that are not necessarily required in a bidder's proposal"), the RFP language amended and reissued by Addendum 5 still expressly permit negotiation and alteration of *material* terms post-award.

137.     Per Addendum 5, Section 0100, paragraph 13 of the RFP, titled "Negotiations Following Award of RFP and Agreement Approval Process," was amended to read, in relevant part:

> Following selection, the City may enter into negotiations with the selected Bidder(s) to secure financial and other terms and conditions that are more favorable to the City than those included in the submitted proposal, and to further define the parameters of the proposed concept, program and scope of services, as authorized by the City Commission.

138.     That provision expressly permits post-award negotiation and alteration of *material* bid terms in two distinct and equally offending ways.

139.     First, "[f]ollowing selection"—that is, after a bidder is selected as the sole awardee—the City may negotiate to alter "financial and other terms and conditions that are more favorable to the City than those included in the submitted proposal." "Financial and other terms" are, literally, every material term in the bid. While such alteration is limited to securing terms that are "more favorable to the City," it does not protect or ensure competitive bidding. That is because the procedure allows the City to horse-trade favorable financial and other material terms for unfavorable non-material terms, which encourages bidders to over-promise enticing non-material terms to secure an award—indeed, non-material "conditions that are not necessarily required in a bidder's proposal" are often deciding factors in highly competitive bid processes, with prominent discretionary factors, among highly qualified bidders—and then eliminate those terms in post-award negotiations in exchange for "more favorable" financial terms. That is also because terms that are "more favorable to the City" may not be unfavorable to the successful bidder, including as compared to its competitors.

140.     Second, "[f]ollowing selection the City may negotiate to "further define the parameters of the proposed concept, program and scope of services." The term "future define" is broad and unrestricted. And the "proposed concept, program and scope of services" encompass

every material term (aside for financial terms) in the bid. Therefore, the City can, post-award, with unfettered discretion, negotiate with the successful bidder to alter and compromise all aspects of the proposed concept, every facet of the project's program, and the full scope of the bidder's services offered—every single material term (aside for financial terms).

   **2.    *The RFP Impermissibly Allows Open Bid Negotiations.***

   141.    The City intends to hold an open-bid process—where it will negotiate with some but not all bidders after staff evaluates the bids—rather than a closed-bid process mandated by the Code.

   142.    The Code's "formal bid process" requires submittal of sealed bids, public opening of sealed bids at a designated time, and then tabulation and consideration of those sealed bids, upon which consideration the City may award the relevant project. This procedure allows the City to consider sealed bids only in a closed universe, with each bidder having made and thus evaluated by their "best and final" proposal, towards selection of the "lowest and best bidder." The Code thus prohibits open bid negotiations—where the City can open solicited bids and thereafter pit bidders against each other in iterative (whether simultaneous or staggered) negotiations.

   143.    Yet, this impermissible process is precisely that chosen and dictated by the City in this RFP. The RFP allows Commission, after opening sealed bids, ranking, and recommendation, to select/award *multiple* bidders, and then negotiate those *open* bids *against one another*. This is the opposite of a sealed bid—a bid is by definition not sealed if it is opened and then renegotiated.

   144.    An open bid process upends the purposes of a closed bid process. A closed bid process incentivizes bidders to present their best and final offer or risk being out bid, because they cannot improve their bid relative to other unknown bidders after bid submission. The

agency can then select the lowest and best bid from among the bidders' respective best and final offers. An open bid process incentivizes bidders to under-bid (so they do not risk being anchored at a less advantageous position not required to out-bid competitors) and create negotiating space to improve their bids relative to other known bids and known bidders in post-bid negotiations. The agency cannot select among best and final offers.

145.    In addition, this RFP process contemplates negotiations with only some but not all responsive bidders, thereby further circumventing the Code's mandate that "[t]he procurement director shall solicit sealed bids from *all* responsible prospective vendors…" to permit the parties to participate in a "competitive bid procedure."

146.    The Code contemplates post-award negotiation of non-material terms with one successful awardee after the closed bid process and selection of that awardee based on its best and final bid being the lowest and best bid received. But the Code prohibits an open bid process. It does not allow the City to open sealed bids, assign multiple awards, and then negotiate with multiple (and not even all) bidders.

### 3.    Addendum 6 Exacerbated the RFP's Vague and Arbitrary Criteria.

147.    Addendum 6 to the RFP allows only one of all prospective bidders, Boucher, to act as a qualifying agent for an otherwise unqualified bidder, uniquely permitting Boucher to avoid the one-submission-per-bidder requirement and have multiple bids in play.

148.    As titled, the purpose of the RFP is to identify the "lowest and best" high-end beach establishment services for the City's One Ocean Drive property. The RFP splits the project into three service areas: the Beach Club (i.e., the high-end beach establishment) and two separate Concession Areas (including the secondarily important beachside lounge and umbrella concessionary).

149.    The City specified that any Bidder was limited to submitting _one_ proposal with two options (based on term length) for all three areas. ("Bidder" as defined by Code Sec. 2-312 means any individual or firm submitting a bid or proposal in response to any formal bid or solicitation.)

150.    To qualify to submit the _one_ bid covering the Beach Club and the two Concession Areas, a Bidder or a principal of the Bidder needed to demonstrate it had the minimum qualifications of "managing or operating a beach establishment, beach concession _or_ a similar operation." The criteria is disjunctive—the Bidder need only qualify for one of the three eligibility requirements.

151.    The City did not provide an option for offering separate services, such as management/operation of the Beach Club on the one hand, and concession services for the Concession Areas on the other. Instead, the City allowed that the second qualification (i.e., beach concession experience), which uniquely favors Boucher, to predominate the first and unquestionably more pertinent qualification (i.e., management of the high-end Beach Club). Stated otherwise, this definition limits qualifying applicants to either (i) those with experience operating a high-end beach establishment, or (ii) Boucher.

152.    With Addendum 6, any Bidder who has _none_ of the three experience types needs only to identify Boucher as a "Key Team Member" to qualify to submit a bid irrespective of any other minimum criteria. The amended criteria provides in pertinent part:

> The Bidder, a principal of Bidder, or a key team member shall demonstrate at least five (5) years of experience (within the last ten (10) years) in managing or operating a beach establishment, beach concession or a similar operation.

153.    This change was prompted by a potential Bidder directly requesting to use Boucher as a qualifying agent in the City's Question and Answer period.

Q 17:   Does the above description "bidder or a principal" allow (which it should) the bidder to hire a beach concessionaire that meets the requisite experience, such as Boucher Brothers, to manage the beach aspects of the property, or is it limited such that the service provider must be an equity owner/partner with the bidder?

A17:   There is no specific requirement in the RFP regarding the contractual relationship between the Bidder and key team members. See revisions to Section 0300, Tab 1, Section 1.4, and Section A1, Appendix A, above.

154.   Thus, Addendum 6 steers potential bidders to hire Boucher to provide services for the Concession Area in order to qualify for the project, affording Boucher the opportunity to submit multiple bids (but as Key Team Member), skirting the one-bid-per-bidder requirement.

**K.      Plaintiff's Second Protest, Denied by the City**

155.   On August 15, 2023, Penrod protested, timely and in compliance with all relevant law, the specifications and procedures in the re-issued RFP and addenda.

156.   Penrod's submission to the City explained, with all factual and legal bases, all of the defects identified above (including restating the defects previously protested but not corrected). In addition to incorporating and restating defects maintained from the City's originally-issued specifications, Penrod explained that the City's amendments and addenda did not cure those defects and in fact created new defects also mandating correction or rescission.

157.   Penrod sought a stay of bid solicitation during consideration of the protest; rescindment of the RFP to correct the various defective criteria and issuance of a new request for proposals consistent with Code and Florida law, and alternatively issuance of an addendum correcting the defective criteria and extending the RFP deadlines by 75 days to allow all potential bidders a fair opportunity to compete for the future of One Ocean Drive.

158.   On August 18, 2023, the City denied Penrod's bid specifications protest in full.

159.   The City extended the deadline to submit bids in response to the request for proposal to August 31, 2023 (to account for the time taken to consider and deny the protest).

**L.      Penrod Transparently and Fully Participated in the Bid Process**

160.    Penrod participated extensively in the pre-proposal RFP process as evidenced by its attendance and inquires made at the mandatory pre-bid conferences on June 28 and July 12, 2023 and Penrod's attendance at the July 12, 2023 site-visit.

161.    In developing its proposal, Penrod engaged in every available City question and answer period and submitted dozens of inquiries to the City to clarify multiple bid criteria as directed by the RFP. Separately, counsel for Penrod sent technical inquiries regarding the RFP process and requested multiple prior sample RFP responses from the City to ensure Penrod's bid aligned with prior acceptable submission formats. The City's procurement contact for this RFP provided all requested exemplar RFPs to counsel for Penrod.

162.    Preparing the proposal to achieve its revolutionary vision for One Ocean Drive, and meeting all City and neighborhood goals, with required responsive documents and material, took months of work, planning, and coordination between architects, international partners, media and design teams, outside accountants and auditors, construction companies, acoustic engineers, and landscape architects, and cost Penrod hundreds of thousands of dollars.

**M.      Penrod Timely Submitted an Extraordinary Winning Bid and Proposal**

163.    On August 31, 2023, Penrod submitted its bid in response to the RFP, timely and in compliance with all relevant instructions.

164.    Penrod's bid offers tens of millions of dollars in guaranteed rent and profit sharing to the City (including millions upfront), included millions of dollars to revitalize public park areas and public parking lot, and provided a lower density offering coupled with an approachable, upscale, restaurant concept to address legacy resident concerns.

165.    The re-envisioned Nikki Beach included a reinvigorated public park with enhanced public spaces and facilities and a re-tooled beach club and concession. The proposal

centered on advancing public benefits, improving urban character and integration, and promoting radical ecological enhancements. The proposal rehabilitated the current iconic structure and its very public site, while harmonizing maximum public advantages with modest structural changes optimizing performance.

166.     From an operational standpoint, maximizing use of the Property did not translate to increasing density; rather, the new concept maintains its lower-impact offerings by providing an elevated high-end restaurant and beach club experience centered on environmental sustainability and luxury, seamlessly integrated into the community. The proposal included expanded public benefit space including recreational areas, a butterfly garden, and a sensory play area for children.

167.     Penrod engaged a world-renowned landscape architect to develop a resiliency plan investing millions of dollars in coastal dune restructuring and preservation. A key part of the proposal is conversion of a majority of the existing exterior footprint to a public park with lushly landscaped salt tolerant planting and incorporation of other resiliency measures to meet City objectives.

168.     Penrod's unique position as the existing operator allows implementation of its vision with minimal public disruption, no City rent concessions, and no dip in guaranteed revenue to the City. Effectively, Penrod is the only proposer who could begin operating day one of the new-proposed lease term.

169.     Upon application of proper procedures and upon proper evaluation by the City, Penrod's bid would have succeeded.

**N.     The City Refuses to Accept or Consider Penrod's Bid**

170.     The City refused to accept and refuses to consider Penrod's bid, claiming that an error in the City's third-party electronic submission platform rendered Penrod's bid untimely.

171.     The City well knew that Penrod had been and is a bidder in this process, and had been expecting Penrod's bid.

172.     On August 30, 2023, Penrod requested a 24-hour deadline extension due to issuance of a State of Emergency by the Governor of Florida due to Hurricane Idalia (which caused power outage, internet non-connectivity, and office evacuation for Tallahassee-based submission counsel); business operations did not resume as normal until after the August 31, 2023 bid submission deadline.

173.     The City summarily denied without properly considering that request.

174.     Penrod submitted its bid as instructed using the Periscope platform prior to the August 31, 2023, 3:00 p.m. deadline.

175.     Penrod selected the final "confirmation" button on the Periscope platform, and its bid on Periscope was "confirmed." But, Periscope did not generate a confirmation. Suspecting error, Penrod immediately and urgently contacted the provider and the City, and then made numerous submissions of copies of its bid by other means (including email, ShareFile, and hand-delivery).

176.     Within minutes of the deadline, Penrod had provided the City backup/courtesy copies of its entire bid package on a secure electronic platform via ShareFile; before the close of business, Penrod went to the Procurement Office with the entire bid by hand-delivery.

177.     Regardless, the City had full access to Penrod's entire bid package, time-stamped, on Periscope, before the 3:00 p.m. deadline.

178.     The City refused to accept Penrod's timely bid on Periscope, refused to address Penrod's identification of error in the City's submission platform, and refused to accept Penrod's multiple courtesy/backup copies.

179.    On August 31, 2023, Penrod, by letter to all relevant City administrative and political officials, explained its timely submission, noted its earlier extension request, identified its timely submission notwithstanding the City's claim of technical error, and requested acceptance of timely submission.

180.    On September 1, 2023, the City, by letter, denied that request and continued to refuse to accept of consider Penrod's bid.

181.    All of this took place against the backdrop of Penrod's challenges to the RFP's specifications and the City anti-competitive conduct related to this procurement project.

## O.    Penrod's Third Protest, Denied by the City

182.    On September 1, 2023, Penrod, timely and in compliance with all relevant law, protested the City's solicitation decisions to deny and refusal to accept or consider Penrod's bid.

183.    Penrod's submission to the City explained, with all factual and legal bases, the error in the City's solicitation denial and decisions.

184.    More specifically, Penrod explained that (1) the City's refusal to accommodate the 24-hour extension request due to an unforeseen natural disaster and attendant business disruption was unduly burdensome, arbitrary and contrary to past City conduct, and an abuse of the City's discretion; (2) Penrod's bid was timely (a) because Penrod actually selected the final "confirmation" button on the Periscope platform, and its bid on Periscope was "confirmed," regardless of whether Periscope in error did not record or generate a "confirmation;" (b) because the City had full access to the submitted and time-stamped bid within the Periscope platform and the City's specifications (RFP Specification Section 0100, Sub-section 6) requires only that bids be "received and time stamped by Periscope" prior to the deadline to be considered "timely submitted" and making no mention of any "confirm" requirement; and (c) because Penrod timely provided the City multiple and courtesy backup copies of the bid; and (3) even were Penrod's bid

not timely (which it was), it was an abuse of discretion, unlawful, and against the City's own interests (given the quality of Penrod's bid) for the City to preclude Penrod from consideration based on what the City claims is unquestionably a minor and non-material timing issue that could not prejudice any other participant.

185.    Penrod requested that the City stay proceedings pending the outcome of its protest; accept and consider Penrod's bid as timely; or alternately exercise its discretion to accept and consider Penrod's bid.

186.    Less than 15 minutes later, the City, by the City Attorney, summarily denied the protest. The City could not have reviewed and properly considered the letter and all evidence and material submitted with it in that timeframe.

187.    The City sent a longer letter reiterating its denial of the protest on September 7, 2023.

**P.    Completion of the Defective Bid Process**

188.    The City continued with its defective bid process. This, despite that, because the RFP specifications, solicitation and submission criteria and decisions, are unlawfully defective in violation of mandatory Charter and Code provisions, any attendant or resulting action, decision or award by the City and any bidder will be voided, and the entire process will be redone, subjecting the City, its citizens, and participating bidders, to extreme waste of time, resources, and expenses.

189.    The City rushed administrative review, recommendation by the City Manager, and Commission consideration, to ensure award prior to the Mayor and Commission election in November 2023.

190.    The City accepted three bids as timely submitted for Option 1, and four bids as timely submitted for Option 2. The bidders were Boucher/Major Food Group, Tao Group, RH (formerly Restoration Hardware), and Akerman/The Group.

191.    Boucher submitted multiple bids, one the pre-negotiated proposals joined with Major Food Groups, and another as part of a competing bidder's proposal.

192.    On September 11, 2023, the City's evaluation committee met.

193.    Multiple evaluators comments reflected that proposals seemed rushed or limited (*i.e.*, due to City time constraints), the criteria of the RFP being blended or duplicative throughout proposals, and proposals missing key information between different options.

194.    Highlighting Penrod's identification of impermissible Negotiations Criteria, during the evaluation proceedings multiple evaluators scored bidders contingent on the ability to negotiate material terms of the bids after the City Manager's recommendation and the City's ultimate award.

195.    Highlighting Penrod's identification of impermissible Negotiations Criteria, during deliberations, multiple evaluators discussed open bid negotiation among competing bidders post bid submission, including revenue sharing opportunities, City payments, and varying proposed public benefits they would like bidders to provide not specified in the bid.

196.    Additionally, the vague and ambiguous RFP criteria left the evaluation committee members no choice but to generate their own criteria, not expressed in the RFP, to judge key material terms in the RFP. Specifically, the evaluation committee members only judged proposals public benefits (Tab 5) based on a direct dollar figure provided, and ranked bidders based on that sole factor. This criteria was not listed in the RFP, nor was it identified as a consideration for scoring the tab.

197.    For financial considerations (Tab 6), the evaluators were left to speculate as to the value of potential rent escalators, the impact of revenue shares on value, and other financial considerations not patent from many bids. Specifically, one bidder offered drastically more guaranteed rent than any bidder (irrespective of potential revenue share), but that bidder ranked lowest in financial considerations.

198.    Ultimately, the resulting evaluation scores reflect and compound the inadequacies and unlawfulness of the RFP process.

199.    On September 11, 2023, the City's evaluation committee issued its results, arbitrarily ranking the Boucher/Major Food Group bid highest for both Option 1 and Option 2.

200.    On September 20, 2023, the City Manager issued her recommendation comparing the proposed Option 1 and Option 2 submissions and ultimately recommended Boucher's Option 1 for award of the RFP. The City Manager's support for her recommendation depended on many of the vague criteria and open bidding aspects identified by Penrod.

**Q.    The City Awards the One Ocean Drive Project to Boucher**

201.    On September 27, 2023 the City Commission met and, in Resolution No. 2023-32783 ("September 27 Resolution"), voted to award the RFP to Boucher.

202.    During the Commission meeting: the Commission expressed concerns that the City's attempt to no-bid the Property to Boucher was wrong, tainted the RFP, and eroded the public's trust; Commissioners requested the public be afforded more time to weigh in on the project, or be afforded a referendum; and the Commission admitted that upcoming election timing necessitated the rushed decision-making.

203.    The September 27 Resolution authorized the "(a)dministration to negotiate an agreement with Boucher Brothers consistent with the RFP and Boucher Brothers' proposal, with the final agreement subject to the final approval of the Mayor and City Commission."

204.    The City's administration then engaged in rushed negotiations with Boucher to ensure that the relevant contract(s) could be approved by the Commission ahead of the November 2023 election.

205.    On or about October 12, 2023, the City's administration publicized its negotiated agreement with Boucher ("City Contract").

206.    On October 18, 2023, the City Commission met and, by Resolution No. 2023-32825 ("October 18 Resolution"), voted to award the publicized contract to Boucher.

**R.      Penrod's Fourth Protest, Denied by the City**

207.    On October 16, 2023, Penrod, timely and in compliance with all relevant law, protested the City's award of the RFP to Boucher, and protested the proposed award of the negotiated lease/concession contract to Boucher.

208.    Penrod's submission to the City explained, with all factual and legal bases, the errors in the City's RFP award and proposed contract award. More specifically and as detailed below, Penrod explained that the September 27 Resolution to award the RFP was infirm for substantially the same reasons identified in Penrod's prior protests; that the City Contract is a lease requiring voter referendum under the Miami Dade County Charter; that the City Contract is a lease in excess of ten years requiring voter referendum under the City's Charter; and that the City Contract incorporated impermissible post-bid material alterations to Boucher's proposal (as Penrod previously alleged and predicted would occur).

209.    First, the City's September 27 Resolution was infirm. The RFP contained defective specifications that violate the City's Charter and Code, and Penrod timely and properly submitted a bid despite that the City refused to consider same. The September 27 Resolution awarded the RFP to Boucher. The City's flawed process and refusal to consider (or accept, or evaluate) Penrod's bid rendered its award of the RFP defective.

210.    Second, the City Contract is a lease requiring voter referendum by County Charter—but the City had determined to strip its citizens of their rights to vote on awarding One Ocean Drive to Boucher.

211.    One Ocean Drive is a neighborhood park requiring, per Miami Dade County Charter, that voters within one mile of the project vote by referendum on any lease agreement or disposition of the property. The City's own Charter additionally requires voter referendum on any lease of City property of ten years or longer.

212.    The City titled the negotiated City Contract a concession agreement, not a lease, in an attempt to avoid the County and City Charters' voter referendum requirements.

213.    By its own terms, the City Contract gives Boucher the exclusive right to occupy and use the defined Concession Area Structures for a fixed term in exchange for payment of a fee. The City Contract also tasks Boucher with conducting all maintenance and repair, obtaining insurance at its own cost, and paying all property taxes. These are all hallmark characteristics of a standard, triple-net, commercial lease. Further, the City Contract acknowledges Boucher's obligation to pay sales and use tax on all of their payments, which is an obligation triggered by the "renting, leasing, letting, or granting a license for the use of any real property[.]" In other words, the City Contract carries with it all of the benefits of a leasehold interest but improperly attempts to disclaim all of the obligations consistent with such a lease, namely, the voter referendum requirement.

214.    Florida law makes clear that the title of an agreement is irrelevant; rather, it is the substance and not the form that controls. Thus, the City's attempt in the City Contract to disclaim its status as a lease is of no moment.

215.    Third, the City Contract is a ten-year-plus lease requiring voter referendum by City Charter—but (again) the City had determined to strip its citizens of their rights to vote on awarding One Ocean Drive to Boucher.

216.    In its RFP, the City offered proposers two options: Option 1 (less than ten years) and Option 2 (less than thirty years). Per the City Commission's vote, the City proceeded to select the Boucher Brothers Option 1 for a term of less than ten years. However, despite selecting Option 1 for less than ten years, the City negotiated an agreement for a term in *excess* of ten years, and further waived Boucher's payment of rent for at least a year (subject to extension), while Boucher begins its build-out. During this rent-free period, the City Contract permits Boucher to begin occupying and using the defined Beachfront Area, including operating its beachfront sales and equipment rentals. This extension of time beyond ten years for occupancy, use, build out and operations triggers requirement under the City Charter of *both* a citywide referendum, *and* approval of a majority 4/7 vote of the Planning Board and 6/7 vote of the City Commission.

217.    Fourth, the City Contract resulted from post-bid material alterations to the RFP criteria and to Boucher's proposal.

218.    On the face of Boucher's proposal, Boucher bid for Option 1 for a term of less than ten (10) years. This is what the City advertised, and the RFP required. However, during negotiations, the City granted Boucher a rent-free period (of at least a year) to allow them significant time to develop the property, during which Boucher can also run its normal concession operations on the Beachfront Area. This necessarily means Boucher will have operational control and possession of the property in excess of ten years. Aside from triggering

the referendum requirements, it materially alters the advertised RFP criteria and Boucher's proposal in contravention of Florida law.

219.    The City Contract also reflects material deviations from Boucher's proposed public benefits promises, financially harming the City and its residents.

220.    On October 17, 2023, the City responded to and denied Boucher's protests. The City then proceeded to present and pass the October 18 Resolution awarding the City Contract to Boucher.

221.    In the end, the City's Charter- and Code-violative and defective process yielded the intended results—selection of the City's pre-selected no-bid vendor and proposal.

## CAUSES OF ACTION

### COUNT I
### PROCEDURAL DUE PROCESS, 42 U.S.C. § 1983
### (No-Bid Process)

222.    Plaintiff incorporates each of the above factual allegations as if fully restated here.

223.    The Fourteenth Amendment to the United States Constitution prohibits the City from "depriv[ing] any person of life, liberty, or property, without due process of law." The Fifth Amendment to the United States Constitution as applied by the Fourteenth Amendment to the United States Constitution prohibits the City from "depriv[ing a person] of life, liberty, or property, without due process of law."

224.    Plaintiff has a liberty and property interest to participate in, to apply for, and to be considered for, public procurement projects within the City, on full, fair and equal consideration to all participants.

225.    Plaintiff has a liberty and property interest in all of the requirements of the Charter and Code described below, including specifically, Charter Sec. 1.03(b)(1) and Code Secs. 82-39, 2-366(a)(1), 2-369, 2-366(f), 2-366(d), and 2-373(a)(2), which together mandate

45

that any prospective lease(s) and contract(s) for services at the One Ocean Drive property contemplated by the City as relevant here required formal, publicly-advertised, competitive bidding; published notice of same and all relevant specifications; closed bid procedures; tabulation and consideration of closed bids; that the project be awarded to the best bidder; and voter referendum.

226.    As described herein, the City deprived Plaintiff of its liberty and property interests, including by preparing and enacting the April 28 Resolution, which circumvented mandatory procedural protections.

227.    As described herein, the City's policy, including the April 28 Resolution, denied and did not afford Plaintiff notice and an opportunity to be heard, both prior to and after the deprivations of those protected interests, by authorizing circumvention of competitive solicitation procedures, direct negotiation exclusively with a preferred prospective bidder, and award to that bidder, all absent participation by Plaintiff.

228.    The City thereby deprived Plaintiff of its constitutionally protected rights.

229.    Such deprivation was the result of a misuse of governmental power in excess of ordinary tortious conduct.

230.    The City acted herein under color of state law.

231.    The City's conduct described herein creates irreparable harm for which there is no adequate remedy at law, including because that conduct violates Plaintiff's constitutionally protected rights. The equities weigh in favor of protecting Plaintiff's constitutional rights and against countenancing the City's unlawful violation of such rights and procedural requirements. The public interest is served by enforcing Plaintiff's constitutionally protected rights and enforcing the procedural protections described herein.

WHEREFORE, Plaintiff demands judgment in its favor and against the City:

    a.     awarding nominal damages for and associated with the deprivation of Plaintiff's constitutional rights, as well as all pre- and post-judgment interest and attorneys' fees and costs for the entirety of this action as provided by 42 U.S.C. § 1983 and 42 U.S.C. § 1988(b);

    b.     entering a preliminary and permanent injunction compelling the City to issue all entitlements to permit Plaintiff to enjoy its constitutionally protected rights;

    c.     entering a preliminary and permanent injunction affording Plaintiff the time required to undo the City's violation of required procedures identified herein; and

    d.     granting Plaintiff such other relief as the Court deems just and proper.

**COUNT II**
**PROCEDURAL DUE PROCESS, ART. I SEC. 9 FLA. CONST.**
**(No-Bid Process)**

232.    Plaintiff incorporates each of the above factual allegations as if fully restated here.

233.    Article I, Section 9 of the Florida Constitution requires procedural due process before any deprivation of "life, liberty, or "property."

234.    Plaintiff has a liberty and property interest to participate in, to apply for, and to be considered for, public procurement projects within the City, on full, fair and equal consideration to all participants, and as provided and entitled by the Charter and Code (both defined elsewhere) and other relevant law.

235.    As described herein, the City deprived Plaintiff of its liberty and property interests, including by preparing and enacting the April 28 Resolution which circumvented mandatory procedural protections.

236.     As described herein, the City's policy, including the April 28 Resolution, denied and did not afford Plaintiff notice and an opportunity to be heard, both prior to and after the deprivations of those protected interests, by authorizing circumvention of competitive solicitation procedures, direct negotiation exclusively with a preferred prospective bidder, and award to that bidder, all absent participation by Plaintiff.

237.     The City thereby deprived Plaintiff of its constitutionally protected rights.

238.     The City's conduct described herein creates irreparable harm for which there is no adequate remedy at law, including because that conduct violates Plaintiff's constitutionally protected rights. The equities weigh in favor of protecting Plaintiff's constitutional rights and against countenancing the City's unlawful violation of such rights and procedural requirements. The public interest is served by enforcing Plaintiff's constitutionally protected rights and enforcing the procedural protections described herein.

WHEREFORE, Plaintiff demands judgment in its favor and against the City:

      a.     awarding nominal damages for and associated with the deprivation of Plaintiff's constitutional rights, as well as all pre- and post-judgment interest and attorneys' fees and costs for the entirety of this action;

      b.     entering a preliminary and permanent injunction compelling the City to issue all entitlements to permit Plaintiff to enjoy its constitutionally protected rights;

      c.     entering a preliminary and permanent injunction affording Plaintiff the time required to undo the City's violation of required procedures identified herein; and

      d.     granting Plaintiff such other relief as the Court deems just and proper.

**COUNT III**
**VIOLATION OF CHARTER/CODE**
**(No-Bid Process)**

239.     Plaintiff incorporates each of the above factual allegations as if fully restated here.

240.     Pursuant to Charter Bill of Rights section (A), Charter Sec. 1.03(b)(1), Code Secs. 82-39, 2-366(a)(1), 2-369, 2-366(f), 2-366(d), 2-373(a)(2), and 2-486, any prospective lease(s) and contract(s) for services at the One Ocean Drive property contemplated by the City as relevant here required at, all relevant times, formal, publicly-advertised, competitive bidding; published notice of same and all relevant specifications; closed bid procedures; tabulation and consideration of closed bids; that the project be awarded to the lowest and best bidder; and voter referendum; all taking place within the cone of silence.

241.     As described herein, the City, in planning, enacting and effectuating the April 28 Resolution, violated the Charter and Code by, *inter alia,* circumventing the above requirements and authorizing direct negotiation exclusively with a preferred prospective bidder and award to that bidder, absent the above requirements (*inter alia,* formal, publicly-advertised, competitive bidding; published notice of same and all relevant specifications; closed bid procedures; tabulation and consideration of closed bids; that the project be awarded to the best bidder; and voter referendum).

242.     As described herein, the City violated the cone of silence by having and allowing those types of prohibited communications between the City and its leaders and administration on the one hand and a prospective bidder for the project(s) and contract(s) associated with One Ocean Drive on the other hand.

243.     The City's breaches and violations of the Charter and Code described herein directly harmed Plaintiff, and directly caused damages to Plaintiff, causing injury in fact to Plaintiff, including specifically, and as described herein, the increased cost and effort to Plaintiff

to participate fairly and equally in, regardless of the outcome of, the procurement process for the project(s) and contract(s) associated with One Ocean Drive, and to be afforded the substantive goals of the procedures and requirements directed by the Charter and Code regardless of the outcome of the procurement process for the project(s) and contract(s) associated with One Ocean Drive.

WHEREFORE, Plaintiff demands judgment in its favor and against the City awarding damages in an amount including but not limited to the actual damages, consequential damages, remunerative damages, and lost opportunity costs, associated with the City's violation of the Charter and Code, as well as all pre- and post-judgment interest and attorneys' fees and costs for the entirety of this action, and granting Plaintiff such other relief as the Court deems just and proper.

**COUNT IV**
**DECLARATORY JUDGMENT**
**(No-Bid Process)**

244.    Plaintiff incorporates each of the above factual allegations as if fully restated here.

245.    Pursuant to Charter Bill of Rights section (A), Charter Sec. 1.03(b)(1), Code Secs. 82-39, 2-366(a)(1), 2-369, 2-366(f), 2-366(d), and 2-373(a)(2), any prospective lease(s) and contract(s) for services at the One Ocean Drive property contemplated by the City as relevant here required formal, publicly-advertised, competitive bidding; published notice of same and all relevant specifications; closed bid procedures; tabulation and consideration of closed bids; that the project be awarded to the best bidder; and voter referendum.

246.    As described herein, the City, in planning, enacting and effectuating the April 28 Resolution, and the April 28 Resolution itself, violated the Charter and Code by, *inter alia*, circumventing the above requirements and authorizing direct negotiation exclusively with a preferred prospective bidder and award to that bidder, absent the above requirements (*inter alia*

formal, publicly-advertised, competitive bidding; published notice of same and all relevant specifications; closed bid procedures; tabulation and consideration of closed bids; that the project be awarded to the best bidder; and voter referendum).

247.    The City disputes that the City has violated the Charter or the Code by any of the actions described herein. The City disputed that the April 28 Resolution violated the Charter and Code.

248.    Therefore there exists a bona fide, actual, present dispute as to the City's violation of the Charter and Code; Plaintiff is in doubt as to its rights in regards the City's adherence to its Charter and Code; and Plaintiff has a justiciable question as to the existence or nonexistence of such violations of the Charter and Code.

249.    The City's conduct and legislative action described herein are capable of repetition and evasion of review, including because the City disputes that the City violated the Charter and Code and disputes that the April 28 Resolution violated the Charter and Code.

250.    After rescission of the April 28 Resolution, the City continued to engage in an undertaking and process for disposition of the One Ocean Drive Property, with such undertaking and process governed by the provisions of the Charter and Code identified herein. Irrespective of the City's undertaking and process for disposition of the One Ocean Drive Property, the City has expressed a present intent to address that Property in a manner required to be governed by the provisions of the Charter and Code identified herein. Plaintiff reasonably anticipates that the City would maintain, as it does now, that it need not comply with the provisions of the Charter and Code identified herein, which further makes the ripening seeds of controversy appear unavoidable. Plaintiff has an interest in the City's undertaking and process for, and present intent as to, disposition of the One Ocean Drive Property. Thus, there is an actual, present need for a

declaration of the parties' respective rights and status concerning and the legality of the April 28 Resolution, the City's violation of its Charter and Code, and City conduct described herein.

WHEREFORE, Plaintiff demands judgment in its favor and against the City declaring that the April 28 Resolution and all City conduct and action planning, enacting and effectuating same were and are invalid, unlawful and void *ab initio*, including in violation of the Charter and Code; that the City is required to abide by the provisions of the Charter and Code identified here for disposition of the One Ocean Drive Property in the manner contemplated by the April 28 Resolution; and granting Plaintiff such other relief as the Court deems just and proper.

### COUNT V
### SUBSTANTIVE DUE PROCESS, 42 U.S.C. § 1983
### (No-Bid Process)

251.   Plaintiff incorporates each of the above factual allegations as if fully restated here.

252.   The Fourteenth Amendment to the United States Constitution prohibits the City from "depriv[ing] any person of life, liberty, or property, without due process of law." The Fifth Amendment to the United States Constitution as applied by the Fourteenth Amendment to the United States Constitution prohibits the City from "depriv[ing a person] of life, liberty, or property, without due process of law."

253.   Plaintiff has state-created liberty and property interests and rights protected by the federal Constitution to participate in, to apply for, and to be considered for, public procurement projects within the City, on full, fair and equal consideration to all participants.

254.   Plaintiff has state-created liberty and property interests and rights protected by the federal Constitution to all of the requirements of the Charter and Code described above, including specifically, Charter Sec. 1.03(b)(1) and Code Secs. 82-39, 2-366(a)(1), 2-369, 2-366(f), 2-366(d), and 2-373(a)(2), which together mandate that any prospective lease(s) and contract(s) for services at the One Ocean Drive property contemplated by the City as relevant

here required formal, publicly-advertised, competitive bidding; published notice of same and all relevant specifications; closed bid procedures; tabulation and consideration of closed bids; that the project be awarded to the best bidder; and voter referendum.

255.    Plaintiff's liberty and property interests and rights identified herein are intended to and do impose significant substantive restrictions on decision-maker discretion and protect substantive goals beyond neutral process.

256.    The City developed and acted on an official policy made, in part, by City Commission resolution to deprive Plaintiff of its constitutionally protected rights, as described herein.

257.    In addition and in the alternative, the City's pattern and practice of conduct to deprive, and resulting in depriving, Plaintiff of its constitutionally protected rights, described herein, constitutes a policy and custom of the City to do so.

258.    In addition and in the alternative, the City was deliberately indifferent to and therefore adopted the actions of its officials, agents and employees, including elected City officials and senior City administrative staff, in depriving Plaintiff of its constitutionally protected rights, as described herein. There is a direct and causal link between the City's policies and customs and the violation of Plaintiff's constitutional rights.

259.    The City's actions in violating Plaintiff's rights were done in part by and included the City Commission's planning and formal adoption of the April 28 Resolution, which is a legislative act.

260.    The City deprived Plaintiff of its constitutionally protected rights in violation of law mandating formal competitive solicitation procedures, which both *per se* and in fact renders

such actions done for no legitimate purpose, and for reasons that were arbitrary and capricious and with no legitimate rational basis.

261.    Such deprivation was the result of a misuse of governmental power in excess of ordinary tortious conduct.

262.    The City acted herein under color of state law.

263.    The City's conduct described herein creates irreparable harm for which there is no adequate remedy at law, including because that conduct violates Plaintiff's constitutionally protected rights. The equities weigh in favor of protecting Plaintiff's constitutional rights and against countenancing the City's unlawful violation of such rights and procedural requirements. The public interest is served by enforcing Plaintiff's constitutionally protected rights and enforcing the procedural protections described herein.

WHEREFORE, Plaintiff demands judgment in its favor and against the City:

a.    awarding damages in an amount including but not limited to the actual damages, consequential damages, remunerative damages, and lost opportunity costs, associated with the deprivation of Plaintiff's constitutional rights, as well as all pre- and post-judgment interest and attorneys' fees and costs for the entirety of this action as provided by 42 U.S.C. § 1983 and 42 U.S.C. § 1988(b);

b.    entering a preliminary and permanent injunction compelling the City to issue all entitlements to permit Plaintiff to enjoy its constitutionally protected rights; and

c.    granting Plaintiff such other relief as the Court deems just and proper.

## COUNT VI
## SUBSTANTIVE DUE PROCESS, ART. I SEC. 9 FLA. CONST.
### (No-Bid Process)

264.    Plaintiff incorporates each of the above factual allegations as if fully restated here.

265.    Article I, Section 9 of the Florida Constitution prohibits the City from "depriv[ing any person] of life, liberty or property without due process of law."

266.    Plaintiff has rights protected by the Florida Constitution to participate in, to apply for, and to be considered for, public procurement projects within the City, on full, fair and equal consideration to all participants.

267.    Plaintiff has rights protected by the Florida Constitution to all of the requirements of the Charter and Code described above, including specifically, Charter Sec. 1.03(b)(1) and Code Secs. 82-39, 2-366(a)(1), 2-369, 2-366(f), 2-366(d), and 2-373(a)(2), which together mandate that any prospective lease(s) and contract(s) for services at the One Ocean Drive property contemplated by the City as relevant here required formal, publicly-advertised, competitive bidding; published notice of same and all relevant specifications; closed bid procedures; tabulation and consideration of closed bids; that the project be awarded to the best bidder; and voter referendum.

268.    The City developed and acted on an official policy made, in part, by City Commission resolution to deprive Plaintiff of its constitutionally protected rights, as described herein.

269.    In addition and in the alternative, the City's pattern and practice of conduct to deprive, and resulting in depriving, Plaintiff of its constitutionally protected rights, described herein, constitutes a policy and custom of the City to do so.

270.    In addition and in the alternative, the City was deliberately indifferent to and therefore adopted the actions of its officials, agents and employees, including elected City

officials and senior City administrative staff, in depriving Plaintiff of its constitutionally protected rights, as described herein. There is a direct and causal link between the City's policies and customs and the violation of Plaintiff's constitutional rights.

271.    The City deprived Plaintiff of its constitutionally protected rights in violation of law mandating formal competitive solicitation procedures, which both *per se* and in fact renders such actions done for no legitimate purpose, and for reasons that were arbitrary and capricious and with no legitimate rational basis.

272.    The City's deprivations of Plaintiff's constitutionally protected rights described herein harmed Plaintiff and caused damages to Plaintiff, including specifically, and as described herein, the increased cost and effort to Plaintiff to participate fairly and equally in, regardless of the outcome of, the procurement process for the project(s) and contract(s) associated with One Ocean Drive.

273.    The City's conduct described herein creates irreparable harm for which there is no adequate remedy at law, including because that conduct violates Plaintiff's constitutionally protected rights. The equities weigh in favor of protecting Plaintiff's constitutional rights and against countenancing the City's unlawful violation of such rights and procedural requirements. The public interest is served by enforcing Plaintiff's constitutionally protected rights and enforcing the procedural protections described herein.

WHEREFORE, Plaintiff demands judgment in its favor and against the City:

   a.    awarding damages in an amount including but not limited to the actual damages, consequential damages, remunerative damages, and lost opportunity costs, associated with the deprivation of Plaintiff's

constitutional rights, as well as all pre- and post-judgment interest and attorneys' fees and costs for the entirety of this action;

b.  entering a preliminary and permanent injunction compelling the City to issue all entitlements to permit Plaintiff to enjoy its constitutionally protected rights; and

c.  granting Plaintiff such other relief as the Court deems just and proper.

**COUNT VII**
**VIOLATION OF CHARTER/CODE**
**(Specifications Challenge)**

274.   Plaintiff incorporates each of the above factual allegations as if fully restated here.

275.   Pursuant to Charter Bill of Rights section (A), Code Secs. 82-39, 2-366(a)(1), 2-369; 2-366 (a) (b), 2-367(d), (e), 2-486(a), 2-366(f), 2-366(d), and 2-373(a)(2), and applicable Florida law, the City was required to address disposition and procurement in respect of the One Ocean Drive Property and the RFP was required to include specifications that included: formal, publicly-advertised, competitive bidding; published notice of same and all relevant specifications; without unsupported, vague or arbitrary specifications; closed bid procedures; tabulation and consideration of closed, best and final, bids; that the project be awarded to the lowest and best bidder; all taking place within the cone of silence.

276.   As described herein, the City by issuing the RFP, and the RFP, violated the Charter and Code by: allowing alteration of material terms post-award; allowing open-bid negotiation with some (not even all) bidders post-submission and pre-final award; including unsupported and arbitrary timelines and deadlines; incorporating anti-competitive communications outside the cone of silence; including material terms too vague to allow discrete and definitive comparison of bids; including arbitrary criteria that artificially provide an anti-

competitive advantage uniquely to a preferred bidder; promoting multiple bids by a preferred bidder.

277.   The City's breaches and violations of the Charter and Code described herein directly harmed Plaintiff, and directly caused damages to Plaintiff, causing injury in fact to Plaintiff, including specifically, and as described herein, the cost of preparing for and participating in the defecting RFP process; and, considering award(s) and contract(s) made pursuant to the RFP, all expected profit from any award.

WHEREFORE, Plaintiff demands judgment in its favor and against the City:

a.   awarding damages in an amount including but not limited to the actual damages, consequential damages, remunerative damages, and lost opportunity costs, associated with the City's violation of the Charter and Code, as well as all pre- and post-judgment interest and attorneys' fees and costs for the entirety of this action;

b.   enjoining and voiding any action, decision, award, contract, or entitlement, associated with or resulting from the RFP;

c.   enjoining the City from taking any action, making any decision, issuing any award, entering into any contract, or providing any entitlement, associated with or resulting from the RFP; and

d.   granting Plaintiff such other relief as the Court deems just and proper.

## COUNT VIII
## DECLARATORY JUDGMENT
### (Specifications Challenge)

278.   Plaintiff incorporates each of the above factual allegations as if fully restated here.

279.   Pursuant to Charter Bill of Rights section (A), Code Secs. 82-39, 2-366(a)(1), 2-369; 2-366 (a) (b), 2-367(d), (e), 2-486(a), 2-366(f), 2-366(d), and 2-373(a)(2), and applicable

Florida law, the City was required to address disposition and procurement in respect of the One Ocean Drive Property and the RFP was required to include specifications that included: formal, publicly-advertised, competitive bidding; published notice of same and all relevant specifications; without unsupported, vague or arbitrary specifications; closed bid procedures; tabulation and consideration of closed, best and final, bids; that the project be awarded to the lowest and best bidder; all taking place within the cone of silence.

280.    As described herein, the City by issuing the RFP, and the RFP, violated the Charter and Code by: allowing alteration of material terms post-award; allowing open-bid negotiation with some (not even all) bidders post-submission and pre-final award; including unsupported and arbitrary timelines and deadlines; incorporating anti-competitive communications outside the cone of silence; including material terms too vague to allow discrete and definitive comparison of bids; including arbitrary criteria that artificially provide an anti-competitive advantage uniquely to a preferred bidder; promoting multiple bids by a preferred bidder.

281.    The City disputes that the City has violated the Charter or the Code by any of the actions described herein. The City disputes that any specification or provisions within the RFP violates the Charter or Code. The City by final decision denied Plaintiff's administrative protests identifying the RFP's violation of the Charter and Code.

282.    Therefore there exists a bona fide, actual, present dispute as to the City's violation of the Charter and Code; Plaintiff is in doubt as to its rights in regards the City's adherence to its Charter and Code; and Plaintiff has a justiciable question as to the existence or nonexistence of such violations of the Charter and Code.

283.     The City and its counterparty(ies) have yet to fully effectuate the terms of the City Contract, including but not limited to build out and planning for the One Ocean Drive project and turnover of possession of the Property, which will not occur until 2026. Plaintiff has an interest in the City's undertaking and process for, and present intent as to, disposition of the One Ocean Drive Property. Thus, there is an actual, present need for a declaration of the parties' respective rights and status concerning and the legality of the RFP and the City's procurement process for disposition of the One Ocean Drive Property.

WHEREFORE, Plaintiff demands judgment in its favor and against the City declaring: that the RFP's specifications and provisions herein identified violate the Charter and Code; void *ab initio* the RFP and any related or attendant action, decision, award, contract, or entitlement; that the City is required to abide by the provisions of the Charter and Code identified here for disposition of the One Ocean Drive Property; and granting Plaintiff such other relief as the Court deems just and proper.

## COUNT IX
## INJUNCTION
### (Specifications Challenge)

284.     Plaintiff incorporates each of the above factual allegations as if fully restated here.

285.     As the primary form or in the alternative to other forms of relief, a direct action for injunction or other appropriate writ is available in the context of denied administrative protests in respect of government procurement.

286.     Pursuant to Charter Bill of Rights section (A), Code Secs. 82-39, 2-366(a)(1), 2-369; 2-366 (a) (b), 2-367(d), (e), 2-486(a), 2-366(f), 2-366(d), and 2-373(a)(2), and applicable Florida law, the City was required to address disposition and procurement in respect of the One Ocean Drive Property and the RFP was required to include specifications that included: formal, publicly-advertised, competitive bidding; published notice of same and all relevant

specifications; without unsupported, vague or arbitrary specifications; closed bid procedures; tabulation and consideration of closed, best and final, bids; that the project be awarded to the lowest and best bidder; all taking place within the cone of silence.

287.    As described herein, the City by issuing the RFP, and the RFP, violated the Charter and Code by: allowing alteration of material terms post-award; allowing open-bid negotiation with some (not even all) bidders post-submission and pre-final award; including unsupported and arbitrary timelines and deadlines; incorporating anti-competitive communications outside the cone of silence; including material terms too vague to allow discrete and definitive comparison of bids; including arbitrary criteria that artificially provide an anti-competitive advantage uniquely to a preferred bidder; promoting multiple bids by a preferred bidder.

WHEREFORE, Plaintiff demands judgment or other appropriate writ in its favor and against the City enjoining any action, decision, award, contract, or entitlement, associated with or resulting from the RFP; enjoining the City from taking any action, making any decision, issuing any award, entering into any contract, or providing any entitlement, associated with or resulting from the RFP; and granting Plaintiff such other relief as the Court deems just and proper.

## COUNT X
### VIOLATION OF CHARTER/CODE
#### (Submission Challenge)

288.    Plaintiff incorporates each of the above factual allegations as if fully restated here.

289.    Pursuant to Charter Sec. 1.03(b)(1), Code Secs. 2-366(f), 2-366(d), and 2-373(a)(2), RFP Specification Section 0100, Sub-section 6, and Florida law, the City is required to accept and consider all timely submitted bids, and must exercise reasonable and non-arbitrary discretion in excepting non-material deviation from bid submission requirements.

61

290.   As described herein, the City violated those provisions and that law by refusing to grant Plaintiff's 24-hour extension, refusing to accept and consider Plaintiff's bid as timely, and refusing in its discretion to accept and consider Plaintiff's bid.

291.   The City's breaches and violations of the Charter and Code described herein directly harmed Plaintiff, and directly caused damages to Plaintiff, causing injury in fact to Plaintiff, including specifically, and as described herein, the cost of preparing for and participating in the defecting RFP process, and, by non-consideration in the RFP, all expected profit from any award.

WHEREFORE, Plaintiff demands judgment in its favor and against the City

    a.    awarding damages in an amount including but not limited to the actual damages, consequential damages, remunerative damages, and lost opportunity costs, associated with the City's violation of the Charter and Code, as well as all pre- and post-judgment interest and attorneys' fees and costs for the entirety of this action;

    b.    enjoining the City to accept and consider Plaintiff's bid;

    c.    enjoining and voiding any action, decision, award, contract, or entitlement, associated with or resulting from the RFP done without Plaintiff's inclusion;

    d.    enjoining the City from taking any action, making any decision, issuing any award, entering into any contract, or providing any entitlement, associated with or resulting from the RFP done without Plaintiff's inclusion; and

    e.    granting Plaintiff such other relief as the Court deems just and proper.

## COUNT XI
## DECLARATORY JUDGMENT
### (Submission Challenge)

292.     Plaintiff incorporates each of the above factual allegations as if fully restated here.

293.     Pursuant to Charter Sec. 1.03(b)(1), Code Secs. 2-366(f), 2-366(d), and 2-373(a)(2), RFP Specification Section 0100, Sub-section 6, and Florida law, the City is required to accept and consider all timely submitted bids, and must exercise reasonable and non-arbitrary discretion in excepting non-material deviation from bid submission requirements.

294.     As described herein, the City violated those provisions and that law by refusing to grant Plaintiff's 24-hour extension, refusing to accept and consider Plaintiff's bid as timely, and refusing in its discretion to accept and consider Plaintiff's bid.

295.     The City disputes that the City has violated the Charter or the Code by any of the actions described herein. The City disputes that any specification or provisions within the RFP violates the Charter or Code. The City by final decision denied Plaintiff's administrative protests identifying the RFP's violation of the Charter and Code.

296.     Therefore there exists a bona fide, actual, present dispute as to the City's violation of the Charter and Code; Plaintiff is in doubt as to its rights in regards the City's adherence to its Charter and Code; and Plaintiff has a justiciable question as to the existence or nonexistence of such violations of the Charter and Code.

297.     The City and its counterparty(ies) have yet to fully effectuate the terms of the City Contract, including but not limited to build out and planning for the One Ocean Drive project and turnover of possession of the Property, which will not occur until 2026. Plaintiff has an interest in the City's undertaking and process for, and present intent as to, disposition of the One Ocean Drive Property. Thus, there is an actual, present need for a declaration of the parties'

respective rights and status concerning and the legality of the RFP and the City's procurement process for disposition of the One Ocean Drive Property.

WHEREFORE, Plaintiff demands judgment in its favor and against the City declaring: that City's refusal to accept and consider Plaintiff's bid violate the Charter and Code; void *ab initio* the RFP and any related or attendant action, decision, award, contract, or entitlement done without Plaintiff's inclusion; that the City is required to accept and consider Plaintiff's bid; and granting Plaintiff such other relief as the Court deems just and proper.

**COUNT XII**
**INJUNCTION**
**(Submission Challenge)**

298.    Plaintiff incorporates each of the above factual allegations as if fully restated here.

299.    As the primary form or in the alternative to other forms of relief, a direct action for injunction or other appropriate writ is available in the context of denied administrative protests in respect of government procurement.

300.    Pursuant to Charter Sec. 1.03(b)(1), Code Secs. 2-366(f), 2-366(d), and 2-373(a)(2), RFP Specification Section 0100, Sub-section 6, and Florida law, the City is required to accept and consider all timely submitted bids, and must exercise reasonable and non-arbitrary discretion in excepting non-material deviation from bid submission requirements.

301.    As described herein, the City violated those provisions and that law by refusing to grant Plaintiff's 24-hour extension, refusing to accept and consider Plaintiff's bid as timely, and refusing in its discretion to accept and consider Plaintiff's bid.

WHEREFORE, Plaintiff demands judgment or appropriate writ in its favor and against the City enjoining the City to accept and consider Plaintiff's bid; enjoining and voiding any action, decision, award, contract, or entitlement, associated with or resulting from the RFP done without Plaintiff's inclusion; enjoining the City from taking any action, making any decision,

issuing any award, entering into any contract, or providing any entitlement, associated with or resulting from the RFP done without Plaintiff's inclusion; and granting Plaintiff such other relief as the Court deems just and proper.

**COUNT XIII**
**SUBSTANTIVE DUE PROCESS, ART. I SEC. 9 FLA. CONST.**
**(Submission Challenge)**

302.    Plaintiff incorporates each of the above factual allegations as if fully restated here.

303.    Article I, Section 9 of the Florida Constitution prohibits the City from "depriv[ing] any person] of life, liberty or property without due process of law."

304.    Plaintiff has rights protected by the Florida Constitution to participate in, to apply for, and to be considered for, public procurement projects within the City, on full, fair and equal consideration to all participants.

305.    Plaintiff has rights protected by the Florida Constitution to all of the requirements of the Charter and Code described above, including specifically, Charter Sec. 1.03(b)(1), Code Secs. 2-366(f), 2-366(d), and 2-373(a)(2), and Florida law, requiring the City to accept and consider all timely submitted bids, and must exercise reasonable and non-arbitrary discretion in excepting non-material deviation from bid submission requirements.

306.    The City developed and acted on an official policy to deprive Plaintiff of its constitutionally protected rights, as described herein.

307.    In addition and in the alternative, the City's pattern and practice of conduct to deprive, and resulting in depriving, Plaintiff of its constitutionally protected rights, described herein, constitutes a policy and custom of the City to do so.

308.    In addition and in the alternative, the City was deliberately indifferent to and therefore adopted the actions of its officials, agents and employees, including elected City officials and senior City administrative staff, in depriving Plaintiff of its constitutionally

65

protected rights, as described herein. There is a direct and causal link between the City's policies and customs and the violation of Plaintiff's constitutional rights.

309.    The City deprived Plaintiff of its constitutionally protected rights to participate in the RFP by refusing to accept or consider Plaintiff's bid as described herein, for reasons that are arbitrary, capricious, irrational, or for an improper purpose, as described herein.

310.    The City's deprivations of Plaintiff's constitutionally protected rights described herein harmed Plaintiff and caused damages to Plaintiff, including specifically, and as described herein, loss of the cost and expense to create the bid, and the inability to participate in the RFP and all resulting potential income.

311.    The City's conduct described herein creates irreparable harm for which there is no adequate remedy at law, including because that conduct violates Plaintiff's constitutionally protected rights. The equities weigh in favor of protecting Plaintiff's constitutional rights and against countenancing the City's unlawful violation of such rights and procedural requirements. The public interest is served by enforcing Plaintiff's constitutionally protected rights and enforcing the procedural protections described herein.

WHEREFORE, Plaintiff demands judgment in its favor and against the City:

a.      awarding damages in an amount including but not limited to the actual damages, consequential damages, remunerative damages, and lost opportunity costs, associated with the deprivation of Plaintiff's constitutional rights, as well as all pre- and post-judgment interest and attorneys' fees and costs for the entirety of this action;

b.      entering a preliminary and permanent injunction compelling the City to permit Plaintiff to enjoy its constitutionally protected rights; and

      c.     granting Plaintiff such other relief as the Court deems just and proper.

**COUNT XIV**
**VIOLATION OF CHARTER/CODE**
**(Award Challenge)**

312.    Plaintiff incorporates each of the above factual allegations as if fully restated here.

313.    Pursuant to Charter Bill of Rights section (A), Code Secs. 82-39, 2-366(a)(1), 2-369; 2-366 (a) (b), 2-367(d), (e), 2-486(a), 2-366(f), 2-366(d), and 2-373(a)(2), and applicable Florida law, the City was required to address disposition and procurement in respect of the One Ocean Drive Property and the RFP was required to include specifications that included: formal, publicly-advertised, competitive bidding; published notice of same and all relevant specifications; without unsupported, vague or arbitrary specifications; closed bid procedures; tabulation and consideration of closed, best and final, bids; that the project be awarded to the lowest and best bidder; all taking place within the cone of silence.

314.    Pursuant to Charter Sec. 1.03(b)(1), Code Secs. 2-366(f), 2-366(d), and 2-373(a)(2), RFP Specification Section 0100, Sub-section 6, and Florida law, the City is required to accept and consider all timely submitted bids, and must exercise reasonable and non-arbitrary discretion in excepting non-material deviation from bid submission requirements.

315.    As described herein, the City's RFP failed to adhere to the Charter, Code, and above provisions by: allowing alteration of material terms post-award; allowing open-bid negotiation with some (not even all) bidders post-submission and pre-final award; including unsupported and arbitrary timelines and deadlines; incorporating anti-competitive communications outside the cone of silence; including material terms too vague to allow discrete and definitive comparison of bids; including arbitrary criteria that artificially provide an anti-competitive advantage uniquely to a preferred bidder; promoting multiple bids by a preferred

bidder; refusing to accept and consider Plaintiff's bid as timely; and refusing in its discretion to accept and consider Plaintiff's bid.

316.   Because, as described herein, the RFP and the City's process for disposition of the One Ocean Drive project failed to adhere to the Charter and Code, the City violated the Charter and Code by awarding the RFP to Boucher.

317.   Because, as described herein, the City Contract reflects and contains material alterations to Boucher's bid post-award, the City violated the Charter and Code.

318.   Pursuant to County Charter Sec. 7.02 and Charter Sec. 1.03(b), award of the One Ocean Drive project and award of the City Contract to Boucher, as described herein, requires approval of a majority 4/7 vote of the Planning Board and 6/7 vote of the City Commission and requires a voter referendum.

319.   As described herein, the City violated the County Charter and Charter by awarding the City Contract to Boucher without the required Planning Board and Commission votes and without the required voter referendum.

320.   The City's breaches and violations of the Charter and Code described herein directly harmed Plaintiff, and directly caused damages to Plaintiff, causing injury in fact to Plaintiff, including specifically, and as described herein, the cost of preparing for and participating in the defecting RFP process; and, considering award(s) and contract(s) made pursuant to the RFP, all expected profit from any award.

WHEREFORE, Plaintiff demands judgment in its favor and against the City:

a.   awarding damages in an amount including but not limited to the actual damages, consequential damages, remunerative damages, and lost opportunity costs, associated with the City's violation of the Charter and

Code, as well as all pre- and post-judgment interest and attorneys' fees and costs for the entirety of this action;

b.     enjoining and voiding all aforementioned City awards and contracts;

c.     enjoining the City from taking any action in contemplation, completion or enforcement of all aforementioned City awards and contracts; and

d.     granting Plaintiff such other relief as the Court deems just and proper.

**COUNT XV**
**DECLARATORY JUDGMENT**
**(Award Challenge)**

321.    Plaintiff incorporates each of the above factual allegations as if fully restated here.

322.    Pursuant to Charter Bill of Rights section (A), Code Secs. 82-39, 2-366(a)(1), 2-369; 2-366 (a) (b), 2-367(d), (e), 2-486(a), 2-366(f), 2-366(d), and 2-373(a)(2), and applicable Florida law, the City was required to address disposition and procurement in respect of the One Ocean Drive Property and the RFP was required to include specifications that included: formal, publicly-advertised, competitive bidding; published notice of same and all relevant specifications; without unsupported, vague or arbitrary specifications; closed bid procedures; tabulation and consideration of closed, best and final, bids; that the project be awarded to the lowest and best bidder; all taking place within the cone of silence.

323.    Pursuant to Charter Sec. 1.03(b)(1), Code Secs. 2-366(f), 2-366(d), and 2-373(a)(2), RFP Specification Section 0100, Sub-section 6, and Florida law, the City is required to accept and consider all timely submitted bids, and must exercise reasonable and non-arbitrary discretion in excepting non-material deviation from bid submission requirements.

324.    As described herein, the City's RFP failed to adhere to the Charter, Code, and above provisions by: allowing alteration of material terms post-award; allowing open-bid negotiation with some (not even all) bidders post-submission and pre-final award; including

unsupported and arbitrary timelines and deadlines; incorporating anti-competitive communications outside the cone of silence; including material terms too vague to allow discrete and definitive comparison of bids; including arbitrary criteria that artificially provide an anti-competitive advantage uniquely to a preferred bidder; promoting multiple bids by a preferred bidder; refusing to accept and consider Plaintiff's bid as timely; and refusing in its discretion to accept and consider Plaintiff's bid.

325.   Because, as described herein, the RFP and the City's process for disposition of the One Ocean Drive project failed to adhere to the Charter and Code, the City violated the Charter and Code by awarding the RFP to Boucher.

326.   Because, as described herein, the City Contract reflects and contains material alterations to Boucher's bid post-award, the City violated the Charter and Code.

327.   Pursuant to County Charter Sec. 7.02 and Charter Sec. 1.03(b), award of the One Ocean Drive project and award of the City Contract to Boucher, as described herein, requires approval of a majority 4/7 vote of the Planning Board and 6/7 vote of the City Commission and requires a voter referendum.

328.   As described herein, the City violated the County Charter and Charter by awarding the City Contract to Boucher without the required Planning Board and Commission votes and without the required voter referendum.

329.   The City disputes that the City has violated the County Charter, Charter or Code by any of the actions described herein. The City disputes that any specification or provisions within the RFP violates the County Charter, Charter or Code. The City by final decision denied Plaintiff's administrative protests identifying its violations of the County Charter, Charter or Code.

330.     Therefore there exists a bona fide, actual, present dispute as to the City's violation of the County Charter, Charter or Code; Plaintiff is in doubt as to its rights in regards the City's adherence to its County Charter, Charter or Code; and Plaintiff has a justiciable question as to the existence or nonexistence of such violations of the County Charter, Charter or Code.

WHEREFORE, Plaintiff demands judgment in its favor and against the City declaring: that the City's aforementioned awards and contracts violated the County Charter, Charter and Code; void *ab initio* the City's aforementioned awards; that the City is required to abide by the provisions of the County Charter, Charter and Code identified here for disposition of the One Ocean Drive Property; and granting Plaintiff such other relief as the Court deems just and proper.

**COUNT XVI**
**INJUNCTION**
**(Award Challenge)**

331.     Plaintiff incorporates each of the above factual allegations as if fully restated here.

332.     As the primary form or in the alternative to other forms of relief, a direct action for injunction or other appropriate writ is available in the context of denied administrative protests in respect of government procurement.

333.     Pursuant to Charter Bill of Rights section (A), Code Secs. 82-39, 2-366(a)(1), 2-369; 2-366 (a) (b), 2-367(d), (e), 2-486(a), 2-366(f), 2-366(d), and 2-373(a)(2), and applicable Florida law, the City was required to address disposition and procurement in respect of the One Ocean Drive Property and the RFP was required to include specifications that included: formal, publicly-advertised, competitive bidding; published notice of same and all relevant specifications; without unsupported, vague or arbitrary specifications; closed bid procedures; tabulation and consideration of closed, best and final, bids; that the project be awarded to the lowest and best bidder; all taking place within the cone of silence.

334.     Pursuant to Charter Sec. 1.03(b)(1), Code Secs. 2-366(f), 2-366(d), and 2-373(a)(2), RFP Specification Section 0100, Sub-section 6, and Florida law, the City is required to accept and consider all timely submitted bids, and must exercise reasonable and non-arbitrary discretion in excepting non-material deviation from bid submission requirements.

335.     As described herein, the City's RFP failed to adhere to the Charter, Code, and above provisions by: allowing alteration of material terms post-award; allowing open-bid negotiation with some (not even all) bidders post-submission and pre-final award; including unsupported and arbitrary timelines and deadlines; incorporating anti-competitive communications outside the cone of silence; including material terms too vague to allow discrete and definitive comparison of bids; including arbitrary criteria that artificially provide an anti-competitive advantage uniquely to a preferred bidder; promoting multiple bids by a preferred bidder; refusing to accept and consider Plaintiff's bid as timely; and refusing in its discretion to accept and consider Plaintiff's bid.

336.     Because, as described herein, the RFP and the City's process for disposition of the One Ocean Drive project failed to adhere to the Charter and Code, the City violated the Charter and Code by awarding the RFP to Boucher.

337.     Because, as described herein, the City Contract reflects and contains material alterations to Boucher's bid post-award, the City violated the Charter and Code.

338.     Pursuant to County Charter Sec. 7.02 and Charter Sec. 1.03(b), award of the One Ocean Drive project and award of the City Contract to Boucher, as described herein, requires approval of a majority 4/7 vote of the Planning Board and 6/7 vote of the City Commission and requires a voter referendum.

339.    As described herein, the City violated the County Charter and Charter by awarding the City Contract to Boucher without the required Planning Board and Commission votes and without the required voter referendum.

WHEREFORE, Plaintiff demands judgment or other appropriate writ in its favor and against the City enjoining all aforementioned City awards and contracts; enjoining the City from taking any action in contemplation, completion or enforcement of all aforementioned City awards and contracts; and granting Plaintiff such other relief as the Court deems just and proper.

## JURY DEMAND

340.    Plaintiff demands trial by jury on all claims so triable.

Dated: November 10, 2023                    Respectfully submitted,

**STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.**
Museum Tower, Suite 2200
150 West Flagler Street
Miami, Florida 33130
Telephone: 305-789-3200
Facsimile: 305-789-3395
By:  */s/Jason S. Koslowe*
    MARIA A. FEHRETDINOV
    Florida Bar No. 52084
    mfehretdinov@stearnsweaver.com
    JASON S. KOSLOWE
    Florida Bar No. 122758
    jkoslowe@stearnsweaver.com
    RYAN T. THORNTON
    Florida Bar No. 99195
    rthorton@stearnsweaver.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 10, 2023, I electronically filed a copy of the foregoing document with the Clerk of the Court using the CM/ECF system. I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List via transmission of Notices of Electronic Filing generated by CM/ECF.

/s/ *Jason S. Koslowe*
JASON S. KOSLOWE

## SERVICE LIST

ROBERT F. ROSENWALD, JR., Chief Deputy City Attorney
Florida Bar No. 0190039
robertrosenwald@miamibeachfl.gov
HENRY J. HUNNEFELD, First Assistant City Attorney
Florida Bar No. 343811
henryhunnefeld@miamibeachfl.gov
FREDDI MACK, Senior Assistant City Attorney
Florida Bar No. 111623
freddimack@miamibeachfl.gov
CITY OF MIAMI BEACH
1700 Convention Center Drive
4th Floor – Legal Department
Miami Beach, FL 33139
Telephone: 305-673-7470
Facsimile: 305-673-7002

ERIC P. HOCKMAN, ESQ.
Florida Bar No. 64879
ehockman@wsh-law.com
MICHAEL KANTOR, ESQ.
Florida Bar No. 90472
mkantor@wsh-law.com
ADAM HAPNER, ESQ.
Florida Bar No. 112006
ahapner@wsh-law.com
**WEISS SEROTA HELFMAN
COLE & BIERMAN, P.L.**
2800 Ponce de Leon Blvd.
Suite 1200
Coral Gables, Florida 33134
Telephone: (305) 854-0800

*Attorneys for Defendant*