# EXHIBIT 4

Rafael Paz
May 05, 2025

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:23-ev-23362

PENROD BROTHERS INC.,

      Plaintiff,

-vs-

CITY OF MIAMI BEACH

      Defendant.

* * * * * * * * * * * * * * * * * *

DEPOSITION OF RAFAEL PAZ

DATE TAKEN: May 5, 2025

TIME: 9:07 - 6:07 p.m.

PLACE:150 West Flagler Street

Miami, Florida 33131

TAKEN BEFORE: RICK E. LEVY, RPR, FPR
           AND NOTARY PUBLIC

* * * * * * * * * * * * * * * * * *

Rafael Paz
May 05, 2025

```
 1   APPEARANCES:

 2   On behalf of the Plaintiff:

 3       JASON KOSLOWE, ESQUIRE
         STEARNS WEAVER MILLER
 4       150 W Flagler Street
         Suite 2200
 5       Miami, Florida 33130
         jkoslowe@stearnsweaver.com
 6
     On behalf of the Intervenor, Boucher Brothers:
 7
         BENJAMIN TYLER, ESQUIRE
 8       Holland & Knight LLP
         701 Brickell Avenue
 9       Suite 3300
         Miami, Florida 33131
10       benjamin.tyler@hklaw.com

11   On behalf of the Defendant:

12
         FREDDI MACK, ESQUIRE
13       City of Miami Beach
         700 Convention Center Drive
14       4th Floor - Legal Department
         Miami Beach, Florida 33139
15       Freddimack@miamibeachfl.gov

16
         ERIC HOCKMAN, ESQUIRE
17       WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.
         2800 Ponce de Leon Boulevard
18       Suite 1200
         Coral Gables, Florida 33134
19       ehockman@wsh-law.com

20   Also Present: Leah Mendez, The Videographer
                   Myriam Leon
21

22

23

24

25
```

Rafael Paz
May 05, 2025

```
 1                          -  -  -

 2                    I N D E X
                          -  -  -

 3
      WITNESS:            DIRECT  CROSS  REDIRECT  RECROSS
 4    RAFAEL PAZ
      BY JASON KOSLOWE          7
 5                          -  -  -

 6                  E X H I B I T S
                          -  -  -

 7

 8    NUMBER                        PAGE
      EX. 1 MB00241105               59
 9    EX. 2 MB00292135               60
      EX. 3 MB00435311               66
10    EX. 4 MB0438311                70
      EX. 5 MB00435428               72
11    EX. 6 Committee Memorandum from  75
      April 21, 2023
12    EX. 7 Transcript of FERC April of  85
      2023
13    EX. 8 Resolution of the Commission  93
      of the City of Miami Beach 2023
14    EX. 9 MB00433368               95
      EX. 10 MB216339               105
15    EX. 11 Section 1.03 of City Charter 107
      EX. 12 Article II of City Code  116
16    EX. 13 MB00292326             155
      EX. 14 MB00095921             157
17    EX. 15 MB00424149             158
      EX. 16 MB00262265             161
18    EX. 17 MB06056399             163
      EX. 18 CMB0017065             167
19    EX. 19 MB00446200             179
      EX. 20 MB00240692             181
20    EX. 21 City of Miami Beach     192
      Resolution 2023-32612
21    EX. 22 CMB0021438             193
      EX. 23 CMB0021446             221
22    EX. 24 MB00308022             227
      EX. 25 MB00314418             239
23    EX. 26 CMB0031727             241
      EX. 27 MB00423930             242
24    EX. 28 MB0147662             265
      EX. 29 MB0097614             276
25    EX. 30 MB000430277           291
      EX. 31 MB0034707             292
```

Rafael Paz
May 05, 2025

```
 1   EX. 32 MB00452200                      324
     EX. 33 Penrod 013963                   333
 2   EX. 34 MB00452197                      341
     EX. 35 MB00439048                      345
 3   EX. 36 MB00452193                      347
     EX. 37 MB00414681                      350
 4   EX. 38 Article and Provision of the 358
     City Code Dealing with Procurement
 5   EX. 39 MB00046982                      365

 6   Exhibits 28 and 33 were retained by Defense Counsel.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Rafael Paz
May 05, 2025

```
 1                P R O C E E D I N G S

 2                        - - -

 3        Deposition taken before Rick E. Levy,

 4   Registered Professional Reporter and Notary Public

 5   in and for the State of Florida at Large, in the

 6   above cause.

 7                        - - -

 8            THE VIDEOGRAPHER:  Good morning.  We are on

 9        the record.  The time is 9:07 a.m. on May 5th of

10        2025.  Audio and video recording will continue to

11        take place until all parties agree to go off the

12        record.  Please note that microphones are sensitive

13        and may pick up whispering and private

14        conversations.

15            This is the video recorded proceeding of

16        Rafael Paz taken by counsel for the plaintiff in

17        the matter of Penrod Brothers versus City of Miami

18        Beach.  This proceeding is being held at 150 West

19        Flagler Street, Suite 2200.  My name is Leah

20        Mendez, I'm the videographer on behalf of US Legal

21        Support.  I am not related to any party in this

22        action nor am I financially interested in the

23        outcome.

24            The court reporter is Rick Levy on behalf of

25        US Legal Support.  Counsel will state their
```

Rafael Paz
May 05, 2025

```
 1   appearances for the record after which the court

 2   reporter will swear in the witness.

 3        MR. KOSLOWE:  Good morning everyone, Jason

 4   Koslowe from Stearns, Weaver, Miller for the

 5   plaintiff Penrod.

 6        MR. HOCKMAN:  Good morning, Eric Hockman from

 7   Weiss, Serota, Helfman, Cole & Bierman on behalf of

 8   the City and Mr. Paz.

 9        MS. MACK:  Freddi Mack from the City of Miami

10   Beach City Attorney's Office.  Also here with the

11   City and Mr. Paz.

12        MR. TYLER:  Benjamin Tyler on behalf of

13   intervenor Boucher Brothers and Pier Park, LLC from

14   Holland & Knight.

15        MR. KOSLOWE:  Before we swear the witness

16   we'll just interpose all our objections with

17   respect to Boucher but no need to repeat on that;

18   right?

19        MR. HOCKMAN:  I believe it's on the record

20   somewhere.

21        MR. TYLER:  For the record I've signed the

22   confidentiality order so bound by that.

23        MR. HOCKMAN:  Protective order.

24        THE WITNESS:  I do.

25                       -  -  -
```

Rafael Paz
May 05, 2025

```
 1   Thereupon,

 2                      (RAFAEL PAZ)

 3           having been first duly sworn or affirmed,

 4   was examined and testified as follows:

 5                    DIRECT EXAMINATION

 6   BY MR. KOSLOWE

 7       Q.   Good morning, sir.

 8       A.   Good morning.

 9       Q.   Can you please state your name spelling your

10   last name for the record?

11       A.   Rafael Paz, P-A-Z.

12       Q.   And could you please provide your address?

13       A.   1450 Brickell Avenue, Suite 2300.

14       Q.   That's your office address?

15       A.   That's my office address.

16       Q.   You also live down here in South Florida?

17       A.   I do.

18       Q.   That's Miami Beach or Miami?

19       A.   Miami Beach.

20       Q.   Sir, have you ever been deposed before?

21       A.   Yes.

22       Q.   About how many times?

23       A.   At least two.  At least twice.

24       Q.   Was that recently?

25       A.   No.
```

Rafael Paz
May 05, 2025

1       Q.    About how long ago?

2       A.    I think 2013 was maybe the last deposition

3   that I took.

4       Q.    Was that in connection with your work or

5   employment or something else?

6       A.    Yes.

7       Q.    Sorry, I asked that either or.  Is that in

8   connection with your work?

9       A.    Employment, yes.

10       Q.    It's been a little while since your last

11   deposition so is it okay if I provide a couple of rules

12   of the road for today?

13       A.    Sure.

14       Q.    Please answer all questions audibly rather

15   than shaking your head or nodding.  Is that all right?

16       A.    Yes.

17       Q.    That way the court reporter can take down a

18   clean record.  Please wait until I finish my question

19   before you provide your answer and I'll try to wait

20   until you finish your answer before I ask my next

21   question; okay?

22       A.    Yes.

23       Q.    That way also we're not talking over one

24   another and the court reporter can get the record clean.

25   Is that all right?

Rafael Paz
May 05, 2025

```
 1        A.    Understood.

 2        Q.    If I ask a question that you don't understand

 3   please let me know, okay?

 4        A.    Okay.

 5        Q.    I'll try to clarify it and we can work to make

 6   sure that the question is understandable; is that all

 7   right?

 8        A.    Yes.

 9        Q.    If you answer my question it's fair to assume

10   you understood it; is that right?

11        A.    Yes.

12        Q.    Is there any reason why you can't provide

13   truthful, complete and accurate testimony today?

14        A.    No.

15        Q.    What did you do to prepare for today's

16   deposition?

17        A.    What did I do to prepare, I had one

18   conversation with counsel.

19        Q.    Which counsel was that?

20        A.    With Mr. Hockman and Freddi.

21        Q.    When was that?

22        A.    Last week.

23        Q.    About how long was that meeting?

24        A.    Maybe 30 to 45 minutes.

25        Q.    Was that in person or by Zoom?
```

Rafael Paz
May 05, 2025

1      A.    It was a call.  It was not in person.

2      Q.    Telephone call?

3      A.    It was -- it might have been a Teams meeting.

4      Q.    Were you shown any documents during that

5   meeting?

6      A.    No.

7      Q.    Did you discuss this deposition with anyone

8   else prior to being here with us today?

9      A.    My partners at my firm just to let them know I

10  would not be in the office today.

11     Q.    Did you speak with anyone at the City of Miami

12  Beach other than counsel that you just mentioned in

13  connection with preparation for this deposition?

14     A.    No.

15     Q.    Did you review any documents on your own

16  outside of that meeting you had with counsel in

17  connection with preparing for this deposition?

18     A.    No.

19     Q.    Sir, what is your current employ, title and

20  role?

21     A.    Well, I'm a lawyer.  I'm at the law firm of

22  Bilzin Sumberg.  I'm a partner in the Land Development

23  and Government Relations practice group.

24     Q.    How long have you been with Bilzin?

25     A.    Since May of last year, '24.

Rafael Paz
May 05, 2025

1    Q.   You said you're in planning and zoning, is
2  that it?
3    A.   Yes, more government relations.
4    Q.   What employ, title and role did you have
5  immediately before joining Bilzin?
6    A.   Before joining Bilzin I was most recently the
7  City Attorney for the City of Miami Beach.
8    Q.   How long were you with the City of Miami
9  Beach?
10    A.   I was employed by the City since 2014.
11    Q.   So about ten years?
12    A.   Yes.
13    Q.   Were you the City Attorney that entire time?
14    A.   No.
15    Q.   Without belaboring the question can you walk
16  through the different roles you had, different time
17  periods from when you started in 2014 until you left the
18  City of Miami Beach in 2024?
19    A.   Yes.
20    Q.   Please do so.
21    A.   So I was hired I think October 1, 2014 as a
22  First Assistant City Attorney and my role was largely
23  transactional, the transactional side of the house and
24  special projects, developments, public/private
25  partnerships and then at some point in the next few

Rafael Paz
May 05, 2025

1  years then I was promoted to Deputy City Attorney with

2  similar portfolio; the economic development and business

3  activities of the City and then I became Interim City

4  Attorney and at the end of 2020 or Acting City Attorney

5  I think was the exact title and then I went back when

6  the City Attorney came back to the job I became Chief

7  Deputy City Attorney and then he -- the City Attorney

8  left again.  I became acting City Attorney again and

9  then I was appointed after the City Attorney retired.

10      Q.   When was that?

11      A.   2021.

12      Q.   So from 2021 to 2024 that's when you were the

13  City Attorney?

14      A.   All of '21 I was acting and then '21 to '24 I

15  was the City Attorney, yes.

16      Q.   You mentioned I think different divisions or

17  different focuses within the City Attorney's Office.

18  Can you describe to me the organization of the City

19  Attorney's Office at the City of Miami Beach?

20      A.   Yes.

21      Q.   Can you please do so?

22      A.   There are about a dozen lawyers in the office

23  and some almost exclusively handle litigation and then

24  there is a land use attorney.  There is the

25  transactional and procurement attorney which is the role

Rafael Paz
May 05, 2025

1    that I largely handled when I was a line attorney in the

2    office and then there is a police legal advisor, code

3    enforcement and building enforcement attorney and I

4    think that's pretty much the division.

5         Q.   In terms of the hierarchy at the City

6    Attorney's Office the first assistant that's sort of the

7    line, the bottom level; is that correct?

8         A.   No, think there is an Assistant City Attorney

9    then there is maybe a Senior Assistant City Attorney.

10   There may be even several levels of Assistant Attorney

11   I, Assistant Attorney II, Senior Assistant City

12   Attorney, First Assistant, Deputy, Chief Deputy and then

13   the City Attorney.  It's largely compensation based

14   for -- in terms of the codes, what do you call it I

15   forget.  Anyway.  The categories are largely for

16   compensation.

17        Q.   So you might have a Senior Assistant Attorney

18   and a First Assistant Attorney it's not that the first

19   is necessarily reporting to the senior it's just they

20   may be working in different parts?

21        A.   Exactly.  The role of the First versus the

22   Senior or even the Assistant City Attorney it's not a

23   hierarchy in terms of reporting to other attorneys in

24   the office other than the City Attorney which everyone

25   reports to.

Rafael Paz
May 05, 2025

1    Q.   Is there no hierarchy in terms of reporting to

2  the deputies or the Chief Deputy City Attorney?

3    A.   Not while I was there.

4    Q.   So a line attorney and Deputy City Attorney it

5  wasn't a deputy was above the line and they reported up

6  to the City Attorney?

7    A.   That's correct.

8    Q.   So it's the City Attorney on top and the other

9  twelve or eleven below; is that right?

10    A.   Yes.

11    Q.   Do you know a Rick Dipico?

12    A.   I do.

13    Q.   Who is he?

14    A.   He is the current City Attorney.

15    Q.   Was he at the City Attorney's Office when you

16  were there?

17    A.   Yes.

18    Q.   What was his role or position when you were at

19  the City Attorney's Office?

20    A.   He was a Deputy City Attorney.

21    Q.   So he was I guess directly below you; is that

22  right?

23    A.   Yes.

24    Q.   Do you know Raul Aguila?

25    A.   Aguila, yes.

Rafael Paz
May 05, 2025

1      Q.    Who was that?

2      A.    He was the former City Attorney.  He was my

3  predecessor.

4      Q.    He was your predecessor as the City Attorney?

5      A.    Yes.

6      Q.    Was he still at the City of Miami Beach when

7  you were the City Attorney?

8      A.    He may -- I think he retired but his end date

9  may have overlapped while I was there so yes and then I

10  believe he subsequently served as special counsel on

11  special projects.

12      Q.    What role is special counsel?

13      A.    Just a consultant, outside consultant.

14      Q.    So the City Attorney's Office -- the City

15  Attorney's Office retains special counsel or is it the

16  City itself through some other means that retain special

17  counsel?

18      A.    The City Attorney's Office retains special

19  counsel or outside counsel.

20      Q.    Outside counsel being a law firm; is that

21  right?

22      A.    Yes.

23      Q.    For a particular project or issues?

24      A.    Yes.

25      Q.    And same thing with special counsel retained

Rafael Paz
May 05, 2025

1    for a specific purpose or just have additional bodies in

2    the office?

3         A.   Could be for any reason but generally for a

4    specific purpose.

5         Q.   So after you became acting and then fully

6    appointed as City Attorney in 2001 Mr. Aguila was

7    retained by the City Attorney's Office as special

8    counsel; is that right?

9         A.   I can't -- I think so but I don't have those

10   documents in front of me.  I need to verify but that's

11   my understanding.

12        Q.   Do you know if Mr. Aguila is still employed in

13   that special -- is he employed or has he been contracted

14   as special counsel with the City of Miami Beach still?

15        A.   I don't know.

16        Q.   Do you know Nick Callegas?

17        A.   I do.

18        Q.   Who is that?

19        A.   A lawyer in the office.

20        Q.   So he is one of the Assistant City Attorneys

21   or Deputy Assistant City Attorney?

22        A.   Yes.

23        Q.   He had that position when you were the City

24   Attorney?

25        A.   Yes.

Rafael Paz
May 05, 2025

1      Q.   Do you know a Gisela Torres?

2      A.   I do.

3      Q.   Who is that?

4      A.   An office in the office.

5      Q.   Also with the City Attorney's Office?

6      A.   Yes.

7      Q.   Also working with you when you were the City

8   Attorney?

9      A.   Yes.

10      Q.   Do you know Amanda Gonzalez?

11      A.   I don't know an Amanda Gonzalez.  There is an

12   Amada Gonzalez.

13      Q.   Who is Amada Gonzalez?

14      A.   She was my assistant.

15      Q.   Not an attorney?

16      A.   Not an attorney.

17      Q.   Paralegal or secretarial staff?

18      A.   I don't know that she had the title of

19   paralegal.  Secretarial staffer would be correct.

20      Q.   Can she --

21      A.   Certainly do the work of a paralegal.

22      Q.   So at least from time to time she would assist

23   you in providing legal services to the City of Miami

24   Beach?

25      A.   Yes.

Rafael Paz
May 05, 2025

1        Q.    Do you know Gabriella Alfonsin?

2        A.    Yes.

3        Q.    Who is that?

4        A.    An employee of the city, not at the City

5   Attorney's Office but I believe she worked in the

6   Facilities Management Department.

7        Q.    Are there other lawyers employed by the City

8   of Miami Beach outside of the City Attorney's Office

9   outside the special counsel and the outside counsel that

10  the City Attorney's Office retained?

11              MR. HOCKMAN:  Objection to form.

12              THE WITNESS:  There are lawyers who are

13          employed in the City but not serving in a legal

14          capacity.  They just happen to have law degrees.

15  BY MR. KOSLOWE

16        Q.    So it's not like the Police Department hires a

17  lawyer inside the Police Department, they rely on the

18  City Attorney's Office to provide them legal services;

19  is that correct?

20        A.    Yes.

21        Q.    I just used the police department as an

22  example?

23        A.    That's right.

24        Q.    As for other departments and divisions in the

25  City; right?

Rafael Paz
May 05, 2025

1     A.    While I was there, yes.

2     Q.    Can you describe to me the responsibilities of

3  the City Attorney in the City Attorney's Office when you

4  were there with the City of Miami Beach?

5     A.    So the City Attorney is a charter officer

6  appointed by and reporting to the City Commission and

7  advising the City Commission and the administration and

8  all of the boards of the City on all legal matters

9  impacting the operations of the City.

10     Q.    In terms of the legal services and advice

11  provided, that was to I think you mentioned the

12  Commission; is that right?

13     A.    Yes.

14     Q.    Individual commissioners as well?

15     A.    Individual commissioners as well.

16     Q.    Are there officers within the city

17  administration also?

18     A.    Yes.

19     Q.    That includes the City Manager?

20     A.    City Manager.

21     Q.    All other staff within the City Administration

22  as well; is that correct?

23     A.    Yes.

24     Q.    What about committees of the Commission, the

25  City Attorney also have responsibility to provide them

Rafael Paz
May 05, 2025

1    legal services?

2         A.    Yes.

3         Q.    How about constituent committees within the

4    City of Miami Beach, legal department also provide them

5    legal services?

6         A.    I don't know what a constituent committee,

7    what you mean by that.

8         Q.    I'll give you an example.  The City of Miami

9    Beach has a sustainability committee.  Are you familiar

10   with that?

11        A.    There have been various sustainability

12   committees over the years so I don't know what exactly

13   you're referring to.

14        Q.    Are you familiar -- I'm trying to get the

15   right terminology and you'll probably help me there.

16   Are you familiar at the City of Miami Beach with

17   committees that are composed of unelected constituents?

18        A.    Yes.

19        Q.    Can you give me an example of one?

20        A.    There are a number of advisory boards of the

21   City that are -- the land use boards for example were

22   all unelected appointed residents of the City.

23        Q.    And does the City Attorney's Office also

24   provide those boards and committees legal services?

25        A.    Yes.

Rafael Paz
May 05, 2025

1    Q.   What role does the City Attorney and the City

2    Attorney's Office have with respect to ordinances,

3    resolutions and contracts that the City of Miami Beach

4    from time to time may issue or engage in?

5    A.   So the attorneys draft all ordinances, advise

6    the sponsors of the legislation involved their options.

7    Same for resolutions, the attorneys draft all

8    resolutions and the attorneys are involved in the

9    drafting and negotiation of all contracts.

10   Q.   Is the same true for items that come before

11   committees of the Commission?

12   A.   I don't know what you mean by the same.

13   Q.   I believe what you testified was that the City

14   Attorney's Office --

15   A.   You mean commission committees like the

16   committees of the commission?

17   Q.   Yes.

18   A.   With commission members.  So any matters that

19   are -- any ordinances or resolutions or contracts that

20   are presented to a committee that go through the

21   legislative process it would be the same, yes.

22   Attorneys are involved in the drafting and negotiation.

23   Q.   Just to make sure because I want to use the

24   correct terminology.  I had referred to resolutions.  In

25   my mind I was referring to resolutions as items that

Rafael Paz
May 05, 2025

```
 1    come before the Commission.  Is there a different term
 2    you use for items that come before a committee of the
 3    Commission?
 4         A.   I don't know that I'm following your question
 5    but committees could weigh in on resolutions but only
 6    the Commission would approve a resolution or an
 7    ordinance.  They're agenda items.
 8         Q.   An agenda item that would come before a
 9    committee of the Commission, what role does the City
10    Attorney's Office have in that agenda item?
11         A.   It would depend on the item.
12         Q.   Can you please explain?
13         A.   So if the item is a discussion item that does
14    not involve legal issues then there would be very
15    limited involvement or if the item is a resolution or a
16    proposed transaction or legislation that does implicate
17    legal issues then the attorneys would be involved.
18         Q.   For ordinances, resolution, these agenda items
19    and the contract that the City would enter into from
20    time to time the City Attorney's Office would be
21    involved in endorsing approval of the form of those
22    documents; is that right?
23         A.   Yes.
24         Q.   Also the language of those documents and
25    approving that language?
```

Rafael Paz
May 05, 2025

```
 1        A.   Yes.
 2        Q.   Would the City Attorney's Office review
 3   ordinances for compliance with the code?
 4        A.   Yes.
 5        Q.   Same for resolutions?
 6        A.   Yes.
 7        Q.   Same for agenda items that come before
 8   committees of the Commission?
 9        A.   Yes.
10        Q.   Same for contracts the City was considering
11   and negotiating entering into?
12        A.   Yes.
13        Q.   Would the City Attorney's Office review those
14   documents, ordinances, resolutions, contracts for
15   compliance with the City of Miami Beach Charter?
16        A.   Yes.
17        Q.   Would the City Attorney's Office review
18   ordinances, resolutions, agenda items, contracts for
19   compliance with all other applicable law?
20        A.   Generally, yes.
21        Q.   When you say "generally" is there some
22   exception that comes to mind?
23        A.   Stated very broadly but yes.
24        Q.   You mentioned drafting ordinances,
25   resolutions, contracts and at times agenda items
```

Rafael Paz
May 05, 2025

1  depending on what they might be, agenda items before a

2  committee, can you please explain that process that the

3  City Attorney's Office will engage in?

4      A.   I don't know what you would like for me to

5  explain.

6      Q.   Well, let's start with one type of writing

7  that we just described.  Let's talk about potential

8  resolutions that the City Commission would consider; all

9  right.  Could you explain the drafting process that the

10  City Attorney's Office engaged in to create a resolution

11  upon which the City Commission would potentially vote?

12      A.   So that would -- the drafting process would

13  depend on where the item originated.  So if the item

14  originated with the administration then generally the

15  departments would prepare a draft and submit the draft

16  to the relevant attorney for review and it would be

17  assigned to an attorney to review.

18          If the sponsor of the resolution was a

19  Commissioner then the attorneys would generally draft

20  the item for the sponsor.

21      Q.   You say generally -- pardon me, strike that.

22  When it comes to items that originate with staff was it

23  ever the case that the City Attorney's Office would

24  draft in the first instance?

25      A.   Yes.

Rafael Paz
May 05, 2025

1        Q.   And the same with commissioners, if there was

2    an item that originated through a Commission or

3    particular sponsor was it ever the case that the City

4    Attorney's Office would draft an item in the first

5    instance?

6        A.   Yes.

7        Q.   Was it ever the case that a commissioner would

8    draft the item in the first instance?

9        A.   No.  In my experience and I can only speak to

10   what I have personal knowledge but my experience is the

11   electeds rely on the attorneys to draft their items.

12   Sometimes they could deal with the administration

13   directly on an item they're sponsoring and work with the

14   administration to have them draft it.  It depends on the

15   issue.  There are maybe a thousand items a year that go

16   through the legislative process in any given year.  It's

17   a fluid process.

18       Q.   When an item originates through a commissioner

19   sponsor how does the City Attorney's Office who is

20   drafting as you testified in the first instance, how do

21   they gain an understanding of the material to do that

22   drafting work?

23       A.   I think it would depend on the item.

24       Q.   Can you give me an example?

25       A.   So if it's an item that has an existing

Rafael Paz
May 05, 2025

1   legislative history they would refer to the existing

2   legislative history.  They would meet with staff and

3   maybe meet with the sponsor to understand what their

4   goal is and then draft accordingly.

5        Q.   If an item originated through a Commissioner

6   sponsor that had been under discussion in one of the

7   committees of the Commission how would the City

8   Attorney's Office gain an understanding of the material

9   and content for drafting a resolution?

10       A.   So if something came out of committee you

11  would look at the committee agenda item.  If there was a

12  committee memorandum and then the proceedings are all

13  recorded and if the attorney was not present there and

14  they could refer to that and they could also work with

15  staff or the sponsor, the legislative sponsor to

16  determine what they need to draft.

17       Q.   In instances where an item originated through

18  a Commissioner sponsor and the City Attorney's Office

19  engaged in drafting in the first instance.  How would or

20  if pardon me, if the City Attorney's Office then

21  interacted with the commissioners how did that work?

22  Let me strike that question.  I think I asked it too

23  confusingly.

24            In instances where an item originates with a

25  Commissioner sponsor and the City Attorney's Office

Rafael Paz
May 05, 2025

1    engages in drafting in the first instance in the manners

2    which you described.  Were there then interactions

3    typically between the City Attorney's Office and the

4    sponsor to refine or further that draft before it

5    reaches its final form that would be presented to the

6    Commission?

7         A.    Typically, yes.

8         Q.    How did that typically work?

9         A.    If there is a conversation with a request for

10   a draft of an item then that would be prepared and sent

11   to the sponsor for review and then there would be

12   feedback and either written or verbal until the item was

13   ready.

14        Q.    So in those instances essentially the City

15   Attorney's Office is looking to the Commissioner sponsor

16   to understand what that sponsor wants out of the

17   resolution for the item he or she is attempting to bring

18   before the Commission; is that fair?

19        A.    Yes.  The Commissioners make policy not the

20   attorneys.  Yes, you look to them for direction.

21        Q.    And is that same process generally true that

22   sort of back and forth between the City Attorney's

23   Office and the originator when an item originates with

24   staff?

25        A.    Yes.

Rafael Paz
May 05, 2025

1      Q.   So staff or the City Attorney's Office may

2   draft in the first instance but then there would be a

3   back and forth between staff and the City Attorney's

4   Office in refining that draft; is that right?

5      A.   Yes.

6      Q.   And during those processes, both when an item

7   originates with a commissioner and when an item

8   originates with staff is the City Attorney's Office

9   reviewing for compliance with the code?

10     A.   Yes.

11     Q.   And compliance with the Charter?

12     A.   Yes.

13     Q.   And compliance with the general law?

14     A.   Yes.

15     Q.   Otherwise applicable to this particular

16  instance?

17     A.   Yes.

18     Q.   Are you familiar with memoranda prepared by

19  the City Manager or other members of City Attorney's

20  administrative staff for committees of the Commissioner

21  for the Commission?

22     A.   Your question was other members of the City

23  Attorney's administrative staff?

24     Q.   I believe I mangled that question.  Are you

25  familiar with memoranda prepared by the City Manager for

Rafael Paz
May 05, 2025

1    the Commission or for committees of the Commission?

2            MS. MACK:  Object to form.

3            THE WITNESS:  There are Commission memoranda

4        that accompany items that are generally prepared by

5        the administration or the attorneys but generally

6        the administration.

7    BY MR. KOSLOWE

8        Q.   Generally does the administration also prepare

9    memoranda for committees of the Commission?

10       A.   Yes.

11       Q.   I use the term --

12       A.   Sorry.  Yes, unless the item was driven,

13   sponsored.  If there was a Commission sponsored item

14   that was being handled by the attorney's office but

15   either attorneys or the administration would be

16   responsible for all agenda items.

17       Q.   When you say responsible that would include

18   preparing memoranda that for the committee or Commission

19   regarding that particular item?

20       A.   Yes.

21       Q.   When I asked the question the first time I

22   asked it as the City Manager preparing the memoranda or

23   the City Manager creating a memoranda.  When you

24   responded you used the city administration.  Is there a

25   reason for that distinction in the way you answered the

Rafael Paz
May 05, 2025

1   question?

2        A.   Well, I think the manager is the chief

3   administrative officer and generally all manager

4   memoranda, all agenda items are approved by the manager

5   but drafted by the applicable department and there is a

6   very -- there is a hierarchy for how those matters are

7   assigned and they go through the department director,

8   the assistant city manager and then the manager.  That's

9   why it's the administration memoranda.

10        Q.   Understood.  Committee memorandum that's

11   signed by the City Manager, that's the official

12   memoranda of the City Manager but it originated through

13   a process in administration.  Is that right?

14        A.   Generally, yes.

15        Q.   When you say "generally" is there a time when

16   the City Manager decides it's not the official word of

17   the City Manager?

18        A.   We're talking about a thousand items.  I can't

19   say that is exactly the approach that is handled for

20   every single one.  Generally, yes.

21        Q.   Let me refine my question a bit.  When

22   memoranda are prepared by the City Administration for

23   Commission or for committee of the Commission and signed

24   by the City Manager, that is always the official word of

25   the City Manager, that memoranda; is that correct?

Rafael Paz
May 05, 2025

1      A.   Yes.

2      Q.   Typically though your testimony is that the

3  process of creating that memoranda flows upwards from

4  staff through department heads through Assistant City

5  Managers up to the City Manager; is that right?

6      A.   Yes.

7      Q.   So typically it's a bottom up process?

8      A.   Yes.

9      Q.   Do you know a Linda Hudak?

10     A.   I do.

11     Q.   Who is she?

12     A.   She is the former City Manager.

13     Q.   Of the City of Miami Beach?

14     A.   Of the City of Miami Beach.

15     Q.   Now she has a position with CONCACAF or World

16  Cup?

17     A.   World Cup Host Committee, yes.

18     Q.   Do you know during what years Ms. Hudak was

19  the City Manager for the City of Miami Beach?

20     A.   Yes.

21     Q.   What's that?

22     A.   I believe Alina overlapped with me I think so

23  it would have been 2021 to 2024 and she stepped in after

24  the prior City Manager Jimmy Morales, your former

25  partner at Stearns here, after he stepped down.

Rafael Paz
May 05, 2025

1      Q.    Did she also have the same sort of transition

2   first acting then official as you had when you walked

3   into your position?

4      A.    That's a good question.  She, no, she was not

5   acting.  She was an Assistant City Manager initially and

6   then when Jimmy resigned then my former boss then Raul

7   Aguila the City Attorney became the Interim City Manager

8   and that's why I was then promoted to Acting City

9   Attorney and then when they went through the hiring

10  process for selection of the City Manager Alina was

11  appointed and then Raul came back and then shortly

12  thereafter he had to go out on medical leave and so I

13  remained as acting.  So that's -- definitely 2021 until

14  July of 2024.

15     Q.    So understanding those nuances essentially

16  your tenure as City Attorney overlapped with the tenure

17  of Ms. Hudak as the City Manager?

18     A.    Yes.

19     Q.    She left around the same time as you in 2024?

20     A.    Yes.  She left after me.

21     Q.    So I guess is it a fair characterization that

22  your tenure as City Attorney the entire time in that

23  tenure Ms. Hudak was the City Manager?

24     A.    She left after me so she was still there.

25  Yes, we largely overlapped.

Rafael Paz
May 05, 2025

1       Q.   During your time as City Attorney in your

2   experience did the City Administration staff assemble

3   all information that was sufficient for them to render

4   the memoranda they did for a Commission and for

5   committees of the Commission?

6             MR. HOCKMAN:  Objection to form.

7             THE WITNESS:  I think staff, you do what you

8        need to do to put the item together to get it done

9        given that there are many, many items and there is

10       never enough time.

11  BY MR. KOSLOWE:

12       Q.   So under the time constraints and given the

13  many items that were before them is it your testimony

14  that staff in all cases assembled all information

15  sufficient for them to render their reports that were

16  contained within the memoranda to Commission and

17  committee?

18            MR. HOCKMAN:  Objection to form.

19            THE WITNESS:  So in all cases staff will do

20       what they need to do to prepare the memoranda.

21       Whether they had sufficient information or not.

22       Some items are themselves outlined information that

23       is still in process.  It just depends but generally

24       yes, we try to have the information that you need

25       to prepare the item.

Rafael Paz
May 05, 2025

```
 1   BY MR. KOSLOWE
 2       Q.   I think that's a fair point you raise which is
 3   that the memoranda may say we need additional
 4   information or additional processes, right?
 5       A.   Yes.
 6       Q.   Let me ask my question in a more refined way.
 7   When you were City Attorney and Ms. Hudak was the City
 8   Manager and a memoranda from administration was issued
 9   to a committee or to the Commission and it contained a
10   statement of information.  Was it always the case that
11   the City staff had assembled all the information they
12   needed to present that particular statement?
13       A.   Staff would assemble the information that is
14   available to them at any given point in time and working
15   with that information they'll prepare the items.
16       Q.   But it was never the case that they would make
17   a presentation that was based on information they didn't
18   have?
19            MR. HOCKMAN:  Objection to form.
20            THE WITNESS:  I don't know how to answer that.
21       It depends on the item.  If there is a report that
22       a consultant is preparing that's outstanding but
23       there are several options that might be available
24       you would say these are the options, the report is
25       outstanding, we'll come back to you when we have
```

Rafael Paz
May 05, 2025

1           additional information or if there are policy

2           issues involved then they weigh in on the policy

3           pending whatever necessary information.

4    BY MR. KOSLOWE

5           Q.    Given the breadth of the content that you

6    dealt with as City Attorney and that the staff dealt

7    with when you were the City Attorney just to narrow it

8    down can I try to give you hypothetical example that

9    might help answer the question?

10          A.    You can.  I'm not going to be comfortable

11   answering questions on hypotheticals but sure, let's do

12   it.

13          Q.    This will be -- I will admit this is just a

14   hypothetical, not entering about any particular fact

15   that might have occurred.  Is that all right?

16          A.    Yes.

17          Q.    Let's assume just for argument's sake that

18   staff was assigned a task to report back to a committee

19   of the Commission about the status of all the private

20   seawalls in the City of Miami Beach, you understand the

21   example?

22          A.    Yes.

23          Q.    Let's say there they were tasked to do that in

24   two weeks, let's say.  You understand the example?

25          A.    Yes.

Rafael Paz
May 05, 2025

1        Q.    And they might report back hey, we've done the

2   work, it's been two weeks, we only covered 50 percent of

3   the seawalls, here is the status.  We need more time to

4   do the rest.  Right.  They may say that?

5        A.    Yes.

6        Q.    But was it ever your experience in that type

7   of example that staff will have not looked at 50 percent

8   of the seawalls but report back here is the status of

9   100 percent of the seawalls, we're going to tell you

10  what they're like?

11            MR. HOCKMAN:  Objection, incomplete

12       hypothetical.

13  BY MR. KOSLOWE

14       Q.    Without also saying --

15       A.    Your question is was it ever the case that

16  staff would report that they had done something that

17  they had not done?

18       Q.    Correct.

19            MR. HOCKMAN:  Same objection.

20            THE WITNESS:  I'm not aware of that.  I'm not

21       aware of any occasion where that happened.

22  BY MR. KOSLOWE

23       Q.    That's what I was trying to get at.  That's

24  the kind of question I was trying to get at.  You're not

25  aware of any situation where staff made a report or a

Rafael Paz
May 05, 2025

1   statement to Commission that was based on information or

2   work they had not done that was necessary for that

3   particular statement or report?

4          MR. HOCKMAN:  Objection, incomplete

5       hypothetical.

6          THE WITNESS:  Well, staff could provide an

7       opinion about something whether or not the work had

8       been done but to -- maybe I'm not following you

9       correctly but if what you're asking is does staff

10      report that work has been done that has not been

11      done that's not my experience.  I hadn't seen that.

12  BY MR. KOSLOWE

13      Q.   Was it your experience that staff would ever

14  report something in a memoranda for which some work was

15  necessary to state that report and staff had not done

16  that work that was necessary to state that report?

17         MR. HOCKMAN:  Objection to form.

18         THE WITNESS:  Depends on whether -- staff may

19      be of the opinion that some work is not necessary

20      to reach the conclusion whether or not somebody may

21      disagree about whether it is necessary.

22  BY MR. KOSLOWE

23      Q.   So in your experience staff would never issue

24  a report or put something in a memoranda based on work

25  that they felt was necessary to be done to do that?

Rafael Paz
May 05, 2025

```
1    They always conducted and did all the work that they
2    thought was necessary to issue that particular
3    memoranda; is that right?
4           MR. HOCKMAN:  Objection to form, foundation.
5           THE WITNESS:  I think staff would use -- you
6        use your judgment for what you are going to state
7        in a report and if staff believes that additional
8        work is necessary that will generally be reflected
9        in the report.
10          If they believe that it's not necessary well
11       then it's not reflected in the report but do staff
12       misrepresent that work is actually done when it
13       hasn't been done that I don't have personal
14       knowledge of that.
15   BY MR. KOSLOWE
16       Q.   In your experience that did not take place?
17       A.   That's right.
18       Q.   In memoranda issued by the administration to
19   the committees of the Commission and to Commission often
20   there would be recommendations or conclusions as part of
21   those memoranda; is that correct?
22       A.   Yes.
23       Q.   This discussion we just had about the type of
24   work that staff did to render their memoranda that also
25   applies to the type of work they did to issue their
```

Rafael Paz
May 05, 2025

1    recommendations; is that correct?

2        A.   Yes.   The recommendations would be included in

3    the Commission memoranda so yes.

4        Q.   So in your experience was it always the case

5    that staff undertook all processes, gather all

6    information that they felt in that particular case was

7    necessary to render a recommendation or opinion in a

8    memoranda?

9            MR. HOCKMAN:  Objection to form, foundation.

10           THE WITNESS:  That's generally my experience.

11   BY MR. KOSLOWE

12       Q.   Was it ever your experience that staff did

13   note undertake some process or gather some information

14   that in their opinion was necessary to render an opinion

15   or render a recommendation but they still rendered the

16   recommendation or opinion in a memoranda?

17           MR. HOCKMAN:  Objection to form, foundation.

18           THE WITNESS:  I'm not aware of any specific

19        instance where something like that happened.

20           MR. KOSLOWE:  Can we go off the record for a

21        minute?

22           MR. HOCKMAN:  Agreed.

23           THE VIDEOGRAPHER:  We are off the record.  The

24        time is 9:51 a.m.

25           (Thereupon, a brief recess was taken.)

Rafael Paz
May 05, 2025

```
 1              THE VIDEOGRAPHER:  We are on the record.  The
 2        time is 10:00 a.m.
 3   BY MR. KOSLOWE
 4        Q.   Mr. Paz, a moment earlier we discussed work
 5   that the City Attorney's Office did to determine
 6   compliance with the Code, with the Charter, with
 7   relevant law when working on drafts of resolutions or
 8   other items for Commission.  Do you recall we discussed
 9   that a moment ago?
10        A.   Yes.
11        Q.   Can you please describe what that work was
12   like?
13              MR. HOCKMAN:  Objection to form.
14              THE WITNESS:  It would depend on the item but
15        generally the attorneys get assigned to matters
16        that are within their subject matter expertise.  So
17        they'll have a familiarity with the relevant law
18        and they will incorporate it in the applicable
19        documents.
20   BY MR. KOSLOWE
21        Q.   What type of legal research was typically done
22   by your office to determine compliance with the Code,
23   with the Charter, with other applicable law when
24   drafting up resolutions or other items for Commission or
25   committees?
```

Rafael Paz
May 05, 2025

1           MR. HOCKMAN:  Objection to form.

2           THE WITNESS:  So that of course would depend

3      on the item.  Many ordinances would require

4      extensive legal research.  If the Commission is

5      pushing the envelope in an area of the law.  But it

6      depends on the item because there are many items

7      that are routine and the analysis is much more

8      straightforward.

9  BY MR. KOSLOWE

10      Q.   Whether the analysis is routine or

11  straightforward or whether it's extensive depending on

12  the item would the City Attorney's Office document their

13  conclusions about compliance with the Code, Charter and

14  relevant law as they did this work?

15      A.   Not formally but by form approving the --

16  whatever the final product is then that is the

17  verification that the attorneys have reviewed and are

18  comfortable with the measures.

19      Q.   In your time as City Attorney did Commission

20  ever -- pardon me, did Commission or committee of the

21  Commission ever direct the City Attorney or the City

22  Attorney's Office to undertake a specific task?

23      A.   Yes.

24      Q.   Was that typical or not typical among the

25  thousand or so items you said took place, legislative

Rafael Paz
May 05, 2025

1    items that take place during a year?

2         A.   Typical.

3         Q.   Your office did those tasks that were directed

4    to it by Commission or by committee; right?

5              MS. MACK:   Object to the form.

6              MR. HOCKMAN:   Join.

7              THE WITNESS:   Generally, yes, you respond to a

8         request for the office to perform certain work.

9    BY MR. KOSLOWE

10        Q.   You say generally.  Was there ever a time when

11   the City Attorney's Office didn't do what it was

12   directed to do by Commission or Committee?

13             MR. HOCKMAN:   Object to form.

14             THE WITNESS:   Didn't do what it was directed

15        to do?  It may be that -- it may be that there is

16        an issue where if there is -- exactly what the

17        commission or the direction contemplates maybe if

18        there was a legal issue then you work on, develop

19        options, alternatives and come back to the

20        Commission with the appropriate response but so if

21        the question is do you do exactly what you are told

22        no, we're professionals and we go through the legal

23        analysis and come back to the Commission as

24        appropriate.  But do we always come back, yes.

25   ///

Rafael Paz
May 05, 2025

1    BY MR. KOSLOWE

2        Q.   So I'll give you some other hypotheticals and

3    just for the purpose of trying to tease out the issue

4    but recognizing these are just supposed facts.

5        A.   Sure.

6        Q.   So let's say Commission directed the City

7    Attorney's Office to negotiate a particularly complex

8    contract in 24 hours, assume that example.

9        A.   Okay.

10       Q.   The City Attorney's Office might respond and

11   say we've done what you've told us but 24 hours is

12   insufficient to do this, here is where we are; right?

13       A.   Yes.

14       Q.   It wouldn't ignore the direction; right?

15       A.   Right.

16       Q.   As you mentioned it would respond, it would do

17   what it was told, it would respond in an appropriate

18   fashion; right?

19       A.   Yes.

20       Q.   So there was never a situation where the City

21   Attorney's Office was directed by Commission or a

22   committee to undertake a particular task and the office

23   didn't do it, it ignored that; right?

24           MR. HOCKMAN:  Objection to form.

25           THE WITNESS:  That's generally how it works,

Rafael Paz
May 05, 2025

```
 1        yes.

 2   BY MR. KOSLOWE

 3        Q.   There may be a situation where the City

 4   Attorney's Office responded in a way that demonstrated

 5   that the work couldn't be completed in the way that

 6   Commission desired but it would respond fully to

 7   whatever the task was at hand; is that fair?

 8             MR. HOCKMAN:  Objection to form.

 9             THE WITNESS:  Yes.

10   BY MR. KOSLOWE

11        Q.   In undertaking those directions you and your

12   office were thorough and professional; is that right?

13             MR. HOCKMAN:  Objection to form.

14             THE WITNESS:  That was the aim, yes.

15   BY MR. KOSLOWE

16        Q.   You never just went through the motions;

17   right?

18             MR. HOCKMAN:  Objection to form.

19             THE WITNESS:  The aim was to be thorough and

20        professional always.

21   BY MR. KOSLOWE

22        Q.   Did you ever serve any of the attorneys under

23   your remit just going through the motions not really

24   doing the work?

25             MR. HOCKMAN:  Objection to form.
```

Rafael Paz
May 05, 2025

```
 1              THE WITNESS:  Well, there were -- occasionally
 2         there were attorneys that had performance issues
 3         and their employment would be -- it would be an
 4         employment -- there would be employment action
 5         taken.
 6    BY MR. KOSLOWE:
 7         Q.    In your experience did you catch those issues
 8    before product was reported back out to committee or
 9    Commission?
10         A.    That would be the ideal scenario but it's not
11    always possible.
12         Q.    Other than particular employment issues where
13    there are performance issues with particular employees
14    your experience was the lawyers who worked for you did
15    the work that was directed to them by committee and
16    Commission thoroughly and professionally?
17         A.    Yes, and if I could just add to the extent
18    that I experienced employment issues it was solely in
19    the litigation group and those matters were handled but
20    when it comes to the work you're speaking about; the
21    ordinances, resolutions, contracts, absolutely the
22    attorneys did what they needed to do professionally.
23         Q.    In your time as City Attorney did Commission
24    or Committee of the Commission ever direct the city
25    administration to undertake specific tasks?
```

Rafael Paz
May 05, 2025

1        A.    Could you repeat the question?

2        Q.    Of course.  In your time as City Attorney did

3   Commission or Committee of the Commission ever direct

4   the City Commission to undertake specific tasks?

5        A.    Yes.

6        Q.    In your experience were those directives

7   typically given to the City Manager to flow down or

8   given to specific departments or both?

9        A.    Both.

10       Q.    If a direction was given to the City Manager,

11   the expectation was the City Manager would assign it to

12   the correct department or division within the city

13   administration?

14       A.    Yes.

15       Q.    In your experience when you were a City

16   Attorney and Ms. Hudak was City Manager which as we

17   mentioned overlapped nearly completely did City staff,

18   did the City administration do as directed when provided

19   a direction or task by the Commission or by committee of

20   the Commission?

21            MR. HOCKMAN:  Objection to form.

22            THE WITNESS:  I think that the

23        administration's approach would be similar to the

24        attorneys that they would respond and they would do

25        what they considered appropriate and professional

Rafael Paz
May 05, 2025

```
 1        to provide that response.

 2   BY MR. KOSLOWE

 3        Q.   So they would provide -- they would always

 4   undertake the task and provide a complete response, it

 5   may not be what Commission told them but they would

 6   explain why it wasn't, is that fair?

 7        A.   Yes.

 8        Q.   So just to use that same example if the City

 9   Commission directed staff to negotiate a particular

10   contract that was complex in 24 hours, same example,

11   understand that?

12        A.   Yes.

13        Q.   Staff might report back we've done X, Y and Z,

14   we haven't completed this negotiation because of items

15   A, B, C; right?

16        A.   Yes.

17        Q.   They wouldn't say no, we can't do that?

18        A.   Generally it would be the former, not no we

19   can't do that.

20        Q.   Have you ever experienced the latter no, we

21   can't do that, just going to ignore that?

22        A.   It depends how crazy the ask might be.  No,

23   there were occasions when the answer was very clearly

24   no, we can't do that.

25        Q.   But that would be an answer given by the City
```

Rafael Paz
May 05, 2025

1    Manager or her designees to Commission to say no, that

2    task can't be accomplished in that particular way?

3         A.   Yes.

4         Q.   They would not receive the instruction and

5    then just not do it; right?

6              MS. MACK:  Object to form.

7              THE WITNESS:  Generally, yes.

8    BY MR. KOSLOWE

9         Q.   Did you ever experience a situation where the

10   Commission or committee of the Commission provided

11   direction or task to the City Manager or the city

12   administration and they just didn't do it?

13             MS. MACK:  Object to form.

14             THE WITNESS:  If an item involved a core

15        fundamental legal issue that implicated for example

16        the building official's licensure.  If there was

17        direction for something that the building official

18        is not going to do such as revoke a permit that she

19        didn't feel needed -- should have been revoked well

20        then she is not going to do it no matter what the

21        direction was.  But generally the answer is yes,

22        they respond as appropriate.

23   BY MR. KOSLOWE

24        Q.   So the examples you've provided that would be

25   exceptions to the response are ones where the

Rafael Paz
May 05, 2025

1    administration would report to the Commission or the

2    committee that they can't do it and why; right?

3         A.   Yes.

4         Q.   Outside of those examples where the staff

5    reports to the Commission or the committee they can't do

6    it and why, did you ever experience a situation where

7    the Commission or Committee provided direction and

8    tasking to the city administration and they didn't do

9    the task?

10             MS. MACK:  Object to form.

11             THE WITNESS:  It may be that the task is

12        taking longer and maybe staff didn't report back

13        soon enough.  But generally the intent is always to

14        report back and not just take a direction, put it

15        in a drawer and ignore it forever.

16   BY MR. KOSLOWE

17        Q.   We already discussed that part of response

18   that City Administration provides to the Committee and

19   Commission through these memoranda to Commission and

20   Committee; right?

21        A.   Yes.

22        Q.   Pardon me.  So putting these two items

23   together that as you testified staff undertook the

24   direction, would explain when they could not and you

25   never experienced a situation where staff provided a

Rafael Paz
May 05, 2025

1    memoranda that was based on action items they felt were

2    necessary but they just didn't do?

3            Is it fair to say that when committee or the

4    Commission provided direction to staff they either did

5    the task, they reported why they couldn't do the task

6    and if they provided a memoranda that was the complete

7    response based on the information they felt was

8    sufficient to undertake that response?

9            MR. HOCKMAN:  Objection to form.

10           THE WITNESS:  Yes, there is a lot to unpack

11       there in your question but I think I've answered

12       this already that staff would report truthfully

13       based on what they felt was appropriate in terms of

14       the work that they had done and/or needed to do and

15       taking into account whatever information available

16       to them to make their recommendations.

17   BY MR. KOSLOWE

18       Q.   Are you familiar with City of Miami Beach

19   property at One Ocean Drive?

20       A.   Not intimately familiar but yes.

21       Q.   Generally familiar?

22       A.   Generally, yes.

23       Q.   You include it includes some upland property;

24   beach area; right?

25       A.   It does not include -- it should not include

Rafael Paz
May 05, 2025

1    beach area.  The beaches are -- the beaches are not part

2    of the upland property.

3         Q.   When --

4         A.   Maybe I just didn't understand what you mean

5    by beach area.

6         Q.   In referring to the One Ocean Drive property

7    in connection -- let's take a step back.  Do you have a

8    general familiarity of the content and facts of this

9    lawsuit?

10        A.   No.  In terms of your specific allegations or

11   theories or what the causes of action are, no.  I know

12   it involves a challenge to the procurement for the One

13   Ocean Drive property but I don't know the details.  I

14   haven't seen the complaint.

15        Q.   That's fair.  When you just described the One

16   Ocean Drive property that you understand part of the

17   subject is this lawsuit what's your understanding of

18   what that property is?

19        A.   My understanding -- it may include a portion

20   of the parking lot facing Washington Avenue.  Not sure

21   if that parking area is included in the leased premises.

22   Then there is the existing facility the building and

23   then the outdoor areas up to the beachwalk.  Beyond that

24   the details of that I don't -- I don't remember.

25        Q.   Do you have an understanding of whether or not

Rafael Paz
May 05, 2025

1   the procurement process that you know is the subject of

2   this lawsuit included operations and management from the

3   beachwalk down towards the ocean?

4        A.   I don't recall.  The beachwalk down towards

5   the ocean that would never be leased.  It would always

6   be -- the operations of that are handled via concession

7   agreements.

8        Q.   Do you understand that property through a

9   Concession Agreement or otherwise is part of what we're

10  discussing as the One Ocean Drive property?

11       A.   Yes.

12       Q.   If we talk about the One Ocean Drive property

13  you understand we're talking about part of the parking,

14  part of what's now a leasehold with improvements on it

15  and operation and management of part of the beach;

16  right?

17       A.   Yes.  I had forgotten that RFP included beach

18  concession but that makes sense.

19       Q.   So if we talk about the One Ocean Drive

20  property in this deposition is it fair you understand

21  that's what we're talking about, that set of property?

22       A.   Yes.

23       Q.   Are you aware -- strike that.  Do you have any

24  awareness of the current lease or agreements or

25  contracts that are in place between the City and another

Rafael Paz
May 05, 2025

1   party in connection with that property?

2        A.   And another party, which party?

3        Q.   I'm just trying to gauge what you know so we

4   can set the terms and framework for the discussion.

5        A.   Generally familiar that the Penrods have the

6   existing agreement.  I believe it's a lease, I'm not

7   certain.  And that then there is I believe there is a

8   management or concession agreement that is in place that

9   would take effect after the expiration of the lease.

10       Q.   So you're aware there is an agreement or set

11  of agreements between the City and Penrod for the One

12  Ocean Drive property that's currently operational;

13  right?

14       A.   Yes.

15       Q.   And if I told you there is a lease and a

16  Concession Agreement, does that refresh your

17  recollection between the City and Penrod?

18       A.   That would refresh my recollection.

19       Q.   Now that your recollection has been refreshed

20  you understand there is a set of contracts, a lease

21  Concession Agreement and so on at the City of Miami

22  Beach for Penrods that's currently operational?

23       A.   Yes.

24       Q.   You mentioned Penrod, I mentioned Penrod.  Do

25  you have an understanding of what that company is?

Rafael Paz
May 05, 2025

```
 1        A.   Of what the company is no, but I have an
 2   understanding of the operations at the property.
 3        Q.   How is it operated?  What's its d/b/a, if you
 4   know?
 5        A.   I don't understand what do you mean what -- I
 6   don't know what the d/b/a is.
 7        Q.   Again, I'm just trying to get terms down which
 8   is fine.  This discussion is sometimes complex or
 9   confusing.  Do you know what the current operation is
10   called?
11        A.   No.
12        Q.   Have you heard of the term Nikki Beach?
13        A.   Nikki Beach.
14        Q.   You understand that a company that goes by
15   Penrod has the contract with the city or contracts with
16   the city operating as Nikki Beach; right?
17        A.   Yes.
18        Q.   If we talk about Penrod we're talking about
19   the company, the entity that has the contract with the
20   city?
21        A.   Yes.
22        Q.   Nikki Beach is the operation there; right?
23        A.   Yes.
24        Q.   Are you familiar at all with Nikki Beach
25   operations outside the City of Miami Beach?
```

Rafael Paz
May 05, 2025

1        A.    No.

2        Q.    Are you familiar at all with any of Nikki

3    Beach's businesses or operations branding, globally?

4        A.    Only what was in the coffee table book that

5    Penrod's prior Alex Tachmes brought to my office when

6    the Penrods were seeking a bid waiver in the next

7    contract after the expiration of the existing contract.

8    That's the only knowledge I have of any other operations

9    I believe.  St. Tropez and I don't know where else.

10        Q.    Did you review any information from that book

11    or elsewise about Nikki Beach's operations globally?

12        A.    I flipped through the book but I wasn't really

13    taking notes.

14        Q.    Are you familiar with a company called Boucher

15    Brothers?

16        A.    Yes.

17        Q.    What's your familiarity with that company?

18        A.    The Boucher Brothers are a concessionaire of

19    the city handling I think all of the city's public

20    concession -- beach concession areas and I understand

21    that they also have similar operations throughout

22    Florida and elsewhere.

23        Q.    These concession operations that Boucher has

24    with the City that's for lounge chair, umbrella and the

25    like, those kind of services?

Rafael Paz
May 05, 2025

 1        A.    Yes.

 2        Q.    Do they run food and beverage at any of these

 3   operations?

 4        A.    I believe so.

 5        Q.    Is that wait staff or are they also preparing

 6   the food?

 7        A.    I don't have personal knowledge of how the

 8   food is prepared.

 9        Q.    Do you know if any of the city contracts,

10   concession contracts with Boucher provide for restaurant

11   operations?

12        A.    Not restaurant operations but there is food

13   service operation.

14        Q.    Like what?

15        A.    I think there are food truck operations.

16   There may have been at the 21st Street concession

17   facility there was an upland building, it wasn't a

18   restaurant but may have been an idea for a cafe or

19   something there at some point in time, I don't know.

20        Q.    Food truck and what like a little hot dog

21   stand.  I don't know what that second place you're

22   describing is?

23        A.    Whatever appropriate food and beverages for a

24   beach, recreational experiences.

25        Q.    Do you have any knowledge as to whether

Rafael Paz
May 05, 2025

1    Boucher Brothers runs any restaurant or dining

2    operations?

3         A.   I do not.

4         Q.   Are you familiar with a company called Major

5    Food Group?

6         A.   I have heard of them.  I've probably been to a

7    Major Food Group restaurant but I'm not familiar with

8    them.

9         Q.   What restaurants to your knowledge does Major

10   Food Group own or operate?

11        A.   Off the top of my head I don't know.

12        Q.   Did you gain any understanding of any of Major

13   Food Group's operation or business in connection with

14   any of your work at the city?

15        A.   No.  That would be outside the scope of my

16   role.

17        Q.   The City of Miami Beach's Commissions

18   Committee on Finance and Economic Resiliency, we call

19   that FERC?

20        A.   FERC.

21        Q.   If I say FERC we'll understand each other?

22        A.   Yes.

23        Q.   In October of 2022 do you recall that the City

24   Commission referred an item FERC to discuss the future

25   of the One Ocean Drive property?

Rafael Paz
May 05, 2025

```
 1        A.    I don't recall it.
 2              THE VIDEOGRAPHER:   We are off the record.   The
 3        time is 10:24 a.m.
 4              (Discussion held off the record.)
 5              THE VIDEOGRAPHER:   We are on the record.   The
 6        time is 10:26 a.m.
 7   BY MR. KOSLOWE
 8        Q.    Putting aside the timeline do you recall the
 9   Commission at the City of Miami Beach referring an item
10   to FERC to discuss the future of the One Ocean Drive
11   property?
12        A.    Not any specifics about referrals but it would
13   have happened.   I know that it would have happened.
14        Q.    Do you recall that it did happen but just not
15   when or you say it would have happened.   I don't
16   understand.
17        A.    Generally if an item is going to go through
18   the legislative process to go through to FERC it always
19   starts with a referral.   So it would have happened.
20   Certainly I know that this matter went through the
21   legislative process.   The timeline and specific memos
22   and all of that I'm very fuzzy on the details so that's
23   why I'm responding that I'm not familiar but I'm
24   generally familiar that this went through the
25   legislative process.
```

Rafael Paz
May 05, 2025

1     Q.   So you recall that it went through FERC and it
2  went through Commission; right?
3     A.   Yes.
4     Q.   And because it went through FERC you're saying
5  generally it would have come from referral from
6  commission to FERC; right?
7     A.   Yes.
8     Q.   You're just not sure about the particular
9  referral and the timeline?
10    A.   Yes.
11         MR. KOSLOWE:  I am going to hand you a
12     document we'll mark this as Exhibit 1 to your
13     deposition.
14         (Plaintiff's Exhibit No. 1 was marked for
15     identification.)
16         MR. KOSLOWE:  Eric, I'll be handing hard
17     copies to the witness and afterwards our staff will
18     give you a list by Bates instead of using stickers
19     right now.  Is that all right.
20         MR. HOCKMAN:  Yes.
21         MR. KOSLOWE:  This document is Bates stamped
22     MB00241105 and this is a Committee Memorandum to
23     FERC from the City Manager Ms. Hudak January 27,
24     2023.
25  ///

Rafael Paz
May 05, 2025

1   BY MR. KOSLOWE

2       Q.   Do you see the document, sir?

3       A.   Yes.

4       Q.   Why don't you take a second to review the

5   analysis section there.  Does this refresh your

6   recollection as to the timeline of the referral on

7   October of 2022 from Commission to FERC?

8       A.   Yes.

9       Q.   It was Commissioner Arriola that requested the

10  referral; right?

11      A.   That's what it says here.

12      Q.   That sound right to you?

13      A.   I don't have personal knowledge that he was

14  involved.  This is actually news.  It's refreshing my

15  recollection but it was news to me that Commissioner

16  Arriola was sponsoring the item on behalf of Penrods.

17  It is consistent with my understanding since Penrods

18  counsel did meet with me to seek this negotiation.

19          MR. KOSLOWE:  But at the time -- I'm going to

20      show you another document, sir.  We'll mark this as

21      2 to your deposition.  This is MB00292135.

22          (Plaintiff's Exhibit No. 2 was marked for

23      identification.)

24  BY MR. KOSLOWE

25      Q.   Sir, why don't you set Exhibit 1 over here to

Rafael Paz
May 05, 2025

1   the side.  You have that Exhibit 2, sir?

2        A.   Yes.

3        Q.   This is an e-mail exchange between yourself

4   and a few others back in January of 2023?

5        A.   Yes.

6        Q.   Do you know who Eric Chiroles is?

7        A.   Yes.

8        Q.   Who is he?

9        A.   He was -- well, he is a firefighter at the

10  City of Miami Beach and he was at the time Commissioner

11  Arriola's legislative aide.

12            MS. LEON:  I just got an e-mail that the

13       witness is muted.

14            (Discussion held off the record.)

15  BY MR. KOSLOWE

16       Q.   So you have Exhibit 2 in front of you?

17       A.   Yes.

18       Q.   Eric is e-mailing with Mr. Morales in January

19  of '23 about the FERC item, that beach item that we were

20  just looking at?

21       A.   Yes.

22       Q.   Who is Adrian Morales?

23       A.   He at the time was the Facilities Management

24  Director.

25       Q.   So part of the City's administrative staff?

Rafael Paz
May 05, 2025

```
 1        A.    Yes.
 2        Q.    And Facilities Management under its remit was
 3    asset management?
 4        A.    Yes.
 5        Q.    And then Mr. Morales forwards on to you this
 6    e-mail; right?
 7        A.    Well, I thought it started with me.
 8        Q.    So let's --
 9        A.    I reached out to Adrian and Ozzie who is the
10    asset management staff of whether the item would be
11    heard or not and then he forwarded it to Chiroles to
12    confirm and it was confirmed that the commissioner did
13    want the item to be heard at that meeting.
14        Q.    So then back then back in January you know
15    that -- you knew that it was Commissioner Arriola was
16    referring the item; right?
17        A.    I would have at the time.  I don't remember
18    now but yes, obviously.
19        Q.    At that point the City knew that Boucher and
20    Major Food Group you were considering joining together
21    to operate the property?
22             MS. MACK:  Object to the form.
23             THE WITNESS:  I don't know how to answer that.
24        I didn't know.
25    ///
```

Rafael Paz
May 05, 2025

1   BY MR. KOSLOWE

2        Q.   At that point were you aware whether Boucher

3   and Commissioner Arriola already had communications

4   about this measure and Boucher's vision for operating

5   the property?

6             MR. HOCKMAN:  Objection to form.

7             THE WITNESS:  No, I was not aware.

8   BY MR. KOSLOWE

9        Q.   Did you ever become aware that those

10  discussions had been had between Boucher and

11  Commissioner Arriola at the time in January of '23?

12       A.   I'm not aware of any discussion between

13  Commissioner Arriola and Boucher or anybody else.

14       Q.   Were you ever aware of any discussions between

15  Commissioner Arriola and anyone else about this item

16  from the time period in January '23 or April '23 or May

17  of '23?

18             MS. MACK:  Object to form.

19             THE WITNESS:  I don't believe so, no.

20  BY MR. KOSLOWE

21       Q.   If Commissioner Arriola had discussions with

22  Mr. Boucher about this item as was coming before FERC

23  you don't have a recollection -- where would I look to

24  see and find out about the content of those

25  communications or discussions?

Rafael Paz
May 05, 2025

```
1              MR. HOCKMAN:  Objection to form.

2              THE WITNESS:  I don't know.

3   BY MR. KOSLOWE

4       Q.   As reflected in this memoranda the City knew

5   that Penrod was interested in a refreshed concept of the

6   future of the site more consistent with the current

7   development in the area; right?

8       A.   The document says what it says but it sounds

9   like you characterized it correctly.

10      Q.   And as you testified earlier this being

11  reported in a memoranda from staff to FERC this would be

12  accurate; right?

13             MR. HOCKMAN:  Objection to form.

14             THE WITNESS:  In that the document says what

15       it says, yes.

16  BY MR. KOSLOWE

17      Q.   In that if this is what staff told FERC then

18  that was accurate at the time; right?

19             MR. HOCKMAN:  Objection to form, foundation.

20             THE WITNESS:  What was accurate at the time?

21  BY MR. KOSLOWE

22      Q.   The representations in this analysis that the

23  administration gave to FERC.

24      A.   I am not in a position to be the one to verify

25  that but that's generally how it works, yes.
```

Rafael Paz
May 05, 2025

1      Q.   We spent some time today discussing your

2   experience as a City Attorney with the kind of work that

3   staff did in connection with the memoranda; do you

4   recall that?

5      A.   Yes.

6      Q.   So in as much this representation is made in

7   this memorandum from staff to FERC do you have any

8   reason to doubt that it was accurate at the time?

9           MR. HOCKMAN:  Objection, foundation.

10          THE WITNESS:  I do not have any information

11      that would lead me to conclude otherwise.

12   BY MR. KOSLOWE

13      Q.   And based on your experience as City Attorney

14   working when Ms. Hudak was City Manager it would be your

15   testimony and your expectation is that this was

16   completely accurate because this is what staff was

17   reporting to FERC; right?

18          MR. HOCKMAN:  Objection to form, foundation.

19          THE WITNESS:  That would be -- that's

20      generally my understanding, yes.

21   BY MR. KOSLOWE

22      Q.   You knew at the time that Nikki Beach had

23   voluntarily ceased nightclub activity despite being

24   licensed and authorized to do so?

25      A.   I might have known but it doesn't -- you're

Rafael Paz
May 05, 2025

1   just -- you're bringing it up.  That sounds correct but

2   I don't specifically recall that.

3        Q.  Do you recall having information and knowledge

4   at the time that Nicky Beach had ceased nighttime

5   outdoor music at the site?

6        A.   I don't have specific information about that

7   but it wouldn't surprise me if that had come up over the

8   years, yes.

9        Q.  Do you recall knowing at the time that Nikki

10  Beach voluntarily ceased alcohol sales in the evening

11  despite being licensed until 5:00 a.m.?

12       A.   I don't recall knowing at the time but it

13  wouldn't surprise me if that was the case.

14       Q.  Do you recall discussions separate and apart

15  from this RFP about alcohol sales on South of Fifth up

16  until 5:00 a.m.?

17            MR. HOCKMAN:  Objection to form.

18            THE WITNESS:  I do recall many discussions

19       about alcohol sales prior to terminating alcohol

20       sales prior to 5:00 a.m.  Sadly more discussions

21       than I ever care to recall.

22            (Plaintiff's Exhibit No. 3 was marked for

23  identification.)

24  BY MR. KOSLOWE

25       Q.  Going to show you a document we'll mark as

Rafael Paz
May 05, 2025

1    Exhibit 3 to your deposition.  This is MB00435311.  This
2    is an e-mail exchange which ultimately gets forwarded to
3    you in January of 2023.  You see that, sir?
4         A.   Yes.
5         Q.   Are you familiar with SOFNA?
6         A.   Yes.
7         Q.   What's that?
8         A.   South of fifth Neighborhood Association.
9         Q.   Is that an HOA under 720 or a condo under 718?
10        A.   No.  I believe it is just a neighborhood
11   association.  They're probably a non-profit but they
12   just advocate for neighborhood issues in the South of
13   Fifth area.
14        Q.   They don't have any formal system of
15   representation; right?
16        A.   I don't know what you mean by "formal system
17   of representation" but I believe they have a board.
18        Q.   But it's not like everyone living in a
19   particular area in the area gets a vote on who is on the
20   board?
21        A.   That's right.
22        Q.   It's a non-profit to advocate what they
23   believe is in the best interest of the neighborhood?
24        A.   Yes.
25        Q.   And the SOFNA is pretty active in city

Rafael Paz
May 05, 2025

1  politics; is that fair?

2          MR. HOCKMAN:  Object to form.

3          THE WITNESS:  Yes.

4  BY MR. KOSLOWE

5      Q.   Did you have substantial interactions with

6  SOFNA when you were City Attorney?

7      A.   I don't know what you would consider

8  substantial but yes, I had interactions with SOFNA

9  representatives over the years.

10     Q.   Having worked for a decade at the City as a

11  City Attorney for a few years also did you consider the

12  interactions you had with SOFNA to be significant or

13  substantial?

14     A.   I considered my interactions relevant to

15  whatever the item is, the measure that they were

16  interested in but I don't know that I understand your

17  question beyond that.

18     Q.   Let's take a step back.  In your view is SOFNA

19  a very active participant in issues that had a relation

20  to the South of Fifth area?

21         MR. HOCKMAN:  Objection to form.

22         THE WITNESS:  When I was there yes, they were

23      a very active participant on matters affecting the

24      South of Fifth neighborhood.

25  ///

Rafael Paz
May 05, 2025

```
 1   BY MR. KOSLOWE
 2        Q.   In as much as they were very active in those
 3   matters did that cause you to have a significant
 4   interaction with them in the work you did on those
 5   matters?
 6             MR. HOCKMAN:  Objection to form.
 7             THE WITNESS:  I had interactions with them.  I
 8        don't know if you would consider it to be
 9        significant or not.
10   BY MR. KOSLOWE
11        Q.   Maybe I'm using the word significant wrong.  I
12   meant it in terms of volume, not in terms of substance.
13        A.   I don't think the volume was significant.  The
14   matters were significant.  For example, this measure
15   here on this Exhibit 3 whatever document you want to
16   call it related to very significant legislation for a
17   roll back of alcohol hours which I believe was
18   challenged in Court and upheld.
19        Q.   The matter -- the roll back was upheld?
20        A.   Yes.
21        Q.   In the middle of that, the large paragraph,
22   that starts with "as we discussed" you see where it
23   reports that "Nikki Beach has not operated as a late
24   night club for several years and that Penrods told us
25   they do not intend to use that right for the remainder
```

Rafael Paz
May 05, 2025

1    of their lease until 2026?"

2          A.    That's what it says, yes.

3          Q.    Do you recall that information being passed on

4    to you at the time?

5          A.    Yes.

6          Q.    So it's fair to say at the time you knew that

7    Penrod wasn't operating a late night club any more?

8          A.    At the time, yes.

9          MR. KOSLOWE:  I am going to show you another

10         document.  We'll mark this as 4 to your exhibit.

11         MR. HOCKMAN:  I think you meant deposition.

12         MR. KOSLOWE:  Mark this as Exhibit 4 to your

13         deposition.  This is MB0438311.  This is another

14         e-mail.  Sir, take a second to look it over.

15         (Plaintiff's Exhibit No. 4 was marked for

16         identification.)

17         THE WITNESS:  Yes.

18   BY MR. KOSLOWE

19         Q.    The 4:00 a.m. BTRs they're talking about here,

20   that has to do with operations and alcohol sales until

21   5:00 a.m.?

22         A.    Yes.

23         Q.    One of the establishments that had that

24   license and ability was Penrods; right?

25         A.    Yes.

Rafael Paz
May 05, 2025

1          Q.   But we already know that Penrods wasn't doing

2     that; right?

3          A.   Yes.

4          Q.   So they had the ability to operate and sell

5     alcohol and have live music outdoors until 5:00 a.m. but

6     they had already ceased doing that voluntarily at this

7     point; right?

8          A.   That's what's reflected here, yes.

9          Q.   Do you recall that being the case you knew

10    that at the time?

11         A.   It must have been, yes.

12         Q.   Do you recall knowing at the time that Penrod

13    had further sought neighborhood input for what residents

14    living in that neighborhood wanted to see with the

15    future of the property?

16              MS. MACK:   Object to form.

17              THE WITNESS:   I recall my conversations with

18         Alex Tachmes when he was shopping around for a

19         negotiation for a new agreement on -- with a waiver

20         of competitive bidding but I don't know the

21         specifics of what they were talking to the

22         neighbors about and it wouldn't surprise me if Alex

23         Tachmes had done some of that homework in terms of

24         what the neighbors wanted to see or not see.  It's

25         pretty typical.

Rafael Paz
May 05, 2025

1   BY MR. KOSLOWE

2        Q.   Do you recall being told from SOFNA that

3   Penrod's agents were trying to find out from neighbors

4   what they wanted with the future of the property?

5             MS. MACK:  Object to form.

6             THE WITNESS:  I don't recall.  Could be in an

7        e-mail somewhere but I don't recall.

8             MR. KOSLOWE:  I'll show you a document which

9        we'll mark as Exhibit 5 to your deposition.  This

10       is MB00435428.

11            (Plaintiff's Exhibit No. 5 was marked for

12       identification.)

13  BY MR. KOSLOWE

14       Q.   This is another piece of information and the

15  e-mail passed on to you from SOFNA; right?

16       A.   Passed on to me.  It was passed on to me from

17  Penrod's counsel.

18       Q.   Pardon me.  There was content from SOFNA

19  that's passed on to you; is that right?

20       A.   Yes.

21       Q.   And it's reporting Mr. Tachmes is sending you

22  an e-mail saying he had discussions on behalf of Penrods

23  to get input on what we would like to see happen with

24  the property, we being the neighborhood association?

25       A.   Yes.

Rafael Paz
May 05, 2025

1       Q.   So you were aware at the time in January 2023

2   that in addition to ceasing alcohol sales, ceasing

3   operations in the evening, no more loud music that

4   Penrod was also looking for input from the community to

5   see what they wanted with the future of the property;

6   right?

7       A.   Yes.

8       Q.   Can we turn back to that Exhibit, sir.  That's

9   the FERC memo.  So this is in January 2023; right, sir?

10      A.   (Indicating).

11      Q.   FERC had a meeting; right?

12      A.   I don't know if the meeting happened but

13  that's -- the intent was this memorandum was going to be

14  part of that agenda.

15      Q.   You don't know if the meeting happened?

16      A.   I don't recall if that specific meeting

17  actually happened but yes, that's what this says.

18      Q.   So in October of '22 Commission Arriola

19  requested and Commission granted that request, acceded

20  to that request and referred a particular matter to FERC

21  to discuss the future of the One Ocean Drive property;

22  right?

23           MS. MACK:  Object to form.

24           THE WITNESS:  I'm sure that happened if this

25      memorandum was prepared, yes.

Rafael Paz
May 05, 2025

1  BY MR. KOSLOWE

2      Q.   And staff did whatever work they felt was

3  sufficient to render this particular memorandum and its

4  conclusion and recommendation to FERC; right?

5           MS. MACK:  Object to form.

6           THE WITNESS:  Yes.

7  BY MR. KOSLOWE

8      Q.   And Ms. Hudak as City Manager, the city

9  administration, recommended that it's in the city's best

10 interest to follow the form competitive list process and

11 issue for request for proposals for the best possible

12 use and viable concepts for the operation and management

13 of the City site, that being the One Ocean Drive

14 property; right?

15     A.   That was her opinion as to what she thought

16 the policy should be.

17     Q.   That was her formal recommendation to FERC?

18     A.   That was her recommendation.

19     Q.   And by her you mean the City Manager after the

20 bottom up process of analysis that the City staff did;

21 right?

22     A.   Yes.  I'm not sure what bottom up process

23 would have been necessary.  I think the administration

24 generally would typically start with a recommendation of

25 the default is a big process.

Rafael Paz
May 05, 2025

 1        Q.   You don't know what work was done by staff to

 2   issue the recommendation?

 3        A.   I don't.

 4        Q.   Do you know whether FERC accepted this

 5   recommendation at the time?

 6        A.   I don't recall.  Ultimately these are -- it's

 7   a policy decision for the Commission to make and the

 8   code allows for the waiver of bidding as the Commission

 9   may deem appropriate.

10        Q.   Do you know whether FERC accepted this

11   recommendation at this time?

12        A.   I don't remember.

13             MR. KOSLOWE:  Going to show you a document

14        that will be marked as Exhibit 6 to your

15        deposition.

16             (Plaintiff's Exhibit No. 6 was marked for

17        identification.)

18   BY MR. KOSLOWE

19        Q.   This is Committee Memorandum from April 21,

20   2023 from Ms. Hudak as City Manager to FERC.  You see

21   that, sir?

22        A.   Yes.

23        Q.   This is an update on that item for the future

24   of the One Ocean Drive property; right?

25        A.   Okay.

Rafael Paz
May 05, 2025

1      Q.    Is that correct?

2      A.    Update on discussion, yes.

3      Q.    Want to take a minute to just scan this over

4  and we can talk about it.

5      A.    Okay.

6      Q.    On the second paragraph of the analysis

7  section it reports that on January27th item was

8  discussed at FERC?

9      A.    Yes.

10     Q.    We now know based on this that's what

11  happened; right?

12     A.    That's what it says, yes.

13     Q.    Do you have any reason to believe that was not

14  true?

15     A.    No, I don't.

16     Q.    Based on the work you did as the City

17  Attorney, based on the work you did at the City of Miami

18  Beach this statement being made in this memorandum you

19  know that's true; right?

20         MR. HOCKMAN:   Objection to form, foundation.

21         THE WITNESS:   I don't know but that's what it

22     says and I have no reason to believe otherwise.

23  BY MR. KOSLOWE:

24     Q.    It reports here that "the committee directed

25  the City Administration to consider the following

Rafael Paz
May 05, 2025

1   options and return to the March 31, 2023 FERC meeting

2   with an update as contained in detail below."  Do you

3   see that?

4          A.   Yes.

5          Q.   Is that consistent with your recollection of

6   the process of events that FERC took up in January,

7   directed staff to do certain things and come back to it?

8          A.   Honestly this is -- this sounds like I'm not

9   surprised this happened but I don't recall this and I

10  just don't remember.  I don't even know -- I might have

11  been at that FERC meeting.  I don't know if I covered it

12  but I just don't today remember.  So I'm reading it and

13  it says what it says.

14         Q.   Do you remember being at this FERC meeting in

15  April?

16         A.   I don't remember.

17         Q.   Ultimately and you can turn to the second page

18  "the conclusion is the administration recommends FERC

19  consider and discuss the foregoing.  It is in the City's

20  best interest to follow the formal competitive

21  solicitation process and issue an RFP for the best

22  possible use and viable concepts for the operation and

23  management of this city site" that being the One Ocean

24  Drive property; right?

25         A.   Yes, they maintained their recommendation.

Rafael Paz
May 05, 2025

1        Q.    So FERC directed them to perform the specific

2    tasks and collect information; right?

3        A.    It sounds like that's what happened.

4        Q.    They did that; right, they reported back to

5    FERC; right?

6        A.    Yes, they reported back to FERC.

7        Q.    Now, they've undertaken additional process,

8    gathered information and their recommendation of the

9    City Manager is identical engage in competitive

10   solicitation; right?

11            MR. HOCKMAN:  Objection to the form,

12        foundation.

13            THE WITNESS:  Her recommendation was to issue

14        an RFP, yes.

15   BY MR. KOSLOWE

16        Q.    Among the items that FERC directed the city

17   staff to do was engage community partners, do you see

18   that, that's that first bullet point there?

19        A.    (Indicating).

20        Q.    And they report back they conducted meetings

21   with Boucher and Penrod; right?  Yes?

22        A.    That's what it says.

23        Q.    It says there were meetings -- one meeting

24   with Boucher in February and a meeting with Penrod in

25   March of 2023; right?

Rafael Paz
May 05, 2025

```
1        A.   Yes.
2        Q.   To review their initial perspective on the
3   future of Nikki Beach; is that right?
4        A.   Yes.
5        Q.   Do you have any recollection of those
6   meetings?
7        A.   No.
8        Q.   Were you present for any of them?
9        A.   I don't think so.  In fact I know I was not
10  present at those meetings.
11       Q.   How do you know -- pardon me --
12       A.   This would have triggered a memory and I never
13  met with the Penrods team to review their prospectives
14  and I never met with the Boucher team and staff to
15  review their -- in response to this.
16       Q.   Did the City Attorney's Office have any role
17  in preparing or drafting this memoranda to FERC?
18       A.   I don't know.
19       Q.   Did typically the City Attorney's Office have
20  a role in drafting memoranda to committee?
21       A.   Not updates.  Not typically but it's not
22  unheard of and I just don't know in this case if any
23  attorney was consulted.
24       Q.   So looking at this document and with the
25  knowledge you have about the way the City of Miami Beach
```

Rafael Paz
May 05, 2025

```
 1   operates and the way staff does their work in responding
 2   to the Commission is it your view that the City staff
 3   collected all the information and did all the work they
 4   needed to to render this conclusion?
 5           MS. MACK:  Object to form.
 6           THE WITNESS:  I don't know what all the
 7       information is but they did what they felt was
 8       appropriate to come back to the committee and
 9       maintain their recommendation which is the default
10       recommendation in this setting.
11   BY MR. KOSLOWE
12       Q.   Well, sir, you said it was the default back in
13   January and you also testified that if there was
14   additional work to be done or additional process that
15   had to be undertaken the staff would report that to the
16   Commission or the committee; right?
17       A.   Yes.
18       Q.   And if you look back at Exhibit 1, put Exhibit
19   1 and Exhibit 6 side by side so it's kind of easy to
20   compare them.  You look back at Exhibit 1 it says
21   "administration properly conducting real estate
22   analysis, facilities condition assessment being
23   conducted;" right?
24       A.   That's what it says.
25       Q.   Additional work that staff is reporting.  We
```

Rafael Paz
May 05, 2025

1    kind of need to look at some more things; right?

2         A.    Yes.

3         Q.    And you go back to Exhibit 6 and there were

4    specific directions, specific tasks that staff was

5    assigned to do; right?

6         A.    Yes.

7         Q.    And they did those things; right?

8         A.    They reported on what was being done as to

9    those things.

10        Q.    I don't see any statement here we need to do

11   more work before we provide a recommendation, do you see

12   that?

13        A.    I don't see that statement.

14        Q.    So based on the information that you testified

15   to based on the knowledge you have on the way the City

16   operates this recommendation was based on all the

17   information that Ms. Hudak and her staff believed they

18   needed to issue this recommendation to FERC; right?

19             MR. HOCKMAN:  Objection to form, foundation.

20             THE WITNESS:  That's -- I didn't speak to

21        anyone.  I have no personal knowledge of what was

22        in anyone's head at the time but yes, that's my

23        understanding that they would present their

24        recommendation based on the information that they

25        felt they needed.

Rafael Paz
May 05, 2025

1   BY MR. KOSLOWE

2        Q.   I'm asking for more than just -- I'm asking

3   based on the sum total of the decade of experience you

4   had with the City of Miami Beach and the several years

5   you spent as the City Attorney which was at this time?

6        A.   Okay.

7        Q.   Based on that experience that you had it's

8   your view that the City Manager and her staff did all

9   the work they felt was necessary to render this opinion;

10  is that right?

11            MR. HOCKMAN:   Objection to form.

12            THE WITNESS:   My view is that they would have

13       done the work they thought was necessary.   I don't

14       know if it was all the work and I have no personal

15       knowledge because I have never spoken with anyone

16       about this memorandum.

17  BY MR. KOSLOWE

18       Q.   You ever speak with the City Manager about

19  this recommendation to have competitive solicitation?

20       A.   I don't remember.

21       Q.   Regardless of the work that was put in,

22  regardless of the knowledge you have based on the

23  understanding that you have as to how the City operates

24  this is the formal recommendation of the City Manager to

25  FERC; is that right?

Rafael Paz
May 05, 2025

1      A.    Yes.

2      Q.    To have competitive solicitation?

3      A.    Yes.

4      Q.    That didn't change from January; right?

5      A.    That's right.

6      Q.    And it didn't change after this; right?

7      A.    Yes.

8      Q.    If the City Attorney's Office had a role in

9  drafting this would there be a record of that?

10      A.    There would be e-mail exchanges with whatever

11  red lines the attorney had to the memorandum and then

12  that would go back to whoever on staff prepared it.

13      Q.    But it's possible that staff just prepared

14  this by themselves without the input of the City

15  Attorney's Office?

16          MR. HOCKMAN:  Objection to form.

17          THE WITNESS:  Yes, it's definitely possible.

18  BY MR. KOSLOWE

19      Q.    Is it more likely that staff did it on their

20  own without input from the City Attorney's Office based

21  on what you know about the process of this particular

22  item?

23          MR. HOCKMAN:  Object to form.

24          THE WITNESS:  In my experience it is more

25      likely that for discussion update items when there

Rafael Paz
May 05, 2025

```
1        is no action item or approval that yes, that staff
2        could just run with that without the need for
3        attorney involvement.
4              MR. KOSLOWE:  We're at the top of the hour.
5        Do you want to take a quick break, Eric?
6              MR. HOCKMAN:  Up to you.
7              MR. KOSLOWE:  I'm asking for consent to go off
8        the record.
9              MR. HOCKMAN:  I see.  In that case I agree.
10             THE VIDEOGRAPHER:  We are off the record.  The
11       time is 11:00 a.m.
12             (Thereupon, a brief recess was taken.).
13             THE VIDEOGRAPHER:  We are on the record.  The
14       time is 11:07 a.m.
15  BY MR. KOSLOWE
16       Q.   At meetings of committees of the Commission
17  like FERC was there always a City Attorney present?
18       A.   There should always be a City Attorney
19  present, yes.
20       Q.   Did you often attend those particular meetings
21  Commission or Commissioner meetings?
22       A.   I would attend the FERC meetings while I
23  decided for a period of time when I covered FERC but
24  then another attorney covered FERC and if another
25  attorney was present I wouldn't attend.
```

Rafael Paz
May 05, 2025

1      Q.   You don't recall sitting here if you were at

2  this particular FERC meeting in April of 2023?

3      A.   I don't.  I don't.

4           MR. KOSLOWE:  I'm going to show you a

5           document, sir, this will been seven.  Exhibit 7 to

6           your deposition.  This is a taped transcript of

7           FERC from April of 2023.  It was a requested item.

8           (Plaintiff's Exhibit No. 7 was marked for

9           identification.)

10          THE WITNESS:  Look, I was there.

11  BY MR. KOSLOWE

12      Q.   I didn't ask the question but that answers the

13  question?

14      A.   I still don't recall but yes, it would have

15  been me then.

16      Q.   So you were in attendance at that meeting in

17  April of '23 the FERC meeting?

18      A.   Yes.  If that's what this says, yes.

19      Q.   Any reason to doubt the voracity of the

20  transcript by the Clerk of the City?

21      A.   No.

22      Q.   So sir, if you would turn to page five of the

23  transcript paragraph -- actually turn to page four

24  you'll see that it's Commissioner Arriola speaking on

25  page three on to four and on to five?

Rafael Paz
May 05, 2025

 1      A.    Okay.

 2      Q.    Do you see that?

 3      A.    Yes.

 4      Q.    The three commissioners were members of FERC

 5   were Arriola, Richardson and Fernandez?

 6      A.    I don't recall but if that's what's in here

 7   then yes.

 8      Q.    Do you have a recollection of that being the

 9   composition of FERC at some point?

10      A.    I mean I'm sure my recollection could be

11   refreshed but I don't specifically remember.

12      Q.    If you just kind of flip through this exhibit?

13      A.    We changed committees at one point and went to

14   four members and that was after this and so I just don't

15   remember but --

16      Q.    If you just look through see if that refreshes

17   your recollection as to the composition of FERC at the

18   time being Arriola, Richardson and Fernandez?

19      A.    Yes.

20      Q.    So going back to pages three through five you

21   see Commissioner Arriola speaking on this particular

22   topic the future of the One Ocean Drive Property?

23      A.    Yes.

24      Q.    On page five the paragraph beginning at line

25   three Commissioner Arriola summing up and he says

Rafael Paz
May 05, 2025

1   starting at line seven "if those talks go well, these

2   are talks with Boucher, administration will bring

3   something to us.  If they don't go well, well, no harm

4   no foul and you know, we could go with the formal RFP at

5   that point."  You see that?

6        A.   Yes.

7        Q.   Do you recall that being the direction that

8   FERC gave to staff, go talk to Boucher, see if you can

9   work out terms.  If that works out great.  If not no

10  harm no foul issue an RFP at that point?

11           MR. HOCKMAN:  Object to form.

12           THE WITNESS:  I don't specifically recall

13      because I don't even recall being there.  But it

14      doesn't surprise me.  It sounds like that is

15      consistent with what happened.

16  BY MR. KOSLOWE

17       Q.   Is that consistent with what you understand

18  took place between FERC and Commission in and around

19  April of 2023, direction to the city to negotiate terms

20  with Boucher and then if not that doesn't work out you

21  can always come back and do formal RFP?

22           MR. HOCKMAN:  Object to form.

23           THE WITNESS:  Yes.

24  BY MR. KOSLOWE

25       Q.   If you turn to page twelve the paragraph

Rafael Paz
May 05, 2025

1    starting at line six Commissioner Arriola is speaking

2    again on the issue.

3         A.    Okay.

4         Q.    Yes?

5         A.    Okay, yes.

6         Q.    And he says "at worst they're going to be a

7    stalking horse in this thing to get future participants

8    in an RFP process;" right?

9         A.    Okay.

10        Q.    Them being Boucher; is that right?

11        A.    I believe he is talking about Boucher, yes.

12        Q.    Who else could he be talking about?

13        A.    So in the context of yes, there is a reference

14   to Boucher there so he would have been talking about

15   Boucher.

16        Q.    Commissioner Arriola's point was we'll

17   negotiate this contract with Boucher.  If Commission

18   agrees, great.  If not at worst they'll be a stalking

19   horse for some future RFP; is that right?

20             MS. MACK:  Object to form.

21             THE WITNESS:  Generally, yes.

22   BY MR. KOSLOWE

23        Q.    Do you recall discussion either at this

24   particular FERC meeting or elsewhere at this general time

25   period in April of 2023 about where Penrod's payments

Rafael Paz
May 05, 2025

1    under their contracts stood in relation to what the

2    market a rate would be for that a -- for those same

3    contracts?

4                MR. HOCKMAN:  Objection to form.

5                THE WITNESS:  I don't specifically recall any

6         conversations about that.  Not to say they didn't

7         happen.  I just don't remember.

8    BY MR. KOSLOWE

9         Q.   Do you recall any conversations around whether

10   or not Penrod's lease was within the ambit of market

11   rate, much more, much less?

12        A.   No.

13        Q.   Why don't we look at page six of this document

14   and this is at line 23.  You see right above there

15   Mr. Morales is there?

16        A.   Yes.

17        Q.   Mr. Morales like you said before was the

18   Assistant City Manager.  Was he Assistant City Manager

19   or director of the department?

20        A.   Director.

21        Q.   Of Fleet and Facilities?

22        A.   Facilities.

23        Q.   That included Asset Management; right?

24        A.   Yes.

25        Q.   Do you know Ozzie Dominguez?

Rafael Paz
May 05, 2025

```
 1        A.   I do.

 2        Q.   Do you recall if Mr. Dominguez was at this

 3   meeting?

 4        A.   I don't recall if I was at that meeting.

 5        Q.   Fair enough.  After you have now read through

 6   this a bit does it refresh your recollection?

 7        A.   It wouldn't surprise me if Ozzie was there.

 8   He would have been the lead staffer reporting to Adrian

 9   on this.

10        Q.   That's because he was in charge of asset

11   management; right?

12        A.   I don't know if he was in charge but he was

13   the staffer.

14        Q.   We have here unidentified male who based on

15   that information --

16        A.   Would have been him.

17        Q.   -- would have been Ozzie Dominguez saying "we

18   have Cushman and Wakefield" that's an appraisal; right?

19        A.   Yes.

20        Q.   And he's saying "from what I can see at a

21   glance their market run analysis is $50 a square foot;"

22   right.  So the market would be $50 a square foot for

23   that operation; right?

24        A.   Yes.

25        Q.   And Nikki Beach is currently paying $42 a
```

Rafael Paz
May 05, 2025

1   square foot; right?

2       A.   That's what this says.

3       Q.   So market rate is slightly higher than we're

4   currently getting right now; right?

5       A.   That's what the unidentified male said.

6       Q.   That's staff reporting to FERC?

7       A.   Yes.

8       Q.   That Nikki Beach's lease which was Concession

9   Agreement set some decades prior the various agreement

10  at various points had a market rent that was slightly

11  less than what the market rate was; right?

12      A.   Yes.  Market rate was slightly higher than

13  what they were receiving.

14      Q.   Do you recall at this FERC meeting or in the

15  aftermath of it whether it was FERC or the Commission

16  directing your office to consider whether this

17  negotiation with Boucher should result in a stand alone

18  contract or perhaps an amendment and add on to Boucher's

19  current existing agreements?

20           MR. HOCKMAN:  Object to form.

21           THE WITNESS:  I think that came up at some

22      point in time as a question but I don't recall the

23      specifics of the conversation or who I had the

24      conversations with or how I learned about that

25      issue.

Rafael Paz
May 05, 2025

1   BY MR. KOSLOWE

2       Q.   And this operation that is under consideration

3   here at FERC that FERC is discussing having

4   administration go and work with Boucher on, the value of

5   that contract was more than $100,000; right?

6           MR. HOCKMAN:  Objection to form, foundation.

7           THE WITNESS:  There was no contract.  I think

8       the direction or the committees or what came out of

9       committee for the commission to consider was

10      whether to just authorize discussions with one

11      party.

12  BY MR. KOSLOWE

13      Q.   And those discussions with that one party

14  would be for operation and management of the One Ocean

15  Drive property?

16      A.   Yes.

17      Q.   And those operations and management of that

18  One Ocean Drive property was worth in excess of

19  $100,000; right?

20          MR. HOCKMAN:  Objection to form, foundation.

21          THE WITNESS:  Yes.  It wouldn't surprise me

22      that, yes, of course.

23  BY MR. KOSLOWE

24      Q.   It's not that it wouldn't surprise you.  You

25  saw the discussion was for $50 a square foot of market

Rafael Paz
May 05, 2025

```
 1   rent, right?
 2            MR. HOCKMAN:  Objection to form, foundation.
 3            THE WITNESS:  That's what this says about
 4        market rent but I don't know how big the property
 5        is but yes, if -- if this would have easily exceed
 6        the regular -- the $100,000 threshold.
 7   BY MR. KOSLOWE
 8        Q.   When you were the City Attorney of the City of
 9   Miami Beach did you have a general understanding of the
10   value of the various properties that the city had if
11   they came within the ambit of the work you were doing?
12        A.   I'll make it easy for you.  Yes, I understand
13   that waterfront property is worth more than $100,000.
14        Q.   Whether it's for sale of the property or
15   operation of some concession the value is well in excess
16   of $100,000?
17        A.   The value would exceed $100,000, yes.
18            MR. KOSLOWE:  Sir, I'm going to show you a
19        document it will be Exhibit 8 to your deposition.
20        You'll see some other stickers on the bottom from
21        prior depositions.  This is resolution of the
22        Commission of the City of Miami Beach 2023, 32586.
23            (Plaintiff's Exhibit No. 8 was marked for
24        identification.)
25   ///
```

Rafael Paz
May 05, 2025

1    BY MR. KOSLOWE

2        Q.    Do you see that, sir.  Why don't you take a

3    moment and read the document just to refresh yourself

4    with it.

5        A.    Okay.

6        Q.    This was the resolution of the full Commission

7    after the recommendation from FERC after the meeting and

8    discussion earlier in April 2022 that we were just

9    discussing, right?

10       A.    Yes, this is the initial resolution.

11       Q.    What role did you and the City Attorney's

12   Office have in drafting this resolution after the FERC

13   recommendation?

14       A.    I don't remember working on this myself.  It

15   wouldn't surprise me if I did but -- I don't know in

16   fact what role the attorneys had but generally based on

17   this template here I would imagine that it was

18   initiated, there was a draft initiated by staff, went to

19   the attorneys and then certainly the title looks to me

20   like it reflects input from the City Attorney's Office.

21       Q.    You say it looks like it started with staff;

22   is that right?

23       A.    It wouldn't surprise me if it did.  But I

24   don't know.

25       Q.    So now that you -- now that you've been --

Rafael Paz
May 05, 2025

1    strike that.  Now that you know you were at that FERC

2    meeting would part of the process have been for you to

3    take the information you gathered from FERC and their

4    direction for what they wanted the resolution to say to

5    Commission and then direct your staff to proceed with

6    the drafting or the drafting yourself?

7        A.   No.  Generally except for -- that's true for

8    ordinances but for all other items and this contract

9    would be no different generally staff follows up and

10   prepares the item for Commission and they'll know to

11   work with the attorney that's assigned to their

12   department.

13           MR. KOSLOWE:  Sir, I am going to show you a

14       document we'll mark it as Exhibit 9 to your

15       deposition.  You can leave Exhibit 8 out there

16       because we'll be looking at it.  Exhibit 9 is

17       MB00433368.  It's a very short e-mail, sir, so

18       after you look at it please let me know.

19           (Plaintiff's Exhibit No. 9 was marked for

20       identification.)

21           THE WITNESS:  Okay.

22   BY MR. KOSLOWE

23       Q.   So this is an e-mail chain first from Gisela

24   Torres to yourself; right?

25       A.   Yes.

Rafael Paz
May 05, 2025

1    Q.   Ms. Torres is one of the lawyers working for

2    you at the City Attorney's Office?

3    A.   Yes.

4    Q.   The subject is 4.21.23 RESO.doc?

5    A.   Yes.

6    Q.   Ostensibly that's the draft of the resolution;

7    right?

8    A.   Yes.

9    Q.   And then apparently there was some follow up

10   between you and Ms. Torres about the drafting?

11        MS. MACK:  Objection to form.

12        THE WITNESS:  I don't know.  It wouldn't

13   surprise me if I responded to this e-mail.

14   BY MR. KOSLOWE

15   Q.   Well, so we see Ms. Torres writing to you at

16   5:35 p.m. on April 21, 2023?

17   A.   No, this e-mail it says 8:53 a.m.  8:53:43.

18   Q.   Why don't we -- let me take a stab at it this

19   way.  Sir, are you familiar with the fact that when you

20   print up an e-mail it often goes bottom to top in terms

21   of earliest in time to latest in time?

22   A.   Yes.

23   Q.   So if we look at the bottom e-mail we see an

24   e-mail from Ms. Torres to you?

25   A.   Yes, but it's blank.

Rafael Paz
May 05, 2025

1    Q.   That's right.  So Ms. Torres sent you an

2  e-mail on April 21, 2023 at 5:35 p.m.?

3    A.   Yes.

4    Q.   And the subject is 4.21.23 RESO.doc?

5    A.   Okay.

6    Q.   The dot doc is a document she is attaching;

7  right?

8         MR. HOCKMAN:  Object to form.

9         THE WITNESS:  Generally yes, it would be.

10  BY MR. KOSLOWE

11    Q.   I mean in as much as Ms. Torres who was a

12  lawyer working for you sent you an e-mail about the

13  resolution with the subject line that says .doc but you

14  don't see any content in the e-mail presumably she was

15  sending you the content in a Word attachment; right?

16         MR. HOCKMAN:  Object to the form.

17         THE WITNESS:  Presumably, yes.

18  BY MR. KOSLOWE

19    Q.   Any other reason you can think of sitting here

20  today knowing the work you did with Ms. Torres that she

21  sent you a blank e-mail other than it included some

22  language or form or content about that resolution?

23         MR. HOCKMAN:  Object to form.

24         THE WITNESS:  I don't know what you're asking

25      but yes, if she sent me an e-mail it would have

Rafael Paz
May 05, 2025

1       been about this item or subject.

2   BY MR. KOSLOWE

3       Q.   So she sends you an e-mail on April 21st

4   something about the resolution and then she sends you an

5   e-mail again on April 24th where she says I think we

6   still need -- "I think we need to still add the history

7   of the Boucher agreement" and so on further drafting

8   about that resolution?

9       A.   That's what she said yes.

10       Q.   Am I correct to surmise she had sent you some

11   initial draft, you had provided some comments and then

12   she is giving you feedback saying I think we still need

13   to add X, Y and Z?

14           MS. MACK:  Object to form.

15           THE WITNESS:  I don't remember specifically

16       providing comments.  It wouldn't surprise me if I

17       did and I just don't recall.

18   BY MR. KOSLOWE

19       Q.   Looking at this here based on the knowledge

20   you have about the work flow you typically participated

21   in is it your testimony that you did in this particular

22   provide feedback and commentary on the drafting of this

23   particular resolution?

24           MR. HOCKMAN:  Object to form.

25           THE WITNESS:  I don't remember specifically

Rafael Paz
May 05, 2025

1        but it wouldn't surprise me if I did.

2   BY MR. KOSLOWE

3        Q.   So sitting here today you don't recall

4   providing initial commentary or initial instructions to

5   anyone at your office for how to conduct this drafting?

6        A.   No, I don't remember providing initial

7   direction.

8        Q.   While this e-mail suggests you had input you

9   don't specifically recall what that input was?

10            MS. MACK:   Objection to form.

11            THE WITNESS:   I don't know if this e-mail

12        suggests that I had input but she was asking for

13        input.   I wouldn't be surprised if I provided it.

14   BY MR. KOSLOWE

15        Q.   Do you see -- pardon me.   Looking at this work

16   flow is it your testimony that the drafting originated

17   with staff or originated with the City Attorney's Office

18   in this particular instance?

19        A.   I don't know.   The e-mail doesn't indicate

20   enough to me to conclude that she initiated the draft or

21   whether she was working with staff on that.

22        Q.   And the e-mail doesn't tell me that either, so

23   I'm asking you based on the experience that you have

24   with the work flow in your office if this indicates to

25   you in this particular instance the drafting for this

Rafael Paz
May 05, 2025

```
 1   resolution started with the City Attorney's Office or
 2   its staff?
 3       A.   It doesn't indicate to me one way or the
 4   other.
 5       Q.   In either case whether it initiated with staff
 6   or initiated with the City Attorney's Office the task of
 7   either staff or the City Attorney's Office was to
 8   reflect what FERC wanted; right?
 9            MR. HOCKMAN:  Objection to form.
10            THE WITNESS:  The task yes, to develop
11        whatever is approved at committee and present that
12        to the Commission.
13   BY MR. KOSLOWE
14       Q.   So Mr. Morales and his staff, you and your
15   staff were present at FERC, you would have taken the
16   information you had from the initial memoranda from the
17   meeting and then you would put together what in your
18   best view reflects what FERC is trying to say to
19   Commission?
20            MR. HOCKMAN:  Objection to form.
21            THE WITNESS:  Yes.
22   BY MR. KOSLOWE
23       Q.   Why don't we turn back to Exhibit 8 which is
24   the actual resolutions.  Perhaps, if you would, could
25   you put Exhibit 1 next to it so we can reference back
```

Rafael Paz
May 05, 2025

1    and forth.  Exhibit 1 was the original memo.

2         A.   Yep.  Got it.

3         Q.   In Exhibit 1 staff is reporting that back in

4    1985 the City had issued a request for proposals for

5    development construction management and operation of

6    essentially One Ocean Drive; right?

7         A.   That's what that said, yes.

8         Q.   That information isn't reflected in the

9    resolution, is it?

10             MS. MACK:  Objection to form.

11             MR. KOSLOWE:  What's the form objection?

12             MS. MACK:  The document speaks for itself.

13             THE WITNESS:  So the reference to the

14        August 1985 sentence from the first memoranda is

15        not in the resolution.

16   BY MR. KOSLOWE

17        Q.   And there is no other reflection in this

18   resolution about the issuance of an RFP in 1985 in

19   connection with the property?

20        A.   I haven't read the whole thing but it sounds

21   like there isn't.

22        Q.   You can go ahead and look through it.

23        A.   No.

24        Q.   Why not?

25        A.   Well --

Rafael Paz
May 05, 2025

1        MR. HOCKMAN:  Objection, foundation.

2        THE WITNESS:  I don't know what --

3   BY MR. KOSLOWE

4    Q.   Sir, sometimes -- because you're a skilled and

5   practice attorney we didn't spend a lot of instructions

6   beforehand.

7    A.   I have to let him raise his objections.

8    Q.   And sometimes your counsel will give an

9   objection and it will be well taken and I'll try to

10  resolve that.  So if I do I'll stop you and try to

11  resolve it before you answer the question.

12   A.   I'll slow down.

13       MR. KOSLOWE:  It's fine but just every now and

14       then.  What's the foundation objection?

15       MR. HOCKMAN:  You're asking him why a document

16       that's a resolution prepared by multiple people

17       does or does not say something.  How does he have

18       any foundation for that?

19  BY MR. KOSLOWE

20   Q.   Sir, did you have any -- did you and your

21  office have any role in drafting this document that

22  became the resolution in April of 2023?

23   A.   Well, clearly the office did and I may have

24  although it's not reflected in these exhibits yet but to

25  answer your question it really isn't necessary to start

Rafael Paz
May 05, 2025

1    from City issued an RFP in 1985.  You could just go

2    right to okay well, there was an existing lease and it

3    was approved on October 1985 and it could just be

4    whoever was drafting just wanted to start with okay, we

5    have an executed contract in place and then this is the

6    history that flows from the date of that approval of the

7    executed contract.  There is no magic to it.

8         Q.   Ms. Torres in fact that's reflected in the

9    e-mail that was in the prior exhibit there's no right

10   way to do it, you can put whatever information you want;

11   right?

12        A.   That reference was I think to something else

13   that she wanted to include.  She is very comprehensive

14   and thorough generally so.  But yes, there was no right

15   way.  In terms of background you provide whatever

16   background staff or the attorneys feel is sufficient.

17        Q.   Whichever background they feel is sufficient

18   in the context of trying to reflect what it is FERC is

19   communicating to Commission; right?

20        A.   Yes, right.  The starting point for that

21   contact here would be there is an existing contract and

22   this item deals with what will happen after the

23   expiration of the existing contract.  So starting with

24   the reference of the -- when the resolution was first

25   approved is perfectly appropriate.

Rafael Paz
May 05, 2025

1      Q.   In both of the memoranda that staff prepared

2   for FERC they started with the RFP that was issued in

3   1985.  Is there any reason that you know based on the

4   drafting work that you and your office did why that

5   wasn't the starting point for this resolution?

6           MR. HOCKMAN:  Objection, speculation,

7       foundation.

8           THE WITNESS:  No, there is no reason that I

9       know and I don't know what Commission memoranda

10      accompanied this resolution in April and it may

11      very well be that the Commission memorandum had

12      that reference to the August '85 issuance.

13   BY MR. KOSLOWE

14      Q.   So the April resolution FERC was the only

15   memoranda that was issued from staff.

16      A.   Okay.

17      Q.   There was no other memoranda from staff.

18          MR. HOCKMAN:  Are you testifying or asking?

19   BY MR. KOSLOWE

20      Q.   Do you have any recollection otherwise?

21      A.   I don't have any recollection.

22          MR. KOSLOWE:  We're going to jump ahead of

23      ourselves for a second.  Just to close the loop so

24      you know it's accurate I'm going to show you

25      another document.  This is a document that will be

Rafael Paz
May 05, 2025

1       Exhibit 10 to your deposition.  It's an e-mail with

2       attachments.

3            (Plaintiff's Exhibit No. 10 was marked for

4       identification.)

5  BY MR. KOSLOWE

6       Q.   MB216339.  You see the document, sir?

7       A.   Okay.

8       Q.   If you flip to the page that has Bates

9  MB00216344 on the bottom going on to 45 you'll see that

10 was provided to Commission in connection with this

11 resolution was a memorandum from you, your office, no

12 memorandum in addition from staff; right?

13      A.   Okay.

14      Q.   Is that correct?

15      A.   Yes, that's what --

16      Q.   So the final word from Ms. Hudak as City

17 Manager and City administration was the memoranda

18 provided to FERC; right?

19      A.   Yes.

20      Q.   So you can set Exhibit 10 aside for a second.

21 We'll come back to that.  So going back to the drafting

22 process and trying to figure out what input there was

23 and why particular items -- particular language was put

24 in I'll ask again now that we foreclosed the possibility

25 that there was an additional memoranda from staff and we

Rafael Paz
May 05, 2025

1   know that you're and your office are participated in the

2   drafting do you know of any reason why despite the fact

3   that the two memoranda started with the RFP 1985 this

4   resolution the drafters chose to start with leaving that

5   off?

6           MR. HOCKMAN:  Objection, foundation.

7           THE WITNESS:  I don't know that.

8   BY MR. KOSLOWE

9      Q.   Do you know if it reflects what message FERC

10  wanted to communicate to Commission?

11          MR. HOCKMAN:  Objection to form.

12          THE WITNESS:  I don't know how to answer your

13      question other than I don't think that that recital

14      and whether it was included or not really was

15      material for purposes of the -- of the action item

16      in the resolution.

17  BY MR. KOSLOWE

18     Q.   Sir, are you familiar with section 1.03F of

19  the City Charter as it existed in 2023?

20     A.   Yes.

21     Q.   Do you know it by heart or would it be helpful

22  for you to look at it?

23     A.   I probably know it by heart but you can show

24  it to me.

25     Q.   Why don't you tell me what your recollection

Rafael Paz
May 05, 2025

1    is and I'll show you the document anyway.

2         A.   Any concession or management agreement in

3    excess of ten years including option periods would

4    require approval by the planning board on the majority

5    vote and a 6/7th City Commission approval.  And there

6    maybe an exception in there for some governmental

7    agencies or something like that.

8              MR. HOCKMAN:  I don't know whether to be

9         impressed or depressed.

10             MR. KOSLOWE:  I will show you what we will

11        mark as Exhibit 11 to your deposition.  This is

12        Section 1.03 of the City Charter as it existed at

13        this time in 2023.

14             (Plaintiff's Exhibit No. 11 was marked for

15        identification.)

16   BY MR. KOSLOWE

17        Q.   By the way, sir, did you participate at all in

18   the amendment of this particular part of the charter?

19        A.   No.  It happened after I left.

20        Q.   So if you turn to the last page of the

21   document, page three of three you'll see provision F.

22   Now looking at it your recollection and the statement is

23   the same?

24        A.   Yes.

25        Q.   Section 1.03 doesn't deal with anything else

Rafael Paz
May 05, 2025

1    other than this particular circumstance.  You have the

2    Management Agreement or Concession Agreement with the

3    private party of ten years or longer you need a

4    particular set of votes; right?

5         A.    Right.

6         Q.    Doesn't deal with any other restriction or

7    limitation or requirement; right?

8         A.    That's right.

9         Q.    If you turn back to Exhibit 8, please, that's

10   the resolution from April of 2023.  Can we turn to the

11   last page, the last whereas clause?

12        A.    Okay.

13        Q.    So what this resolution is saying is tell me

14   if I'm right or wrong, that after some negotiation with

15   Boucher Commission will determine whether to proceed

16   with that management agreement or Concession Agreement

17   in accordance with those limitations you just discussed

18   from Section 1.03F of the Charter; is that right?

19             MS. MACK:  Object to form.

20             THE WITNESS:  Yes.

21   BY MR. KOSLOWE

22        Q.    Why don't we go one whereas clause up.  That's

23   the first whereas clause on the page.  You see that,

24   sir?

25        A.    Yes.

Rafael Paz
May 05, 2025

1    Q.   It begins "whereas notwithstanding the

2    administration's recommendation to issue a competitive

3    solicitation with respect to the futures of the

4    property," that being One Ocean Drive, you with me, sir?

5    A.   Yes.

6    Q.   "On April 21st 2023 FERC unanimously

7    recommended that the City Commission authorize

8    administration to negotiate proposed nonbinding term

9    sheet with Boucher" and so on.  Is that right?

10   A.   Yes.

11   Q.   So what the resolution is communicating,

12   you'll tell me if I'm right or wrong, is that

13   administration recommended competitive solicitation;

14   right?

15        MR. HOCKMAN:  Objection to form.

16        THE WITNESS:  We.

17   BY MR. KOSLOWE

18   Q.   That was the final word of the City Manager on

19   this item the future of One Ocean Drive; right?

20        MR. HOCKMAN:  Objection to form.

21        THE WITNESS:  I don't know the final word but

22        up through that -- up until this point in time yes,

23        their position was to issue a competitive

24        solicitation and that recommendation at the

25        Commission's discretion at FERC's and the

Rafael Paz
May 05, 2025

1        Commission's discretion was not acceptable.

2   BY MR. KOSLOWE

3        Q.   Commission --

4        A.   Initially at least.

5        Q.   At this point in time in April of 2023 both

6   Commission and FERC rejected that recommendation from

7   the City Manager to have a competitive solicitation;

8   right?

9        A.   Yes.

10       Q.   They said we'll do something else, some other

11  process to decide what to do with the future of One

12  Ocean Drive property; right?

13            MS. MACK:   Object to form.

14            THE WITNESS:   Well, they said go and negotiate

15       a proposed nonbinding term sheet.   That's what they

16       said and nothing further.

17  BY MR. HOCKMAN

18       Q.   It says in the last whereas clause that you

19  just read and we'll go back there just read and

20  testified about it.   "Upon review of the proposed term

21  sheets the City Commission would then determine whether

22  to proceed with a management agreement or concession

23  agreement."  You see that?

24       A.   Yes.

25       Q.   What this means is that staff would negotiate

Rafael Paz
May 05, 2025

1   the terms and come back to Commission with the proposed

2   agreement; right?

3            MR. HOCKMAN:  Objection to form.

4            THE WITNESS:  Staff would come back with the

5       proposed terms.

6   BY MR. HOCKMAN

7       Q.   Does it say --

8       A.   The term sheet.  The direction was to prepare

9   a non-binding term sheet for the Commission to then

10  decide what would happen next.

11      Q.   Sir, am I reading this wrong?  "Upon review of

12  the proposed terms the City Commission would then

13  determine whether to proceed with a Management Agreement

14  or Concession Agreement."  You see that?

15      A.   Yes.

16      Q.   Did I read that right?

17      A.   Yes.

18      Q.   So Commission is going to determine what to do

19  about a Management Agreement or Concession Agreement;

20  right?

21            MR. HOCKMAN:  Objection to form, best

22       evidence.

23            THE WITNESS:  The Commission would determine

24       whether to proceed with the drafting of a

25       Management Agreement or Concession Agreement if

Rafael Paz
May 05, 2025

```
1          they accepted whatever term sheet is presented to

2          them at the conclusion of this negotiation.

3    BY MR. KOSLOWE

4        Q.   So you negotiate terms.  You come back and

5    commission says go ahead and execute that contract based

6    on those terms?

7          MR. HOCKMAN:  Objection.

8    BY MR. KOSLOWE

9        Q.   Is that's one of the options?

10          MR. HOCKMAN:  Objection, incomplete

11          hypothetical.

12          THE WITNESS:  No.  It would be go ahead and

13          initiate the process for the drafting of the

14          agreement and then it would go through the

15          legislative process for the appropriate approval of

16          that agreement.

17    BY MR. KOSLOWE

18        Q.   Your office was also tasked to determine

19    whether you could append these terms to the existing

20    contract; right?

21        A.   I don't know if my office was specifically

22    tasked but it is oh, yes requesting City Attorney's

23    Office and the administration to consider that so yes,

24    were we were both tasked with looking at that issue.

25        Q.   This arrangement for Boucher to operate and
```

Rafael Paz
May 05, 2025

1   manage One Ocean Drive was contemplated as either or

2   part of their existing contract or a stand alone

3   contract?

4         MR. HOCKMAN:  Objection to form, best evidence

5      rule.

6         MS. MACK:  Objection.

7         THE WITNESS:  The direction was to evaluate

8      whether the management and operation of the One

9      Ocean Drive could be effectuated if the terms with

10     Boucher brothers would be accepted if it could be a

11     stand alone agreement or am amendment to their

12     existing contract which already provided many terms

13     governing the conception and operation of all of

14     the beachfront areas.

15  BY MR. KOSLOWE

16     Q.   And it could be that the city administration

17  and Boucher couldn't negotiate terms that were

18  acceptable to the City; right?

19        MR. HOCKMAN:  Objection, incomplete

20     hypothetical.

21        THE WITNESS:  It is entirely possible that

22     parties cannot negotiate terms successfully, yes.

23  BY MR. KOSLOWE

24     Q.   That's one of the things that Commissioner

25  Arriola discussed back at FERC.  See if you can

Rafael Paz
May 05, 2025

1   negotiate terms.  If you don't work it out all right?

2        A.   That is always one option.  As is if you do

3   work out terms then the Commission doesn't like then

4   there is no agreement and you don't proceed any further

5   with the matter.

6        Q.   So one of the possible outcomes that this

7   particular resolution authorized was negotiating terms,

8   Commission accepts the terms, staff goes and drafts the

9   contract and Commission goes go ahead and votes on that?

10            MR. HOCKMAN:  Objection, best evidence.

11            THE WITNESS:  To negotiate terms, come back to

12        the Commission to consider the terms, Commission

13        could direct the drafting of the agreements for the

14        agreement to go through the applicable legislative

15        process.

16   BY MR. KOSLOWE

17        Q.   Which would be coming back to Commission for

18   vote of approval; right?

19        A.   Ultimately, yes.

20        Q.   And the Commission would then prove -- could

21   then approve that contract based on those negotiated

22   terms; right?

23            MR. HOCKMAN:  Objection, speculation.

24            THE WITNESS:  It could.

25   ///

Rafael Paz
May 05, 2025

1    BY MR. KOSLOWE

2        Q.    That would all be without a competitive

3    solicitation?

4        A.    That is certainly an option under the City

5    code, yes.

6        Q.    Can you describe that option under the City

7    code.  I think you referred to it as a bid waiver.

8        A.    Waiver of competitive bidding.

9        Q.    What are the conditions in your opinion that

10   allows for waiver of competitive bidding in these

11   circumstances?

12       A.    I believe it's established in Chapter 87 of

13   the City code, 82-37, sorry and it's a typical waiver by

14   a Commission if they determine it's in the best interest

15   any of the City without a competitive solicitation.

16       Q.    So the only requirements for waiver of

17   competitive solicitation otherwise required by the code

18   would be a particular vote, particular super majority

19   vote of the Commission; is that right?

20            MS. MACK:  Object to form.

21            THE WITNESS:  Repeat your question, please.

22   BY MR. KOSLOWE

23       Q.    The only requirements for waiver of

24   competitive bidding otherwise required by the code would

25   be a vote of the Commission at a particular number; is

Rafael Paz
May 05, 2025

1    that right?

2            MR. HOCKMAN:  Objection, form.

3            THE WITNESS:  I would have to see -- it would

4        be in the code.  The requirement would be in 82-37

5        whatever it is.

6    BY MR. KOSLOWE

7        Q.   I'm asking you in your role as City Attorney

8    what's your understanding of what requirements there are

9    in the code for waiver of competitive solicitation

10   required by the code, is it just a vote of Commission;

11   is that right?

12       A.   I would have do look at 82-37.

13       Q.   Is that what you think it is, 82-37?

14       A.   Or 39, one of the two.

15           MR. KOSLOWE:  Show you a document mark as

16       Exhibit 12 to your deposition.

17           (Plaintiff's Exhibit No. 12 was marked for

18       identification.)

19   BY MR. KOSLOWE

20       Q.   Article in the City Code titled Sale and Lease

21   of Public Property starting at section 82-36.  You see

22   that, sir?

23       A.   Yes.

24       Q.   Why don't you look at that and see if it says

25   what you think it says?

Rafael Paz
May 05, 2025

1    A.    This is an 82-39.

2    Q.    Any particular sub provision?

3    A.    Subsection A "for sale or lease of City

4  property the conditions of this subsection may be waived

5  by 5/7th vote of the City Commission upon a finding by

6  the City Commission that the public interest would be

7  served by waiving such conditions."

8    Q.    This deals with sale or lease of City

9  property, right?

10    A.    It could.  Actually I'm glad I asked for the

11  document but if it's a sale or lease of City property

12  that this would be the waiver -- the applicable waiver

13  provision.

14    Q.    But not if it's for a Concession Agreement in

15  connection with City property?

16    A.    Not if it's for a concession agreement.

17    Q.    But if it were a sale or lease of City

18  property there would need to be a finding of City

19  Commission that public interest would be served by

20  waiving such conditions?

21    A.    Yes.

22    Q.    You have to have that formal finding by the

23  Commission?

24    A.    Yes.

25    Q.    But if we're not dealing with a sale or lease

Rafael Paz
May 05, 2025

1    then there is some other process?

2         A.   Then I believe in that instance there would be

3    another City code section governing the waiver of

4    competitive bidding for goods and services and certainly

5    concession services and I believe that would be in 2-369

6    of the City code or around there, one of those and it

7    also would require in that instance for that final

8    agreement to be approved a recommendation of the City

9    Manager for waiving competitive bidding to proceed with

10   that final agreement and a 5/7th vote.

11        Q.   In this instance we've already seen that the

12   City Manager had twice recommended competitive

13   solicitation; right?

14        A.   She had recommended a competitive solicitation

15   but the approval that requirement is a recommendation

16   for the approval of the final agreement and that would

17   remain to be seen.  She had certainly the ability to

18   weigh in and say that she would support and recommend

19   the waiver at that final agreement even if she hadn't

20   before.

21        Q.   What other information would the City Manager

22   have at her disposal that would allow her to change her

23   recommendation from what she had been doing from

24   January, February, March, April?

25             MS. MACK:  Object to form.

Rafael Paz
May 05, 2025

```
 1              THE WITNESS:  Sorry.

 2              MR. HOCKMAN:  And foundation.

 3              THE WITNESS:  Had the terms -- had this

 4        resolution not been rescinded and the terms with

 5        Boucher develop certainly based on to final terms

 6        if they were favorable to the City it would give

 7        the manager -- would always have the opportunity to

 8        change her mind and recommend in favor of

 9        proceeding with that agreement.

10   BY MR. KOSLOWE

11        Q.   How would the City Manager know if the terms

12   that were reached with Boucher after negotiations

13   exclusively with Boucher were better or worse than terms

14   for that same operation and management the City could

15   have achieved with any other party?

16              MR. HOCKMAN:  Objection to form.

17              THE WITNESS:  Well, we're speaking in

18        hypotheticals here because there were no direct

19        negotiations with Boucher for this exclusive -- on

20        these terms since this resolution was rescinded but

21        the manager could rely on it and we're speaking

22        hypotheticals.

23              You could review the appraisals that are

24        obtained and hire real estate consultants that will

25        tell you what the market is bearing and she is
```

Rafael Paz
May 05, 2025

1          certainly capable of -- it's possible that based on
2          the terms that she could have changed her
3          recommendation of that final approval where that
4          recommendation is required.
5     BY MR. KOSLOWE
6          Q.   Let's unpack that a bit.  The City Manager
7     already knew, when I say the City manager, she and her
8     if staff everyone who formed her decision in January and
9     April of 2023 to recommend issuance of a competitive
10    solicitation.  The City manager already knew at that
11    point that one of the possible options that the City was
12    considering was negotiating directly with Boucher as
13    opposed to a competitive solicitation, right?
14              MR. HOCKMAN:  Objection to form, foundation.
15              THE WITNESS:  The City Manager knew that one
16         of the possible options was what?
17    BY MR. KOSLOWE
18         Q.   Negotiating exclusively and directly with
19    Boucher.
20              MR. HOCKMAN:  Same objection.
21              THE WITNESS:  Well, yes, that's what came out
22         of committee.
23    BY MR. KOSLOWE
24         Q.   She still recommended no, I want competitive
25    solicitation, that's still in the City's best interest;

Rafael Paz
May 05, 2025

1  right?

2          MR. HOCKMAN:   Object to form.

3          THE WITNESS:   I don't know that what was

4      presented in that memoranda March, April if it

5      was -- if the discussion about moving forward with

6      potential just non-binding negotiations with

7      Boucher was part of that or not.  I don't know if

8      she made her recommendation in the last memorandum

9      and then the discussion happened where they

10     rejected her recommendation and then directed to

11     proceed.  The timing I'm not sure how that --

12  BY MR. KOSLOWE

13     Q.   You do know that she didn't issue a new

14  memoranda to commission after FERC recommended this

15  exclusive negotiation with Boucher?

16     A.   I don't know.  There were no subsequent

17  meetings or she didn't -- if there was nothing else in

18  record.  In April based on what you've shown me she did

19  not prepare that final item.

20     Q.   The City administration knew that one of the

21  possible considerations that Commission, committee was

22  exploring was exclusive negotiation with Boucher.

23  Despite that they recommended competitive solicitation;

24  is that right?

25          MR. HOCKMAN:   Objection to form.

Rafael Paz
May 05, 2025

1           THE WITNESS:  No, that's not what I said.

2       They recommended a competitive solicitation.  Then

3       the discussion happens that the discussion at

4       committee there is clear direction to negotiate

5       terms.  I don't know if that direction or those

6       discussions happened before she made her

7       recommendation.

8   BY MR. KOSLOWE

9       Q.   But you know that after FERC recommended to

10  Commission to go forward with its process of negotiating

11  exclusively with Boucher the City Manager did not issue

12  another memorandum from after the one she had issued to

13  FERC.  She stuck with the FERC memoranda that went up to

14  Commission?

15          MR. HOCKMAN:  Objection to form.

16          THE WITNESS:  I don't know that she stuck with

17      her FERC memoranda.  Clearly the FERC meeting

18      happened in it was April 21st and the Commission

19      meeting was April 28th.  The agenda for the

20      Commission meeting had probably already printed

21      when that FERC meeting happened and in that

22      instance my office would certainly step in with

23      addendum items.  It's just much faster for the

24      attorneys to work and place items on the agenda.

25          That may have driven why and it likely drove

Rafael Paz
May 05, 2025

1          why I prepared that agenda item for the April 28th

2          meeting.  But not -- it was never my understanding

3          or my recollection that any of this happened

4          because the manager was sticking with that earlier

5          recommendation.  It was just a function of getting

6          the item on the agenda.

7   BY MR. KOSLOWE

8          Q.   So your view of the additional information

9   that the City Manager would have to change from the

10  earlier recommendation to a different recommendation

11  about whether or not to move forward --

12         A.   Sorry, I lost you.  My view of?

13         Q.   Earlier you testified that it's possible that

14  after compliance with the April resolution, staff's

15  compliance with the April resolution, negotiating terms

16  with Boucher the City Manager might have said you know

17  what, I've seen this negotiation and now I recommend

18  going with that and not with an RFP.  That's a

19  possibility?

20         A.   That is what I said is possible, yes.

21         Q.   The recommendation was simply to negotiate

22  simply with Boucher and nobody else, that was the

23  direction from the April resolution; right?

24              MR. HOCKMAN:  Object to the form.

25              THE WITNESS:  Yes, to negotiate a non-binding

Rafael Paz
May 05, 2025

1        term sheet with the Bouchers.

2   BY MR. KOSLOWE:

3        Q.   How could the City have known what terms,

4   better, worse, any other kind of terms or could have

5   gotten from any other party at that point in time?

6             MR. KOSLOWE:   Objection, speculation.

7             Incomplete hypothetical.

8             THE WITNESS:   It didn't -- that didn't

9             materialize.   That wasn't the path that was taken

10            but if it had -- if they had gone down that path

11            they could have relied on any number of sources to

12            verify that the proposed terms are competitive and

13            that like I said you could rely on appraisals.   You

14            could rely on real estate consultants and market

15            information but it didn't happen.   Don't know how

16            else to answer that.

17   BY MR. KOSLOWE:

18        Q.   How would I determine whether or not the City

19   Manager would have altered her recommendation from what

20   she had done in January and April of 2023?

21            MR. HOCKMAN:   Objection, speculation.

22            THE WITNESS:   I don't know.

23   BY MR. KOSLOWE:

24        Q.   Who would I speak to to find out if the City

25   manager would never have alter recommendation or might

Rafael Paz
May 05, 2025

1  have considered additional factors to alter

2  recommendation what those factors might be?

3          MR. HOCKMAN:  Objection, speculation.

4          THE WITNESS:  No.

5  BY MR. KOSLOWE

6      Q.  Having worked a decade in the City, having

7  worked for two years with Ms. Hudak, three years with

8  Ms. Hudak you can't tell me who I might speak to to find

9  out that information?

10     A.  Who would you speak to to find out

11  hypothetical information?  I don't know.  I don't know

12  how to answer something that didn't happen, I don't

13  know.

14     Q.  I'm granting you that at some point the City

15  changed course but you've provided testimony that you

16  believe it's possible for the City Manager to have

17  altered her recommendation based on some future

18  contingency; right?

19         MS. MACK:  Object to form.

20         THE WITNESS:  The requirement for the final

21     approval it is possible that the manager could have

22     recommended a waiver of competitive bidding after

23     going through an entire negotiation for final

24     approval notwithstanding any initial

25     recommendation.  It is possible for people to

Rafael Paz
May 05, 2025

```
 1        change their recommendations.
 2  BY MR. KOSLOWE:
 3        Q.   The best person to speak to to find out what
 4  factors there would be or if she might have changed the
 5  documentation would be Ms. Hudak herself; right?
 6             MR. HOCKMAN:  Objection, speculation.
 7             THE WITNESS:  I don't know.  I guess.  I don't
 8        know that I would speak to that.  I don't know that
 9        I'm in a position to speak to that.
10  BY MR. KOSLOWE:
11        Q.   You're one of I think three people on the
12  staff, strike that.  The City Attorney, the City Manager
13  and who else is a constitutional or charter position
14  within the City of Miami Beach?
15        A.   The City clerk is a charter officer as is the
16  inspector general.
17        Q.   You're one of four charter positions.  You
18  work with Ms. Hudak.  You were the City Attorney.  She
19  was the City Manager for three years.  Is it fair to say
20  you have a sense of how her administration operated?
21        A.   How her administration operating, yes, it is
22  fair to say.
23        Q.   We're dealing with trying to figure out what
24  the conditions would be for Ms. Hudak and her
25  administration to change their position from a
```

Rafael Paz
May 05, 2025

1    recommendation they held in January and April of 2023

2    based on a process that didn't take place was but was

3    authorized to take place, right, you understand that's

4    what we're doling with?

5            MR. HOCKMAN:  Objection, speculation.

6            THE WITNESS:  Right.

7    BY MR. KOSLOWE

8        Q.   I'm trying to figure out who would have the

9    information to tell me what factors they would have

10   considered, if any, and if it's possible for that

11   recommendation to have changed.  Do you understand that?

12           MR. HOCKMAN:  Objection, speculation.

13           THE WITNESS:  I do understand that and the

14       only way I can answer it is to go back to the

15       discussion we had earlier about the legislative

16       process and the bottom up.  What factors would

17       require a hypothetical change or would lead to a

18       hypothetical change well, you start with the staff

19       that are working on that matter and their

20       recommendations to the City Manager.

21   BY MR. KOSLOWE

22       Q.   This particular item, April 2023 resolution,

23   do you remember which member of the administration it

24   was assigned to?

25       A.   I don't.

Rafael Paz
May 05, 2025

1       Q.   Based on that information you have, knowledge

2   you have what we've seen today it would have been

3   assigned to asset management; right?

4       A.   Yes.

5       Q.   So it would have been assigned to Mr. Morales,

6   Mr. Dominguez; right?

7       A.   Yes.

8       Q.   So in addition to Mr. Dominguez and

9   Mr. Morales going up the chain who is the next person to

10   speak to about this decision making?

11           MS. MACK:  Object to form.

12           MR. HOCKMAN:   Speculation.

13           THE WITNESS:   So there was no decision making

14       on this hypothetical that we were discussing but

15       the next position up the chain would be the

16       Assistant City Manager that handles facilities and

17       asset management.

18   BY MR. KOSLOWE

19       Q.   So I'm trying to construct the chain.

20   Mr. Dominguez, Mr. Morales.  Was Mr. Taxis the Assistant

21   City Manager at that point in that stage?

22       A.   He was an Assistant City Manager.  I don't

23   remember if he had facilities or not at that time.  It

24   has changed over the years but I think so yes.

25       Q.   Then it would be Ms. Hudak at the top of the

Rafael Paz
May 05, 2025

1    chain; right?

2         A.    That's the chain, yes.

3         Q.    In your experience working with Ms. Hudak as

4    City Manager did she impart any independent thinking or

5    decision making on these memoranda or these

6    recommendations that went from Staff to Committee or

7    Commission?

8              MS. MACK:  Object to form.

9              THE WITNESS:  Yes.

10   BY MR. KOSLOWE

11        Q.    What was her process like for that independent

12   decision making that she would render?

13             MR. HOCKMAN:  Objection to form.

14             THE WITNESS:  Well, from what I observed of

15        Alina she is incredibly collaborative and would

16        listen to her staff and take in all the information

17        from her staff.  She would ask a lot of questions.

18        She needed to ask for more information and this is

19        on many different items.  And then she would confer

20        with me.  She would confer with whoever she felt

21        she needed to confer with to make sure she was

22        doing the right thing and making the right call.

23   BY MR. KOSLOWE

24        Q.    So I want to go back to the set of information

25   that based on your experience would be available to the

Rafael Paz
May 05, 2025

1   City Manager.  Had the process and directives authorized

2   by the upper resolution carried forward to their

3   conclusion, right?

4        A.   Okay.

5        Q.   And what you said was there would have been

6   negotiated terms with Boucher then the City Manager and

7   her staff could compare that to market conditions such

8   as appraisals and rent studies and the like; right?

9             MR. HOCKMAN:  Object to form.

10            THE WITNESS:  That's one option, yes.

11   BY MR. KOSLOWE

12        Q.   What information would the City have about

13   what the universe of potential competitors would offer

14   in terms of competing terms for those operations and

15   management services that would have been negotiated with

16   Boucher?

17            MR. HOCKMAN:  Objection, speculation.

18            THE WITNESS:  I don't know.

19   BY MR. KOSLOWE

20        Q.   Are you aware of any process by which the City

21   would be able to go out and get those competing terms

22   from potential competitors?

23        A.   So in this hypothetical I think you would

24   start, the City would start with engaging the

25   appropriate subject matter experts.  So engaging

Rafael Paz
May 05, 2025

1  consultants to provide advice as to market information.

2      Q.   The information you saw you have in front of

3  you is that the City already engaged market consultants

4  and already engaged appraisals and facility assessments.

5  They already knew what the market conditions were;

6  right?

7      A.   I don't know that those were all completed by

8  the time she made that recommendation.

9      Q.   Why don't we turn back to Exhibit 6.  That

10  should be the FERC memo from Ms. Hudak in April 2023.

11  Commission had already directed staff to collect a

12  certain set of information; right?

13          MR. HOCKMAN:  Objection to form.

14          THE WITNESS:  It says here they directed the

15      administration to consider the options that are

16      then delineated in the memorandum.

17  BY MR. KOSLOWE

18      Q.   In January of 2023 FERC directed staff to

19  engage in a certain set of tasks which included

20  collecting a certain set of information; right?

21      A.   Yes.

22      Q.   And that included obtaining two appraisals

23  from in this particular case staff went out and got from

24  CBRE about Cushman and Wakefield?

25      A.   Yes.

Rafael Paz
May 05, 2025

1    Q.   That was already completed by April 1, 2023;

2  right?

3         MS. MACK:  Object to form.

4         THE WITNESS:  I don't know if it was in fact

5      was but it says here they anticipated they would be

6      completed by April 1st, yes.

7  BY MR. KOSLOWE

8    Q.   This is taking place on April 21st?

9    A.   Okay.

10   Q.   So that's April 1st is before April 21st;

11  right?

12   A.   It doesn't say that the appraisals were done.

13   Q.   Do you recall the transcript from the FERC

14  meeting that we went over where they were reporting from

15  one of the appraisals and the market rent study that had

16  already been done?

17   A.   Yes.

18   Q.   And a facilities assessment was being

19  conducted by another third party?

20   A.   Yes.

21   Q.   So the City had -- the City Commission had

22  directed staff and staff collected market information on

23  rent and qualified appraisers; right?

24         MR. HOCKMAN:  Objection, wasn't the

25      Commission.  You said City Commission.

Rafael Paz
May 05, 2025

1   BY MR. KOSLOWE

2        Q.   I'll stick with the question.

3        A.   So there was a direction to obtain appraisals,

4   yes.

5        Q.   And they got that market information, right?

6        A.   It looks like at least one of those appraisals

7   was completed, yes.

8        Q.   Maybe I'm reading this wrong.  Administration

9   has engaged two appraisers, CBRE and Cushman and

10  Wakefield, to conduct these studies which should be

11  completed by April 1st.

12       A.   Yes.

13       Q.   Maybe it's a bit of faulty language here but

14  that would have been completed 20 days before this

15  particular memoranda; right?

16            MR. HOCKMAN:  Objection, speculation.

17            THE WITNESS:  Yes.  I don't understand the

18       reference.  I don't know what the author of this

19       was getting at.

20  BY MR. KOSLOWE

21       Q.   But in any event these two appraisals were

22  coming in?

23       A.   Yes.

24       Q.   At least you had already seen some of the

25  results at that time?

Rafael Paz
May 05, 2025

1    A.   I was present at the meeting where they were

2    discussing the results from one of them.  It could be I

3    don't know if it was a certified appraisal.  It could be

4    a draft appraisal.  A lot of times the appraisers will

5    give you back of envelope information that you need

6    because you're going into a meeting and you need it but

7    they're not -- the report hasn't been submitted.  I

8    don't know.  I wasn't -- that's outside any scope.

9    Q.   But in any event this information is all

10   general market information.  What does the market bear

11   for rent, payments, for price of the property, general

12   market information about the property; right?

13   A.   Yes.

14   Q.   It's not specific information about potential

15   competitors to Boucher might provide if Boucher had

16   provided terms; right?

17   A.   Right.

18   Q.   There is no way for the City to have known

19   what those potential competitors would have done because

20   they were not running a competitive process at that

21   point, right?

22        MR. HOCKMAN:  Objection to form, speculation.

23        THE WITNESS:  If you do not -- that's right,

24   you don't know.  If you do not -- if you waive bids

25   then you don't have other bids, yes, that's how it

Rafael Paz
May 05, 2025

```
 1        works.

 2   BY MR. KOSLOWE

 3        Q.   Did the City have an understanding at that

 4   time that there was a market of several to many

 5   potential operators for this particular set of

 6   management and operation services?

 7             MR. HOCKMAN:  Objection, foundation.

 8             THE WITNESS:  I don't know what was in the

 9        City records but yes, there is always -- there are

10        always restaurants that are opening up and closing

11        and one of the factors that could be considered in

12        connection with a recommendation to waive bidding

13        or in connection with a Commission's determination

14        had this actually ever been presented to them is if

15        they're dealing a known quantity that has performed

16        well under existing contracts.  Restaurants, even

17        successful ones the operations of that are complex.

18             You're taking a lot of risk and evaluation of

19        that risk is certainly a factor and you can

20        certainly do that without having the benefit of

21        other proposals.

22   BY MR. KOSLOWE

23        Q.   Explain that to me.  You're saying that you

24   would have you had the benefit of knowing what a known

25   quantity has provided you without knowing what other
```

Rafael Paz
May 05, 2025

1    competitors could provide?

2        A.   What I'm saying is it is possible to negotiate

3    a term sheet with one party, evaluate the strength of

4    that party's performance and recommend proceeding with

5    that one party based on the risk profile that that one

6    party presents based on the known quantity, yes.

7        Q.   But the City would still have less information

8    at that point in time than had it conducted a

9    competitive solicitation; right?

10       A.   It would.

11            MR. HOCKMAN:  Objection, speculation.

12   BY MR. KOSLOWE

13       Q.   The City would have all the information that

14   it would have if it didn't conduct a competitive

15   solicitation all the information you just described such

16   as what the known quantity was, what it's like to deal

17   with them, what the risk quantity is.  It would have

18   that information and more if it conducted a competitive

19   solicitation; right?

20            MR. HOCKMAN:  Objection, speculation and

21       incomplete hypothetical.

22            THE WITNESS:  There would be additional data

23       points, yes.

24   BY MR. KOSLOWE

25       Q.   The City manager and her staff could not have

Rafael Paz
May 05, 2025

1  less information about what competitors were offering,

2  and what the market had to bear had they issued an RFP

3  than had they not?

4          MR. HOCKMAN:  Objection, speculation and

5      incomplete hypothetical.

6          THE WITNESS:  The administration would have

7      fewer data points available to them but certainly

8      that's not to say that the data points that were

9      available are not sufficient to make a

10      recommendation.

11  BY MR. KOSLOWE

12      Q.   And the City Manager and her staff knew all

13  that in January and in April 2023; right?

14          MR. HOCKMAN:  Objection, foundation.

15          THE WITNESS:  I don't know what knew all that,

16      knew all what?

17  BY MR. KOSLOWE

18      Q.   The City Manager and her staff knew in April

19  of 2023 that negotiating exclusively and directly with a

20  known quantity would provide them less information than

21  had they issued an RFP but would provide them some

22  information upon which they could have based on a

23  recommendation not to proceed with an RFP; right?

24          MR. HOCKMAN:  Objection, form, foundation,

25      speculation.

Rafael Paz
May 05, 2025

```
 1              THE WITNESS:  I don't know what they knew at
 2        any point.  I don't know how to answer that
 3        question.
 4   BY MR. KOSLOWE
 5        Q.   You just testified just now yourself based on
 6   the information that you have, right, that it's possible
 7   for the City Manager and her staff to know certain
 8   information about what it's like to work with a known
 9   quantity such that they could have sufficient
10   information to make a recommendation to proceed with
11   that known quantity rather than having a competitive
12   solicitation, right?
13              MR. HOCKMAN:  Objection, foundation.
14              THE WITNESS:  I think what I said it is fully
15        possible to fully negotiate terms for an agreement,
16        work with outside consultants and bring subject
17        matter expertise and evaluate then the known
18        quantity and it is a whole not determining any
19        initial recommendation yes, the agreement before
20        you is a good deal with a good party that it would
21        be in the interest of the City to move forward
22        with.
23              It is possible for that hypothetical to happen
24        at that final approval when -- if direction was
25        ever provided to draft definitive agreements and go
```

Rafael Paz
May 05, 2025

```
1         through the approval process.

2   BY MR. KOSLOWE

3         Q.   All that you just described the City Manager

4   and her team knew that even in January of 2023?

5              MR. HOCKMAN:  Objection, speculation.

6         Objection, foundation.

7              THE WITNESS:  But what they didn't know is

8         what those final terms were.

9   BY MR. KOSLOWE

10        Q.   The only thing that would have changed is what

11  the final terms of Boucher would have been?

12        A.   Which is pretty significant.  We don't know --

13  if you don't know what is going to be proposed, what the

14  deal is then yes, it makes sense that their

15  recommendation would be what it was initially but that's

16  not to foreclose any subsequent recommendation is all

17  I'm saying.  Hypothetically since this never happened.

18        Q.   We'll figure out soon if it happened or not

19  but let me try to take the information you just

20  testified to and put it into context.  Standing in

21  January of 2023 the City Manager knows that they've been

22  tasked to provide a recommendation to FERC about how to

23  dispose of, how to deal with, how to plan for the future

24  of the One Ocean Drive property; right?

25             MR. HOCKMAN:  Objection, foundation.
```

Rafael Paz
May 05, 2025

```
 1            THE WITNESS:  That's what the record reflects,

 2       yes.

 3  BY MR. KOSLOWE

 4       Q.   You have to reason to doubt the voracity of

 5  any of the records you saw here?

 6       A.   I do not.

 7            MR. HOCKMAN:  Objection, speculation.

 8            MR. KOSLOWE:  What's the speculation?

 9            MR. HOCKMAN:  You're asking him to speculate

10       about what may or may not have been in the City

11       Manager or staff mind.

12            MR. KOSLOWE:  No, what I asked him was if he

13       has any reason to doubt the voracity of the records

14       in front of him.

15            MR. HOCKMAN:  Exactly.  You are asking him to

16       speculate about what's in their minds and whether

17       all this is all true.  They state what they state.

18       Best evidence rule too.

19            MR. KOSLOWE:  I don't believe it's well taken.

20            MR. HOCKMAN:  You're not the Judge, Jason.

21       You want to maybe leave the colloquy out.  Let's

22       not do that again.

23            MR. KOSLOWE:  I'm allowed to ask.

24            MR. HOCKMAN:  You are allowed to ask.  You are

25       not allowed to rule on my objection.  Just ask a
```

Rafael Paz
May 05, 2025

1           question.  I will object and we'll keep going.

2           Every time we got to go through this.

3                MR. KOSLOWE:  Eric, I don't need the

4           commentary.  Under the rules --

5                MR. HOCKMAN:  You invited the commentary.

6                MR. KOSLOWE:  Under the rules I can ask you

7           for the basis and if I think it's well taken I'll

8           proceed accordingly.  If I don't I'll proceed

9           differently.

10               MR. HOCKMAN:  You do not need to say.

11               MR. KOSLOWE:  I'm saying it so I can tell you

12          what I'm doing next.

13               MR. HOCKMAN:  I don't care.  I made an

14          objection, you decided to ignore it.  Move on.

15   BY MR. KOSLOWE

16          Q.   Do you have any reason to doubt the voracity

17   of the documents in front of you?

18          A.   I don't have any personal knowledge what

19   you're presenting these records is not accurate.

20          Q.   So you saw among the records here memoranda

21   from the City Manager which stated they were tasked with

22   looking at and providing a recommendation in

23   January 2023 to FERC about the future disposition of the

24   One Ocean Drive property; right?

25          A.   Yes.

Rafael Paz
May 05, 2025

1      Q.   You have no reason to doubt that that was

2   asked of them and they provided that recommendation;

3   right?

4           MR. HOCKMAN:  Objection, foundation,

5       speculation.

6           THE WITNESS:  There was a recommendation in

7       these memos, yes.

8   BY MR. KOSLOWE

9      Q.   Do you have any reason to doubt that they were

10  asked to provide a recommendation and they did so?

11          MR. HOCKMAN:  Objection, speculation,

12      foundation.

13          THE WITNESS:  No, I don't have any reason.

14  BY MR. KOSLOWE

15     Q.   Sitting then in January of 2023 the City

16  Manager and her staff knew all of what you just

17  described which is that there is a possibility of

18  negotiating directly with a known quantity and having

19  information about that known quantity about how they

20  could perform relative to the market.  They knew that

21  was a possibility even back in January of 2023; right?

22          MR. HOCKMAN:  Objection, speculation and

23      incomplete hypothetical and foundation.

24          THE WITNESS:  I don't know what she would have

25      known about this hypothetical situation but yes,

Rafael Paz
May 05, 2025

```
1        did she know that if proceeding with one party was

2        a known quantity or another party because there

3        were two in the initial recommendation in that

4        memo, yes, she would know that she is dealing with

5        a known quantity.

6             What she doesn't know what any of the terms

7        are for the entire deal in which case the default

8        position of going through a competitive process

9        was -- looks like that was her recommendation.

10   BY MR. KOSLOWE

11        Q.   So knowing that she still recommended

12   competitive solicitation; right?

13        A.   She recommended a competitive solicitation.

14        Q.   By the way, the competitive solicitation would

15   have given the City, the City Manager and her staff, all

16   the best terms that all the competitors would have to

17   offer, right?

18             MR. HOCKMAN:   Objection, speculation.

19             THE WITNESS:   I don't know that that's true.

20        It will give you additional data points from the

21        submittals that you received, if any.

22   BY MR. KOSLOWE

23        Q.   So if the particular known quantity that we're

24   referencing participated you would get their final and

25   best offer through the proposal; right, through the
```

Rafael Paz
May 05, 2025

1    bidding process?

2              MR. HOCKMAN:  Objection, incomplete

3        hypothetical, speculation.

4              THE WITNESS:  You would get their proposal,

5        yes, and you would understand their terms.

6    BY MR. KOSLOWE

7        Q.   You would get their terms whether you

8    negotiated directly with them or whether they

9    participated in an RFP; right?

10             MR. HOCKMAN:  Same objection.

11             THE WITNESS:  Yes.

12   BY MR. KOSLOWE

13       Q.   So based on this set of testimony there is no

14   additional information that the City Manager would have

15   directly negotiating with a known quantity versus having

16   that known quantity participate in the bid process?

17             MR. HOCKMAN:  Same objection.

18   BY MR. KOSLOWE

19       Q.   There is no additional information about that

20   known quantity?

21             MR. HOCKMAN:  Same objection.

22             THE WITNESS:  I'm not following your question

23       but she would not have had -- she would have

24       additional information after the negotiation of the

25       terms.  She would have the terms.  She would not

Rafael Paz
May 05, 2025

1      have that information on the front end when she

2      made her initial recommendation.

3  BY MR. KOSLOWE

4      Q.   Perhaps I asked the question awkwardly.  Let

5  me ask it differently.  Whether the City Manager and her

6  staff negotiated terms directly with a known quantity or

7  whether that known quantity participated in a

8  competitive solicitation the City Manager would have no

9  additional information about the terms that that known

10 quantity would offer for that proposed management and

11 operation; right?

12         She would have the same information about the

13 terms that that known quantity would propose whether she

14 negotiated directly with them or whether that known

15 quantity participated in a competitive solicitation

16 process; right?

17         MR. HOCKMAN:  Objection to form, speculation,

18      hypothetical.  Incomplete hypothetical.

19         THE WITNESS:  Not sure I'm following but if

20      she -- if you negotiate directly you would have the

21      terms that flow from that negotiation or if you

22      issue a competitive solicitation you would have the

23      proposal that is submitted and a response to that

24      competitive solicitation.

25 ///

Rafael Paz
May 05, 2025

1   BY MR. KOSLOWE

2        Q.   So in both situations assuming the known

3   quantity participates in the bid process you would get

4   the terms they want for that particular proposal; right?

5             MR. HOCKMAN:  Same objection.

6             MR. KOSLOWE:  That particular project; right?

7             THE WITNESS:  Yes, we would get the terms they

8        are proposing, yes.

9   BY MR. KOSLOWE

10       Q.   So I'm struggling to understand if the City

11  manager -- let me take a step back for a second.  I

12  apologize if I didn't ask these questions in the lead

13  up.  In your experience working with Alina Hudak as City

14  Manager of the Miami Beach was she qualified for the

15  position?

16       A.   Yes.

17       Q.   Was she sophisticated in the various different

18  tasks that fell to the City Manager including

19  participating in leading negotiations of complex

20  arrangements with third parties for the disposition of

21  City property?

22            MS. MACK:  Object to form.

23            THE WITNESS:  I don't know exactly what

24       experience she had in negotiations for Concession

25       Agreements or leases but yes, she is eminently

Rafael Paz
May 05, 2025

```
 1        qualified to serve as City Manager.
 2   BY MR. KOSLOWE
 3        Q.   You mentioned before that Ms. Hudak's
 4   leadership style was collaborative, she would work with
 5   her various team members to get the best product that
 6   she can and bring to bear to discharge her
 7   responsibilities; right?
 8        A.   Yes.
 9        Q.   So was Ms. Hudak well qualified and
10   experienced in taking that collaborative effort using
11   all members of her team to negotiate complex Concession
12   Agreements or leases with third party in respect of
13   management and operation of City property?
14             MS. MACK:  Object to form.
15             THE WITNESS:  Yes.
16   BY MR. KOSLOWE
17        Q.   She had those qualifications and experience
18   back in January of 2023?
19        A.   Yes.
20        Q.   So being that she had, Ms. Hudak, those
21   qualifications and experiences back in 2023, the
22   knowledge and expertise necessary to work with her team
23   to negotiate complex terms for the disposition of
24   management and operation of City property she knew
25   standing then that whether she negotiated directly with
```

Rafael Paz
May 05, 2025

1    a known quantity, whether that known quantity

2    participated in an RFP she would get that known

3    quantity's terms and conditions for that management and

4    operation and disposition of that property and that

5    project; right?

6            MR. HOCKMAN:  Objection, form, speculation,

7        incomplete hypothetical, foundation.

8            THE WITNESS:  Yes.

9    BY MR. KOSLOWE

10       Q.   And yet she recommended competitive

11   solicitation?

12           MR. HOCKMAN:  Objection, argumentative.

13           THE WITNESS:  She recommended a competitive

14       solicitation.

15   BY MR. KOSLOWE

16       Q.   Knowing all that information and having all

17   that experience she did?

18           MR. HOCKMAN:  Objection.

19           THE WITNESS:  This is a hypothetical about

20       what she knew and in a hypothetical scenario so I

21       don't know that I can answer that but she

22       recommended a competitive solicitation in January

23       of '23 at the time when she did not have any of the

24       proposed terms for the transaction or the scope of

25       the program would look like and since we're

Rafael Paz
May 05, 2025

```
 1        speaking hypothetical, hypothetically, with the

 2        development of those terms I don't know that it

 3        could be said that when you have the known party,

 4        you have the terms, you have the program, you have

 5        the consultants with the market information, you

 6        have the appraisals I can't say oh no, she would

 7        have not recommended a waiver of competitive

 8        bidding at that time, right.  So this is an

 9        extraordinary hypothetical and I am just trying to

10        answer it as best I can.

11  BY MR. KOSLOWE

12        Q.   Fair enough.  Ms. Hudak would know whether she

13  would do that, right, not you?

14             MR. HOCKMAN:  Objection, speculation,

15        foundation.

16             THE WITNESS:  If you asked her you could

17        engage in hypotheticals with her, yes.

18  BY MR. KOSLOWE

19        Q.   In April 2023 you knew that more than one

20  party was interested in operating and managing the One

21  Ocean Drive property after the expiration of the lease

22  that the City had with Penrod; right?

23        A.   Yes.

24        Q.   Everyone involved in City decision making; the

25  commissioners, the City Manager, Senior City staff all
```

Rafael Paz
May 05, 2025

1    knew there was more than one party that was interested

2    in managing and operating the One Ocean Drive property

3    after the expiration of the lease in 2026; right?

4              MR. HOCKMAN:  Objection, foundation.

5              THE WITNESS:  I don't know what other people

6         knew but I can speak for myself, yes.

7    BY MR. KOSLOWE

8         Q.   Looking at the documents you in front of you

9    and based on the recollections you had about the

10   negotiations and experiences at the time the City

11   Manager knew that; right?

12             MR. HOCKMAN:  Objection, speculation and

13        foundation.

14             THE WITNESS:  The City Manager's memorandum I

15        don't know if it referenced Penrod but I would

16        assume that yes, that it was generally known that

17        both Penrods and the Bouchers were interested in

18        continuing after the expiration of the existing

19        agreements.

20   BY MR. KOSLOWE

21        Q.   And the City had an understanding there would

22   be more than those two potential operators interested in

23   this particularly lucrative City project, right?

24             MR. HOCKMAN:  Objection, foundation,

25        speculation.

Rafael Paz
May 05, 2025

1          THE WITNESS:  I think that could be assumed,

2      yes.

3  BY MR. KOSLOWE

4      Q.   Was it a very strong assumption at the time?

5          MR. HOCKMAN:  Speculation.

6          THE WITNESS:  Yes.  That other parties would

7      be interested not to say that those were the

8      parties that the City wanted to do business with.

9  BY MR. KOSLOWE

10      Q.   Did the City have an understanding that other

11  parties with whom the City would want to do business

12  would have an interest in this particular project?

13          MR. HOCKMAN:  Objection, foundation.

14          THE WITNESS:  Repeat the question.

15  BY MR. KOSLOWE

16      Q.   Did the City have an understanding at the time

17  January, February, March, April 2023 that other parties

18  at the City would potentially want to do business would

19  have an interest in this particular site?

20          MR. HOCKMAN:  Objection, foundation,

21      speculation.

22          THE WITNESS:  I don't know what other people

23      in the City knew about what -- whether there was

24      any other interest.

25  ///

Rafael Paz
May 05, 2025

1   BY MR. KOSLOWE

2       Q.   Did you have an understanding that would be a

3   market interest in this particular project?

4       A.   That's outside the scope of my role but I

5   didn't one way or another have any understanding of

6   that.  I apologize, we're going for 90 minutes.  If

7   we're going to continue that's fine but I would like a

8   restroom break.

9           MR. KOSLOWE:  I should have told you at the

10          outset any time you need a break as long as we're

11          not in the middle of a question for sure you can

12          ask for it and we'll do that.  Eric, off the

13          record.

14          MR. HOCKMAN:  Agreed.

15          THE VIDEOGRAPHER:  We are off the record.  The

16          time is 12:28 p.m.

17          (Thereupon, a brief recess was taken.)

18          THE VIDEOGRAPHER:  We are on the record.  The

19          time is 12:41 p.m.

20  BY MR. KOSLOWE

21      Q.   Was there an after action memo or document

22  created after the April resolution in terms of what

23  Commission had directed and what staff was going to do

24  under that direction?

25      A.   Generally there would be.

Rafael Paz
May 05, 2025

1    Q.   Do you recall that after action direction?

2    A.   I don't recall it.  It would be in the minutes

3    of the Commission meeting.

4    Q.   You recall that this matter was assigned to

5    asset management?  Do you recall that this resolution

6    April of 2023 was assigned to Facilities and Fleet under

7    it to Asset Management?

8    A.   I don't recall that but it wouldn't surprise

9    me.

10    Q.   Is there any other division within

11    administration to whom this particular action item would

12    have been assigned?

13    A.   No.  It would have been Asset.

14    Q.   And Mr. Morales, Mr. Dominguez, that staff

15    within Asset Management did what they were directed to

16    do in this resolution from April of 2023; right?

17         MR. HOCKMAN:  Objection to form.

18         THE WITNESS:  I don't know what they did.

19    BY MR. KOSLOWE

20    Q.   Earlier in our discussion you testified that

21    you were unaware of any situation where City staff

22    unless they were unable to in which case they would

23    report so did not do as directed by Commission when

24    provided asking; is that right?

25         MR. HOCKMAN:  Object to form.

Rafael Paz
May 05, 2025

```
 1            THE WITNESS:  Yes, we discussed that, yes.
 2   BY MR. KOSLOWE
 3       Q.   So knowing that this resolution directed Asset
 4   Management within the City administration to conduct
 5   particular tasks specifically to negotiate terms with
 6   Boucher you know they went ahead and started doing that;
 7   right?
 8            MR. HOCKMAN:  Objection, speculation,
 9       foundation.
10            THE WITNESS:  I don't have any personal
11       knowledge of what they did in response to this
12       resolution prior to the rescinding of the
13       resolution.
14   BY MR. KOSLOWE
15       Q.   Did your office do what it was directed to do
16   in terms of determining whether this could be
17   accomplished through an amendment to the Boucher
18   agreements or a stand alone agreement?
19            MS. MACK:  Object to form.
20            THE WITNESS:  I don't recall but I believe in
21       the e-mail that you shared from Gisela where she --
22       her thinking was that this should be a stand alone
23       agreement I think I concurred in that.
24   BY MR. KOSLOWE
25       Q.   Did you assign someone from the City
```

Rafael Paz
May 05, 2025

1    Attorney's office to accomplish these tasks, negotiating

2    with Boucher, putting together the contract terms,

3    figuring out how the contract form would look?

4         A.   I don't recall.  It would have been either

5    Gisela or Rick Dipico but I don't recall since the

6    resolution was very shortly after its adoption and

7    rescinded.

8         Q.   The resolution was in force until it was

9    rescinded; right?

10        A.   I don't know.  Let's see.  I don't remember if

11   resos take effect ten days after adoption or immediately

12   and I don't remember the date when the reso was

13   rescinded so yes.  It would have been in effect for

14   whatever period of time.

15        MR. KOSLOWE:  Sir, I'm going to show you a

16        document that's Exhibit 13 to your deposition.

17        This is MB00292326.

18             (Plaintiff's Exhibit No. 13 was marked for

19        identification.)

20   BY MR. KOSLOWE

21        Q.   This is on 5/1/2023.  So this is just after

22   April resolution; right?

23        A.   A few days after, yes.

24        Q.   Mr. Morales was the Director of Facilities and

25   Fleet Management under which was housed Asset

Rafael Paz
May 05, 2025

1    Management; right?

2        A.   Yes.

3        Q.   That's the division within the City

4    administration tasked with accomplishing the directive

5    set out by the resolution; right?

6        A.   Yes.

7        Q.   And he is asking you who from your team is the

8    person for this particular item, right?

9        A.   Yes.

10       Q.   So this is showing how the -- your office,

11   City staff is moving forward with the tasks that were

12   directed to them under the April resolution; right?

13       A.   I don't know.

14       Q.   You don't know?

15       A.   There is that e-mail asking me who from my

16   team is but I don't know what they were doing.

17       Q.   Is that a question for Mr. Morales not

18   indicative of the fact he was working on the item that

19   was assigned to him?

20            MR. HOCKMAN:   Objection, speculation.

21            THE WITNESS:   He was following up on the item,

22       yes.

23   BY MR. KOSLOWE:

24       Q.   By the way do you know who was assigned?

25       A.   It would have been either Gisela or Rick.

Rafael Paz
May 05, 2025

 1    Most likely Rick.

 2            MR. KOSLOWE:  I'm going to show you another

 3        document.  This will be 14 to your deposition.

 4        This is MB00095921.

 5            (Plaintiff's Exhibit No. 14 was marked for

 6        identification.)

 7    BY MR. KOSLOWE

 8        Q.   Eric Carpenter, he was the Assistant City

 9    Manager at the time?

10        A.   Or Deputy City Manager.

11        Q.   Now he is the City manager of City of Miami

12    Beach?

13        A.   Yes.

14        Q.   He is reporting that Mr. Taxis who is also one

15    of the ACMs he is going to be the point person for the

16    Nikki Beach project, right?

17        A.   Yes.

18        Q.   Your office ostensibly -- let me take a step

19    back.  Mr. Morales asked you who was going to be point

20    you would have responded to him; right?

21        A.   Yes.

22        Q.   So you would have assigned somebody to be

23    point on this item?

24        A.   Yes.

25        Q.   Either Rick or Gisela?

Rafael Paz
May 05, 2025

1      A.   Yes.

2      Q.   Eric Carpenter is assigning Mr. Taxis to be

3  point for administration perspective; right?

4      A.   Yes.

5      Q.   This item being negotiating with Boucher to

6  reach terms and to bring those terms and a contract back

7  to the City Commission for their future determination?

8      A.   To negotiate a nonbinding term sheet.  Not a

9  contract.

10     Q.   And bring those terms back so the Commission

11 can decide whether to move forward with the Management

12 or Concession Agreement or not to?

13     A.   Yes.

14     Q.   And then your team started to work with the

15 lawyers for Boucher on these items; right?

16     A.   I don't know.

17     Q.   You don't recall doing that?

18     A.   I don't recall.

19         MR. KOSLOWE:  Show you another document, mark

20     as Exhibit 15 to your deposition.  This is

21     MB00424149.

22         (Plaintiff's Exhibit No. 15 was marked for

23     identification.)

24 BY MR. KOSLOWE

25     Q.   This is an e-mail exchange between you and

Rafael Paz
May 05, 2025

1    Mr. Andrade, right, sir?

2         A.    Yes.

3         Q.    That was the lawyer for Boucher; right?

4         A.    I believe he was representing Boucher, yes.

5         Q.    You were talking about bid waiver resolution?

6              MS. MACK:  Object to form.

7              MR. KOSLOWE:  What's the form objection?

8              MS. MACK:  The document speaks for itself.

9    BY MR. KOSLOWE

10        Q.    Were you talking about a bid waiver

11   resolution?

12        A.    I wasn't talking.  He asked me for a copy of a

13   bid waiver resolution.

14        Q.    And you provided it?

15        A.    And I provided it.

16        Q.    Was that in the context of the April 2023

17   resolution?

18        A.    I don't know.

19        Q.    Do you recall any other interactions you had

20   with Mr. Andrade on behalf of Boucher?

21        A.    At the time, no.

22        Q.    Does it not suggest if you're having these

23   conversations, these discussions or communications with

24   Mr. Andrade who represented Boucher they were done in

25   connection with the work you were tasked to perform

Rafael Paz
May 05, 2025

1   under the April resolution?

2          MR. HOCKMAN:  Objection, form.

3          THE WITNESS:  I can't speak to that, why he

4      asked for it but he asked for it and I provided it.

5   BY MR. KOSLOWE

6      Q.   You had as the City Attorney you had a staff

7   of eleven other attorneys who worked for you, right?

8      A.   Yes.

9      Q.   And you had a clerk's office also available

10  that in the normal course would provide documents or

11  City records that were requested by third parties to the

12  City; right?

13         MS. MACK:  Object to form.

14         THE WITNESS:  Yes.

15  BY MR. KOSLOWE

16     Q.   And in the normal course would a lawyer

17  representing a party the City is negotiating with just

18  come to you for a document just out of nowhere?

19         MS. MACK:  Object to form.

20         MR. HOCKMAN:  Join.

21         THE WITNESS:  Yes.  We've gotten a lot of

22      e-mails from lawyers for documents.

23  BY MR. KOSLOWE

24     Q.   Would you respond to that or would you assign

25  it down to staff or clerk?

Rafael Paz
May 05, 2025

1      A.    In this case I happened to have it handy so --

2    and I know Ralph Andrade and so I just produced it.

3    Faster for me to just hit send real quick than to assign

4    it to someone and have them follow up.  So I provided

5    it, yes.  I will do that in the ordinary course.

6      Q.    And you don't think that this interaction that

7    we're looking over here in this exhibit was within the

8    context of the task that you and your office were

9    directed by the April resolution?

10     A.    I don't know but yes, probably.  If it's

11   referenced in the April resolution then yes, this is a

12   follow up item I would presume from that.

13         MR. KOSLOWE:  I am going to show you another

14      document you, sir.  This is Exhibit 16 to your

15      deposition.  This is MB00262265.

16         (Plaintiff's Exhibit No. 16 was marked for

17      identification.)

18   BY MR. KOSLOWE

19     Q.    Let me know when you've had a chance to look

20   it over.

21     A.    Okay.

22     Q.    So here Mr. Morales is asking you for follow

23   up information, additional information, about what the

24   next steps are going to be for this Nikki Beach item;

25   right?

Rafael Paz
May 05, 2025

1      A.    Yes.

2      Q.    You're responding to him giving him again the

3  process that's set out in 1.03F; right?

4      A.    Yes.

5      Q.    Was this part of the work that his team and

6  your team were doing to begin attending to the

7  directives of the Commission?

8      A.    Well, no because the directives hadn't been

9  provided yet.  He's just asking assuming that the item

10  would have passed to direct those negotiations.  He's

11  just asking for what the path for the item would be.

12      Q.    Do you know if his team had been doing work

13  subsequent to the FERC directive in January of 2023?

14           MS. MACK:  Object to form.

15           THE WITNESS:  I don't know.

16  BY MR. KOSLOWE

17      Q.    Aside from the items you saw that they

18  undertook or reported back to FERC in April that they

19  had done?

20      A.    I don't know.

21      Q.    So you didn't participate at all in the work

22  that staff did after taking direction from FERC in

23  January of 2023?

24      A.    I don't remember participating in the work

25  that the staff did, whatever engagement work or ordering

Rafael Paz
May 05, 2025

1   the appraisals or the facility assessment.  I wasn't a
2   part of that.
3           MR. KOSLOWE:  Going to show you a document it
4       will be 17 to your deposition.  This is MB06056399.
5           (Plaintiff's Exhibit No. 17 was marked for
6       identification.)
7   BY MR. KOSLOWE
8       Q.   This is -- this document shows you accepting a
9   meeting invitation on May 15th 2023 by Boucher Bros;
10  right?
11      A.   Yes.
12      Q.   Do you recall what this meeting was about?
13      A.   I don't but knowing that it came from Rob
14  Rosenwald it would have been a litigation matter.
15      Q.   Rob Rosenwald is one of the litigators?
16      A.   Yes.
17      Q.   Do you remember having this meeting with
18  Mr. Rosenwald?
19      A.   I don't.  I don't.  But I have no doubt that
20  it occurred if it's on my calendar.
21      Q.   And did you discuss anything about the April
22  resolution?
23           MS. MACK:  Objection.
24           MR. HOCKMAN:  Objection.  This question calls
25       for privileged attorney-client communications.

Rafael Paz
May 05, 2025

1           MS. MACK:  And attorney work product.

2           MR. HOCKMAN:  And attorney work product.

3           MR. KOSLOWE:  Your counsel admonished you not

4       to answer.

5           MR. HOCKMAN:  Didn't say that.  Just

6       objecting.  If you can answer it without --

7           THE WITNESS:  I don't remember this meeting.

8       I vaguely remember that the lawsuit -- there was a

9       lawsuit filed.  I don't remember when and it was

10      not your firm.  It was Duane Morris.  Always forget

11      to guy's name.  Phil Hudson and I believe it was

12      challenging the Commission's right to issue an RFP

13      which was bizarre, as bizarre as it comes but I

14      don't know if this meeting was about that.  I don't

15      recall this meeting.

16  BY MR. KOSLOWE

17      Q.   Do you know about this meeting you discussed

18  the City's work to undertake the tasks assigned to it by

19  the April resolution?

20          MR. HOCKMAN:  I am going to object to the

21      extent it calls for attorney client communication

22      or work product.  If you can answer without

23      disclosing that you may.

24          THE WITNESS:  Rob would not have been involved

25      in the negotiation of any proposed terms for an

Rafael Paz
May 05, 2025

1          agreement.  It is not within his subject matter

2          area.  He is the Chief of Litigation and that's his

3          focus.

4    BY MR. KOSLOWE

5          Q.   So do you know what work the City

6    administration and staff did to carry out the tasks

7    assigned to it in the April resolution?

8          A.   I don't.

9          Q.   Did you see the concepts and renderings that

10   Boucher provided to the City?

11             MS. MACK:  Object to form.

12             MR. HOCKMAN:  Foundation.

13             THE WITNESS:  I don't.  I don't remember.  I

14         don't even think I saw as a result of the

15         competitive solicitation what the concept was or --

16         but I don't know if there was even a concept ready

17         at that time or what had been proposed.  I don't

18         know.

19   BY MR. KOSLOWE

20         Q.   I'm focusing my question on the time period

21   after issuance of the April resolution and before an RFP

22   was issued, okay?

23         A.   Okay.

24         Q.   During that time period did you see any

25   renderings or concepts from Boucher for the future of

Rafael Paz
May 05, 2025

1    the One Ocean Drive property?

2         A.   No.

3         Q.   Did you see or participate in any discussions

4    between the City and Boucher related to the tasks that

5    Commission directed staff to undertake in the April

6    resolution?

7         A.   No, and I'm not aware that they even submitted

8    any initial draft of proposed terms prior to that

9    resolution being rescinded.

10        Q.   You're not aware or you didn't see, which is

11   it?

12        A.   Both.

13        Q.   Might it have happened but you weren't

14   involved?

15             MS. MACK:  Object to form.

16             THE WITNESS:  If it had happened I would have

17        seen it.

18   BY MR. KOSLOWE

19        Q.   So if there had been any terms discussed

20   between Adrian Morales and his team and Boucher you

21   would have seen it?

22        A.   If there was a draft that was submitted with

23   proposed terms I would have seen it.

24        Q.   What about if there was a concept or

25   renderings that were provided by Boucher, would you have

Rafael Paz
May 05, 2025

1   seen that?

2        A.   Not necessarily, no.

3        Q.   You met with Steve Boucher and one of his

4   representatives and the Mayor in April of 2023; right?

5        A.   I did.

6        Q.   Earlier you said you didn't have any meetings

7   with Boucher in April of 2023 when we were looking at

8   the FERC resolution.  I was confused by that.

9        A.   I don't know that I said that.

10       Q.   I guess we'll have to go through the

11  transcript.  Before the FERC meeting on April 21, 2023

12  did you have a meeting with Mayor Gelber, Steve Boucher

13  and another representative from Boucher?

14       A.   I remember there was one meeting in the

15  Mayor's large conference room.  I don't remember when.

16  It was before the Finance Committee meeting, I believe.

17       Q.   Mayor Gelber called the meeting?

18       A.   I don't know who called the meeting but I

19  attended.

20            MR. KOSLOWE:  Show you a document we'll mark

21       it as 18 to your deposition.  This is CMB0017065.

22            (Plaintiff's Exhibit No. 18 was marked for

23       identification.)

24  BY MR. KOSLOWE

25       Q.   If you go down to the earliest e-mail on the

Rafael Paz
May 05, 2025

1    chain it's at the page ending in 67.?

2         A.    Okay.

3         Q.    So it was Mr. Gelber, the Mayor, who called

4    this meeting?

5         A.    Yes, his Chief of Staff requested the meeting.

6         Q.    He requested it with you and Mr. Boucher;

7    right?

8         A.    That's what this says, yes.

9         Q.    You asked for Eric Carpenter to be looped in;

10   right?

11        A.    Yes.

12        Q.    The Mayor met with Boucher prior to this in

13   order to set up this meeting; right?

14             MR. HOCKMAN:   Objection, foundation.

15             THE WITNESS:   I don't know.

16   BY MR. KOSLOWE

17        Q.    How else would it be that the Mayor is asking

18   for a meeting with a third party constituent and you if

19   he had not first had some communication with that third

20   party constituent to set up a meeting?

21             MR. HOCKMAN:   Objection, speculation.

22             THE WITNESS:   So you asked did the Mayor meet

23        with them before requesting this meeting.  I don't

24        know that the Mayor met with them.  I don't know if

25        Michelle Berger met with them or spoke with them.

Rafael Paz
May 05, 2025

```
1              I don't know if the Mayor was the one that

2         initiated the request for the meeting and then

3         Michelle was reaching out to the Bouchers and to

4         me.  I wasn't involved in any of that.  I got the

5         invite.  I wasn't even invited on the invite.  It

6         was through my assistant.

7    BY MR. KOSLOWE

8         Q.   So there had to have been some communication

9    between someone at the Mayor's office and someone at

10   Boucher before they invited you to a meeting between the

11   Mayor, Boucher and you; right?

12             MR. HOCKMAN:  Objection, speculation.

13             THE WITNESS:  I don't know.

14   BY MR. KOSLOWE

15        Q.   So you think there is a possibility that this

16   e-mail from Thursday December 13, 2023 asking to

17   schedule a meeting between the Mayor, yourself and

18   Mr. Boucher took place and there had been before that no

19   communication at all between the Mayor's office, anyone

20   involved in the Mayor and anyone involved with Boucher?

21             MR. HOCKMAN:  Objection, speculation,

22        argument.

23             THE WITNESS:  I'm not saying that.  I'm saying

24        I don't know.  I don't have any personal knowledge

25        of anything leading up to this e-mail being sent to
```

Rafael Paz
May 05, 2025

```
 1        my assistant.
 2   BY MR. KOSLOWE
 3        Q.   Based on your experience working at the City
 4   of Miami Beach and also just based on common sense you
 5   know that prior to this meeting invitation that was sent
 6   out by Ms. Berger on April 13, 2023 there was some
 7   communication between the Mayor and the Mayor's office,
 8   maybe his staff and someone at Boucher, right?
 9             MR. HOCKMAN:  Objection, speculation,
10        foundation, hypothetical.
11             THE WITNESS:  It's possible.
12             MR. KOSLOWE:  Not just possible it's definite;
13        right?
14             MR. HOCKMAN:  Objection, speculation,
15        foundation, hypothetical, argumentative.
16             THE WITNESS:  I don't know that it's definite.
17        I already answered that I don't have any factual
18        information about anything that transpired prior to
19        this e-mail being sent.
20   BY MR. KOSLOWE
21        Q.   I understand your testimony is that you don't
22   have any personal information about what that
23   communication was.  But I'm going to have to ask someone
24   about that if it happened.  So based on the fact that
25   you worked at the City for a decade and you were the
```

Rafael Paz
May 05, 2025

1    City Attorney for several years and part of that was

2    under the tenure of Mayor Gelber I'm asking with all

3    that information that you have and that experience if

4    prior to this e-mail being sent to set up a meeting

5    whether there must have been some communication between

6    the Mayor's office and someone at Boucher?

7              MR. HOCKMAN:  Objection, speculation,

8         foundation, argument.

9              THE WITNESS:  I don't know whether there must

10        have been but yes, it's possible.

11   BY MR. KOSLOWE

12        Q.   Is it highly likely or just possible?

13             MR. HOCKMAN:  Same objection.

14             THE WITNESS:  It's likely.

15   BY MR. KOSLOWE

16        Q.   Is it more than likely -- is it highly likely?

17             MR. HOCKMAN:  Same objections.

18             THE WITNESS:  I don't know but it's likely.

19   BY MR. KOSLOWE

20        Q.   Since I'm going to want to talk to everyone

21   involved to figure out what happened since you're saying

22   it's not definite but only likely that prior to this

23   communication setting up the meeting that there was some

24   communication between the Mayor's office and Mr. Boucher

25   what other possibilities were there for communications

Rafael Paz
May 05, 2025

1    about this meeting leading up to it other than some

2    communication between the Mayor's office and Boucher?

3              MR. HOCKMAN:  Objection, speculation.

4              THE WITNESS:  I don't know how the request for

5         the meeting was initiated.  If it came from the

6         Mayor or if it came from the Bouchers but it would

7         have come from one or the other.

8    BY MR. KOSLOWE

9         Q.   From one of the other to the other?

10        A.   Yes.

11        Q.   So either from the Bouchers to the Mayor or

12   from the Mayor to the Bouchers?

13        A.   Yes.

14        Q.   Then there was some communication between the

15   Mayor, Mayor's office?

16        A.   Or his staff.

17        Q.   And Boucher prior to this e-mail from

18   April 13th?

19             MR. HOCKMAN:  Objection, speculation.

20             THE WITNESS:  Most likely.  Unless the request

21        to -- from the Mayor if it was initiated by him or

22        his office to the Bouchers went contemporaneous

23        with the request to me.  I don't know.  I don't

24        have that information.

25   ///

Rafael Paz
May 05, 2025

1   BY MR. KOSLOWE

2       Q.   It could have been at or around the same time

3   the Mayor could have reached out personally and the

4   Mayor could have reached out to the Bouchers at or

5   around the same time?

6           MR. HOCKMAN:   Objection, speculation.

7           THE WITNESS:   That's possible.

8   BY MR. KOSLOWE

9       Q.   What was the subject of this meeting?

10      A.   The subject of the meeting was the Finance

11  Committee agenda item that was going to be discussed on

12  the 27th or 21st.

13      Q.   That being the future disposition and

14  operation and management of One Ocean Drive?

15      A.   The subject of the meeting was the agenda item

16  for the Finance Committee that was on April 21st.

17      Q.   And did that include the City's future

18  disposition, operation and management of the One Ocean

19  Drive property after the termination of the lease that

20  was there at the time?

21      A.   Yes.  If that's what -- it was on the

22  discussion regarding the upcoming exploration of Nikki

23  Beach lease, yes.

24      Q.   So the subject of this meeting between the

25  Mayor of the City of Miami Beach, the deputy City

Rafael Paz
May 05, 2025

1    Manager of the City of Miami Beach and the City Attorney

2    of the City of Miami Beach with Boucher was the future

3    of One Ocean Drive; right?

4         A.   It was the Finance Committee meeting agenda

5    item.

6         Q.   Did that include the future operation and

7    management of One Ocean Drive after the expiration of

8    the lease?

9         A.   Yes.

10         Q.   And did that subject and topics or material

11    covered at this meeting include Boucher's plans for them

12    running and operating or managing One Ocean Drive?

13         A.   I don't recall if there was a reference to

14    specific plans or not.

15         Q.   Before we get to specific plans was the

16    general topic of Boucher operating and managing One

17    Ocean Drive discussed at this meeting?

18         A.   Yes.

19         Q.   Were there any general concepts or plans of

20    Boucher running or operating One Ocean Drive discussed

21    at this meeting?

22         A.   Were there any general concepts or plans?

23         Q.   For any general concept or plans --

24         A.   Specific proposal.  I don't recall a specific

25    proposal for a particular concept or plan for the

Rafael Paz
May 05, 2025

1    operation.

2         Q.   Were there any general concepts or plans for

3    Boucher operating One Ocean Drive discussed at this

4    meeting?

5         A.   Yes.

6         Q.   What were they?

7         A.   The general concept was that they would

8    operate the facility and have a beach club and

9    restaurant type operation.

10        Q.   Were any partnerships or joint ventures

11   between Boucher or anyone else for that plan discussed?

12        A.   That I don't recall.

13        Q.   But you know the Bouchers never operated a

14   restaurant before; right?

15        A.   Yes.

16        Q.   You yourself just testified that among the

17   characteristics or strike that.  You yourself testified

18   that among the topics and issues that the City would

19   consider in forming up with a partner for property that

20   it has would be its past operations of similar services;

21   right?

22        A.   Yes.

23        Q.   You don't recall at this meeting any

24   discussion between anyone from the City side and Boucher

25   about who they worked with to operate this beach club in

Rafael Paz
May 05, 2025

1   as much it had never done so before?

2       A.   No, I don't remember.

3       Q.   They didn't discuss Major Food Group at this

4   meeting?

5       A.   I don't remember.

6       Q.   So you were there, Mr. Carpenter was there,

7   the Mayor was there from the City?

8       A.   Yes.

9       Q.   Anyone else there from the City?

10      A.   Michelle Berger may have come in and out of

11  that meeting.

12      Q.   But she wouldn't have been there the whole

13  time?

14      A.   She would often kind of come in and out of

15  meetings.  I don't remember if she was there for the

16  whole time.

17      Q.   What details or specific information about

18  Boucher's concept for a beach club that they would

19  manage and operate at One Ocean Drive do you recall from

20  that conversation?

21      A.   What I remember was the general concept and I

22  remember that there were no proposed terms for the

23  operation at that time.  They did not -- they were not

24  far along enough in developing proposed terms for the

25  City to consider.

Rafael Paz
May 05, 2025

1    Q.   Why did you ask for Mr. Carpenter to be

2  included in the meeting?

3    A.   That's a good question.  It's really important

4  for me as the attorney to bring in the administration on

5  items that involve -- that will involve the

6  administration and there was a disconnect with not so

7  much with the Mayor.  He was generally pretty good about

8  including the administration but there were members of

9  the Commission that would want to work around the

10 administration and -- so there was constant information

11 flow between me and Alina to make sure that they would

12 get brought in as appropriate but it's just by virtue of

13 all the thousand issues that everyone's dealing with.

14      So, yes, this came up at a time when we often

15 wanted to work together to make sure that the manager is

16 aware of everything that's being developed for any given

17 agenda.

18   Q.   So this is part of what's being developed for

19 the agenda before FERC in April?

20   A.   The subject of the meeting was about the

21 Finance Committee meeting and what that would look like,

22 yes.

23   Q.   What work did you do after the meeting for the

24 items that were discussed at that meeting?

25   A.   Nothing.  I prepared for the Finance Committee

Rafael Paz
May 05, 2025

1   meeting just like I would for any other meeting.

2        Q.   What did you do to prepare for the Finance

3   Committee meeting?

4        A.   I don't know when the date was but the first

5   question that I have is an item actually going to happen

6   or not which I think there was an e-mail to that effect

7   where I was asking if the item was going to be deferred

8   or not.  But in this case my participation in the

9   meeting was limited to basically providing the Mayor and

10  Steve who was in the room with the same information that

11  I provided to Adrian of what is the path for an approval

12  of a Concession Agreement and so those options were

13  discussed.  If it's going to be a lease there's one

14  path.  If it's going to be a Concession Agreement there

15  is another path.  If it's going to be a Concession

16  Agreement that's less than ten years then there is yet

17  another path.

18            So I think that was the gist of the meeting in

19  terms of what the possible outcomes of the meeting could

20  be and if the outcome was to negotiate with one party

21  what the path would look like.

22       Q.   Did you do additional work to get yourself

23  familiar with the current lease terms, cart and rent

24  terms, financial term, at the existing contracts?

25       A.   No, that would not be germane to the legal

Rafael Paz
May 05, 2025

1     approval process for a new agreement.

2              MR. KOSLOWE:  Going to show you a document,

3         sir, we'll mark it as 19 to your deposition.

4         E-mail with attachments.  This is at MB00446200.

5              (Plaintiff's Exhibit No. 19 was marked for

6         identification.)

7     BY MR. KOSLOWE

8         Q.   Why don't we start with the e-mail as it's

9     quite short.

10        A.   Okay.

11        Q.   So on April 19th, the day after the meeting

12    you had with the Mayor and Boucher, you write to Gisela

13    Torres "can you send me the Penrod's lease for Nikki

14    Beach.  Thanks?"

15        A.   Yes.

16        Q.   She sends along the document with the lease

17    summaries at the end of them; right?

18        A.   Yes.

19        Q.   I thought you just said the lease terms

20    wouldn't be germane to your discussion or the actions

21    you were taking?

22        A.   I said they would not be germane to the

23    approval process for a new agreement which was that was

24    what that meeting, I said that was what my participation

25    in that meeting was about.  I did before the Finance

Rafael Paz
May 05, 2025

1  Committee meeting it is possible during the meeting

2  where electeds could ask what does the agreement say

3  about this, what does the agreement say about that.  I

4  didn't review it.  I wanted to have it so that I could

5  refer to it if asked at the Finance Committee meeting

6  and that's what this was.

7       Q.   Wasn't knowledge about the lease's basic terms

8  and financial terms within the purview of Asset

9  Management?

10       A.   It could be.  It is within the purview of

11  Asset Management, yes.

12       Q.   They need to know what the lease and financial

13  terms are; right?

14       A.   Yes, they administer those agreements so yes.

15       Q.   And this particular item was already within

16  their remit, this particular item that was going before

17  FERC was already within their remit?

18       A.   Yes.

19       Q.   They were doing work after being directed in

20  January of 2023 by FERC to come back to report back to

21  FERC in April of 2023; right?

22       A.   Yes.

23       Q.   Did you not trust them to have the information

24  basic lease information and the basic financial

25  information that they would need to know to administer

Rafael Paz
May 05, 2025

1    the lease when they were reporting back to FERC?

2         A.   Of course I trust them but I need to be

3    prepared myself to be able to answer any questions that

4    are made of me and so I just wanted to have the

5    agreement handy.

6         Q.   Did you also want to have -- I'm sorry.  I

7    want to know what your role here was.  The basic lease

8    terms in case they asked about the contract terms from a

9    legal perspective?

10        A.   Yes.

11             MR. KOSLOWE:  I'm showing you a document.

12        This will be Exhibit 20 to your deposition.  This

13        is an e-mail with attachments starting at

14        MB00240692.  The final page of the document was

15        produced in native.

16             (Plaintiff's Exhibit No. 20 was marked for

17        identification.)

18             THE WITNESS:  Okay.

19   BY MR. KOSLOWE

20        Q.   So why are you following up with Ozzie about

21   the annual rent terms?

22        A.   Just asking for information.

23        Q.   Why?

24        A.   I don't remember.

25        Q.   You just met with the Mayor and Boucher where

Rafael Paz
May 05, 2025

1    Boucher discussed general concepts for their operation

2    of One Ocean Drive.  FERC's having a meeting where

3    they're discussing the future of One Ocean Drive and

4    you're asking for rent information and you obtain it.

5    You don't remember why?

6              MS. MACK:  Object to form.

7              THE WITNESS:  No, I don't remember.  I didn't

8         even remember starting this deposition that I

9         attended that meeting.  So yes, I don't remember.

10   BY MR. KOSLOWE

11        Q.   Now that you're seeing the work that you did

12   to prepare for the FERC meeting does it refresh your

13   recollection about the work that you did after the

14   meeting with the Mayor and in preparation for the FERC

15   meeting?

16        A.   No, I think that would be all that would be

17   required for the FERC meeting.

18        Q.   Why was your meeting with the Mayor not

19   reported by the administration to FERC in their memo?

20              MR. HOCKMAN:  Objection, foundation.

21              THE WITNESS:  I don't know.  I don't know if

22         their memo had printed by the time that the -- I

23         don't know.

24   BY MR. KOSLOWE

25        Q.   Did you discuss with the members of the

Rafael Paz
May 05, 2025

1    Commission who were part of FERC that you and the Mayor

2    had a meeting with Boucher about the future of One Ocean

3    Drive?

4         A.    Could you repeat the question?

5         Q.    Did you discuss with the commissioners who

6    were members of FERC at that FERC meeting that prior to

7    that meeting you had had a meeting with the Mayor and

8    with Boucher about the future of One Ocean Drive?

9         A.    No, I wouldn't have had to discuss with FERC

10   if there was any individual meeting that took place

11   prior to the FERC meeting.

12        Q.    You didn't think it's germane?

13        A.    Just not -- I don't think that it matters.

14        Q.    Why not?

15        A.    Because the Mayor is one member of the

16   governing body, one of seven.  He has one vote like

17   everybody else and he is entitled to understand what

18   is -- what an item is about and what the options are at

19   that committee and what could come out of committee that

20   he would be dealing with as the chair of the Commission

21   and it's just an individual meeting.

22             We don't disclose generally individual

23   conversations with electeds don't shared with other

24   electeds and there are Sunshine Law issues and it's just

25   not necessary.

Rafael Paz
May 05, 2025

1          Q.   So this was a meeting between one of the most

2     senior members of City staff, the most senior attorney

3     at the City and Boucher and the Mayor and it was about

4     Boucher's future operation of One Ocean Drive.  Go into

5     a meeting with FERC and the commissioners are discussing

6     hey, I have an idea, we'll just negotiate directly with

7     FERC and see what -- pardon me, negotiate directly with

8     Bouchers and see what concept they have.  You didn't

9     think it was germane to say by the way I just had a

10    meeting with Boucher, we're already talking to them

11    about what general concept they may have.  You didn't

12    think that was germane to talk about?

13              MS. MACK:  Object to form.

14              MR. HOCKMAN:  Speculation and argumentative.

15              THE WITNESS:  No, and that's not what I said.

16         So there was a meeting.  Obviously Boucher was

17         interested in pursuing the agreement.  The options

18         for FERC were what do they want to do.  Do they

19         want to issue a competitive solicitation consistent

20         with the manager's recommendation or do they want

21         to not accept the manager's recommendation and

22         pursue something different.

23              Whether -- I don't think that it would be news

24         to anyone in the room that Boucher was interested

25         in negotiating with the City for the potential

Rafael Paz
May 05, 2025

```
 1        terms of an agreement.
 2   BY MR. KOSLOWE
 3        Q.   And by negotiating with the City for potential
 4   terms of an agreement you're talking about negotiating
 5   directly just between Boucher and the City for potential
 6   terms for an agreement; right?
 7             MR. HOCKMAN:  Object to the form.
 8             THE WITNESS:  Yes, no surprise that any party
 9        given the option would prefer to have the
10        opportunity for direct negotiations.
11   BY MR. KOSLOWE
12        Q.   And that was the tenor and tone of the
13   discussion that Boucher had at that meeting that you
14   took with the Mayor and Mr. Carpenter that they had this
15   concept and they would like to negotiate directly with
16   the City for?
17             MS. MACK:  Object to form.
18             THE WITNESS:  I don't know about tenor or tone
19        but yes, they wanted the opportunity to develop
20        proposed terms for the City's consideration.
21   BY MR. KOSLOWE
22        Q.   Directly with the City?
23        A.   Directly with the City.
24        Q.   So staff -- everyone knew that.  When they
25   issued the memo to FERC and when they had the FERC
```

Rafael Paz
May 05, 2025

1   meeting and staff made the recommendation and Ms. Hudak

2   made the recommendation to have an RFP they knew that

3   Boucher wanted direct negotiations instead?

4            MR. HOCKMAN:  Objection, speculation,

5       foundation.

6            THE WITNESS:  I don't know who knew what but

7       yes, they knew that the Bouchers were interested

8       and the Penrods similarly wanted the opportunity to

9       develop terms and on an exclusive bid waiver basis,

10      yes.

11  BY MR. KOSLOWE

12      Q.   Just to make sure you said it was I believe

13  the words was no secret to anyone in the room?

14      A.   Probably, yes.  It would not be news to anyone

15  in the room that the Penrods or the Bouchers wanted the

16  opportunity to negotiate terms directly.

17      Q.   And the City knew that, the City staff knew

18  that, the senior City staff knew that, at least as far

19  back as the meeting that you took with the Mayor and

20  Mr. Carpenter on April 18th of 2023?

21           MR. HOCKMAN:  Objection, speculation and

22      foundation.

23           THE WITNESS:  I would think so but how do I

24      know what they knew exactly.

25  ///

Rafael Paz
May 05, 2025

1   BY MR. KOSLOWE

2        Q.   Mr. Carpenter knew it and he was in the

3   meeting with you.  If you figured it out he probably

4   figured it out; right?

5             MR. HOCKMAN:  Objection, speculation,

6        foundation, argument.

7             THE WITNESS:  I don't know what was in

8        Mr. Carpenter's head.

9   BY MR. KOSLOWE

10       Q.   Putting aside what was in his head at that

11  meeting you already testified that Boucher communicated

12  that they wanted to negotiate directly with the City for

13  proposed terms for management and operation of One Ocean

14  Drive; right?

15       A.   Yes, that was an option.

16       Q.   And so Mr. Carpenter was there so he heard

17  that?

18             MR. HOCKMAN:  Objection, speculation,

19        foundation.

20             THE WITNESS:  Yes.  He would have been aware

21        of what they said at that meeting.

22  BY MR. KOSLOWE

23       Q.   And nevertheless despite that the City

24  administration, Ms. Hudak as the City Manager and her

25  administration made the recommendation have competitive

Rafael Paz
May 05, 2025

1   solicitation; right?

2          MR. HOCKMAN:  Objection to form.

3          THE WITNESS:  I don't know if it was despite

4      that but they did make the recommendation.

5   BY MR. KOSLOWE

6      Q.   They made the recommendation despite knowing

7   that?

8          MR. HOCKMAN:  Object to form.

9          THE WITNESS:  I answered just now I don't know

10     if it was despite that but they made the

11     recommendation.

12  BY MR. KOSLOWE

13     Q.   Did they make the recommendation while having

14  that information?

15     A.   I don't know that I could speak to exactly

16  when that recommendation was made.  I don't know how to

17  answer your question.

18     Q.   Recommendation was made when the memo issued

19  to FERC on April 21st that's what it says on the memo;

20  right?

21     A.   Right.  I don't know when that was issued.

22     Q.   Was it not issued on April 21st?

23     A.   The meeting was on April 21st so the agenda

24  item would have been released days before up to a week

25  before.

Rafael Paz
May 05, 2025

1      Q.   And if there was new information that the City

2  had, that the City administration had, was there a way

3  for them to inform FERC about that, perhaps by changing

4  their memo or giving them some additional information at

5  the meeting?

6           MR. HOCKMAN:   Objection, speculation.

7           THE WITNESS:   That is an option.

8  BY MR. KOSLOWE

9      Q.   But they did not do that?

10     A.   I don't know if -- I don't know if they did.

11 We can go through the transcript but I don't know if

12 they did or didn't.

13     Q.   Why don't we look at the transcript and we'll

14 see if -- this is what we're looking for.  Look at the

15 transcript and the memo if there is any indication that

16 the City administration has changed its recommendation

17 because of their knowledge that Boucher wants to

18 negotiate exclusively those terms with the City.

19     A.   So --

20     Q.   I think the two exhibits are seven --

21     A.   I don't know that it's necessary for me to

22 read the entire transcript but it doesn't sound to me

23 like they changed their recommendation.

24     Q.   So I want to give you all the opportunity that

25 you would need to peruse the document, sir?

Rafael Paz
May 05, 2025

1      A.    Okay.

2      Q.    Have you had that opportunity?

3      A.    You've provided me the ability to peruse the

4  document.

5      Q.    And also the memorandum which is also one of

6  the exhibits here?

7      A.    Yes.

8      Q.    And based on your recollection, based on the

9  reviewing these documents now the City administration

10  knew that Boucher wanted direct negotiations for terms

11  to manage and operate One Ocean Drive.  They knew that

12  prior to the FERC meeting.  They issued their

13  recommendation knowing that, that the City should in its

14  best interests have competitive solicitation and there's

15  no information they changed that recommendation to have

16  competitive solicitation; right?

17           MR. HOCKMAN:  Objection, speculation,

18       foundation, argument.

19           MS. MACK:  Objection.

20           THE WITNESS:  The record does not reflect they

21       changed their recommendation.  What the City

22       administration knew at or during or before or after

23       they made their recommendation I can't really speak

24       to that.

25  ///

Rafael Paz
May 05, 2025

 1  BY MR. KOSLOWE

 2      Q.   You can speak to the fact that Mr. Carpenter

 3  knew at least as late as when you did at that meeting

 4  that he had with you and the Mayor and Boucher; right?

 5           MR. HOCKMAN:  Objection, speculation.

 6           THE WITNESS:  He was at the meeting.  Sorry,

 7       did you finish?

 8           MR. HOCKMAN:  Let me start over.  Objection,

 9       speculation.

10           THE WITNESS:  He was at the meeting.

11  BY MR. KOSLOWE

12      Q.   And being at the meeting he heard Boucher say,

13  communicate, that they wanted direct negotiations for

14  operation and management of One Ocean Drive; right?

15           MR. HOCKMAN:  Same objection.

16           THE WITNESS:  He heard that that was an

17       option, that they were interested in, yes.

18  BY MR. KOSLOWE

19      Q.   And is Mr. Carpenter one of the senior members

20  of the City Administration at that time?

21      A.   Yes.

22      Q.   Second only to Ms. Hudak at that time?

23      A.   Yes.

24           MR. KOSLOWE:  Sir, I'm going to show you

25       another document.  This will be Exhibit 21 to your

Rafael Paz
May 05, 2025

1       deposition and this is City of Miami Beach

2       Resolution 2023-32612.

3              (Plaintiff's Exhibit No. 21 was marked for

4       identification.)

5   BY MR. KOSLOWE

6       Q.   This was the other resolution you mentioned

7   before that the City issued in connection with the One

8   Ocean Drive property; right?

9       A.   Yes.

10      Q.   And you were involved in drafting this

11  resolution, right, sir?

12      A.   I was.

13      Q.   This was done at the direction of Commissioner

14  Richardson?

15      A.   Yes.

16      Q.   Where did you come up with the RFP terms that

17  are in the bullets going from page to three of the

18  resolution?

19             MR. HOCKMAN:  Objection, foundation.

20             THE WITNESS:  So I believe that this was

21      developed in consultation with the sponsor of the

22      resolution and most likely also facilities staff

23      weighed in.

24             MR. KOSLOWE:  Sir, I'm going to show you a

25      document that will be Exhibit 22 to your

Rafael Paz
May 05, 2025

```
 1        deposition.  This is CMB0021438.

 2               (Plaintiff's Exhibit No. 22 was marked for

 3        identification.)

 4   BY MR. KOSLOWE

 5        Q.   Sir, this is an e-mail from you to

 6   Commissioner Richardson and others on May 5, 2023;

 7   right?

 8        A.   Yes.

 9        Q.   And this is attaching an initial draft that

10   you did of what became that resolution of the City in

11   May of 2023; right?

12        A.   Yes.

13        Q.   It says "attached is a draft resolution we

14   discussed for your review;" right?

15        A.   Yes.

16        Q.   You had had discussion with Commissioner

17   Richardson; right?

18        A.   Yes.

19        Q.   He provided you with the basic terms of what

20   this resolution should be?

21        A.   Yes.

22        Q.   Then you put them together and then asked him

23   for feedback and asked him if he would like review and

24   input from Alina, that's Alina Hudak, right?

25        A.   Yes.
```

Rafael Paz
May 05, 2025

1        Q.    And Alex Denis?

2        A.    Yes.

3        Q.    And that's Head of Procurement; right?

4        A.    And others.

5        Q.    Why don't we look at that draft.  I see here

6   in this draft those bullet points we discussed in the

7   final form of the resolution again going from page two

8   to three, do you see those?

9        A.    Item 22 is the draft.

10       Q.    Item 22 is the e-mail with the attachment that

11  is the draft.

12       A.    Okay.

13       Q.    That goes from CMB0021438 sequential to 41;

14  right, sir?

15       A.    Yes.

16       Q.    So this is your draft in the first instance of

17  what will be the May resolution; right?

18       A.    Yes.

19       Q.    It has here a set of terms for the RFP; right?

20  Where did you get those terms?

21       A.    It was developed with Commissioner

22  Richardson's input.

23       Q.    So he -- Commissioner Richardson is the one

24  who said put these various terms together?

25       A.    Yes.

Rafael Paz
May 05, 2025

1           MS. MACK:  Object to form.

2           MR. KOSLOWE:  What's the form objection?

3           MS. MACK:  You are testifying as to what

4      Commissioner Richardson said to him.

5           MR. KOSLOWE:  I formed it with a question

6      "right" at the end.

7  BY MR. KOSLOWE

8      Q.   Did Commissioner Richardson provide you the

9  content that you then drafted into these bullets?

10      A.   Yes.

11      Q.   It says in the last whereas clause which

12  precedes those bullet, precedes the bullets.  High end

13  beach club and ancillary uses.

14      A.   Which recital?

15      Q.   It's the last recital that precedes the

16  bullets.

17      A.   Okay.

18      Q.   "Whereas as part of resolution the Mayor and

19  City Commission further desire."

20      A.   Yes.

21      Q.   It says "high end beach club and ancillary

22  uses."  You see that, sir?

23      A.   It says that, yes.

24      Q.   What does that mean?

25      A.   So that is the description of the program that

Rafael Paz
May 05, 2025

1    he wanted to include in the RFP.

2         Q.    What does it mean?

3         A.    What does it mean a beach club?

4         Q.    What is a high end beach club?

5         A.    High end beach club -- this goes outside of my

6    scope as an attorney but my understanding of a high end

7    beach club as a layperson would be a restaurant

8    operation, serving alcoholic beverages with high quality

9    beach chairs and lounge chairs and maybe even additional

10   programming.

11        Q.    How do you -- how do you know that that

12   content is what meant by high end beach club?

13        A.    This goes outside the scope of me as City

14   Attorney and I don't know that I would be the arbiter of

15   what is high end or not.  That's for business people to

16   determine but I think the quality of the food and

17   beverage operation, the quality of the program and the

18   layout, the furniture, fixtures and equipment.  All of

19   that plays into determining whether something is high

20   end.

21        Q.    When you say it falls outside your purview as

22   City Attorney you're drawing the definition and content

23   you just gave me from general information you have as a

24   layperson; right?

25        A.    I'm drawing the general concept in the

Rafael Paz
May 05, 2025

1  resolution that provides the general direction to

2  prepare an RFP with more detailed specs.

3       Q.   So at some point the procurement office would

4  draft the RFP and that would include the proper

5  definition of this particular term; is that right?

6            MR. HOCKMAN:  Objection.

7            MS. MACK:  Objection.

8            THE WITNESS:  I don't know that it would

9       include a definition but it would certainly

10      elaborate on what the RFP was seeking proposals in

11      response to.

12 BY MR. KOSLOWE

13      Q.   That was drafted by Mr. Denis and his team?

14      A.   I don't know but yes, he was the procurement

15 director so it would have fallen on his department.

16      Q.   Now, when you wrote the term "high end beach

17 club" you took that from Commissioner Richardson, right?

18      A.   Well, I didn't invent the term and I was

19 reflecting what he wanted in his resolution so yes.

20      Q.   Are you aware of any industry terminology that

21 would inform someone as to what content would be

22 necessary for an operation to qualify as a high end

23 beach club?

24      A.   I'm not aware off the top of my head, no.

25      Q.   Would a high end beach clubbing require loud

Rafael Paz
May 05, 2025

1    electronic music?

2         A.    Not require.  I don't believe it would require

3    it, no.

4         Q.    Why do you believe that one way or the other?

5         A.    I don't know that loud electronic music is

6    something that necessarily goes to the quality of an

7    operation.

8         Q.    How do I know that by looking at this term

9    here, how would I know whether or not loud electronic

10   music is required or not required for a high end beach

11   club?

12        A.    Well, in this resolution it's just providing

13   the general parameters but if you are looking to propose

14   in response to an RFP you would look at what the RFP

15   provides as to any number of operational areas.

16        Q.    So this resolution is direction from

17   Commission to staff that staff being the procurement

18   department would determine what the actual

19   specifications and qualifications and terms of the

20   request for proposals would be; right?

21        A.    Working with the user department, the

22   facilities folks, yes.

23        Q.    The second bullet here it says "the RFP shall

24   include minimal requirements to ensure the property is

25   managed by qualified operator."  You see that?

Rafael Paz
May 05, 2025

1          A.   Yes.

2          Q.   Gives three different alternative for what

3    would qualify an operator, operating a beach club, a

4    beachfront concession or similar concerns.  You see

5    that?

6          A.   Yes.

7          Q.   Where did you get these three alternative

8    qualifications for a qualified operator?

9          A.   I think all of the terms in the resolution

10   were drafted with Commissioner Richardson's input and so

11   that -- I don't remember if this specifically was

12   developed with his input but yes, they were developed

13   with -- generally this was all developed with his input.

14         Q.   I'll tell you I have no other prior draft of

15   this, before this draft from you to Commissioner

16   Richardson.  So do you have any other information as to

17   where that particular language beach club, beachfront

18   concession or similar concern came from other than

19   Commissioner Richardson to you?

20         A.   No, I don't.  I drafted this resolution.  I

21   initiated the draft because I believe that the item was

22   placed on an agenda and I developed the draft on a

23   Saturday or Sunday speaking with Commissioner Richardson

24   and I didn't want to bother my staff over the weekend

25   with it so I did it myself.

Rafael Paz
May 05, 2025

1        Q.    These conversations you had with Commissioner

2    Richardson, they were by phone?

3        A.    Yes.

4        Q.    And he was out of town, right?

5        A.    I don't know if he was out of town but they

6    were by phone.

7        Q.    If you look at the draft at the final page

8    there is highlighted blank, second to last bullet point.

9    You see that?

10       A.    Yes.

11       Q.    Says "RFP shall include the following

12   evaluation criteria and scoring "followed by a blank?

13       A.    Yes.

14       Q.    That was an item that Commissioner Richardson

15   hadn't yet provided you guidance on?

16       A.    Yes, that's why it was blank.

17       Q.    Then Commissioner Richardson through various

18   conversations with you later provided that content for

19   what the evaluation criteria should be?

20            MS. MACK:  Object to form.

21            THE WITNESS:  I don't remember if he provided

22       it or if that was then developed in consultation

23       with the administration since we were looping them

24       in.

25   ///

Rafael Paz
May 05, 2025

1    BY MR. KOSLOWE

2        Q.   You suggested looping them in; right?

3        A.   Yes, I suggested.  I don't know what.  I have

4    to see what the e-mail showed.

5            MS. MACK:  Before we get into a new exhibit

6        can we take a brief comfort break?

7            MR. KOSLOWE:  Sure.

8            THE WITNESS:  It's 1:45.  Should we break for

9        lunch soon.

10           MR. KOSLOWE:  Why don't we go off the record.

11           THE VIDEOGRAPHER:  We are off the record.  The

12       time is 1:46 p.m.

13           (Thereupon, a brief lunch recess was taken.)

14           THE VIDEOGRAPHER:  We are on the record.  The

15       time is 2:22 p.m.

16   BY MR. KOSLOWE

17       Q.   Sir, what, if any, communications between

18   various of the City's Commissioners and Boucher during

19   the time period of January through April of 2024 were

20   you aware of?

21       A.   Communications between commissioners and

22   Boucher?

23       Q.   Boucher, representative of Boucher, anyone at

24   the operation?

25       A.   I am aware of the meeting in the Mayor's

Rafael Paz
May 05, 2025

1    conference room that I participated in and I don't

2    recall any other conversation where I participated in

3    and would be aware of a conversation between electeds

4    and the Bouchers.

5         Q.   I wasn't limiting my question to conversations

6    or discussions or communications in which you

7    participated.  What I was asking was what communications

8    between, if there were any, commissioners and Boucher

9    during the time period of January 2023 to April of 2023

10   are you aware of and you already did mention that one

11   meeting, outside of that?

12        A.   About the project?  About the RFP?  I'm not

13   aware of any specific communications between electeds

14   and the Bouchers.

15        Q.   Did you come to any awareness of any such

16   communications after the fact while you were still City

17   Attorney?

18             MR. HOCKMAN:  Objection to form.

19             THE WITNESS:  Not that I recall.

20   BY MR. KOSLOWE

21        Q.   Sitting here today are you aware of whether

22   Commissioner Arriola had communications with Mr. Boucher

23   in January, February, March, April 2023 about the future

24   disposition of One Ocean Drive?

25        A.   I personally am not aware.

Rafael Paz
May 05, 2025

1        Q.   Commissioner Richardson, same question?

2        A.   I am not aware.

3        Q.   Commissioner Rosa Gonzalez, same question?

4        A.   Same.  I'm not aware of any conversations she

5   would have had with him.

6        Q.   Might you have been aware but you have since

7   forgotten or are you testifying now that you know you

8   never knew about any of that if it existed?

9        A.   It's possible but I don't recall sitting here

10   today.  I don't recall specific conversations between

11   the electeds and the Bouchers.

12        Q.   You testified earlier that sitting in April of

13   2023 the City was aware that there was more than one

14   entity interested in managing and operating One Ocean

15   Drive after the end of the current lease in 2026; right?

16            MR. HOCKMAN:  Objection, foundation.

17            THE WITNESS:  I did say there were that the

18        Penrods and the Bouchers so that's more than one so

19        yes, they were aware.

20   BY MR. KOSLOWE

21        Q.   And you testified that the additional

22   information that the City Manager and her staff would

23   have after completion of the tasks assigned to the City

24   administration from the April resolution would have been

25   the negotiated terms with Boucher; right?

Rafael Paz
May 05, 2025

 1           MS. MACK:  Object to form.

 2           MR. HOCKMAN:  Objection to form.

 3           THE WITNESS:  It would have -- the negotiation

 4      of the term sheet would include all of the terms

 5      and conditions for the agreements as well as the

 6      proposed program and all of the operational items

 7      that are associated with that.

 8  BY MR. KOSLOWE

 9      Q.   That is the basket of additional information

10  the City Manager and her staff would have had they

11  completed the task assigned to them in the April

12  resolution?

13           MR. HOCKMAN:  Objection, speculation.

14           THE WITNESS:  That is what I think would be

15      involved in developing a term sheet for

16      Commission's consideration for a project.

17  BY MR. KOSLOWE

18      Q.   They have the programming and concept and

19  Boucher and all the various deal terms for proposed

20  contract; right?

21      A.   Yes.

22           MR. HOCKMAN:  Same objection.

23  BY MR. KOSLOWE

24      Q.   They wouldn't have any information about

25  proposed concept or deal terms from any other potential

Rafael Paz
May 05, 2025

1    operator or manager of the site; right?

2              MR. HOCKMAN:  Objection, speculation.

3              THE WITNESS:  In that context if there was not

4         unsolicited information that was provided then no,

5         they would haven't any other information.

6    BY MR. KOSLOWE

7         Q.   Do you know if anyone else aside from Penrod

8    expressed interest to the City at that time?

9         A.   I don't.

10        Q.   So the City knew Penrod was interested; right?

11        A.   Yes.

12        Q.   And the City wouldn't have if it had

13   negotiated exclusively with Boucher for their concept

14   and terms it wouldn't have the competing concept and

15   terms from Boucher; right?

16             MR. HOCKMAN:  Objection, speculation.

17             THE WITNESS:  Can you repeat the question?

18   BY MR. KOSLOWE

19        Q.   Sure.  Had the City completed the tasks you

20   described and gotten the basket of information you

21   described which would be Boucher's concept, Boucher's

22   programming and the set of terms that would build out

23   the contract from Boucher it would not also have a

24   concept and programming and a set of services from

25   Penrod and a set of contracts, contract terms and other

Rafael Paz
May 05, 2025

1    provisions for proposed contract from Penrod, right, it

2    wouldn't have that?

3              MR. HOCKMAN:  Objection, speculation,

4         incomplete hypothetical.

5              THE WITNESS:  Under the framework of that

6         April resolution which was rescinded but under that

7         framework they would not have had information from

8         any other party.

9    BY MR. KOSLOWE

10        Q.   Then how would the City have made an informed

11   decision that whatever the concept and whatever the

12   programming and whatever the terms were that was within

13   the basket of information it got through that process

14   with Boucher was the best the City could get?

15             MR. HOCKMAN:  Objection, speculation.

16             THE WITNESS:  I think we covered this several

17        times for a good chunk of the morning session where

18        the City would develop the terms, develop the

19        program, they could rely on real estate advisors,

20        consultants with market information.  Could rely on

21        appraisals and rely on the known quantity and

22        performance of the party they're dealing with under

23        existing contracts.

24   BY MR. KOSLOWE

25        Q.   How would the City know that whatever that

Rafael Paz
May 05, 2025

1    that was was the best it could get?

2         MR. HOCKMAN:  Same objection.

3         THE WITNESS:  Well, I think in the totality of

4    the circumstances they would know by evaluating all

5    of the relevant factors and coming to a decision as

6    to whether they're comfortable that this is a

7    competitive proposal and the best that they would

8    get.  That is all a hypothetical since it didn't

9    happen again but that's I think how they would go

10   about it.

11   BY MR. KOSLOWE

12        Q.  So what you said was evaluate all the

13   information but among the information that you concede

14   they wouldn't have were competing terms, competing

15   consents, competing services so on from anybody else;

16   right?

17        MR. HOCKMAN:  Objection, speculation.

18        THE WITNESS:  Yes, under that hypothetical

19   they wouldn't have competing concepts or competing

20   terms.

21   BY MR. KOSLOWE

22        Q.  So it's not possible for the City to have

23   determined that whatever they got from Penrod was the

24   best they could get from anybody else; right?

25        MR. HOCKMAN:  Objection, speculation.

Rafael Paz
May 05, 2025

```
1              THE WITNESS:  I don't know that it's not
2         possible but they wouldn't have competing terms and
3         it's not required to verify that you have the very
4         best that you can get.  That's not the standard for
5         a governing body making a decision to proceed in
6         the best interest of the City on any given matter.
7    BY MR. KOSLOWE
8         Q.   The standard isn't for them to determine
9    what's the best they could get?
10        A.   The standard is not to verify that this is
11   absolutely the best that you can get.  The standard is
12   is this in the best interest of the City.
13        Q.   And by contrast when the City runs a
14   competitive solicitation it knows that what it receives
15   is the best it could get from the market under the
16   conditions of the RFP that it issued?
17             MR. HOCKMAN:  Objection, foundation,
18        speculation.
19             THE WITNESS:  No, not right.  What you get
20        when you run a competitive solicitation is
21        additional data points about certain proposed
22        terms.  You don't get the certainty of the party
23        that you're dealing with.  You don't get to rely on
24        your prior experience with that party and
25        performance under existing contracts.  All of these
```

Rafael Paz
May 05, 2025

```
 1        are factors that weigh into a decision about
 2        whether an item as a whole is in the interest of
 3        the City to proceed with and, you know, one --
 4        whether one term is the very best you can get as
 5        opposed to 98 other terms.  I don't know that there
 6        is such a thing that -- for any competitive
 7        solicitation to give you what your hypothetical is
 8        calling for.
 9   BY MR. KOSLOWE
10        Q.   In what way would the City not have quote
11   unquote certainty from the party that it negotiated
12   with?
13             MR. HOCKMAN:  Objection, speculation.
14             THE WITNESS:  Well, for example you could get
15        proposed terms that are the very best that were
16        provided of all the proposers but the proposer
17        submitting them had been in six bankruptcies in the
18        last ten years.  That may not give you as a city
19        the assurance that you're proceeding with a partner
20        that is going to deliver on what they're proposing.
21   BY MR. KOSLOWE
22        Q.   I think you're misunderstanding my question.
23   The two scenarios that I'm trying to compare here and we
24   did discuss this and you did provide some testimony on
25   it but I see I perhaps asked the questions in a way or
```

Rafael Paz
May 05, 2025

1    you understood them in way that's confusing.

2            The two scenarios we're trying to compare here

3    is one where the City is negotiating directly with one

4    potential operator and the other have having a

5    competitive process where that operator also

6    participates.  Do you understand that?

7        A.    Okay.

8        Q.    In comparing those two situations how is -- in

9    what situation, in what scenario, in what circumstance

10   would the City have less information about that

11   preferred bidder in the RFP context?

12           MR. HOCKMAN:  Objection, speculation.

13           THE WITNESS:  I don't understand your line of

14       questioning.  I don't understand how they would

15       have less information.  I don't think that they

16       would have less information about the party that

17       they're dealing with.  They're not required to have

18       all information about every issue under the sun.

19           They're just required to have sufficient

20       information for them to make their good faith

21       judgment about what's in the best interest of the

22       City.

23   BY MR. KOSLOWE

24       Q.    So putting the various pieces of testimony

25   that you spoke about here together you have stated, you

Rafael Paz
May 05, 2025

1    have admitted, that the City would have all the

2    information about the programming, the deal terms from

3    the preferred bidder that is directly negotiating with

4    also in the scenario where that preferred bidder

5    participated in a competitive solicitation.  It would

6    have all the information of what that bidder's

7    programming and terms would be; right?

8              MR. HOCKMAN:  Objection, speculation, form.

9              THE WITNESS:  Under your hypothetical yes,

10        they would have similar information if it was

11        proposed under an option that is available to the

12        City Commission for exclusive negotiations or it

13        would have similar information if it did a

14        competitive solicitation.

15   BY MR. KOSLOWE

16        Q.   But in the scenario where the City had

17   completed the tasks that Commission assigned

18   administration under the April resolution it would have

19   that information about the preferred bidder Boucher but

20   it wouldn't have any information about proposed

21   programming, scope, services, deal terms and whatnot

22   from anybody else; right?

23              MR. HOCKMAN:  Objection, speculation.

24              THE WITNESS:  I think we covered that already

25        that no, they would not have other proposers unless

Rafael Paz
May 05, 2025

1          there was unsolicited information that was provided

2          to the City along the way.

3    BY MR. KOSLOWE

4          Q.   So the direct negotiation scenario provides

5    the City less information than the RFP and the RFP

6    doesn't provide the City any less information than the

7    direct negotiation; right?

8               MR. HOCKMAN:  Objection, speculation.

9               THE WITNESS:  Sure.

10   BY MR. KOSLOWE

11         Q.   So in that scenario -- strike that.  We've

12   also established that the City Manager and her staff in

13   April of 2023 when they issued the recommendation to

14   FERC to have competitive solicitation knew that one of

15   the options in front of them because Boucher had

16   requested it was to directly negotiate with Boucher

17   exclusively for a concept and terms for management

18   operation of the site; right?

19              MR. HOCKMAN:  Objection, foundation,

20         speculation.

21              THE WITNESS:  I don't know that we've

22         established that but yes, it was generally known

23         at -- it was generally known that both Bouchers and

24         the Penrods were interested in pursuing an option

25         with exclusive negotiations.

Rafael Paz
May 05, 2025

1    BY MR. KOSLOWE

2        Q.    So the City Manager and her team knew those

3    two sets of facts that you just testified about, one,

4    that an option before them, this is in April 2023, when

5    they issued their recommendation to FERC.  One option

6    was to negotiate exclusively with Boucher.  Another

7    option was to pursue competitive solicitation and they

8    knew that if they pursued the option with Boucher they

9    would get terms from Boucher, they wouldn't get terms

10   from anybody else and if they pursued an RFP they would

11   get the terms from Boucher and they get terms from other

12   people and the City Manager and her staff recommended

13   the RFP; right?

14           MR. HOCKMAN:  Objection, foundation,

15       speculation.

16           THE WITNESS:  Yes.  The City Manager and her

17       staff recommended the RFP.

18   BY MR. KOSLOWE

19       Q.    So I'm at a loss to understand what additional

20   information the City Manager and her staff would have

21   after they got the terms and concept from Boucher that

22   they didn't know they would have when they recommended

23   the RFP despite knowing they would get that information

24   through an exclusive negotiation with Boucher?

25           MR. HOCKMAN:  Objection, foundation,

Rafael Paz
May 05, 2025

1      speculation, argument.

2              THE WITNESS:  Is there a question there?  You

3      said you're at a loss to understand so what is the

4      question?

5  BY MR. KOSLOWE

6      Q.   What information is there?

7              MR. HOCKMAN:  Same objection.

8              THE WITNESS:  About what?

9  BY MR. KOSLOWE

10     Q.   I think you understood the question even

11  though I posed it in phraseology as I'm at a loss to

12  understand but I'll rephrase it if you didn't.

13     A.   I would appreciate that.

14     Q.   Please explain to me what additional

15  information the City Manager and her staff would have at

16  her disposal had the City administration completed the

17  tasks assigned to them by the April resolution thereby

18  gaining the programming and terms proposed by Boucher

19  that they did not know they would have when they

20  recommended despite knowing they would have that through

21  an exclusive negotiation with Boucher when they knowing

22  that they would get that through an exclusive

23  negotiation with Boucher nevertheless recommended

24  competitive solicitation?

25             MR. HOCKMAN:  Objection, speculation,

Rafael Paz
May 05, 2025

1    foundation, improper argument, improper inference

2    and improper hypothetical.

3         THE WITNESS:  Okay.  To unpack that for maybe

4    the sixth or seventh time the same question, they

5    would have the information developed as part of the

6    term sheet, they would have the program.  They

7    would have also developed that and had that as part

8    of a competitive solicitation but in your

9    hypothetical there wouldn't have been a competitive

10   solicitation and at the conclusion of developing

11   that term sheet then at that point the manager

12   always has the prerogative to say based on these

13   terms which were never developed under this

14   hypothetical that never happened she could say

15   based on these terms this program, this party, I

16   recommend moving forward and this is a good deal

17   for the City.  Based on consultants, based on

18   appraisals, based on all of it.

19        So I don't understand what the relevance and

20   it's not for me to say, this is why I'm getting a

21   little annoyed why does it matter what they would

22   have had under an RFP or not if the hypothetical is

23   that there was no RFP?

24        The decision is the governing body's to make.

25   They make the decision.  You proceed unless of

Rafael Paz
May 05, 2025

```
 1        course the governing body comes back and says oh,

 2        wait, let's do an RFP which is exactly what

 3        happened.

 4   BY MR. KOSLOWE

 5        Q.   So let me try to explore it this way because

 6   I'm still not getting the answer and I'll blame myself

 7   on asking the question the way that doesn't allow you to

 8   answer it properly.

 9             The City Manager knew in April of 2023 that

10   the only additional information that she would have from

11   an exclusive process of negotiating just with Boucher

12   would be the programming and terms that Boucher and the

13   City would reach as part of the negotiation; right?

14             MR. HOCKMAN:  Objection, asked and answered,

15        improper hypothetical, foundation, speculation.

16             THE WITNESS:  I can't speak to what she knew

17        but yes, if you go down a path that is only to

18        discuss with Boucher then all you will have are

19        those terms and that program and that based on the

20        final overall package could very well be enough for

21        the manager to then conclude that she's comfortable

22        proceeding with a bid waiver at the appropriate

23        time.

24   BY MR. KOSLOWE

25        Q.   But she knew in April 2023 that she would have
```

Rafael Paz
May 05, 2025

1    that additional information if they had negotiated

2    exclusively with Boucher, right?  She knew that she

3    would have that if they negotiated exclusively with

4    Boucher; right?

5              MR. HOCKMAN:  Objection, form, speculation,

6         asked and answered.

7              THE WITNESS:  If they negotiate exclusively

8         with Boucher yes, she would have known that she

9         would end up having terms and a program with

10        Boucher, yes.

11   BY MR. KOSLOWE

12        Q.   And knowing that if she negotiated exclusively

13   with Boucher she would have that additional information

14   she nevertheless recommended despite knowing she would

15   get that competitive solicitation is best?

16             MR. HOCKMAN:  Objection, asked and answered,

17        speculation, foundation, improper hypothetical.

18             THE WITNESS:  She made her recommendation.

19        Whether it was based on a cursory, this is just my

20        default position, we don't have proposed terms yet,

21        there's nothing for me to look at, do an RFP or

22        whether it was based on your detailed hypothetical

23        that never happened about what she would have known

24        and could have known and should have known I don't

25        know.  I don't know how to answer your question any

Rafael Paz
May 05, 2025

1          differently than the now eight times that we have

2          answered it.  I am clearly not saying what you want

3          to hear.

4     BY MR. KOSLOWE

5          Q.   Your testimony is exactly what your testimony

6     should be and I have no qualms or quibbles with it, it's

7     not about what I want to hear just trying to get the

8     question phrased properly to allow you to answer it.

9     What you said is you don't know if it was based on

10    cursory or something -- some further analysis.  Who

11    should I ask to find out if Hudak's analysis was only

12    cursory or was more appropriate or more detailed?

13              MR. HOCKMAN:  Objection, speculation.

14              THE WITNESS:  I think you asked this earlier

15         in the session and you go through the chain and in

16         your words the bottom up you would start with the

17         staff from the administration and that's what you

18         would ask.

19    BY MR. KOSLOWE

20         Q.   If staff said our analysis was complete, we

21    looked at all the factors we're supposed to have looked

22    at, this is our recommendation.  In your experience did

23    Ms. Hudak have any role in that or did she rubber stamp

24    whatever came before her?

25              MR. HOCKMAN:  Objection, speculation, form.

Rafael Paz
May 05, 2025

```
 1           THE WITNESS:  In my experience Alina Hudak

 2      doesn't rubber stamp.

 3   BY MR. KOSLOWE

 4      Q.   To figure out what her thought process was

 5   because ultimately it was her final decision I would

 6   have to ask her, right?

 7           MR. HOCKMAN:  Objection, speculation.

 8           THE WITNESS:  You could go through the chain

 9      to ask her or her staff.  That's certainly an

10      option, yes.

11   BY MR. KOSLOWE

12      Q.   Go through the chain to ask her staff what

13   they thought?

14      A.   What they thought about the hypothetical that

15   never materialized, yes.

16      Q.   And if I'm barred from doing that I would then

17   go up to her; right?

18           MR. HOCKMAN:  Objection, speculation.

19   BY MR. KOSLOWE

20      Q.   If I run that course and someone has stopped

21   me from asking those questions I would go up to her;

22   right?

23           MR. HOCKMAN:  Objection, speculation.

24           THE WITNESS:  I can't really speak to you what

25      you would if you were barred from doing any one
```

Rafael Paz
May 05, 2025

1          thing or another.

2     BY MR. KOSLOWE

3          Q.    I'm asking you.  Not what you're entitling me

4     to do since you don't have control over that but in your

5     view of how this information is assembled and created

6     and where it exists if I've gone through and asked the

7     various staff members and if I would have said I don't

8     know or someone said don't ask that question then I

9     would reach Ms. Hudak and ask her okay, ultimately since

10    you don't rubber stamp anything what was your thought

11    process and decision making when it came to issuing this

12    recommendation; right?

13             MR. HOCKMAN:  Objection, speculation,

14         argument.

15             THE WITNESS:  I guess that's an option.

16    BY MR. KOSLOWE

17         Q.    Going back to the May 2023 resolution the

18    various different criteria that the evaluation committee

19    was meant to look at that was also provided to you from

20    Commissioner Richardson; right?

21         A.    The evaluation criteria?

22         Q.    Yes.

23         A.    No, it wasn't reflected in this draft so there

24    was nothing that -- at least based on these documents

25    that would show that.

Rafael Paz
May 05, 2025

1        MR. KOSLOWE:  But you -- I'll just show you a

2    document, mark it as 23 to your deposition.

3        (Plaintiff's Exhibit No. 23 was marked for

4    identification.)

5        MR. KOSLOWE:  This is a CMB0021446.  Let me

6    know when you've had a chance to look at it.

7        MR. HOCKMAN:  Did you say 23 or 24.

8        MS. MACK:  Can you read the Bates stamp?

9        MR. KOSLOWE:  CMB0021446.

10       MR. HOCKMAN:  I had a 23 previous.

11       MR. KOSLOWE:  No, we're on 23.

12   BY MR. KOSLOWE

13       Q.   So this is follow up communication and

14   drafting between you and Commissioner Richardson; right?

15       A.   That's what it looks like, yes.

16       Q.   That is what it is, right?

17       A.   Yes.

18       Q.   So the bottom e-mail here from May 5th 2023

19   that was that initial draft we saw before; right?

20       A.   Yup.

21       Q.   You must have had or strike that.  You had

22   additional conversation with Commissioner Richardson

23   after that initial draft; right?

24       A.   Yes.

25       Q.   And then on May 6th you wrote back to

Rafael Paz
May 05, 2025

1    Commissioner Richardson thanking him for his input and

2    updated draft?

3         A.   Yes.

4         Q.   You ask if he wanted to have Alina and Alex

5    weigh in; right?

6         A.   Yes.

7         Q.   You then had additional conversation or

8    discussion with Commissioner Richardson later that same

9    day sometime in the next hour or so; right?

10        A.   Yes.

11        Q.   This is on a Saturday afternoon; right?

12        A.   Yup.

13        Q.   And then you provided an additional draft or

14   revised draft; right?

15        A.   Yes.

16        Q.   At this point Alina and Alex hadn't weighed

17   in; right?

18        A.   Correct.

19        Q.   That's Ms. Hudak and Mr. Denis; right?

20        A.   Yes.

21        Q.   So the attachment to this document this is the

22   third draft after at least four conversations between

23   you and Mr. Richardson, Commissioner Richardson, about

24   drafting up this resolution; right?

25        A.   Yes.

Rafael Paz
May 05, 2025

1        Q.   If you look at CMB0021449 the last page there

2   now are evaluation criteria filled out where previously

3   there was a blank; right?

4        A.   Yes.

5        Q.   So Commissioner Richardson is providing you

6   these evaluation criteria; right?

7             MS. MACK:  Object to form.

8             THE WITNESS:  The criteria was developed as a

9        result of my conversation with Commissioner

10       Richardson.

11  BY MR. KOSLOWE

12       Q.   What does that mean, it was developed as a

13  result of the conversation?  Where did the ideas, where

14  did the terminology come from?

15       A.   I don't remember the specifics of my

16  conversation but it looks to me like it would have come

17  from me because pretty much the five criteria all

18  correspond to the standard criteria that you would

19  normally see in an RFP and I probably suggested that to

20  him and he probably gave me feedback on that.

21            MR. HOCKMAN:  Hold on one second, Jason.  I

22       need to caution the witness that communications

23       between the City Attorney and City Commissioners

24       are elected officials for the purpose of legal

25       advice is protected by the attorney-client

Rafael Paz
May 05, 2025

1    privilege.  So be careful not to disclose those

2    communications, please.

3         THE WITNESS:  I don't recall my specific

4    communications with Richardson.

5         MR. KOSLOWE:  Our position is that there is no

6    privilege here over these communications.

7         MR. HOCKMAN:  Which communications?

8         MR. KOSLOWE:  You just made a statement about

9    communications providing advice and I don't believe

10   they're privileged and protected.

11        MR. HOCKMAN:  Let me put on the record.

12        MR. KOSLOWE:  You've stated it.  I stated my

13   position.

14        MR. HOCKMAN:  No, you've opened the door so

15   now I'm going to push back.

16        MR. KOSLOWE:  I am not making him testify

17   about it.  I am just telling you our position.  We

18   don't have to argue that now.  There is no point in

19   that.

20        MR. HOCKMAN:  Let me put it on the record.

21   City of Tampa vs. Titan Southeast Construction

22   Corporation, 535 Federal Supplement 63, Middle

23   District of Florida 1982.  Florida Statute Section

24   90.502 Absolute Activist versus Dineen, 262 Federal

25   Supplement 3d. 1312 Middle District of Florida 2017

Rafael Paz
May 05, 2025

1          and then Aquaport, LC vs. Collier County case

2          201:cv-341 FTM29DF Middle District of Florida

3          October 16th 2002 and State vs. Coca-Cola Bottling

4          Company of Miami Incorporated, 528 So.2d first

5          So.2d one Florida DCA 1990 supports our position.

6    BY MR. KOSLOWE

7          Q.    In any event the first draft you sent

8    Commissioner Richardson didn't include any evaluation

9    criteria; right?

10         A.    That's right.

11         Q.    Then you had further conversation the sum and

12   substance only of which is the addition of the

13   evaluation criteria; right?

14         A.    I don't know if that's the only change but if

15   that's when you're saying it's reflected here then sure.

16         Q.    Certainly that's one of the changes?

17         A.    Okay.

18         Q.    You left open an open blank and highlighted it

19   when you sent it back to Commissioner Richardson the

20   first time?

21         A.    Yes.

22         Q.    Ostensibly you were asking for his input on

23   that data; right?

24         A.    It was blank.  I don't know that I asked for

25   his input but yes, it was blank and we spoke about it

Rafael Paz
May 05, 2025

1   subsequently and I then drafted an updated resolution.

2       Q.   And you're saying that these five criteria,

3   evaluation criteria, are standard form; is that what

4   you're saying?

5       A.   To me, yes.

6       Q.   So then why didn't you just put them in the

7   first draft?

8       A.   I can't recall specifically but it ended up in

9   this draft.

10      Q.   So what I'm asking is based on the fact that

11  you traded drafts and conversations with Commissioner

12  Richardson your testimony was that for each of the other

13  bullet points you had gotten the information, the

14  content of that from Commissioner Richardson is it not

15  safe to say that this information also came from

16  Commissioner Richardson?

17      A.   No, I don't know that it's safe to say that

18  this came from Commissioner Richardson because again I

19  don't recall the conversation and the back and forth on

20  that Saturday afternoon but it looks to me like the

21  standard criteria that you would see in any RFP covering

22  scope, experience, past performance, financial terms and

23  additional benefits.

24           MR. KOSLOWE:  Going to show you a document,

25       sir, we'll mark it as 24 to your deposition.  This

Rafael Paz
May 05, 2025

1        is MB00308022.

2            (Plaintiff's Exhibit No. 24 was marked for

3        identification.)

4    BY MR. KOSLOWE

5        Q.   Here is another in that -- strike that.  Here

6    is another set of communications between yourself and

7    Commissioner Richardson as you are drafting this

8    resolution; right?

9        A.   Yes.

10       Q.   This is on May 7, 2023; right?

11       A.   Yes.

12       Q.   May 6th being a Saturday.  This is a Sunday

13   now?

14       A.   Yes.

15       Q.   And Commissioner Richardson writes "Rafael,

16   this draft reflects the discussions we have had and the

17   changes I suggested;" right?

18       A.   Yes.  That's what it says.

19       Q.   He is drafting and sending it to you?

20       A.   It looks like yes, this includes revisions

21   that he made, yes.

22       Q.   So if we're going to look at the last page of

23   the prior document at CMB ending in 49 and we look at

24   the last page of this document ending in MB25

25   Commissioner Richardson is adding content to the

Rafael Paz
May 05, 2025

1    evaluation criteria; right?

2         A.   Yes.  Reflecting the discussions that we had.

3         Q.   So he is now drafting an additional evaluation

4    criteria; right?

5         A.   I don't know that there is additional

6    evaluation criteria but he is providing clarifying

7    language about the same evaluation criteria.

8         Q.   If you compare those two do you not see there

9    is now six instead of five in the second draft?

10             MR. HOCKMAN:  Objection to form.

11             THE WITNESS:  There are six instead of five

12        but I think he has broken out one which is

13        separate.  Let's see.  He broke out the experience

14        and qualifications two and three in his draft was

15        just two under the prior draft.

16   BY MR. KOSLOWE

17        Q.   The prior draft that's ending at 49 says

18   "experience of the proposer and the proposer's team

19   members;" right?

20        A.   That's right.

21        Q.   The next draft says "experience of the

22   proposer and proposer's team members" and adds in a new

23   one "qualifications including financial capability of

24   the proposer;" right?

25        A.   Yes.  I take qualifications to be -- to fall

Rafael Paz
May 05, 2025

1    within the subset of experience.

2        Q.   And financial capabilities also that

3    experience then?

4        A.   It would fall under your experience.  But he

5    wanted to add additional clarity from what is reflected

6    in this document.

7        Q.   So you looking at this document remember with

8    granularity that this is additional clarity that

9    Commissioner Richardson is drafting and not adding

10   additional criteria; is that right?

11            MR. HOCKMAN:  Objection to form, argument.

12            THE WITNESS:  That's my opinion, yes.

13   BY MR. KOSLOWE:

14       Q.   So now that we've seen these set of documents

15   and we've seen Commissioner Richardson suggesting

16   language at the very least for these evaluation criteria

17   I would like to know who drafted these evaluation

18   criteria where they came from, yourself, Commissioner

19   Richardson, a combination thereof or something else?

20            MR. HOCKMAN:  Going to caution you on the

21        attorney-client privilege and work product.  You

22        can answer.

23            MR. KOSLOWE:  The witness has been testifying

24        about this document, the communication been

25        provided to us so I don't see what privilege you

Rafael Paz
May 05, 2025

1       have to assert here.  Are you clawing something

2       back?

3            MR. HOCKMAN:  There is a difference between

4       public record and the Public Records Act and oral

5       communications that are privileged.  That's what

6       those cases say, specifically Aquaport, LC.

7            THE WITNESS:  I drafted this resolution.

8  BY MR. KOSLOWE

9       Q.   Commissioner Richardson also drafted it;

10  right?

11       A.   He provided some red line comments but I

12  drafted it, yes.

13       Q.   So he drafted it and you drafted it; right?

14  When someone provides red line comments they're also

15  drafting; right?

16       A.   He was involved in the review and comment on

17  my draft.

18       Q.   And in the first place he is the one who gave

19  you all the content to put in the first draft anyway;

20  right?

21       A.   He was the sponsor of the item so yes.

22       Q.   The fact that he was a sponsor of the item

23  doesn't dictate that he would have been the one to

24  provide you all the initial content, could have drawn it

25  from somewhere else but you testified you drew it from

Rafael Paz
May 05, 2025

1    him; right?

2           MR. HOCKMAN:  Objection, argument.

3           THE WITNESS:  The draft was developed with the

4       sponsor of the item to reflect what the sponsor of

5       the item wanted.  I drafted it.  He reviewed and

6       provided comments.

7    BY MR. KOSLOWE

8       Q.   So if I would like to understand what was

9    meant by these criteria what would I ask you as the

10   person who wrote the words or would I ask you to tell me

11   what Commissioner Richardson meant when he told you to

12   write the words?

13          MR. HOCKMAN:  Objection, speculation.

14          THE WITNESS:  I don't know but this resolution

15      is not self executing.  The criteria is what was

16      drafted in the RFP and that would govern.  So

17      asking whoever drafted that RFP would be germane.

18   BY MR. KOSLOWE

19      Q.   So that would be Alex Denis and his team

20   including Christy Bada in the Procurement Department?

21      A.   Yes.

22      Q.   So whomever drafted the RFP that's who we

23   would consult to determine -- strike that.  The RFP is a

24   written document; right?

25      A.   Yes.

Rafael Paz
May 05, 2025

1      Q.    So it contains definitions and terms and

2  specifications and provisions; right?

3      A.    Yes.

4      Q.    So those speak for themselves; right?

5      A.    Yes.

6      Q.    But if there was any question about what

7  meaning they have we would go to the drafters of that

8  document that would be Mr. Denis, Ms. Bada and the rest

9  of the procurement team whoever within that procurement

10 department worked on that document; right?

11     A.    Yes.

12     Q.    So it's irrelevant you're telling me what this

13 resolution says if the Procurement Department did what

14 they want to do with it?

15     A.    That's no what I said.  I said the evaluation

16 criteria that governs is the criteria that is

17 established in the RFP.  That's all I said.

18     Q.    If I'm going back to MB ending in 24 of this

19 document, Exhibit 24, which is showing the initial four

20 bullets of the RFP terms?

21     A.    Okay.

22     Q.    I'm looking at the language we looked at a

23 little while ago, the three potential types of

24 experiences that would qualify a bidder beach club,

25 beachfront concession or similar concession.  Your

Rafael Paz
May 05, 2025

1    testimony previously was Commissioner Richardson

2    provided that, that content?

3         A.   It was developed with his input, yes.

4         Q.   And so if I want to know what beach club means

5    do I ask you, do I ask him?  Who do I ask?

6              MR. HOCKMAN:  Objection, speculation.

7              THE WITNESS:  I don't know who you would ask.

8         You can ask anyone you want.

9    BY MR. KOSLOWE

10        Q.   Well, did you draft the term beach club or did

11   you write the term beach club because Commissioner

12   Richardson told you to?

13        A.   I believe that the term came from Commissioner

14   Richardson.

15        Q.   What did Commissioner Richardson mean by the

16   term beach club?

17             MR. HOCKMAN:  Objection, calls for

18        attorney-client communications.  You can answer if

19        you can avoid that.

20             THE WITNESS:  My understanding of what was

21        meant by beach club I think you've asked and we've

22        covered this but we can cover it again was a

23        restaurant operation along with beach chairs and

24        associated recreational amenities consistent with

25        beach use.

Rafael Paz
May 05, 2025

1  BY MR. KOSLOWE

2     Q.   Where do you draw that definition from?

3     A.   It's just my understanding.

4     Q.   So it's your personal understanding based on

5  your experiences outside of your role as a City

6  Attorney; right?

7     A.   Yes, I did not consult Webster's.

8     Q.   Or any industry standard for that?

9     A.   I did not.

10    Q.   Consult any outside source for what that term

11 means?

12    A.   That would be outside the scope of my

13 responsibilities.

14    Q.   So Commissioner Richardson said write down one

15 of the three things that could qualify a bidder is they

16 ran a beach club and you wrote it down; is that right?

17        MR. HOCKMAN:  Objection to the extent it calls

18     for attorney client communications.

19        THE WITNESS:  The concept was developed with

20     Commissioner Richardson so yes.

21 BY MR. KOSLOWE

22    Q.   Same thing for beachfront concession?

23        MR. HOCKMAN:  Same objection.

24        THE WITNESS:  Yes.

25 ///

Rafael Paz
May 05, 2025

1    BY MR. KOSLOWE

2         Q.   Same thing for similar concession?

3              MR. HOCKMAN:   Same objection.

4              THE WITNESS:   Yes.

5    BY MR. KOSLOWE

6         Q.   Does the beachfront concession -- must a

7    beachfront concession include food and beverage

8    services?

9         A.   I don't know that it has to but it probably

10   generally does.

11        Q.   Where do you draw that information for the

12   definition of that term?

13        A.   I don't know that there is a definition to --

14   I don't know that there is a source for that kind of

15   authority but yes, I think if you can consult similar

16   operations throughout the State of Florida to determine

17   if food and beverages are part of beachfront

18   concessions.

19        Q.   Are you familiar with any industry standard

20   terminology that uses the term beachfront concession and

21   has content or definition to it?

22        A.   I'm not.  I'm not sure if the code, the City

23   code may have a definition somewhere.  There may be I

24   don't know if there were manuals for -- I think the City

25   had in addition to the operations that Boucher handled

Rafael Paz
May 05, 2025

1   for the public concessions there are private beachfront

2   concessions all up and down the beach and there is I

3   think there were some kind of booklet or manual or

4   something for the applications for private beachfront

5   concessions and perhaps that would give you some kind of

6   general guidance as to what is included as part of a

7   beachfront concession.

8        Q.   In as much as any of this terminology found

9   its way or used by the RFP your testimony is it's the

10  drafters and the procurement department that put

11  together the RFP that would define what those terms mean

12  for that purpose; right?

13       A.   Yes.

14       Q.   We can look at this draft or we can go back to

15  the actual RFP itself which is Exhibit 21.  It's the

16  same but I don't want to confuse you.

17       A.   This is the final.

18       Q.   There we go.  There is a timeline here at the

19  third to last bullet "the administration shall issue the

20  RFP no later than."  Do you see that?

21       A.   Yes.

22       Q.   That's consistent throughout all the drafts.

23  You can check if you would like.

24       A.   Yes.

25       Q.   That timeline came from Commissioner

Rafael Paz
May 05, 2025

1    Richardson; right?

2        A.   Yes.

3        Q.   Why did he direct you to put this timeline in

4    this resolution?

5             MR. HOCKMAN:  Objection, foundation,

6        attorney-client communications and speculation.

7             THE WITNESS:  Well, the timeline is in there

8        because it reflects what he wanted for the item

9        that he was sponsoring.

10   BY MR. KOSLOWE

11       Q.   Understanding that he wanted this timeline why

12   did he want this timeline?

13            MR. HOCKMAN:  Same objections.

14            THE WITNESS:  I don't know.

15   BY MR. KOSLOWE

16       Q.   Did you two have any discussion about the

17   purpose of this timeline?

18            MR. HOCKMAN:  Objection, asked and answered,

19       foundation.  He said he didn't know.

20            THE WITNESS:  I don't remember a conversation

21       with him about the timeline or him ever sharing

22       with me what his motivation for his legislative

23       request was.

24   BY MR. KOSLOWE

25       Q.   Do you recall any conversation from the City

Rafael Paz
May 05, 2025

1    Manager taking issue with the timeline in any way?

2         A.   I would imagine that, you know, the

3    administration always would want the benefit of more

4    time given the many directions that they're pulled in,

5    you know, at any given point in time.

6         Q.   Do you recall the City Manager communicating

7    to Commissioner Richardson that this was too constricted

8    a timeline given other tasks at hand or given the task

9    at hand?

10        A.   It's possible but I don't specifically

11   remember that conversation.  I've had many conversations

12   over the course of a few years that Alina and I

13   overlapped where that was the gist of the conversation

14   that all of the deadlines that the Commission wanted

15   were ambitious.

16        Q.   By ambitious you mean too expedited?

17        A.   Well, not from their perspective.  From the

18   elected's perspective they're here for a limited time

19   and they want to see things done.

20        Q.   I meant from the perspective of the City

21   Manager and her staff.

22        A.   The preference of the City Manager would

23   always be for additional time.

24        Q.   And that doesn't mean they can't get the job

25   done in the time set for them, it just means they felt

Rafael Paz
May 05, 2025

1  time was too short and giving it anyway?

2      A.  Right.

3      Q.  It's possible to have a view that a timeline

4  is too short but you can get the job done anyway; right?

5      A.  Yes.

6          MR. KOSLOWE:  Just to close the loop I'll show

7      you a document it will be admitted as 25 to your

8      deposition.  This is MB00314418.

9          (Plaintiff's Exhibit No. 25 was marked for

10     identification.)

11  BY MR. KOSLOWE

12     Q.  This is the follow up e-mail from Ms. Hudak

13  also on that same May 7, 2023 responding to the e-mail

14  from Commissioner Richardson to you with that prior

15  draft of what became the May resolution; right?

16     A.  Yes.

17     Q.  And here among what Ms. Hudak -- Ms. Hudak is

18  not providing in this e-mail any substantive comments or

19  content to change anything in the draft resolution;

20  right?

21     A.  That's correct.

22     Q.  She is just saying my only concern is the

23  schedule recommended; right?

24     A.  Yes.

25     Q.  Given a bunch of other stuff they have to do?

Rafael Paz
May 05, 2025

1      A.   Yes.

2      Q.   Which is consistent with what you just

3  testified?

4      A.   Yes.

5      Q.   And Commissioner Richardson wanted this item

6  on consent; right?

7      A.   I don't recall.

8      Q.   What does it mean on consent?

9      A.   The consent agenda is part of the regular

10 agenda consisting of all of the individual items that

11 are then taken up as a whole and voted on once and

12 approved all together unless any individual Commissioner

13 pulls the item from consent which they're all entitled

14 to do at the commencement of the meeting.

15     Q.   So if an item is on consent there is no debate

16 or discussion on it; right?

17     A.   Correct.

18     Q.   Voted on in block with all other items in

19 consent; is that right?

20     A.   Yes.

21          MR. KOSLOWE:   I am going to show you a

22     document this will be Exhibit 26 to your

23     deposition.   This is CMB0031727.

24          (Plaintiff's Exhibit No. 26 was marked for

25     identification.)

Rafael Paz
May 05, 2025

1    BY MR. KOSLOWE

2        Q.   This is two days later now on Tuesday May 9th

3    Commissioner Richardson tells you to put this Boucher

4    Brothers resolution on consent; right?

5        A.   Yes.

6        Q.   And then you do so; right?

7        A.   The Clerk did, yes.

8        Q.   You write back "done."

9        A.   After I probably spoke with the clerk, yes.

10       Q.   He tasked you with the item and the way you

11   had it established is by speaking to the clerk?

12       A.   It's his agenda, so yes.

13       Q.   Did you have any discussion with Commissioner

14   Richardson as to why he wanted this on consent?

15            MR. HOCKMAN:  Objection to the extent it calls

16       for attorney-client communications.

17            THE WITNESS:  No.  Our practice at the time

18       and I don't know if it still is but electeds always

19       have the opportunity to decide if they want their

20       item on the regular agenda or on the consent agenda

21       it could be pulled if it was on consent.

22   BY MR. KOSLOWE

23       Q.   Putting aside what the practice was did you

24   have any communications with Commissioner Richardson or

25   anyone else about why or whether this particular item

Rafael Paz
May 05, 2025

1   should be heard on consent without debate and

2   discussion?

3           MR. HOCKMAN:  Same objection as to legal

4       advice.

5           THE WITNESS:  No, I don't remember any

6       conversation about consent.

7   BY MR. KOSLOWE

8       Q.   Do you recall if any Commissioners expressed

9   to you objection to the lack of public debate and

10  discussion on this item?

11      A.   I don't recall.  I don't recall that.

12          MR. KOSLOWE:  Going to show you a document,

13      this will be Exhibit 27 to your deposition.  This

14      is MB00423930.

15          (Plaintiff's Exhibit No. 27 was marked for

16      identification.)

17          MR. HOCKMAN:  Which exhibit?

18          MS. LEON:  27.

19  BY MR. KOSLOWE

20      Q.   The Laura who is e-mailing you on May 16th

21  that's Commissioner Dominguez; right?

22      A.   Yes.

23      Q.   And she is copying it looks like a

24  communication from someone else?

25      A.   That's what it looks like, yes.

Rafael Paz
May 05, 2025

1       Q.   And part of what she is writing to you is

2   please pull it from consent and schedule public debate;

3   right?

4       A.   That's what it says, yes.

5       Q.   This is about the Nikki Beach item, right?

6       A.   Yes.  This entire e-mail, the remainder of

7   that now this is refreshing my recollection.  Rick

8   Kendall is a zealous if not zealot park activist who

9   over the years has misconstrued and the County Charter

10  requirements and the requirements for parks with every

11  single time and so I do now remember receiving this and

12  whatever he's written here is just completely wrong.

13  But yes, she did express as part of this e-mail that she

14  wanted the item pulled and so I probably let Ralph know,

15  Ralph Granada the clerk, to add the item to the pulled

16  list.

17      Q.   Did any other commissioner express concern or

18  disapproval with this item going up on consent rather

19  than for public debate and discussion?

20      A.   I don't recall but it wouldn't surprise me.  I

21  know that there was -- there were folks in the community

22  drumming up a lot of drama over the item so yes.

23  Wouldn't surprise me.

24          MR. KOSLOWE:  Can we go back to just so it's

25      easier to the actual resolution which is Exhibit 8.

Rafael Paz
May 05, 2025

1          MS. LEON:  Yes, Exhibit 8.

2          THE WITNESS:  We're going back?

3          MS. LEON:  Exhibit 21.

4          MR. KOSLOWE:  Exhibit 21.  I apologize.  Not

5     the April resolution.  The May resolution.

6  BY MR. KOSLOWE

7     Q.   Just make sure my record is clear going back

8  to Exhibit 21 which is Resolution 2023-32612.  Penrods'

9  original lease was the subject of an RFP?

10     A.   Yes.

11     Q.   It had a Concession Agreement as part of that

12  lease as well back in 1985; right?

13     A.   I don't remember the date but they had a

14  Concession Agreement, yes.

15     Q.   Do you remember that it came out of that same

16  RFP?

17     A.   I was twelve years old in 1985.  I wouldn't

18  have personal knowledge of whether it came out of the

19  same RFP or not.

20     Q.   The question was if you were sitting on the

21  dais in 1985 the question is when putting together this

22  resolution that reflects a whole bunch of history

23  background and doing the work that you and your office

24  did to make sure that was accurate and complete do you

25  have a recollection as to whether both the lease and the

Rafael Paz
May 05, 2025

1    Concession Agreement originally entered into in the mid

2    '80s was the subject of an RFP?

3         A.   No.

4         Q.   Do you recall which pieces of the property

5    were part of the lease, the Concession Agreement, any

6    subsequent Concession Agreements?

7         A.   No.

8         Q.   On the second page the second whereas clause

9    states that Commissioner Richardson since the April

10   Commission meeting he learned "the Penrods' current

11   Concession Agreement was approved in 2004 as a bid

12   waiver.  Penrods has been operating the concession area

13   on the property without any competitive process for

14   nearly 20 years."  Do you see that?

15        A.   Yes.

16        Q.   Did you ensure that was accurate?

17        A.   I don't know what you mean by ensuring it was

18   accurate.

19        Q.   You wrote it; right?

20        A.   Yes.

21        Q.   Did you ensure those facts stated there are

22   accurate as true?

23             MR. HOCKMAN:  Objection to form.

24             THE WITNESS:  I believe that it was true.

25   ///

Rafael Paz
May 05, 2025

1  BY MR. KOSLOWE

2      Q.   Not aware of any RFP for any piece of the

3  Concession Agreements or any piece of the property that

4  would have been subject of this sentence here?

5      A.   I don't understand what -- I'm not following

6  your question but I would have had the resolution from

7  2004 and a Concession Agreement and would have verified

8  that there was a bid waiver for that Concession

9  Agreement.

10     Q.   How many Concession Agreements were in place

11  for the property?

12     A.   That I couldn't tell you.

13     Q.   So there may be a Concession Agreement for

14  part of the property that was subject of an RFP but you

15  don't know that?

16     A.   I don't know if I maybe should have said a

17  portion of the Concession Agreement or concession area

18  was approved as a bid waiver versus all of it.  I don't

19  know if that's your question but certainly it's correct

20  to say that they had a Concession Agreement approved in

21  2004 as a bid waiver.

22     Q.   But that particular --

23     A.   And this I drafted specifically because I

24  believe and I don't know what the timeline was that we

25  were already in litigation from your client or if it was

Rafael Paz
May 05, 2025

1    threatened but it was really pissing me off to hear from

2    a current operator to say that the City doesn't have the

3    right to issue an RFP that they somehow, they somehow

4    have, you know, indefinite rights into perpetuity over

5    this property after the expiration of their agreements

6    and they were making -- they were raising all of these

7    issues, you know, with the bid waiver process when they

8    themselves were the first ones to initiate the bid

9    waiver process not only in 2004 but then in 2021 or '22

10   when Alex Tachmes was shopping around town for a bid

11   waiver leaving pretty coffee table books.

12          It really pissed me off to hear this and I

13   wanted to make sure it was clear that a portion -- at

14   least a portion maybe I could have been more clear that

15   Nikki Beach and Penrods had benefited from bid waivers

16   in their favor.  They only have a problem with bid

17   waivers when it's not given to them and it's awarded to

18   somebody else.

19   Q.   You wanted to make sure it was clear by

20   misrepresenting what piece of the property was subject

21   to bid waiver or not?

22          MR. HOCKMAN:  Objection to form and argument.

23          THE WITNESS:  I don't believe it's a

24     misrepresentation.  If I could have been more clear

25     that a portion of the concession area as opposed to

Rafael Paz
May 05, 2025

1          entirety of it I think that would have satisfied

2          really the gist of why I put that in there.

3    BY MR. KOSLOWE

4          Q.   The next paragraph says "based on the

5    foregoing dot dot dot and finally provide for a

6    competitive process with respect to the future use of

7    the property;" right?

8          A.   Yes.

9          Q.   Finally provide.  What did you mean by that

10   when you wrote that?

11         A.   Well, there was since the item had been first

12   considered there was a lot of drama that was being

13   generated in the community and I believe that the

14   Penrods initiated a campaign and an e-mail campaign and

15   the public comment and so it would finally address

16   what -- the outcome that we were hearing from the public

17   that they wanted.  Finally provide for a competitive

18   process.

19         Q.   The suggestion that you wrote in these two

20   paragraphs here was that Penrods didn't have any

21   competition and now finally there would be one for the

22   property; right?

23         A.   Yes.

24         Q.   Despite the fact that you knew that Penrod had

25   won the property in an RFP back in the '80s, right?

Rafael Paz
May 05, 2025

1      A.    The property but we weren't talking about --
2  we were talking about the concession area.
3      Q.    Actually you wrote here "the property," with
4  respect to future use of the property that's the entire
5  leasehold and concession agreement; right?
6      A.    To provide for a competitive process with
7  respect to the future use of the property which is what
8  we were hearing in the intervening weeks leading up to
9  that that people wanted a competitive process for the
10 future use of the property.
11     Q.    And that's fine but what you wrote here
12 "finally provide for a competitive process" was to
13 suggest that the process by which Penrods had use of the
14 property was not subject ever to a competitive process,
15 that's what you were trying to convey?
16          MS. MACK:  Object to form.
17          MR. HOCKMAN:  Objection, argument, improper
18      inference.  Do not argue with the witness.
19          THE WITNESS:  No.  For the third time that is
20      not what I said.  To finally provide for
21      competitive process was simply referring to
22      immediate context in the weeks leading up to this
23      resolution where your client was stirring up
24      members of the community to ask for a competitive
25      process and they finally got one.

Rafael Paz
May 05, 2025

1    BY MR. KOSLOWE

2         Q.   So it's not finally as opposed to what Penrods

3    did in the past and not finally as opposed to the April

4    resolution, just finally as opposed to what?

5              MR. HOCKMAN:   Objection, asked and answered,

6         argument, improper inference.

7              THE WITNESS:   So now time number four finally

8         provide for a competitive process that in the weeks

9         leading up to the consideration of this item

10        certain members of the community were e-mailing

11        about in response to being stirred up for a

12        different outcome.

13   BY MR. KOSLOWE

14        Q.   You talked a couple times here today about

15   Alex Tachmes and this coffee table book that offended

16   you so.  I didn't ask --

17        A.   The coffee table book didn't offend me.

18        Q.   I didn't ask a question.

19             MR. HOCKMAN:   Let him finish his question.

20        Give me a chance.

21   BY MR. KOSLOWE

22        Q.   When were those conversations you had with

23   Mr. Tachmes?

24        A.   They were at some point after the referendum

25   for the Smith and Wilensky continuation of their lease

Rafael Paz
May 05, 2025

1   and concession area which I believe was 2021 or 2020 but

2   just to clarify the coffee table book did not offend me.

3   What offended me was that the party seeking a bid waiver

4   was then turning around and only objecting to a bid

5   waiver when the bid waiver wasn't in their favor.

6        Q.   When you say the party requesting a bid waiver

7   you're talking about Alex Tachmes misrepresenting

8   Penrod; right?

9        A.   Yes.

10       Q.   Was that request for a bid waiver provided to

11  you in writing?

12       A.   No.  That's not how it needs to work.

13       Q.   In what context and in what form was a request

14  for a bid waiver provided to you by Mr. Tachmes for

15  Penrod?

16       A.   First request contemplated a bid waiver

17  because they wanted to continue on the property and get

18  the same deal that Smith and Wilensky got and since he

19  handled that matter for them.  So that's where that came

20  from.

21       Q.   I'm not understanding the answer.  In what

22  form --

23       A.   In what form.

24       Q.   As in a communication, a telephone

25  conversation, in-person meeting did Mr. Tachmes to your

Rafael Paz
May 05, 2025

1  testimony and recollection request a bid waiver on

2  behalf of Penrod?

3      A.   So it would have been in -- we spoke by phone

4  and we met in person.

5      Q.   When did those conversations, telephone and in

6  person, take place?

7      A.   At some point prior to the initial referral of

8  this matter.

9      Q.   And was anyone else privy to those

10  conversations, anyone else participate?

11      A.   He came to my office.  I don't know if anybody

12  else participated.  I don't remember.

13      Q.   How did you come to understand that what he

14  was requesting was a bid waiver?

15      A.   I think he said that.

16      Q.   But you don't have any writing to that effect?

17      A.   I don't have anything in writing to that

18  effect, no.

19      Q.   And it's possible that -- by the way

20  throughout the conversation today you testified that

21  there were many conversations and discussions and items,

22  a thousand legislative items a day, a year that take

23  place at the City?

24      A.   A year, yes.

25      Q.   So throughout the conversation today you

Rafael Paz
May 05, 2025

1    testified that there were parts of this that you don't

2    recall; right?

3         A.   Yes.

4         Q.   So I would like to know with what type of

5    clarity you recall these two conversations, it was a

6    phone call and meeting with Mr. Tachmes?

7         A.   I recall because I told you it pissed me off

8    when all of this happened and to hear Penrods

9    complaining about and suing the City over the ability to

10   issue an RFP and taking issue with a bid waiver that is

11   perfectly available to a Commission but -- so they

12   didn't succeed but they wanted the same thing and they

13   were doing the same thing and going about it the same

14   way just like anybody else.  I specifically remember

15   that and that's why it stands out in all of this.

16        Q.   So in April and May when Penrod pissed you off

17   that caused you to remember with clarity the

18   conversations you had had some years or months prior, I

19   don't know exactly when since you don't remember when;

20   is that right?

21             MR. HOCKMAN:  Objection, argumentative, asked

22        and answered.

23             THE WITNESS:  Yes, that's right.

24   BY MR. KOSLOWE

25        Q.   And is it possible that your recollection is

Rafael Paz
May 05, 2025

1    not 100 percent accurate that Mr. Tachmes did not

2    request a bid waiver but requested for Penrod to

3    continue with their operation and lease of the property

4    by some other means?

5            MR. HOCKMAN:  Objection, asked and answered.

6            THE WITNESS:  He did not request a competitive

7        solicitation.  And the only mechanism for otherwise

8        continuing with the property was through a bid

9        waiver process which I believe was the model for

10       Smith and Wilensky because there was no competitive

11       solicitation for that and he handled that and so it

12       was very clear to me that that was what was

13       contemplated.  If I was wrong I was wrong but that

14       was my impression.

15           MR. KOSLOWE:  Okay, that's fair.  Can we go

16       off for a couple minutes?

17           MR. HOCKMAN:  Agreed.

18           THE VIDEOGRAPHER:  We are off the record.  The

19       time is 3:30.

20           (Thereupon, a brief recess was taken.)

21           THE VIDEOGRAPHER:  We are on the record.  The

22       time is 3:36 p.m.

23           MR. HOCKMAN:  Following consultation with the

24       witness the witness is going to waive the seven

25       hour limitation proposed by federal rules.

Rafael Paz
May 05, 2025

1      Obviously that's within reason.

2   BY MR. KOSLOWE

3      Q.   Sir, I know earlier in your deposition you

4   spoke about your practice which is government

5   consulting, government work, planning use and zoning,

6   that ambit?

7      A.   My practice is focused on public/private

8   partnerships.

9      Q.   Do you appear before the Commission or boards

10   or interact with members of the staff of the City of

11   Miami Beach?

12      A.   I don't because I'm subject to a two year post

13   service restriction but yes, my firm does.

14      Q.   And do you engage on behalf of your clients on

15   public/private partnerships and procurements for other

16   municipalities here in South Florida?

17      A.   Yes.

18      Q.   So not the City of Miami Beach right now

19   during that window?

20      A.   That's correct.

21      Q.   When you were working as City Attorney and

22   during your ten years at the City of Miami Beach you

23   were familiar with Florida Statute Chapter 119; right?

24      A.   Yes.

25      Q.   By that I mean the public records laws?

Rafael Paz
May 05, 2025

1        A.   Yes.

2        Q.   So you're aware that absent certain

3    restrictions all communications that you had within the

4    ambit of the work you did for the City of Miami Beach

5    were subject to public disclosure, right?

6        A.   Subject to certain restrictions, yes.

7        Q.   Knowing that did you attempt to not create a

8    written record so that there would not be public

9    disclosure of whatever was the subject of those

10   communications?

11            MR. HOCKMAN:  Objection to form.

12            THE WITNESS:  I don't know for -- in general I

13       would -- my intent would be to create as few

14       records as possible.

15   BY MR. KOSLOWE

16       Q.   Why is that?

17       A.   Just I want to be efficient in how I go about

18   my work.

19       Q.   I guess I wasn't asking about just papering

20   the record but if you were to engage in a communication

21   with a member of the City staff did you attempt to not

22   do that by e-mail but to do that by phone so there would

23   not be a written record that could be subject of a

24   request under FS119?

25            MR. HOCKMAN:  Objection to form.

Rafael Paz
May 05, 2025

1           THE WITNESS:  Certainly sometimes you want to

2      have conversations that are on sensitive matters

3      without unduly creating a record that then people

4      can mischaracterize and/or even just to avoid

5      weighing in on an issue and on the politics of any

6      given issue.  Just my role was to stay out of it as

7      much as I could to let the electeds do their thing

8      and try to move forward their agendas.

9  BY MR. KOSLOWE

10      Q.   I'm asking a more specific question.  More

11  specific set of questions.  Which is and I'll ask it

12  this way, as you testified a moment earlier you

13  recognize that Florida Statute 119 has exceptions to the

14  disclosure of records to the public; right?

15      A.   Yes.

16      Q.   And those are the exceptions drawn by the

17  statute that outside of those exceptions all the records

18  that are created by the City of Miami Beach are public?

19           MR. HOCKMAN:  Objection, form.

20           THE WITNESS:  Unless there is an exemption in

21      place then yes, records are public records.

22  BY MR. KOSLOWE

23      Q.   So your --

24      A.   Official records.

25      Q.   Official records would include all

Rafael Paz
May 05, 2025

1   communications by the City Attorney to anyone at staff,

2   anyone to the City as long as it doesn't fall within one

3   of those exceptions or exemptions within the statute;

4   right?

5        A.   Yes.

6        Q.   So your understanding is those were the lines

7   drawn by the legislature that the communications within

8   the exemptions or exceptions are not to be disclosed but

9   everything else is to be disclosed and made public?

10            MS. MACK:  Object to form.

11            MR. HOCKMAN:  Object to form.

12            MR. KOSLOWE:  And subject to request, pardon

13       me.

14            THE WITNESS:  That's my understanding of the

15       public records law, yes.

16   BY MR. KOSLOWE

17       Q.   Did you when you were communicating with

18   whomever you were you communicating in your role as City

19   Attorney ever attempt to not create paper records

20   despite the fact that they were not in the exception or

21   exemption in order to not have a record that would be

22   subject to disclosure?

23            MR. HOCKMAN:  Objection, argumentative, asked

24       and answered.

25            THE WITNESS:  You lost me on that.  I'm just

Rafael Paz
May 05, 2025

```
1          trying to follow your question.  There were double

2          or triple negatives.

3    BY MR. KOSLOWE

4          Q.   I'll ask it again.  If you were you having a

5    communication that you knew was not subject of an

6    exception or exemption; right?

7          A.   A record that is subject to disclosure, okay.

8          Q.   Would you attempt to have that communication

9    not in writing so that your communication would not

10   later be subject to disclosure?

11              MR. HOCKMAN:  Objection to form.

12              THE WITNESS:  I don't -- it's possible that I

13         would opt to have a communication that is not in

14         writing but I also created a lot of e-mails and a

15         lot of records so it's possible, yes.

16   BY MR. KOSLOWE

17         Q.   My question isn't whether you might have

18   spoken rather than e-mail.  My question is did you

19   intentionally have communications not by written means

20   in order to avoid disclosure under the public records

21   laws?

22              MR. HOCKMAN:  Objection, asked and answered.

23              THE WITNESS:  Depending on the issue and the

24         sensitivity involved typically politically

25         sensitive information that I would want to be
```

Rafael Paz
May 05, 2025

1    careful in creating records that perhaps were not

2    necessary to create.  So did I do it in every

3    single case, was it top of mind, no.  But if the

4    circumstances required it I would certainly

5    exercise professional discretion.

6  BY MR. KOSLOWE:

7    Q.   So your testimony is there were communications

8  that you had that you knew were not within any exception

9  or exemption to disclosure under the public records laws

10  that you chose to have in a form that was not written

11  because the matter was politically sensitive in order to

12  avoid later public disclosure of that communication?

13    MR. HOCKMAN:  Objection to form, completely

14    misunderstands the public records laws, asked and

15    answered.

16    THE WITNESS:  So I have the professional

17    discretion if I'm going to have a communication, I

18    have always had the option to have the

19    communication verbally or in writing.  I exercised

20    those options depending on the circumstances as I

21    felt were appropriate.  To answer your question

22    were there occasions where perhaps I was

23    intentional in my approach sure, yes, it's my job

24    to be intentional in my approach but it's always my

25    option to memorialize a conversation either

Rafael Paz
May 05, 2025

```
 1          verbally or in writing.
 2    BY MR. KOSLOWE
 3          Q.   I understand what you've just stated.  Didn't
 4    specifically answer the question.  So I'll ask it again
 5    perhaps more pointedly.  Understanding that you have
 6    discretion and choices in the normal course of how to
 7    engage in communications were there instances where you
 8    had a communication and you knew that it was not subject
 9    to exception or an exemption and therefore could later
10    be subject to disclosure under the public records laws
11    that you chose to have not by written means so that it
12    would not be subject to disclosure later in order to
13    avoid that disclosure if it was subject of a request?
14               MR. HOCKMAN:  Objection, asked and answered.
15          Same objection as before.
16               THE WITNESS:  And the answer is yes, there are
17          instances both ways.  There are instances where I
18          knew that a record was public and I chose to either
19          memorialize it in writing or not memorialize it in
20          writing if I were to create that record.  It's
21          always my option.  So yes.
22    BY MR. KOSLOWE
23          Q.   Do you know who Keith Marks is?
24          A.   I do.
25          Q.   Who is that?
```

Rafael Paz
May 05, 2025

```
 1        A.   I don't know if he still is but at the time
 2   that I was there he was the president of the SOFNA,
 3   South of Fifth Neighborhood Association.
 4        Q.   Do you recall Mr. Marks' association or
 5   affiliation with the subject we've been discussing, the
 6   City's future disposition of the One Ocean Drive
 7   property?
 8        A.   Generally although I'm certain that the
 9   records could refresh my recollection as to his
10   involvement.
11        Q.   Do you recall Mr. Marks being selected for the
12   Evaluation Committee?
13        A.   Yes.
14        Q.   And to your understanding what is the purpose
15   of an evaluation committee in a competitive solicitation
16   project run by the City of Miami Beach?
17        A.   So an evaluation committee would be -- the
18   members would be appointed by the City Manager and they
19   would review the proposals that were received and then
20   following the criteria and the scoring in the RFP then
21   they would rank proposals for the purpose of providing a
22   non-binding advisory recommendation to the City Manager
23   as part of the City Manager's due diligence of her
24   advisory recommendation to the Commission for an award
25   of a contract.
```

Rafael Paz
May 05, 2025

1        Q.   And the work that the Evaluation Committee did

2   was applying evaluation criteria stated in the request

3   for proposals or elsewise in the procurement documents

4   to the bids that came in; is that correct?

5        A.   Yes.

6        Q.   And that would be a neutral and objective

7   application of those evaluation criteria to the bid

8   proposals that came in; is that correct?

9             MR. HOCKMAN:  Objection to form.

10             THE WITNESS:  They apply -- they take their

11        review, their experience and use their best

12        judgment to rank proposals using their best

13        judgment.

14   BY MR. KOSLOWE

15        Q.   But the ranking is based on criteria

16   established by the City, by the City's procurement

17   department in the RFP documents?

18        A.   Yes.  Applying the criteria and the scoring

19   and the RFP.

20        Q.   So if the RFP says I want you to look at

21   factors A, B and C let's say the color, the height and

22   the length of a particular project just to give you

23   random criteria then the evaluator can't come in and say

24   I also want to talk about how old it is?

25             MR. HOCKMAN:  Objection.

Rafael Paz
May 05, 2025

1  BY MR. KOSLOWE

2      Q.   Not a criteria that was established by the

3  Evaluation Committee?

4           MR. HOCKMAN:  Objection to form.

5           THE WITNESS:  I don't know that they can't

6      talk about it but the rankings need to be based on

7      the criteria in the RFP.

8  BY MR. KOSLOWE

9      Q.   The evaluations must be made based on the

10  criteria in RFP and not based on other criteria brought

11  to bear by members of the Evaluation Committee in their

12  own subjective determination of what criteria there

13  should be; is that right?

14          MR. HOCKMAN:  Objection to form.

15          THE WITNESS:  Generally, yes.

16  BY MR. KOSLOWE

17     Q.   Is there any allowance for a member of the

18  Evaluation Committee to bring in some other criteria

19  using which to evaluate the bids other than those

20  criteria provided in the procurement documents?

21     A.   No.  You're using the criteria in the RFP but

22  how you go about exercising your best judgment I think

23  that there is no hard and fast rule in terms of how to

24  do that.

25          MR. KOSLOWE:  I'm going to show you a

Rafael Paz
May 05, 2025

1          document.   This will be Exhibit 28 to your

2          deposition.   This is MB00147662.   E-mail chain

3          between Mr. Marks and some others and then in which

4          you were involved, Ms. Hudak was involved as well.

5               (Plaintiff's Exhibit No. 28 was marked for

6          identification.)

7     BY MR. KOSLOWE

8          Q.   The underlying e-mail which is on the second

9     page Mr. Marks is writing to Ms. Hudak; is that correct?

10         A.   Yes.

11         Q.   And essentially asking to be on the Evaluation

12    Committee; right?

13         A.   He is asking for SOFNA to be a part of the

14    process.

15         Q.   In the second paragraph he writes "much has

16    been said by the current operator concerning an unfair

17    process."   That's Penrod; right?

18         A.   Yes.

19         Q.   He says "we strongly disagree.   And believe

20    that placing our community review within the RFP

21    selection process would help strengthen the City's

22    position against all specious claims against the Mayor

23    and commissioners for unfair practices;" right?

24         A.   That's what that says.

25         Q.   So was that one of the reasons to put

Rafael Paz
May 05, 2025

1    Mr. Marks on the Evaluation Committee so that the City

2    could defend itself against claims from Penrod about

3    unfair practices?

4            MR. HOCKMAN:  Objection to form, speculation.

5            THE WITNESS:  I think this document just

6        establishes that was his opinion for why the

7        association should have a role on the process.

8    BY MR. KOSLOWE

9        Q.   Mr. Marks eventually goes on the Evaluation

10   Committee; right?

11       A.   I believe that's correct.

12       Q.   So was one of the City's considerations for

13   agreeing to put Mr. Marks on the Evaluation Committee so

14   he could participate in strengthening the City's

15   position against specious claims against the Mayor and

16   Commissioners for unfair practices?

17           MR. HOCKMAN:  Objection, speculation,

18       foundation.

19           THE WITNESS:  No, I believe that one of the

20       reasons for placing him on the committee is to

21       satisfy SOFNA's request for a role in the process.

22   BY MR. KOSLOWE

23       Q.   I didn't ask whether that was one of the

24   reasons.  So let's assume that one of the reasons for

25   putting Mr. Marks on was to satisfy SOFNA's request to

Rafael Paz
May 05, 2025

1  be part of the evaluation process.  Was one of the

2  reasons the City put Mr. Marks on was in order to defend

3  and strengthen the City's position against specious

4  claims against the Mayor and commissioners for unfair

5  practices?

6          MR. HOCKMAN:  Objection, speculation and

7      foundation.

8          THE WITNESS:  I have no way of knowing whether

9      that was one of the reasons.  Not to my knowledge

10      it wasn't.

11  BY MR. KOSLOWE

12      Q.   This discussion here we're looking at in this

13  exhibit is discussion between you and members of City

14  senior staff including Ms. Hudak, Mr. Denis head of

15  procurement, Mr. Pico, now the City Attorney,

16  Mr. Tachmes Assistant City Manager about putting

17  Mr. Marks on the committee; right?

18      A.   Yes.

19      Q.   You participated in process of helping to

20  select who would be on the Evaluation Committee; right?

21      A.   I discussed this matter with the

22  administration, yes.

23      Q.   So you do have some way of knowing whether

24  what we just discussed was one of the reasons why

25  Mr. Marks was selected, you have some way of knowing

Rafael Paz
May 05, 2025

1    that; right?

2        A.   Yes.

3        Q.   When you just said you have no way of knowing

4    that's not accurate, you have some way of knowing

5    because you're part of the discussion?

6        A.   Well, just to answer you want to pin this --

7    you want to pin the City's placing him on the committee

8    for the purpose of strengthening against the all

9    specious claims yada, yada.  That is not my

10   understanding.  It was placing him on the committee to

11   show that they were responsive to the association's

12   request for community participation in the process.

13           MR. HOCKMAN:  Counsel, I'm going to claw this

14       back.  This is a June 2, 2023 e-mail and June 4th

15       2023 e-mail containing legal advice to the City

16       Manager from the City Attorney.  Not the portion on

17       MB00147663 which is Mr. Marks but Mr. Paz' e-mail

18       and Ms. Hudak's response are clearly part of legal

19       counsel.

20           MR. KOSLOWE:  That would include the part

21       where Mr. Paz is saying in bold "as we've already

22       been sued on this procurement.  Before issuing an

23       RFP let's discuss offline if possible?"

24           MR. HOCKMAN:  Obviously.  He is discussing the

25       lawsuit.

Rafael Paz
May 05, 2025

1          MR. KOSLOWE:  Is he discussing the lawsuit
2     here or is he telling everyone let's not talk about
3     this in an e-mail?
4          MR. HOCKMAN:  The way this works I tell you
5     I'm clawing something back and you have to decide
6     whether you're going to take that to the bank.
7     It's clawed back.  Only as to MB00147662 from
8     Mr. Paz's e-mail to Ms. Hudak's response.
9          MR. KOSLOWE:  You're just noticing this now?
10          MR. HOCKMAN:  Yes, sir.
11          MR. KOSLOWE:  Well, if you're clawing it back
12     then you should take it away from the witness.
13          MR. HOCKMAN:  Okay.
14          MR. KOSLOWE:  It's your action, it's not mine.
15          MR. HOCKMAN:  That's what we're going to do.
16  BY MR. KOSLOWE
17     Q.   So now that we're discussing this in front of
18  you, sir, did you ever advise members of senior City
19  staff not to have communications in writing about the
20  subject matter of this RFP?
21          MR. HOCKMAN:  Objection, that calls for legal
22     advice and instruct the witness not to answer.
23     Also going to designate the deposition confidential
24     at this point.
25          MR. KOSLOWE:  I actually thought that when I

Rafael Paz
May 05, 2025

1      made my objection at the beginning about Boucher

2      that covered that but that's fine.

3           MR. HOCKMAN:  If we covered that, that's fine.

4           MR. KOSLOWE:  I didn't mean to have us have

5      that conversation again.  Can we go off the record

6      for just a brief moment?

7           THE VIDEOGRAPHER:  We are off the record.  The

8      time is 3:55 p.m.

9           (Discussion held off the record.)

10          THE VIDEOGRAPHER:  We are on the record.  The

11     time is 3:56 p.m.

12          MR. KOSLOWE:  I'm going to ask a series of

13     questions.  You can pose objections and admonish

14     the witness not to answer but I'll make my record.

15          MR. HOCKMAN:  Ask away.

16  BY MR. KOSLOWE

17     Q.   Mr. Paz, what were the subject of

18  communications you had with Ms. Hudak and others at the

19  City about the composition of the Evaluation Committee?

20          MR. HOCKMAN:  Going to caution you not to

21     reveal attorney-client communications.

22          THE WITNESS:  Well, you just refreshed my

23     recollection about what's his name Keith Marks'

24     participation.  I don't recall who else was on that

25     committee or what -- or if I was consulted about

Rafael Paz
May 05, 2025

```
 1        anybody else on the committee.
 2   BY MR. KOSLOWE
 3        Q.   Did you ever instruct or advise members of the
 4   City administration not to have written communications
 5   about any of the subject matters, the factual underlying
 6   subject matters, of this lawsuit that involving the
 7   future disposition of One Ocean Drive, the RFP, the
 8   terms and conditions by which any bidder would be
 9   selected?
10             MR. HOCKMAN:   Same caution.
11             THE WITNESS:   I don't know that I instructed
12        people but I may have pointed out that yes, we were
13        in litigation so people should just be mindful of
14        that as they proceed to do their work and
15        memorialize things in writing that could be taken
16        out of context.
17   BY MR. KOSLOWE
18        Q.   Legal advice the City Attorney's Office
19   provided in connection with ongoing litigation to your
20   mind was subject to exception or exemption under 119;
21   right?
22             MR. HOCKMAN:   Objection to form.  You can
23        answer if you can.  Don't disclose attorney-client
24        communications.
25             THE WITNESS:   There is an exception for
```

Rafael Paz
May 05, 2025

```
 1         attorney work product and so yes, to the extent

 2         that legal advice falls under attorney work product

 3         during the pendency of litigation then my position

 4         is that that statutory exemption and my

 5         understanding is that that statutory exemption

 6         would apply.

 7              MR. HOCKMAN:  Also for the record counsel

 8         section 90.502 which has been adopted by the

 9         federal courts provides for an attorney privilege

10         to cities, commissioners, elected officials and

11         City staff regardless of the Public Records Act.

12    BY MR. KOSLOWE

13         Q.  Because you knew that, what you just testified

14    to is that exception or exemption within the Public

15    Records Act, you would not have been concerned that

16    opinion work product, litigation advice in connection

17    with ongoing litigation would be subject to public

18    disclosure; right?

19              MR. HOCKMAN:  Same caution.

20              THE WITNESS:  You never know what's going to

21         be subject to public disclosure so the word of

22         caution, you know, in many cases is appropriate to

23         remind staff.

24    BY MR. KOSLOWE

25         Q.  What other criteria -- strike that.  Did you
```

Rafael Paz
May 05, 2025

1    discuss with any members of the City administration

2    criteria other than those stated in the RFP documents

3    for evaluating a bid should be considered for the

4    composition of the Evaluation Committee for this RFP?

5             MR. HOCKMAN:  Same caution.

6             THE WITNESS:  I don't recall other than I

7         don't recall a conversation like that.

8    BY MR. KOSLOWE

9         Q.   Do you recall any conversation between

10   Ms. Hudak and other members of the City administration

11   about whether or not to choose Mr. Marks specifically

12   for participation as a member of the Evaluation

13   Committee?

14        A.   I don't.  I believe the gist of how I was

15   approached was about whether to have some process for

16   SOFNA as a whole to weigh in versus placing a

17   representative of SOFNA on the committee.

18        Q.   Was there any consideration by the City to

19   look outside of SOFNA for neighborhood input on the

20   evaluation of this bid?

21             MR. HOCKMAN:  Objection, foundation.

22             THE WITNESS:  I don't know.

23   BY MR. KOSLOWE

24        Q.   Are you familiar with the term or phrase cone

25   of silence?

Rafael Paz
May 05, 2025

1       A.   Yes.

2       Q.   That means bidders in a city competitive

3   solicitation on the one side and members of the City

4   administration and staff on the other side can't speak

5   with one another outside of whatever channels are

6   provided specifically in the RFP documents; right?

7            MR. HOCKMAN:   Objection to form.

8            THE WITNESS:   That's generally correct, yes.

9   BY MR. KOSLOWE

10      Q.   Could you give me a better explanation of what

11  the cone of silence is in your own experience and

12  expertise as former City Attorney?

13      A.   From and after the issuance of competitive

14  solicitation then bidders and prospective bidders or

15  existing vendors cannot communicate with not only the

16  administration but they can't communicate with electeds

17  and they can't communicate with members of the

18  Evaluation Committee outside of any public meetings or

19  the RFP process or as permitted in writing with a copy

20  to the clerk.

21      Q.   And did members of the City Attorney's Office

22  participate in the RFP process?

23      A.   In the RFP process most likely, yes.

24      Q.   So there might have been someone assigned from

25  your office help the procurement department put together

Rafael Paz
May 05, 2025

1    certain aspects of the request for proposals; right?

2         A.    Yes.

3         Q.    And then after issuance of an award there

4    would have been a member of your office, perhaps

5    yourself, would be as tasked with helping to devise and

6    draft the various contracts or whatever legal documents

7    would ensue?

8         A.    Yes.

9         Q.    Are those people also because they're

10   participating in the RFP barred from having

11   communications with bidders?

12        A.    There is an exception in the cone of silence

13   for communications with the City Attorney's Office.

14        Q.    There's no Chinese wall set up within the City

15   Attorney' Office?

16        A.    The cone of silence does not apply to

17   communications with attorneys.  So bidders and

18   prospective bidders can always speak to a member of the

19   City Attorney's office about a pending matter.

20        Q.    Would that even be if that member of the City

21   Attorney's Office is participating in the RFP process?

22             MR. HOCKMAN:  Objection to form.

23             THE WITNESS:  Yes.  There is no exception to

24        the exception in the cone of silence.

25   ///

Rafael Paz
May 05, 2025

1          MR. KOSLOWE:  I'm going to show you a document
2      we'll mark it as 29.
3          (Plaintiff's Exhibit No. 29 was marked for
4      identification.)
5  BY MR. KOSLOWE
6      Q.   This is MB0097614.  It's an e-mail exchange in
7  which you were a part.  You can take a moment and just
8  review it.
9      A.   Bottom up?
10     Q.   I usually do from back to forward given that's
11 how they appear in time?
12     A.   Wow, I don't even recall this.  Okay.
13     Q.   In these communications various attorneys or
14 lobbyists depending on what capacity they were acting on
15 behalf of Penrod were requesting and gaining your
16 approval for discussions between them and elected
17 officials at the City; right?
18     A.   Yes.
19     Q.   And there was concern on the part of Penrods'
20 representatives not to violate the cone of silence at
21 one point that would go into effect; right?
22     A.   Yes.
23     Q.   And there was also concern that discussions
24 should be within the scope of the RFP and not within the
25 scope of whatever the litigation that was ongoing;

Rafael Paz
May 05, 2025

1    right?

2         A.   That's right.

3         Q.   Did you have any similar concern to ensure

4    that members of your office and your staff working on

5    the RFP didn't bleed over into members of your staff

6    working on the ongoing litigation?

7              MR. HOCKMAN:  Objection to form.

8              THE WITNESS:  So, the members of the office

9         that were handling the procurement would have

10        really no role in litigation.

11   BY MR. KOSLOWE

12        Q.   So if -- let's assume, take a step back.  You

13   testified earlier that in your best recollection you had

14   assigned Rick Dipico as point from your office on this

15   process; is that right?

16        A.   At some point I did.  I don't remember when

17   that was but yes.

18        Q.   And if it wasn't him it would have been

19   Ms. Torres; right?

20        A.   That's right.

21        Q.   One of two of them would have been leading

22   point at some point in the RFP process after the City

23   carried out the May resolution; is that right?

24        A.   Yes.

25        Q.   And at various points in the RFP process there

Rafael Paz
May 05, 2025

1   might have been questions that were raised by

2   procurement to the City's lawyers; right?

3          A.   Yes.

4          Q.   And the City's lawyers would have been

5   involved in helping the City's procurement department

6   and the City's Evaluation Committee work through

7   whatever questions they might have about the procurement

8   process; right?

9          A.   Yes.

10         Q.   There is also bid protests that happen in

11  procurement processes; correct?

12         A.   Yes.

13         Q.   And the City Attorney's Office works on those

14  bid protests; right?

15         A.   Yes.

16         Q.   Sometimes they hire outside counsel, sometimes

17  they do it themselves, right?

18         A.   Yes.

19         Q.   And did you ever take efforts to ensure that

20  the lawyers who are working on the bid process didn't

21  have discussions with the bidders to avoid an improper

22  communication during a procurement process between the

23  City and a prospective bidder?

24             MS. MACK:  Object to form.

25             MR. HOCKMAN:  Object to the form.  Caution you

Rafael Paz
May 05, 2025

```
1         on any advise given to City Attorney or staff.
2              THE WITNESS:  Your question presumes there is
3         anything improper about a bidder communicating with
4         a member of the attorney's office and the only
5         reason the cone of silence exists is by ordinance
6         and the ordinance exempts communication with the
7         attorney's office so there would be nothing in
8         improper about a bidder and an attorney having a
9         communication.
10   BY MR. KOSLOWE
11        Q.   So if --
12        A.   Without regard to that person's role in the
13   office or whatever matter they're working.
14        Q.   So if one bidder issues a bid protest in
15   connection with one of the guidelines or specifications
16   in an RFP it's appropriate for the City Attorney's
17   Office to communicate that bid protest with another
18   bidder; is that right?
19             MR. HOCKMAN:  Objection to form, improper
20        hypothetical.
21             THE WITNESS:  The bid protest is a public
22        record and if asked for a copy then it is
23        certainly -- we have the obligation to produce it
24        and a lawyer with a question about a bid protest
25        can certainly raise those questions.  The cone of
```

Rafael Paz
May 05, 2025

1           silence allows for those communications and the

2           other bidders have a stake in the bid protest as

3           well.  So it's not surprising to me that there

4           would be communications.

5   BY MR. KOSLOWE

6           Q.   So I'm trying to isolate different streams of

7   communication.  You discussed a few there.  One you

8   discussed one would be communications between the bidder

9   issuing the protest and the City Attorney's office about

10  that protest, that's one thing you described?

11          A.   That's perfectly acceptable.

12          Q.   I'm asking about something else, which is if

13  bidder A lodges a protest would it be appropriate for

14  the City Attorney's Office to work with another bidder

15  to help resolve that protest?

16          MS. MACK:  Object to form.

17          THE WITNESS:  I don't know what you mean by

18          "work with" but would it be appropriate to

19          communicate with another bidder if the other bidder

20          had questions about the protest or their own role

21          in the process yes.  That would be appropriate.

22  BY MR. KOSLOWE

23          Q.   When I say work with to resolve what I meant

24  was -- let me take a step back.  What role does the City

25  Attorney's Office typically have in a bid protest in

Rafael Paz
May 05, 2025

1   connection with the procurement process at the City of

2   Miami Beach?

3        A.   The City Attorney's Office would be involved

4   in reviewing the merits of the bid protest and in

5   working with the administration on the disposition of

6   the protest or whether it's to deny or grant the

7   protest.

8        Q.   And what is the goal of the City of Miami

9   Beach, the administration and the City Attorney's Office

10  together, when they receive a bid protest?  What's the

11  goal in addressing a bid protest?

12            MR. HOCKMAN:  Objection, foundation.

13            THE WITNESS:  So the goal in addressing a bid

14       protest would be to ultimately make sure that the

15       competitive process is fair.

16  BY MR. KOSLOWE

17       Q.   And your understanding is the City code is the

18  one -- the City code is the authority that provides any

19  bider with a substantial interest and aggrieved by in

20  connection with some procurement process or decision by

21  the City the ability to file a formal -- let me strike

22  that.  I read that wrong so I'm going to strike the

23  whole question.

24            Your understanding is that it's the City code

25  that gives the authority to any bidder with a

Rafael Paz
May 05, 2025

1  substantial interest in connection with any solicitation

2  issued by the City of Miami Beach or any post award of

3  formal solicitation a right to protest, right?

4            MR. HOCKMAN:  Objection to form.

5            THE WITNESS:  Yes.  There are two categories

6        of protest.  The protest to the specifications of

7        the bid and a protest to the award.

8  BY MR. KOSLOWE

9        Q.   And the goal in both of those -- in the City's

10  response to both of those types of protests is to ensure

11  fairness in the process?

12       A.   A fair and open process, yes.

13       Q.   The goal isn't necessarily to defend whatever

14  it was against which the protest was lodged.  The goal

15  is instead to provide fair and proper rules and

16  determinations by the City of Miami Beach in connection

17  with its procurement decisions; is that right?

18            MR. HOCKMAN:  Objection to form.

19            THE WITNESS:  Yes and to -- in the context of

20       public procurement law and the discretion afforded

21       to local governments to determine what they think

22       is fair.

23  BY MR. KOSLOWE

24       Q.   I guess what I'm asking is as opposed to an

25  adversarial litigation matter where the goal when you

Rafael Paz
May 05, 2025

1    receive a complaint is to defend the action.  The goal

2    when the City of Miami Beach receives a protest is to

3    determine if the specifications or the award is proper

4    within the context of the procurement laws that you

5    described; is that correct?

6              MR. HOCKMAN:  Objection to form, incomplete

7         hypothetical.

8              THE WITNESS:  The goal is to determine whether

9         the content of that bid protest has merit because

10        in many instances bidders are not motivated by

11        ensuring a fair and open process but use bid

12        protests to try to manipulate and game the system

13        and to achieve ends that could very well thwart a

14        competition.

15             So the goal is not to find ways to grant a bid

16        protest, it's to evaluate the merits to ensure that

17        the City is proceeding in a fair manner.

18   BY MR. KOSLOWE

19        Q.    The goal is not to find ways to deny or find

20   ways to grant.  The goal is to find ways to make sure

21   the process is fair; right?

22        A.    And to apply public procurement law and the

23   broad discretion that's a forwarded to municipalities to

24   make those determinations of what is fair.

25        Q.    Within the context of applying procurement law

Rafael Paz
May 05, 2025

1   and affording municipality the discretion that the law

2   provides it the goal is to ensure a fair process not to

3   approve, not to deny specifically but to afford a fair

4   process, that is the goal in determining if the protest

5   has merit?

6        A.   Yes, recognizing that in many cases the bid

7   protests themselves are not motivated by ensuring a fair

8   process.

9        Q.   How often in your experience did City

10  Attorney's Office receive a bid protest from one bidder

11  and then work with another bidder to address the bid

12  protest from the first bidder?

13            MS. MACK:  Object to form.

14            THE WITNESS:  I don't know what you mean by

15       work with.

16  BY MR. KOSLOWE

17       Q.   Well, has the City Attorney's office ever

18  retained outside counsel to help them with bid protest

19  matters?

20       A.   Yes.

21       Q.   And the City Attorney's Office would work with

22  outside counsel to help them address the bid protest,

23  right?

24            MR. HOCKMAN:  Objection to form.

25            THE WITNESS:  Yes.

Rafael Paz
May 05, 2025

1    BY MR. KOSLOWE

2        Q.   That's what I mean by work with.

3        A.   Okay.

4        Q.   Has in your experience the City Attorney's

5    ever worked with another bidder to resolve a bid protest

6    received by one bidder?

7            MS. MACK:  Object to form.

8            THE WITNESS:  That's -- I don't have personal

9        knowledge of that, no.

10   BY MR. KOSLOWE

11       Q.   Did your office share any of the bid

12   protests -- strike that.  Did your office communicate

13   with counsel to any of the other bidders in this RFP

14   about the content of in order to address and resolve bid

15   protest received by Penrod in this RFP?

16           MR. HOCKMAN:  Objection to form.

17           THE WITNESS:  It's possible that my office had

18       communications with counsel for other bidders.

19       That does not mean that they were working with

20       another bidder to resolve a bid protest.

21   BY MR. KOSLOWE

22       Q.   Were those communications -- do you recall any

23   communications or conversations between your office and

24   Boucher about bid protest received by Penrod in this

25   case?

Rafael Paz
May 05, 2025

1      A.   I don't.  Honestly I didn't even recall the

2   Tachmes and I forgot that Alfredo was even involved in

3   this at all.  So I'm just learning -- just from reading

4   this.  Just had forgotten completely.  So no, I don't

5   have that level of recollection.  There was nothing

6   pissing me off unlike in the -- in our earlier exchange.

7      Q.   If the City Attorney's Office had had

8   communications with Boucher about any of the bid

9   protests that the City received from Penrod in this RFP

10  would those communications be protected by privilege?

11           MR. HOCKMAN:  Object to form.

12           THE WITNESS:  Could you repeat the question?

13  BY MR. KOSLOWE

14      Q.   Sure.  We've been discussing the possibility

15  of the City of Miami Beach through its City Attorney's

16  Office having a conversation, having communication,

17  having some discussion with Boucher about the content of

18  in order to resolve or address any of the bid protests

19  received by the City from Penrods in this RFP?

20           MR. HOCKMAN:  Objection.

21           MR. KOSLOWE:  That's the context.

22           MR. HOCKMAN:  Objection, incomplete

23      hypothetical, speculation.

24           MR. KOSLOWE:  I didn't even ask a question.

25           THE WITNESS:  If I can answer before I forget.

Rafael Paz
May 05, 2025

1           I don't recall a specific communication but

2           certainly it was not in order to resolve a bid

3           protest.  It was if a communication happened it's

4           because as a professional courtesy you extend that

5           courtesy to another lawyer who is reaching out who

6           may have a substantial stake in the matter but that

7           doesn't mean in order to work with that person to

8           resolve the protest.

9     BY MR. KOSLOWE

10          Q.   So that communication certainly wouldn't be

11    privileged because you're just providing information as

12    part of a courtesy, right?

13               MS. MACK:  Object to form.

14               THE WITNESS:  That communication would not be

15          privileged.

16    BY MR. KOSLOWE

17          Q.   And any communication between the City and

18    Boucher in the context of resolving or addressing the

19    bid protest couldn't be privileged because in the

20    context of participating in the RFP Boucher is adverse

21    to the City; right?

22               MR. HOCKMAN:  Objection, incomplete

23          hypothetical.

24               THE WITNESS:  I don't know that Boucher is

25          adverse to the City but the communications are not

Rafael Paz
May 05, 2025

1   privileged.

2        MR. KOSLOWE:  Counsel, there were documents

3   and communications logged in this case,

4   communications --

5        MS. MACK:  While the litigation was ongoing

6   and Boucher was still a party.

7        MR. KOSLOWE:  Communications were logged in

8   this case between the City Attorney's Office and

9   Boucher in connection with bid protest.  The City

10  Attorney, former City Attorney, testified he

11  doesn't believe those are privileged.  I ask you to

12  revisit the log and see if you can make a

13  determination about that.

14       MR. HOCKMAN:  The former City Attorney is not

15  making privilege determinations in this case.  We

16  are.

17       THE WITNESS:  Can I clarify?

18       MR. KOSLOWE:  Not a question posed to you.  I

19  just asked if you'll consider that.

20       MR. HOCKMAN:  He is allowed to clarify his

21  answer.

22       MR. KOSLOWE:  There is no question posed.

23       MR. HOCKMAN:  Go ahead and clarify, sir.

24       THE WITNESS:  By privilege I was referring to

25  attorney/client privilege.  I was not referring to

Rafael Paz
May 05, 2025

1  attorney work product that would be covered under

2  an exception.  So I don't know if that makes a

3  difference.  I don't really care but that's what I

4  was --

5       MR. KOSLOWE:  I was talking about the

6  attorney-client privilege.

7       MS. MACK:  If you're asking us to take another

8  look at the documents in the log and re-evaluate we

9  can do as a courtesy.

10      MR. HOCKMAN:  If you identify the documents

11  you want us to look at.

12      MR. KOSLOWE:  They're identified in Exhibit C

13  to our recent response to the Boucher motion to

14  intervene.  At least some of them are.  It was a

15  400,000 line log so I did not include all of them.

16      MR. HOCKMAN:  I am aware and just since we're

17  talking about that record you are aware that was

18  the error by an E-discovery vendor not necessarily

19  the City Attorney's Office or my office and we are

20  still revisiting that.  As you point out it's a lot

21  to look at.

22      MR. KOSLOWE:  The documents we're referring to

23  weren't produced.  They were withheld.  They were

24  logged and withheld.  Why don't you all take a look

25  at that.

Rafael Paz
May 05, 2025

1           MS. MACK:  That was Exhibit C to the reply?

2           MR. KOSLOWE:  Exhibit C to the reply should

3      contain sample of the log.

4           MR. HOCKMAN:  It's a portion.  If you want us

5      to take a look at all of them you have to identify

6      it.

7           MR. KOSLOWE:  How about this.  It's your guys

8      withholding so I'm identifying a category of

9      documents you say you withheld.  If you want to

10     review it if not I'm just asking for it.

11 BY MR. KOSLOWE

12     Q.   Sir, did you participate at all in the City's

13 responses to bid protests lodged by Boucher in

14 connection with this request for proposal?

15     A.   Yes.

16     Q.   What was your role?

17     A.   I believe that I reviewed the draft of the

18 response.  I may have had conversations with the

19 attorneys or members of staff that were involved in the

20 preparation of the response and I believe I signed it.

21 I don't know if I did provide -- maybe the response came

22 from the manager but -- or from both of us.  We would

23 sometimes both sign responses.

24     Q.   What was the breakdown of role, if any,

25 between the City Attorney's office and the procurement

Rafael Paz
May 05, 2025

```
 1   staff, administrative staff in responding to bid

 2   protests in this case?

 3        A.   I don't know that I recall on this specific

 4   case what the breakdown was but generally we would rely

 5   on staff to certainly outline if there are

 6   specifications that are being challenged or questions

 7   about what is meant by different terms.  We would look

 8   to procurement staff to weigh in on those and sometimes

 9   depending on the matter they would just draft the

10   response themselves and then we would review them.  But

11   I don't recall in this case exactly what procurement did

12   versus other professionals.

13        Q.   I'm trying to establish that breakdown so I

14   can understand who worked on what and then ask questions

15   about that.  I'm going to show you a document or two

16   about that.

17        A.   Sure.

18             MR. KOSLOWE:  Going to show you a document

19        we'll mark as Exhibit 30 to your deposition.  This

20        is MB00430277.

21             (Plaintiff's Exhibit No. 30 was marked for

22        identification.)

23   BY MR. KOSLOWE

24        Q.   This is an e-mail exchange in early

25   August 2023, right, sir?
```

Rafael Paz
May 05, 2025

```
 1        A.   Yes.

 2        Q.   And these are what look like to be the

 3   beginning of the drafting process in response to one of

 4   the bid protests lodged by Penrod in connection with

 5   this RFP; right?

 6        A.   Yes.

 7        Q.   Here you have counsel involved in this

 8   process.  I don't believe I see anyone on the list who

 9   is a member of the professional staff.

10        A.   That's correct.

11        Q.   Does this help refresh your recollection of

12   who did what part of the drafting?

13        A.   No, it does not.  But I vaguely remember this

14   outline, yes.

15             MR. KOSLOWE:  I'm going to give you another

16        document.  This will be marked as Exhibit 31 to

17        your deposition.  This is MB0034707.  It's e-mail

18        with an attachment.

19             (Plaintiff's Exhibit No. 31 was marked for

20        identification.)

21   BY MR. KOSLOWE

22        Q.   Do you see it, sir?

23        A.   Yes.

24        Q.   Here you have Mr. Denis sending e-mail to Rick

25   Dipico, that's a member of your staff, right, sir?
```

Rafael Paz
May 05, 2025

1        A.    Yes.

2        Q.    Copying Christie Bada that's a member of

3  Mr. Denis' staff?

4        A.    Yes.

5        Q.    This is attaching the addendum that issued

6  from the City and in connection with one of the bid

7  protests issued by Penrod in this matter; right?

8        A.    If you say so.

9        Q.    Why don't you take a look and see?

10       A.    It's an addendum but whether it came after the

11  protest in response to the protest.  Otherwise I don't

12  know.

13       Q.    That's one of the reasons why I gave you the

14  prior document, Exhibit 30, you can see you're

15  discussing the outline and notes for a response to the

16  bid protests on August 1st and August 3rd.  Here we have

17  on August 3rd a draft of the addendum that's coming in

18  response as well?

19       A.    The link between the one and the other doesn't

20  really do anything for me in terms of changing my

21  response.  I don't know what this was generated -- what

22  drove this addendum.

23       Q.    Did you participate at all in drafting this

24  addendum document?

25       A.    I don't remember.

Rafael Paz
May 05, 2025

1      Q.    The City Attorney's Office or procurement who

2 drafted the addendum RFP criteria?

3      A.    I don't recall.

4      Q.    In the normal course who would address addenda

5 or changes to RFP criteria.  Would that be the

6 procurement staff or the City Attorney's Office?

7      A.    Initiate with procurement.

8      Q.    Do you recall the subject matter of this bid

9 protest that took place in early August of 2023?

10      A.    No.

11      Q.    Who in your office would be the best person to

12 speak with and by your office I mean your former office

13 in the City Attorney about the City's response prepared

14 to this bid protest?

15           MR. HOCKMAN:  Objection, speculation.

16           THE WITNESS:  I don't know.

17 BY MR. KOSLOWE

18      Q.    Do you know biased on these e-mails if Rick

19 Dipico was the lead at the time?

20      A.    Most likely.

21      Q.    If Rick Dipico was the lead at the time would

22 he be the best person to speak to about understanding

23 the content of the City's response to the bid protest?

24           MR. HOCKMAN:  Objection, speculation.

25           THE WITNESS:  I don't know that he would be

Rafael Paz
May 05, 2025

```
 1        the best person but he was involved, yes.
 2  BY MR. KOSLOWE
 3        Q.   When you say he was involved he was load;
 4  right, for the City Attorney's office?
 5        A.   Yes.
 6             MR. HOCKMAN:  Objection, asked and answered.
 7  BY MR. KOSLOWE
 8        Q.   So he was lead for the City Attorney's Office
 9  and then we have Mr. Denis and Ms. Bada from the
10  procurement department; right?
11        A.   Yes.
12        Q.   Would that be the universe of people best
13  situated to understand and testify about what took place
14  at the time?
15             MR. HOCKMAN:  Objection, speculation.
16             THE WITNESS:  Yes.
17  BY MR. KOSLOWE
18        Q.   Can the City waive non-compliance by a bidder
19  with any of the RFP specifications?
20             MS. MACK:  Object to form.
21             THE WITNESS:  I think minor irregularities
22        could be waived in certain circumstances but the
23        way you've drafted -- the way you've articulated
24        the question is very difficult for me to respond.
25  ///
```

Rafael Paz
May 05, 2025

1    BY MR. KOSLOWE

2        Q.   So the City can waive non-compliance by a

3    bidder with certain specifications or terms or rules in

4    a procurement but only a certain type of non-compliance

5    can be waived.  Is that what you're saying?

6             MR. HOCKMAN:  Objection, speculation and

7        incomplete hypothetical.

8             THE WITNESS:  Minor irregularities my

9        understanding generally can be waived.  There are

10       certain irregularities that whether they are viewed

11       as minor or otherwise the City would never waive

12       any, would never be in the City's interest in my

13       opinion to waive.

14   BY MR. KOSLOWE

15       Q.   Well, the question isn't whether it was in --

16   what your opinion was.  The question is what's the

17   possible category of non-compliance that the City can

18   waive?

19       A.   Okay.

20       Q.   So is it your testimony that what the City can

21   waive are minor irregularities?

22       A.   Yes.  With minor irregularities you look to

23   case law on the scope of that.

24       Q.   So what constitutes a minor irregularity?

25            MR. HOCKMAN:  Objection to the form, calls for

Rafael Paz
May 05, 2025

1          expert opinion.

2                THE WITNESS:  Off the top of my head I

3          couldn't tell you.

4    BY MR. KOSLOWE

5          Q.   Who within the City has the authority to

6    address and then waive or not waive a minor

7    irregularity?

8          A.   Depending on what it is most likely to

9    determine at first you want to determine is it minor or

10   is it not.  Certain things somebody may characterize as

11   minor but the administration the City would not view

12   them as minor.  For example submitting an untimely late

13   proposal.  That the City would never view as minor and

14   it's addressed in the RFP documents.  But generally if

15   there is consensus that there is -- that an irregularity

16   is minor the administration could waive that.

17         Q.   It's the administration that would address

18   that?

19         A.   I may even be speaking out of turn or if

20   that's part of the award.  Certainly the commission

21   could waive it if there was a minor irregularity.

22         Q.   You said that the determination of whether an

23   irregularity is minor that's mainly based on the law

24   that exists within the procurement space for determining

25   whether or not an irregularity is minor?

Rafael Paz
May 05, 2025

```
 1        A.    In part, yes.

 2        Q.    What else is it based on?

 3        A.    The policy interest and ultimately that

 4   fairness principle that we were talking about that is

 5   the goal of public competitive process.

 6        Q.    So I believe you just testified that late

 7   submission of a bid is something that's never waived; is

 8   that your testimony?

 9        A.    At the City of Miami Beach, yes.

10        Q.    You're sure?

11        A.    Well, I can only speak to in my ten years

12   there and I had -- I was primary.  I was lead on

13   procurement matters.  I never waived or allowed a late

14   bid to be considered.  And I know also from speaking

15   with my predecessor, the City Attorney, who was not only

16   City Attorney for eight years but then for 20 years

17   before that he was the lead procurement person and I

18   know that I had multiple conversations with him over the

19   years that we would never allow for an untimely bid

20   because we would lose control of the procurement process

21   the second that you allowed one bidder to submit a late

22   bid and then create this arbitrary situation the next

23   time if you don't allow a late bid.  We just never went

24   there.  In my understanding for at least 30 years.

25        Q.    You just testified about 30 years of
```

Rafael Paz
May 05, 2025

1    information that you have, ten of which you participated

2    in 20 of which you got from somebody else, about the

3    evaluation of non-compliance with procurement

4    specifications and determining whether they're minor or

5    not.

6            I'm going to ask you again based on that three

7    decades of experience you professed what factors, factor

8    or factors, are there in the relevant law for

9    determining whether an irregularity is minor?

10           MR. HOCKMAN:  Objection, asked and answered,

11       calls for expert opinion.

12           THE WITNESS:  And you're mischaracterizing my

13       testimony.  My response was as to the issue of

14       untimely and late bids.

15   BY MR. KOSLOWE

16       Q.   That's the only procurement non-compliance

17   with which you're familiar?

18           MR. HOCKMAN:  Objection, misstates testimony.

19           THE WITNESS:  Not my testimony but I was

20       advising as to what my understanding of how the

21       City has addressed that issue and that issue alone.

22       There could be other irregularities that are deemed

23       minor.  I don't have sitting before you today

24       examples of that and what that might look like.  I

25       could just tell you what it doesn't look like and

Rafael Paz
May 05, 2025

 1        that's what I did.

 2   BY MR. KOSLOWE

 3        Q.   Do you have recollection of a request by

 4   Penrod, its representative in connection with the RFP,

 5   for an extension of the RFP submittal deadline in

 6   connection with a hurricane?

 7        A.   I don't recall that.  Oh, yes.  Yes, there was

 8   something about a hurricane that affected or was maybe

 9   coming through Tallahassee but it had no impact on

10   operations in Tallahassee and the request was to provide

11   an extension due to a hurricane warning or I don't know

12   what happened.  I don't know what it was but something

13   like that came up.

14        Q.   You said your recollection was there was a

15   hurricane that was coming but there were no closures in

16   Tallahassee, that's your recollection of what took

17   place?

18        A.   Vaguely I remember there was a request based

19   on a hurricane event or threat of a hurricane event and

20   I don't remember how it was resolved but I vaguely

21   remember that maybe the requester was overstating the

22   impact of the event.

23        Q.   So your recollection is that the requester was

24   overstating the impact?

25        A.   That's my vague recollection.

Rafael Paz
May 05, 2025

1       Q.    Do you have any recollection of there being an

2   issuance of evacuations and closures and emergency

3   procedures by the governor in connection with the

4   hurricane at the time for the area?

5       A.    Typically -- I don't have any specific

6   recollection but typically when there is a storm event

7   the governor to access F.E.M.A. funding will routinely

8   issue emergency orders.

9       Q.    So --

10      A.    I don't know anything about evacuations.

11      Q.    So your recollection is that there was an

12  overstatement of a potential impact of a hurricane and

13  that was the basis of whatever you considered?

14          MR. HOCKMAN:   Objection, asked and answered.

15          THE WITNESS:   And it's a vague gist of what

16      the issue.   I don't even remember -- I don't

17      remember who I discussed it with.   I don't remember

18      how it came to my attention.

19  BY MR. KOSLOWE

20      Q.    So what factors and facts and information did

21  you look at to see if that hurricane was a valid basis

22  for an extension?

23      A.    I don't remember.

24      Q.    Did you look at anything?

25      A.    I don't remember.

Rafael Paz
May 05, 2025

1      Q.    You ever had an experience in connection with

2   any procurement process in the City of Miami Beach where

3   there was some hurricane or similar storm that would

4   impact the local area and there was some request for a

5   deadline change because of that?

6           MR. HOCKMAN:   Objection, form, incomplete

7       hypothetical.

8           THE WITNESS:   I don't have personal knowledge

9       of a situation like that.

10  BY MR. KOSLOWE

11     Q.    In the ten years you worked at the City of

12  Miami Beach, most of which you said dealt with

13  procurement issues, there was never once a situation

14  where there was an expected hurricane and coincided with

15  a procurement process?

16     A.    That's not what I said.   I said I don't

17  remember an event like that.

18     Q.    So it sounds like -- again I only know what

19  you know.   I'm only asking you what you know.   What

20  you're telling me is that the basis for your response to

21  this particular request for an extension of a deadline

22  in connection with a hurricane was that the request was

23  overstated, the impact of the hurricane was overstated

24  and therefore there was no basis to provide the

25  extension; is that correct?

Rafael Paz
May 05, 2025

1          MR. HOCKMAN:  Objection, form, misstates prior

2     testimony.

3          THE WITNESS:  I think that that's the gist.

4     What I do remember with over ten years is

5     procurement would always view with skepticism

6     requests for extensions because everybody always

7     wants an extension.

8          At some point it has to be pencils down and

9     the City needs to move on with its business.  And

10     historically the City is generally very, very

11     strict and not very generous about extensions.

12  BY MR. KOSLOWE

13     Q.   Are there conditions under which the threat of

14  business disruption from a hurricane would be a valid

15  basis to grant an extension of a deadline and a

16  procurement process with the City of Miami Beach?

17     A.   It's possible.

18     Q.   What would those conditions be?

19     A.   So if you lose power and you are unable to

20  work on a proposal and can demonstrate that that is the

21  case then that might theoretically be the basis for

22  granting an extension.

23     Q.   That would be the bidder who would lose power

24  and being unable to work on the proposal; right?

25     A.   Correct.

Rafael Paz
May 05, 2025

1      Q.   The City at this time used Periscope as its

2  third party vendor for the bid procurement platform; is

3  that right?

4      A.   That's my understand.

5      Q.   Do you know where Periscope's services are

6  located.

7      A.   I have no idea.

8      Q.   Do you know if they're located here in the

9  State of Florida?

10      A.   I don't.

11      Q.   Do you have any understanding of whether or

12  not Periscope's system would continue to operate if

13  there was a category five hurricane that struck South

14  Florida?

15      A.   That's outside the scope of my role but no, I

16  don't.

17      Q.   And that's not one of the considerations that

18  you would view in connection with determining whether or

19  not to grant an extension of a deadline in connection

20  with a hurricane that Periscope's platform is

21  operational; right?

22          MR. HOCKMAN:  Objection to form.

23          THE WITNESS:  If the proposals were going to

24      be submitted when Periscope was under a threat of

25      hurricane and if we heard from Periscope that there

Rafael Paz
May 05, 2025

1        was -- they didn't have generators or any number

2        of -- you could qualify this any number of ways

3        then yes, potentially that might be the basis for

4        an extension.

5   BY MR. KOSLOWE

6        Q.   But despite that Periscope might be

7   operational because whatever hurricane was coming

8   wouldn't affect them it would still be appropriate as

9   you just testified to consider extending a deadline if

10  the bidder could demonstrate that the hurricane did in

11  fact or would impact them?

12            MR. HOCKMAN:  Objection.  Mischaracterizes

13       prior testimony and form.

14            THE WITNESS:  It's possible that yes, that

15       would be a basis to consider an extension.

16  BY MR. KOSLOWE

17       Q.   What information, facts would you look at to

18  determine whether or not the bidder had adequately

19  presented information showing that a hurricane would

20  impact power in their area such that they would or would

21  not be able to work on the bid?

22            MR. HOCKMAN:  Objection, speculation.

23            THE WITNESS:  These matters would -- that's

24       not within my scope as the attorney to make these

25       determinations.  I could certainly advise staff in

Rafael Paz
May 05, 2025

1          terms of how they go about making their

2          determination.  If they needed assistance.

3               You would look to the actual conditions and

4          evidence of an actual adverse impact that

5          materially reduced the time available to the bidder

6          to prepare their proposal response.

7    BY MR. KOSLOWE

8          Q.   So if a bidder said a category four hurricane

9    has been predicted for my area, here is the declaration

10   of emergency from the governor, here is information from

11   NOAH if they still exist after recent cuts to show that

12   the hurricane is likely to impact my area here is a

13   report from my local municipality showing that there are

14   concerns for loss of power would that be the type of

15   information that you would look at to determine whether

16   or not this is a legitimate and proper request to

17   consider for extension of a deadline?

18               MR. HOCKMAN:  Objection, form and incomplete

19          hypothetical.

20               THE WITNESS:  I mean if and if and if and I

21          don't know that if about a concern -- a concern for

22          loss of power as opposed to an actual loss of power

23          but -- sorry.

24   BY MR. KOSLOWE

25          Q.   Go on.

Rafael Paz
May 05, 2025

```
 1        A.   If all of these hypotheticals demonstrated an
 2   actual adverse impact then yes, that would form the
 3   basis for a legitimate request for an extension.
 4        Q.   If a hurricane is coming and you're going to
 5   lose power because it's predicted that you would, the
 6   prudent thing to do for the bidder would be to notify
 7   the municipality that you anticipate the problem because
 8   if you lose power then you can't ask; right?
 9             MR. HOCKMAN:  Objection to form, incomplete
10        hypothetical.
11             THE WITNESS:  And that depends on when the
12        proposal is due.  If you're talking about a storm
13        that is happening when a proposal submission is due
14        versus a week before or how ever many days and I
15        don't know if a proposer has a single
16        representative in Tallahassee but is otherwise
17        based in Miami Beach whether there is anything to
18        preclude the representatives based in Miami Beach
19        from reaching out to the City to advise of actual
20        impacts or not.  I don't know.  There are so many
21        nuances to this hypothetical that I'm not sure that
22        you can answer them any number of ways.
23   BY MR. KOSLOWE:
24        Q.   When Penrod --
25             MS. MACK:  Sorry to interrupt your flow I was
```

Rafael Paz
May 05, 2025

1          indicating the Zoom is out to the extent you need

2          Tony to be on?

3                MR. KOSLOWE:  No.

4    BY MR. KOSLOWE

5          Q.    When Penrods' representative made this request

6    for deadline extension due to hurricane impact did you

7    undertake any investigation into whom within Penrods

8    representatives was responsible for creation and

9    submission of the bid?

10               MR. HOCKMAN:  Objection to form.

11               THE WITNESS:  I don't remember.

12   BY MR. KOSLOWE

13         Q.    You just mentioned that one of the things you

14   might consider is whether they have multiple staff

15   members and who is responsible and what level and role

16   they might ply.  Is that what you said?

17         A.    Yes.  For purposes of advising the City of

18   actual impacts without regard to who was doing the work.

19         Q.    Did the City undertake any investigation or

20   review or collect information as to who at Penrod was

21   responsible for any aspect of the bid to determine

22   whether or not the request for extension due to

23   hurricane impact had merit?

24         A.    I don't know.

25         Q.    Would you expect them to do that kind of work

Rafael Paz
May 05, 2025

 1   in order to determine whether or not the request had

 2   merit?

 3        A.   I would expect procurement to do some of that

 4   work, yes.

 5        Q.   You didn't do the work, you would expect

 6   procurement to do it?

 7        A.   Yes.

 8        Q.   Although the request came into your office?

 9        A.   Which I would have forwarded to the

10   procurement director.

11        Q.   Did you provide any advice to procurement

12   about how they should consider that at the time?

13             MR. HOCKMAN:   Objection to the extent it calls

14        for legal advice.

15             THE WITNESS:   I don't remember if there was

16        specific advice or not.

17   BY MR. KOSLOWE

18        Q.   You mentioned before and -- strike that.

19   You'll tell me if this is accurate or not.  The City's

20   goals in connection with responding to any -- I'll

21   rephrase.  I'll try to package it better.  I apologize.

22             When it comes to considering -- let me state

23   it this way.  A request for extension of a deadline

24   prior to expiration of the deadline, do you consider

25   that a request for a waiver of particular specification

Rafael Paz
May 05, 2025

1    or is that in the form of a bid protest, how does -- how

2    in your mind does that fit within the types of issues

3    that the City deals with in connection with a

4    procurement?

5         A.   A request for an extension of a deadline would

6    not implicate a waiver of a specification.  It would not

7    need to be raised as a bid protest.  That is perhaps

8    protestable, the City's response but no, the request is

9    just a request for an extension.

10        Q.   Deadline itself is one of the bid

11   specifications; right?

12        A.   Yes.

13        Q.   So the request to modify the deadline, that's

14   not in the form of a bid protest, it's in the form of

15   what then?

16        A.   I don't know how to answer your question.

17   It's just a request for an extension.

18        Q.   When the City considers that type of request

19   is its objectives the same as what you described in

20   connection with the City's consideration of bid protests

21   which is to provide a fair process would be the scope of

22   procurement law and the discretion afforded to

23   municipality under that law?

24        A.   I think it's a little different because as I

25   mentioned the City historically is pretty strict about

Rafael Paz
May 05, 2025

1    deadlines and not particularly just as general matter at

2    least under Alex Denis and the ten years that he was

3    there.  They're not particularly generous about

4    extensions because people will take advantage of them

5    and at some point it's pencils down and the City is

6    strict about it.

7         Q.   So the City you would expect the procurement

8    department as you stated to consider verifiable

9    information about the severity of the impact; right?

10        A.   They can consider that, yes.

11        Q.   Shouldn't they consider it?

12        A.   I don't know whether they should or they

13   shouldn't.  They can consider it.

14        Q.   Are you saying it's your view that it's

15   appropriate for request to be made for a deadline

16   extension due to a hurricane impact and for the City not

17   to consider verifiable information about the severity of

18   that impact?

19             MR. HOCKMAN:  Objection, foundation.

20             THE WITNESS:  It's appropriate to consider.

21   BY MR. KOSLOWE

22        Q.   Isn't it necessary for the City to consider

23   that information in evaluating whether or not to grant

24   that extension that's requested?

25             MR. HOCKMAN:  Objection, speculation and

Rafael Paz
May 05, 2025

```
 1        foundation.
 2              THE WITNESS:  I don't know that it's necessary
 3        but it's certainly appropriate to consider those
 4        factors.
 5   BY MR. KOSLOWE
 6        Q.   So if a bidder makes a request for an
 7   extension and the bidder represents I'm in an area,
 8   there is predicted a severe storm is it not necessary
 9   for the City's procurement department to do some fact
10   checking to determine whether that's accurate?
11              MR. HOCKMAN:  Objection, speculation,
12        incomplete hypothetical and foundation.
13              THE WITNESS:  I don't know that it's
14        necessary.  If they are otherwise comfortable with
15        their response as being an appropriate response I
16        don't know that it's necessary.
17   BY MR. KOSLOWE
18        Q.   So how would --
19        A.   Is there a provision in the code requiring it,
20   no.  So I don't know that it's necessary.
21        Q.   I think we're talking about within the context
22   of procurement law generally.  So if a bidder says I'm
23   in direct path of a hurricane how else but through
24   investigation of at the very least verifiable facts
25   about that representation could the City render an
```

Rafael Paz
May 05, 2025

```
 1   appropriate response?
 2              MR. HOCKMAN:  Objection, speculation,
 3        foundation.
 4              THE WITNESS:  I can't tell you.  I don't know.
 5   BY MR. KOSLOWE
 6        Q.   So you think it would ever be appropriate for
 7   a bidder to say I'm in the path of a category five
 8   hurricane and the City procurement department wouldn't
 9   investigates any facts about that and determine to
10   reject it?
11              MR. HOCKMAN:  Objection, argumentative,
12        foundation.  He just told you he didn't know.
13              THE WITNESS:  It would be appropriate, I don't
14        know that it is necessary.  If staff is otherwise
15        comfortable with their handle of the relevant
16        facts.
17   BY MR. KOSLOWE
18        Q.   What other relevant facts would there be over
19   which staff would have comfort as to their handle?
20              MR. HOCKMAN:  Objection, incomplete
21        hypothetical, speculation, foundation.
22              THE WITNESS:  I don't know.
23   BY MR. KOSLOWE
24        Q.   This is outside your remit?
25              MR. HOCKMAN:  Asked and answered.
```

Rafael Paz
May 05, 2025

1           THE WITNESS:  You're asking me hypotheticals

2       and sitting in front of you right now and you're

3       asking the same question seven times now I don't

4       know how else to answer because clearly I'm not

5       telling you what you want to hear and so we get the

6       question the same question over and over and over

7       again but I am telling you it is appropriate but

8       not necessary to consider, evaluate, additional

9       factors or to verify a request.

10          It is appropriate but not necessary if staff

11      is otherwise comfortable with their response.  This

12      is the third or the fourth time I provided the same

13      response and I keep getting the same question.

14  BY MR. KOSLOWE

15      Q.   So then what facts in your view will -- are

16  necessary for staff to consider in responding to a

17  request for an extension due to a storm like a hurricane

18  or some other natural event like that?

19          MR. HOCKMAN:  Objection, asked and answered

20      many times, speculation, incomplete hypothetical.

21          THE WITNESS:  I don't know how to answer your

22      question any differently than I've already answered

23      it now eight times.

24  BY MR. KOSLOWE

25      Q.   We had a discussion about a specific set of

Rafael Paz
May 05, 2025

1  facts and you said you thought they were appropriate but

2  not necessary.  Now I'm asking you to testify about in

3  your view as a City Attorney for several years the City

4  of Miami Beach and someone who worked in the City

5  Attorney's Office for a decade in procurement what set

6  of facts and information are necessary for the City's

7  procurement department to evaluate, to look at, to

8  investigates, to have at their disposal in order so that

9  they can adequately respond to a request to extend a

10 deadline due to a natural disaster like a hurricane?

11       MR. HOCKMAN:  Objection, asked and answered,

12       lack of foundation, the witness has already told

13       you he does not know.  Let's move on.  You're on

14       borrowed time as it is here and I said we would

15       extend within reason.  He's given you all the

16       answers he can give you.

17       MR. KOSLOWE:  Please answer the question, sir.

18       MR. HOCKMAN:  This is the last time.

19       THE WITNESS:  Can you repeat the question?

20       MR. KOSLOWE:  Can you read it back?

21       (Thereupon, a portion of the record

22       was read back by the reporter.)

23       THE WITNESS:  The way you ask it I get it.

24  Just kidding.  It's not -- there are no set of

25       facts that aren't necessary to determine.  They can

Rafael Paz
May 05, 2025

1          consider any relevant facts sufficient for them for

2          staff to be comfortable with their response to the

3          request.  Any relevant facts related to the request

4          for the extension can be considered.

5               Whether any are necessary to consider I don't

6          know that any are specifically necessary and I

7          don't have examples of any that are specifically

8          necessary but they can consider any appropriate,

9          any relevant facts that would support one way or

10         another the City's response to the request.

11              I'm sure I didn't answer it the way you want

12         it and I'm sure I'm going to get another question

13         to give you the answer that you want the way you

14         want it.

15    BY MR. KOSLOWE

16         Q.   Is one of the relevant facts how many protests

17    had been lodged in that particular matter?

18              MR. HOCKMAN:  Objection, asked and answered.

19              THE WITNESS:  So it is relevant if a party is

20         engaging in frivolous conduct.  For example

21         challenging a city's right to even issue a

22         competitive solicitation which is offensive for

23         anyone working in procurement for any period of

24         time.

25              So yes, if the request is -- appears to be

Rafael Paz
May 05, 2025

```
 1      gaming the system.  That's always when you're
 2      doling with all bidders is something that the City
 3      needs to look at with skepticism because bidders
 4      will take advantage and particularly bidders that
 5      are showing repeated effort to stall and delay and
 6      preclude the City from doing the work of the City.
 7 BY MR. KOSLOWE
 8      Q.   You mentioned a couple times now this concept
 9 of someone suing the City to stop them from issuing any
10 RFP.  You've mentioned it a couple times today; right?
11      A.   Yes.
12      Q.   That's your view of what Penrods was doing at
13 the time, they were trying to stop the City from issuing
14 any RFP?
15      A.   That was in fact what they were trying to do.
16      Q.   That is your testimony what they were trying
17 to do?
18           MR. HOCKMAN:  Objection.  Don't argue with the
19      witness.
20           THE WITNESS:  I said yes, that is in fact what
21      they were trying to do, to challenge the City's
22      authority to issue a competitive solicitation.
23      That was what Mr. Hudson's lawsuit was about and
24      that's my understanding of it.
25 ///
```

Rafael Paz
May 05, 2025

1   BY MR. KOSLOWE

2       Q.   And that was one of the things that you

3   directed staff to consider when responding to bid

4   protests and requests by Penrods in the case that

5   litigation background; right?

6           MR. HOCKMAN:  Objection to the extent it calls

7       for legal advice.

8           THE WITNESS:  I never said I told them

9       consider it.

10          THE VIDEOGRAPHER:  Can we go off the record.

11      I need to change the storage disk.

12          MR. KOSLOWE:  Sure.

13          THE VIDEOGRAPHER:  We are off the record.

14          (Thereupon, a brief recess was taken.)

15          THE VIDEOGRAPHER:  We are on the record.  The

16      time is 5:05 p.m.

17  BY MR. KOSLOWE

18      Q.   And if you provided any guidance to the City's

19  procurement staff in connection with responding to

20  Penrods' request for an extension due to a hurricane you

21  don't recall what that is; right?

22          MR. HOCKMAN:  Objection, calls for

23      attorney-client communications.

24          THE WITNESS:  I don't.

25  ///

Rafael Paz
May 05, 2025

1   BY MR. KOSLOWE

2       Q.   Do you recall receiving bid protests and/or

3   requests, putting the form aside, from Penrod in

4   connection with the form and timing of their ultimate

5   bid submission?

6       A.   The late proposal, yes.

7       Q.   Also the form of the proposal, right?

8       A.   I don't recall the form but I do recall that

9   one of the bid protests, subsequent ones, included a

10  protest to the City's decision to not waive the

11  requirement for timely submissions.

12      Q.   And do you recall that the series of events

13  that was subject of the bid protest was a question about

14  whether or not the bid was timely submitted on the

15  Periscope platform and then whether or not to waive that

16  late submission on the Periscope platform and/or

17  submission of that bid by different means such as

18  through a share file or physical copy?

19           MR. HOCKMAN:  Objection to form.

20           THE WITNESS:  I think that's correct that the

21      protests addressed all the above.

22  BY MR. KOSLOWE

23      Q.   And the decision of the City not to waive

24  those -- what the City states were non-compliance with

25  the RFP specifications that was made by whom?

Rafael Paz
May 05, 2025

1        A.    That decision ultimately for the resolution of

2    the protest would have been, if that's what you're

3    asking about, would have been the manager and myself.

4        Q.    The protest came and how long did it take for

5    the City to write back to Penrod and tell them the

6    protest has been rejected?

7        A.    That particular one about the untimely bid I

8    don't recall how much time elapsed before a response was

9    provided to them.

10        Q.    Do you recall yourself dealing with that

11    immediately rather than the City Manager and her staff?

12        A.    Yes.  I believe that a representative of

13    Penrods reached out to me directly with a request.  I

14    responded we don't accept late bids.  I don't view that

15    as an actual protest.  I guess it could be but I think

16    there was a formal protest is what I was thinking about

17    and I'm not -- I think the same day of the late protest

18    I responded that the City does not accept late bids.

19        Q.    That's a hard and fast rule there is no

20    consideration and no condition in which the City would

21    accept a late protest?

22            MR. HOCKMAN:  Objection to form.

23            THE WITNESS:  Hard and fast rule and it's so

24        hard and fast that the City could not have been

25        more clear in the RFP documents about the

Rafael Paz
May 05, 2025

1          responsibility of the bidders for all technical

2          issues and could not have been more clear or set

3          expectations any -- with any additional clarity,

4          about how the City would approach a late bid in

5          that we would not accept late bids period.

6    BY MR. KOSLOWE

7         Q.   So the City did not consider any factor, any

8    fact, any issue, any reasoning in determining to reject

9    the request to accept the bid by a different means or

10   determining to waive the non-adherence to the

11   specification other than it's not on time, it's not

12   accepted.  Is that fair?

13              MR. HOCKMAN:  Objection to form, foundation.

14              THE WITNESS:  That's correct.

15   BY MR. KOSLOWE

16        Q.   And in terms of foundation you wrote back

17   right away and you said that; right?

18        A.   Yes.

19              MR. HOCKMAN:  Your previous question is what

20         the City thought.  He is not here as a corporate

21         representative.

22   BY MR. KOSLOWE

23        Q.   And you responded on behalf of the City at

24   that time as the City Attorney saying it's late, it's

25   not coming in?

Rafael Paz
May 05, 2025

1          A.    I responded right away, yes.

2          Q.    As the City Attorney?

3          A.    As the City Attorney.  I was not responding as

4     a resident.

5          Q.    Responding on behalf of the City?

6          A.    Yes.

7          Q.    You and your colleagues at the City Attorney's

8     office were happy that Penrod's bid was not submitted on

9     time; right?

10              MR. HOCKMAN:  Object to the form.

11              THE WITNESS:  No.

12     BY MR. KOSLOWE

13          Q.    Were you happy about the circumstances around

14     the late bid submission, the request to waive that, were

15     you happy about that?

16              MR. HOCKMAN:  Objection to form.

17              THE WITNESS:  There is very little about

18         anything involving any procurement that brings

19         happiness to me.  So I don't know how to answer

20         that.

21     BY MR. KOSLOWE

22          Q.    Whether there is much or little about

23     procurement in general that brings you happiness were

24     you and your colleagues happy about the response that

25     you had provided to Penrod that what's late is late and

Rafael Paz
May 05, 2025

1   their bid is not being accepted?

2            MR. HOCKMAN:  Objection to the form, asked and

3       answered.

4            THE WITNESS:  I don't know what it would mean

5       to be happy with the response I provided.  I

6       provided the response that I feel was the right one

7       for the City and Penrods is not my client.

8   BY MR. KOSLOWE

9       Q.   So you don't recall expressing or other

10  members of your office expressing joy or glee,

11  happiness, whatever adjective you would like to fill in

12  there, about the circumstances?

13           MR. HOCKMAN:  Objection, asked and answered.

14           THE WITNESS:  I don't recall joy or glee.

15      This was a many months long process with Penrods

16      raising every objection under the sun and what we

17      felt was an effort to prevent the City elected

18      officials from doing what they were elected to do

19      and the fact that Penrods didn't do its job of

20      complying with the requirements of the RFP it's not

21      that it made anyone happy or brought joy or glee

22      but there is certain amount of -- what is that

23      word, schaden -- schadenfreude, I think I'm saying

24      it wrong, but yes, after many months of taking the

25      City to task for even having the audacity of

Rafael Paz
May 05, 2025

1        issuing a competitive solicitation there is some

2        irony that they couldn't get it together to respond

3        to the RFP in a timely manner.

4   BY MR. KOSLOWE

5        Q.   Schadenfreude is as I understand it happiness

6   at the misfortune of others.  Is that what you

7   understand it to mean?

8        A.   I think I mean it's just -- it was ironic

9   under the circumstances.

10       Q.   But no level of happiness or joy, positive

11  response to the fact that Penrods didn't get their bid

12  in on time?

13       A.   No, I really don't care who gets a bid or not.

14            MR. KOSLOWE:  Here is a document, sir, going

15       to go in as Exhibit 32 to your deposition.  This is

16       at MB00452200, it's a native produced document

17       you'll see it's a text message from -- between

18       yourself, Mr. Aguila and Mr. Dipico and

19       Mr. Callegas from September 2nd 2023.  Do you see

20       that, sir?

21            THE WITNESS:  Yes.

22            (Plaintiff's Exhibit No. 32 was marked for

23  identification.)

24  BY MR. KOSLOWE

25       Q.   Mr. Aguila says "I'm having multiple orgasms

Rafael Paz
May 05, 2025

1  just thinking about it.  You guys have all the fun."

2  You see that?

3       A.   Well, he is not a member of the City

4  Attorney's office.

5       Q.   Sorry, he is just a former City Attorney who

6  is contracted to do work for you as a member of your

7  team, right?

8       A.   I don't know that he was contracted at the

9  time but he is certainly a former colleague of mine,

10  yes.

11      Q.   So then why were you sharing information from

12  him with other City Attorneys about this matter if he

13  wasn't working with you on the matter?

14      A.   I'm close to Raul and would speak to him

15  regularly and still do.

16      Q.   Mr. Callegas, he is one of your Assistant City

17  Attorneys?

18      A.   Yes.  He was a member of the attorney's

19  office.

20      Q.   So he laughed at Mr. Aguila having multiple

21  orgasms just thinking about the fact that Penrods didn't

22  get their bid on time right?

23      A.   He laughed at Raul's response, yes.

24      Q.   Do you now perhaps recall that members of your

25  team, those within your office and those that you worked

Rafael Paz
May 05, 2025

1   for, were happy, gleeful, joyful about the fact that

2   Penrods didn't get their bid on time to your

3   understanding of the fact?

4       A.   I stand by my former -- by my testimony.  I

5   don't know that it's happiness that's reflected here as

6   opposed to a text exchange, an informal text exchange

7   where people are blowing off steam.

8       Q.   Whether it's a formal or informal text

9   exchange I'm asking about the content and I am asking

10  about how your office reacted what their view was about

11  the facts here.  I'll if ask again now that you've seen

12  the text exchange that you and your colleagues engaged

13  in is it correct that you and the members of your team

14  were happy that Penrod's bid was to your understanding

15  not submitted on time?

16          MR. HOCKMAN:  Objection, best evidence, asked

17      and answered.

18          THE WITNESS:  No, this does not reflect that I

19      was or my office was happy.  It is just a text

20      exchange people blowing off steam.

21  BY MR. KOSLOWE

22      Q.   You think this is a different interpretation

23  to multiple orgasms than something involving happiness,

24  joy, glee, that's not what's being conveyed there, LOL

25  laughing at stuff you don't think that has to do with

Rafael Paz
May 05, 2025

1  happiness and joy?

2          MR. HOCKMAN:  Objection, asked and answered.

3          THE WITNESS:  If you ever met Raul Aguila he

4      could have multiple orgasms about any number of

5      topics and it has nothing to do with his happiness

6      or not.

7  BY MR. KOSLOWE

8      Q.   So your earlier testimony that you were pissed

9  off about Penrod's challenge and this document showing

10  the many orgasms those in your office and among your

11  close friends had about this process did those emotions

12  have any impact on you and your office's consideration

13  of Penrod's bid protest and the requests around the

14  timeliness of Penrod's bid submission?

15          MS. MACK:  Object to form.

16          THE WITNESS:  No.

17  BY MR. KOSLOWE

18      Q.   As the City considered awarding the RFP to

19  Boucher you helped Mayor Gelber draft a response for his

20  statement to the Commission and responses to

21  constituents about that topic, right?

22      A.   I don't remember what the statement to the

23  Commission was but it wouldn't surprise me if the Mayor

24  wanted me to review a draft of any statement that he

25  would make or a newsletter or other materials.

Rafael Paz
May 05, 2025

1      Q.   Do you recall --

2      A.   Particularly for a matter that had been in

3  litigation.

4      Q.   Do you recall going back and forth with Mayor

5  Gelber preparing those statements or remarks that were

6  intended for Commission and to respond to constituents?

7      A.   I don't recall but that's not to say that my

8  recollection can't be refreshed.

9      Q.   Some of the underlying facts that were being

10 dealt with at the time included that the Mayor and other

11 commissioners had attended a Formula One event by gift

12 of those tickets from Boucher and its joint venture

13 partner in connection with its RFP; right?

14          MS. MACK:   Object to the form.

15          THE WITNESS:   I believe there was an issue

16     around a different event.   It had nothing to do

17     with Formula One or its connection to Formula One I

18     don't know.   I don't know that there was one.

19 BY MR. KOSLOWE

20     Q.   So there was some event with a gift of several

21 thousands of dollars per ticket for that event that was

22 provided to the Mayor and other commissioners by Boucher

23 and its joint venture partner and that was among the

24 facts that were connected to these events at the time;

25 right?

Rafael Paz
May 05, 2025

1           MS. MACK:  Object to the form.

2           MR. HOCKMAN:  Object to the form.

3           THE WITNESS:  No, I believe that there were

4      tickets to a Carbonne beach event.  Whether it was

5      connected to Formula One or not I have no idea.

6      There were tickets.  There were questions about the

7      source of those tickets.

8           So I don't know that it's correct to say that

9      they came from Boucher or its partner.  I think

10     there was a question of whether the tickets came

11     from American Express or another party.  And those

12     matters were resolved in an abundance of caution by

13     the electeds that attended the event paying for

14     their tickets.

15 BY MR. KOSLOWE

16     Q.   Now, you knew that -- you had met with Mayor

17 Gelber and Boucher back in April of 2023; right?

18     A.   Yes.

19     Q.   And the aim at the time was for the City to

20 negotiate terms of the property directly with Boucher;

21 right?

22     A.   The aim at the time was at that meeting was to

23 discuss what the possible options were and the path if

24 the Finance Committee provided direction for a

25 negotiation.

Rafael Paz
May 05, 2025

1      Q.   At which eventually was to negotiate directly

2   with Boucher for the property, right?

3      A.   Yes, until then that resolution was rescinded

4   in May but yes.

5      Q.   And then at some point contemporaneous to

6   those events there was an event attended by Mr. Gelber

7   while he was the mayor where he received a gift for

8   attendance to that event that was affiliated with

9   Carbonne?

10          MS. MACK:  Object to form.

11          THE WITNESS:  I believe what the Mayor -- the

12      Mayor spoke at the event and I think provided

13      welcome remarks and so his ticket I believe there

14      was an exception where there was no issue about the

15      acceptance of the ticket to the event and there was

16      a second -- he had a second ticket, I don't know if

17      it was his wife that attended with him and that

18      ticket I believe he paid for that ticket.

19   BY MR. KOSLOWE

20      Q.   What other communications between Mayor Gelber

21   and those affiliated with Boucher and their bid were you

22   aware of at the time?

23          MS. MACK:  Object to form.

24          THE WITNESS:  Your question was what other

25      communications?  Other than that meeting in April I

Rafael Paz
May 05, 2025

1          don't have knowledge of any communications with

2          Boucher.

3    BY MR. KOSLOWE

4          Q.   What about with Major Food Group?

5          A.   I don't know.

6          Q.   You know Major Food Group was the joint

7    venture partner with Boucher on their submission?

8               MS. MACK:  Object to form.

9               THE WITNESS:  I know they ultimately submitted

10         a bid with the Bouchers.  Yes, I don't know if

11         they're joint venture partners or what the nature

12         of their relationship is or when it was formalized.

13   BY MR. KOSLOWE

14         Q.   Putting a side the legal nature of their

15   relationship you understood that Major Food Group was

16   part of Boucher's set of principals that they

17   represented were part of their group in connection with

18   their bid; right?

19              MS. MACK:  Object to form.

20              THE WITNESS:  I would only have that

21         understanding when they actually submit a proposal

22         with Major Food Group.  Up until that time if there

23         is no proposal then how would one know?  There is

24         no joint venture or there is no proposal partner

25         until there is an actual proposal that is

Rafael Paz
May 05, 2025

1      submitted.

2   BY MR. KOSLOWE

3      Q.   Are you aware -- strike that.  Are you aware

4   of any communications between Mayor Gelber and Boucher

5   on the one side or Major Food Group on the other side at

6   any point in time about the relationship between Major

7   Food Group and Boucher in connection with no bid?

8      A.   No.  Not aware.

9      Q.   So the Mayor meets with you and Boucher.  The

10  Mayor goes to the Carbonne event.  He gets a ticket for

11  himself because he is participating and a ticket for

12  someone else through the vendee, any other connections

13  between Mayor Gelber and Boucher or Major Food Group

14  that you are aware of at the time?

15     A.   No.

16     Q.   And that was all at the time public; right?

17     A.   I don't know what you mean by public.

18     Q.   At this time there was a public discussion,

19  there was news reporting about the Formula One event,

20  about the Carbonne Beach, about the attendance of the

21  Mayor and commissioners, about the gifts; that was all

22  public discussion; right?

23          MS. MACK:  Object to form.

24          THE WITNESS:  I don't know anything about a

25      Formula One event.  I know about the Carbonne beach

Rafael Paz
May 05, 2025

1           event and that single event and yes, I believe that

2           it was publicly -- I think it was reported on

3           publicly, yes.

4    BY MR. KOSLOWE

5           Q.   Was that in the background to the comments you

6    provided to Mayor Gelber in formulating the statement

7    you would provide to Commission and/or to constituents?

8           A.   I don't know what statement you're referring

9    to.  I would have to look at it to then put it in

10   context.

11          MR. KOSLOWE:  I'll introduce an exhibit.  This

12          will be 33 to your deposition.  This is Penrod

13          013963.

14          (Plaintiff's Exhibit No. 33 was marked for

15   identification.)

16          THE WITNESS:  I just want to reflect that in

17          less than one minute we will be at the seven hours

18          and we can keep going but not for that much longer.

19          I want to give you more than the full allotment on

20          the record but not that much more.  I just want to

21          reflect that.  What is it that I'm looking at here?

22   BY MR. KOSLOWE

23          Q.   You tell me, sir.

24          A.   So it's an e-mail from Mayor Gelber to me

25   copying his Chief of Staff and yes, he was putting out a

Rafael Paz
May 05, 2025

1    statement.  I don't know at one point in time

2    September 27th was, where in the procurement process

3    this fell.  I don't know if this was before the

4    Commission approvals or not.  I would like to read.  Let

5    me just read the whole thing.

6                MR. HOCKMAN:  Actually before you do that a

7          Rafael, this appears to be an e-mail from Former

8          Mayor Gelber to you copying only his Chief of Staff

9          asking for legal advise.  We're going to claw this

10         back.

11               MR. KOSLOWE:  This was provided in response to

12         a public records request.

13               MR. HOCKMAN:  It's still asking legal advice

14         of the City Attorney.  So go ahead and hand that

15         one to me.

16               MR. KOSLOWE:  Before you do so, sir.  I don't

17         know that you have the ability to claw back a

18         document that you didn't provide in discovery.

19         This is not claw back.  This is provided in

20         response to a public records request.

21               MR. HOCKMAN:  I still don't understand how you

22         got it but it should not have been given and I

23         think that if you had reviewed this Mr. Koslowe you

24         would realize this is attorney-client privilege.

25         Why wasn't I told about it?

Rafael Paz
May 05, 2025

1      MR. KOSLOWE:  Because it was provided by the

2  City so we understood it not to be attorney-client

3  privilege communication.

4      MR. HOCKMAN:  No, sir, you know very well

5  there's a possibility of inadvertent disclosure.

6  You did not give me notice that you had received

7  this.

8      MR. KOSLOWE:  This was not disclosed by you in

9  connection with the litigation.

10     MR. HOCKMAN:  You did not give me notice or

11 the City Attorney notice that you received this,

12 did you?

13     MR. KOSLOWE:  We do not believe this to be

14 privileged.  We do not believe this to be subject

15 to clawback.  We believe this to be appropriate

16 subject of inquiry which is why we're doing it.

17     MR. HOCKMAN:  Hand me the document, Mr. Paz.

18     MR. KOSLOWE:  This is also on the public

19 docket, Eric.

20     MR. HOCKMAN:  You understand what

21 attorney-client privilege is, Mr. Koslowe?  Do you

22 understand that you have an obligation to advise me

23 when you've received something that might be

24 inadvertently disclosed?

25     MR. KOSLOWE:  Don't believe this was.  I

Rafael Paz
May 05, 2025

1   believe it was advertently disclosed.  I don't

2   believe it's privileged and it's also on the public

3   docket, Eric.

4        MR. HOCKMAN:  So if you get a communication

5   from Mr. Gelber to Mr. Paz asking him whether he

6   should proceed in a certain way and you think that

7   that's not privileged?

8        MR. KOSLOWE:  I do not think it's privileged.

9        MR. HOCKMAN:  Wonderful.  You make that

10  argument to the magistrate.

11       MR. KOSLOWE:  Magistrate's already seen the

12  document because it's on the public docket.

13       MR. HOCKMAN:  Well, it shouldn't be there

14  either.

15       MR. KOSLOWE:  You talked about at it a

16  hearing, Eric.

17       MR. HOCKMAN:  Which hearing?

18       MR. KOSLOWE:  A discovery hearing in this case

19  that took place in February of '25.

20       MR. HOCKMAN:  You're saying this is one of the

21  documents the magistrate was looking at?

22       MR. KOSLOWE:  I believe so.

23       MR. HOCKMAN:  Which motion?

24       MR. KOSLOWE:  Do you want to take time on the

25  record to go this because I don't want to keep the

Rafael Paz
May 05, 2025

1   witness?  You've already clawed the document back

2   and you're not going to let him testify about it;

3   right.

4        MR. HOCKMAN:  Then you're going to continue

5   arguing with me about it?

6        MR. KOSLOWE:  I am just asking.  You've asked

7   me where it is in the docket.

8        MR. HOCKMAN:  Yes.

9        MR. KOSLOWE:  Do you want to do that on the

10  record?

11       MR. HOCKMAN:  Maybe I waived the privilege.

12  Would you please explain?  Why do you argue with me

13  about everything, just tell me.

14       MR. KOSLOWE:  I will take the time to find you

15  exact docket reference.

16       MR. HOCKMAN:  Thank you.

17       MR. KOSLOWE:  Apologize you don't have control

18  of the docket.

19       MR. HOCKMAN:  Not while I'm sitting here no,

20  sir.  I'm in your office.

21       MR. KOSLOWE:  The document that's on the

22  public record is 118-20 and it is MB00414681 which

23  is the underlying e-mail and not the response from

24  Mr. Paz.

25       MR. HOCKMAN:  What is 118?

Rafael Paz
May 05, 2025

 1        MR. KOSLOWE:  118 is our response to the

 2   Motion for Protective Order that the City raised in

 3   connection with Apex witnesses.  We provided

 4   documentation in connection with that in response

 5   reference the other times the docket as well

 6   demonstrating that Mr. Gelber had information

 7   relevant to the case.  This is one of those

 8   documents.

 9        MR. HOCKMAN:  You're telling me that Mr. Paz's

10   response was not part of that?

11        MR. KOSLOWE:  No, it wasn't.  I can use that

12   document instead.

13        MR. HOCKMAN:  Use that document instead

14   please.  I'll concede the other document.

15        MR. KOSLOWE:  I believe that document was one

16   of the ones you sent in a letter to us last week.

17        MR. HOCKMAN:  Which one?

18        MR. KOSLOWE:  The one on the docket.

19        MR. HOCKMAN:  We'll withdraw that.  If

20   Mr. Geller's e-mail was already part of the docket

21   and we didn't object then I think we probably

22   waived it I don't have a leg to stand on there.

23        MR. KOSLOWE:  But the response you're going to

24   claw back?

25        MR. HOCKMAN:  Yes, I don't want the City

Rafael Paz
May 05, 2025

```
1          Attorney's legal opinions to be disclosed.

2              MR. KOSLOWE:  It's going to take us a second

3          to print it.  Want to move on to another topic

4          while we print it?

5              MR. HOCKMAN:  Fine, your deposition.

6   BY MR. KOSLOWE

7          Q.   Sir, as we're getting ready to show you that

8   next document which we'll essentially replace the one

9   you were just looking about allow me to tell you some of

10  its content, see if that refreshes your recollection

11  about the work you did with Mr. Gelber on that

12  statement.

13         A.   Sure.

14         Q.   Mayor Gelber proposed having you -- pardon me,

15  proposed to you the following bullet among the several

16  that he asked about.  Said "the current operators of

17  Nikki Beach were not included in the final evaluation

18  because apparently they failed to submit their bid on

19  time.  The Commission had nothing to do with that

20  decision.  It was entirely driven by our legal

21  department and the professional staff overseeing the

22  process.  I learned about it after the decision was

23  made."  Is that statement substantially correct in your

24  recollection?

25         A.   Yes.
```

Rafael Paz
May 05, 2025

1    Q.   So Commission had no role at all in deciding
2 whether to or not to waive non-compliance as the City
3 saw there was with Penrod's adherence to the bid
4 specifications in terms of timing and form; right?
5    A.   No role at all.
6    Q.   I'll move on and try to close other parts out
7 while we're waiting for the document to print.  Did you
8 have a role in connection with the contract negotiations
9 that the City engaged in with Boucher after it was
10 awarded the RFP?
11    A.   No.
12    Q.   That was led by whom within your department?
13    A.   Rick Dipico.
14    Q.   Do you know who it was led by from a business
15 standpoint from the City administration?
16    A.   I don't.  I don't know it was Eric.  I don't
17 know if it was Mark Taxis.
18         MR. KOSLOWE:  I'm going to show you a
19      document -- in waiting for the document in as much
20      as it's on the record you can understand why we
21      have no appreciation for the fact that this
22      document is considered privileged since it was
23      provided to you in the case.
24         MR. HOCKMAN:  I am not going to argue with you
25      about your obligation about something that's been

Rafael Paz
May 05, 2025

```
 1        inadvertently disclosed.

 2              MR. KOSLOWE:  This will be Exhibit 34 to your

 3        deposition.  This is at MB00452197.

 4              (Plaintiff's Exhibit No. 34 was marked for

 5        identification.)

 6   BY MR. KOSLOWE:

 7        Q.    This is a text message exchange between

 8   yourself and Mr. Dipico; right, sir?

 9        A.    So it starts the first one is up above?

10        Q.    It has actual time stamps next to every text

11   message.  This is a text message exchange all on 9/27

12   and 28, 2023 right, sir?

13        A.    Okay.

14        Q.    This appears to be you and Mr. Dipico while

15   you were observing Commission discussing this particular

16   item which was award of the RFP to Boucher, right?

17        A.    Yes.  That's what it appears to be.

18        Q.    You write at 11:13 "since we apparently got

19   only two weeks to negotiate a concession deal you get to

20   work wherever you F'ing want," right?

21        A.    Yes.

22        Q.    So --

23        A.    He asked to work from home and I said yes.

24        Q.    The point I would like to focus on is that you

25   only have two weeks to negotiate the concession.  Was
```

Rafael Paz
May 05, 2025

1   that accurate?

2        A.   Yes.

3        Q.   It appears that was also some sort of rushed

4   process; right?

5             MS. MACK:  Object to the form.

6             THE WITNESS:  It reflects that he had two

7        weeks to negotiate the deal.

8   BY MR. KOSLOWE

9        Q.   I think it reflects more than that right, sir,

10  you say we got only two weeks to negotiate a concession

11  deal you get to work wherever you F'ing want?

12       A.   That's what I said.

13       Q.   I think the color you're providing is that two

14  weeks to negotiate this concession deal in addition to

15  all other work that Mr. Dipico has to do was a rushed or

16  a short or expedited process, right?

17       A.   It was a two week process, yes.

18       Q.   Not just that it was a two week process but it

19  was a constricted, rushed, expedited process, right,

20  sir?

21            MR. HOCKMAN:  Object to the form.

22            THE WITNESS:  Doesn't say that here in the

23       text.  I didn't use those words.

24  BY MR. KOSLOWE

25       Q.   I understand you didn't use those words.  I

Rafael Paz
May 05, 2025

1   think the color you provided that only two weeks to

2   negotiate a concession deal and therefore he gets to

3   work wherever he wants is it not as you read this now

4   reflective of the fact that this was a short expedited

5   period of time to work out this concession deal?

6          MR. HOCKMAN:  Object to the form.

7          THE WITNESS:  Not necessarily.  It could also

8      reflect he had many other matters that he is

9      dealing with at the time that he is doing that not

10     to say that you can't get it done in that time

11     period.

12  BY MR. KOSLOWE

13     Q.   Again, I didn't ask whether it was your view

14  or Mr. Dipico's view couldn't get it done.  I asked

15  whether it was reflective two weeks was a short period

16  of time given the work at task and other work Mr. Dipico

17  had to do?

18     A.   It was a limited time, yes.

19     Q.   And does this refresh your recollection

20  Mr. Dipico was primary on that negotiation from your

21  office?

22     A.   Yes.

23     Q.   Is there an important distinction in your view

24  as a City Attorney for the City of Miami Beach between a

25  Concession Agreement with a fee payment vs. a lease with

Rafael Paz
May 05, 2025

1  rent payments?

2      A.   There are a number of -- a concession

3  agreement with a fee payment versus a lease with what

4  kind of payment?

5      Q.   Rent payments.

6      A.   With rent payments.  There are material

7  differences between a concession agreement and a lease.

8      Q.   And here with this RFP the City had an option

9  of seeking an either or, a lease or a concession

10  agreement; is that right?

11      A.   I believe so, yes.

12      Q.   The City ultimately in its view devised a

13  concession agreement and not a lease; is that right?

14          MR. HOCKMAN:  Objection, foundation.

15          THE WITNESS:  I don't know what you mean but I

16      believe the final agreement that was approved was a

17      concession agreement.

18  BY MR. KOSLOWE

19      Q.   The City's view is that the contract it struck

20  with Boucher was a concession agreement and not a lease;

21  right?

22          MR. HOCKMAN:  Objection, foundation.

23          THE WITNESS:  Was it a concession?  Now I'm

24      confused.

25  ///

Rafael Paz
May 05, 2025

1   BY MR. KOSLOWE

2       Q.   Your recollection has been and is that it was

3   a concession agreement; right?

4       A.   I'm not sure now.  I would want to look at the

5   agenda item.

6       Q.   Let me try to find you the right document.

7   I'm going to show you another document, sir, to help

8   refresh your recollection about this.  I was trying to

9   jump us along since you said you did not primarily

10  engage in the negotiations?

11      A.   I didn't.

12          MR. KOSLOWE:  But just to contextualize it.

13      I'm going to show you a document we'll mark it as

14      35 to your deposition.  This is MB00439048 which is

15      an e-mail and attachment and this is an e-mail from

16      Adam Cedratti to yourself on October 4, 2023.  Do

17      you see that?

18          THE WITNESS:  Yes.

19          (Plaintiff's Exhibit No. 35 was marked for

20      identification.)

21  BY MR. KOSLOWE

22      Q.   Mr. Cendrati is one of the representatives of

23  Boucher?

24      A.   Yes.

25      Q.   Appears he is the CFO?

Rafael Paz
May 05, 2025

1      A.   Yes.

2      Q.   Did you know Mr. Cendrati in a professional

3   capacity in connection with this process or otherwise?

4      A.   Otherwise certainly, yes.

5      Q.   What otherwise?

6      A.   I believe I was involved for many -- going

7   back ten years I did the 21st and 46th Street Concession

8   Agreement and Adam was involved and then on amendments

9   to their Master Concession Agreement Adam was involved

10  and so in that capacity with regard to their other

11  contracts with the City.

12     Q.   Would you characterize that relationship that

13  your office had with Boucher in connection with those

14  contracts as positive?

15     A.   Yes, they're an excellent partner of the City

16  of Miami Beach.

17     Q.   And here Mr. Cendrati is sending you an

18  initial draft or I don't know if it's the initial draft

19  but some draft in some form of the agreement for the One

20  Ocean Drive property; right?

21     A.   Yes.

22     Q.   And you concede it's titled Concession

23  Agreement?

24     A.   Yes.

25     Q.   Does this help to --

Rafael Paz
May 05, 2025

1       A.   Yes, it does.

2       Q.   This was a Concession Agreement the City

3  negotiated with Boucher, right?

4       A.   Yes.

5            MR. KOSLOWE:  And I'm going to show you

6       another document, sir.  This will be 36 to your

7       deposition.  This will be MB00452193.

8            (Plaintiff's Exhibit No. 36 was marked for

9       identification.)

10  BY MR. KOSLOWE

11      Q.   This is a text message exchange between

12  yourself and Mr. Dipico October 17th 2023 right, sir?

13      A.   Sure.

14      Q.   And here it appears again that you two are at

15  Commission and were listening in on the Commission

16  discussion; is that right?

17      A.   I don't know what the context is.

18      Q.   I'll refer you to --

19      A.   It would be strange to be where 9:00 p.m. at

20  Commission, I don't think so.  That doesn't make sense.

21      Q.   Sorry, sir.  If you look at the text messages

22  they start at 10/17 at 9:00 p.m. and it goes on until

23  10/18 at various points in time.  If you're looking a

24  few lines down you see 10/18/2023 at 10:59 a.m. from you

25  "are you here?  Boucher should be text."  Do you see

Rafael Paz
May 05, 2025

1    that?

2          A.   Yes.  I see that.

3          Q.   Then Rick says "yes, in the back corner at the

4    Commission aides only table" and some sort of the smiley

5    face?

6          A.   Yes.

7          Q.   The two of you are there at the Commission

8    meeting observing the discussion of Boucher's award of

9    the contract, right?

10         A.   Yes.

11         Q.   And later on it seems like you two are again

12   commenting on whatever is being presented to the

13   Commission; right, sir?

14         A.   It looks that way, yes.

15         Q.   You say all in caps fees not rent?

16         A.   Okay, yes.

17         Q.   And is it accurate that someone had made a

18   misstatement either commissioner or someone else making

19   presentation to Commission that this was -- there were

20   rent payments here under a lease rather than fee

21   payments under a Concession Agreement and you're saying

22   no it's fees, it's not rent?

23         A.   Yes.

24         Q.   Because that's as you point out a material

25   distinction?

Rafael Paz
May 05, 2025

1        A.    It's relevant you don't pay rent under a

2    Concession Agreement and so if that characterization was

3    made then it was not correct.

4        Q.    The fact that you put it in all caps is an

5    indication you felt it was I suppose an important thing

6    that was being misstated?

7        A.    I don't know that it necessarily does.  You're

8    sitting up there on the dais.  There is a lot going on

9    in those public meetings.  I don't know that means.  But

10   yes, I wanted to convey to him the distinction.

11       Q.    Are you aware of whether or not Boucher in

12   their proposal to the City asked for a lease with rent

13   payments?

14       A.    I'm not aware.

15       Q.    But that distinction between a lease with rent

16   payments versus a concession or management agreement

17   with fees that is a material distinction in your view?

18       A.    The distinction is between a Concession

19   Agreement and a lease.  They're two different legal

20   documents with -- that have material distinctions.

21            MR. KOSLOWE:  Sir, going to show you a

22       document now this will be 37 to your deposition.  I

23       apologize I only have one copy for you guys and one

24       for myself.  This is that document MB00414681 we've

25       been discussing prior.  You see that, sir?

Rafael Paz
May 05, 2025

1            THE WITNESS:  Yes.

2            (Plaintiff's Exhibit No. 37 was marked for

3    identification.)

4    BY MR. KOSLOWE

5        Q.   So this is Mr. Gelber asking for your input in

6    connection with what appears to be just some statements

7    presentation to either Commission or constituents,

8    right?

9        A.   That's what it appears to be, yes.

10       Q.   And what it says here is initially the

11   Commission was going to explore contract with Boucher

12   because they already have an existing contract with the

13   beach area itself, right?

14       A.   Yes.

15       Q.   So that was what Mayor Gelber understood that

16   that Commission was going to explore a contract with

17   Boucher; right?

18       A.   (Indicating).

19       Q.   Is he correct?

20       A.   The April resolution is what he is referring

21   to.

22       Q.   Then many assets to open up the bidding in

23   order to create a more robust process which is what we

24   did?

25       A.   Which is what happened, yes.

Rafael Paz
May 05, 2025

1    Q.   He says the commission -- the Commission had

2    zero involvement in evaluating the bids that resulted in

3    the recommendation we are considering.  Is that

4    accurate?

5    A.   That would be accurate, yes, you're under a

6    cone so there would be no communications with the --

7    with the bid until after the manager's recommendation is

8    issued.  There was a limited exception allowing the

9    manager and to attorney to discuss at their agenda

10   review after she makes a recommendation and otherwise

11   the public -- the conversations happen at the public

12   meeting.

13   BY MR. KOSLOWE

14   Q.   Of course it was Commissioner Richardson who

15   created the terms for RFP in the first place; right?

16   A.   He was the sponsor of the May resolution that

17   outlined the scope for the RFP, yes.

18   Q.   So Commissioner Arriola sponsors an item that

19   says let's negotiate directly with Boucher, that's what

20   Commission takes up to do.  Staff knows that.  Then

21   Commission --

22   A.   I don't know that's what -- that Commissioner

23   Arriola's time was about Boucher.  I thought it was

24   about Penrods.

25   Q.   Commissioner Arriola both referred the item to

Rafael Paz
May 05, 2025

1    FERC and then was a sponsor of the April resolution?

2          A.   Okay, very well.  The referral of the item was

3    about exploring the Penrod's relationship.

4          Q.   It was exploring Penrod's relationship not the

5    future of Nikki Beach generally?

6          A.   I think we would have to look at the referral

7    but yes, I think -- can you rephrase your question?

8          Q.   Was it not the case that Commissioner Arriola

9    referred or pardon me, Commissioner Arriola asked that

10   Commission refer to FERC consideration of the future of

11   One Ocean Drive after expiration of the lease not

12   necessarily who would at the time in October of 2022 who

13   would be in charge of that?

14         A.   Yes.

15         Q.   But then Commissioner Arriola is the one who

16   takes up and sponsors the item from FERC that becomes

17   the April resolution; right?

18         A.   I don't know that but I'm sure that -- if

19   that's reflected in record that's the case.

20         Q.   I believe you went through the transcript of

21   that item you saw Commissioner Arriola come up or speak

22   about the concept of let's talk to Boucher.  We'll come

23   up with terms.  If that works great we get a contract.

24   If not we'll go back to an RFP; right?

25         A.   Yes.  The transcript was provided in these

Case 1:23-cv-23362-DSL   Document 184-4   Entered on FLSD Docket 06/04/2025   Page 354 of

Rafael Paz
May 05, 2025

1    materials, yes.

2        Q.   And staff was aware that direct negotiations

3    with Boucher was the City Commission's first preference;

4    right?

5            MR. HOCKMAN:  Objection to the form.

6            THE WITNESS:  It was the direction in the

7        April resolution until the May resolution rescinded

8        that direction, yes.

9    BY MR. KOSLOWE

10       Q.   And do you know what view, if any,

11   Commissioner Richardson of Penrod's operation in April

12   or May of 2023 when he was directing you in drafting the

13   terms of the May resolution?

14       A.   I don't.

15       Q.   Do you know if his views of Penrod's operation

16   had any influence on the crafting of that resolution and

17   the terms of the RFP within it?

18           MS. MACK:  Object to form.

19           THE WITNESS:  I don't but I'm sure he made his

20       views -- he articulated them at the public

21       meetings.

22   BY MR. KOSLOWE

23       Q.   Do you recall Commissioner Richardson saying

24   he doesn't like the current operation, doesn't want

25   Penrods on the property, wants someone else?

Rafael Paz
May 05, 2025

1              MS. MACK:  Object to form.

2              THE WITNESS:  I don't specifically recall but

3         it wouldn't surprise me if that was in the record,

4         yes.

5    BY MR. KOSLOWE

6         Q.   Based on your recollection of events that

7    seems accurate for what Commissioner Richardson was

8    saying at the time?

9         A.   It seemed accurate, yes.

10        Q.   And is it therefore your view that that

11   opinion that Commissioner Richardson had influenced the

12   content of the May resolution and the outline of the RFP

13   that was contained in it?

14             MS. MACK:  Object to form.

15             THE WITNESS:  That's not my view, no.  I think

16        the content of the May resolution was very

17        favorable to Penrods in that you pointed out the

18        bullet for the minimum qualifications of which

19        without question the Penrods satisfied those

20        minimum qualifications whether it was in the three

21        categories of beach club, beachfront concession or

22        similar concession.

23             They certainly had one if not all three of

24        those.  So I don't think that the view was colored

25        by any -- it reflected anything that he thought

Rafael Paz
May 05, 2025

```
1        about their specific operations.
2   BY MR. KOSLOWE
3        Q.   How -- since you and he are the only two
4   people who have an understanding of how his view colored
5   or didn't color the directions he gave to you in
6   drafting the May resolution I've heard your testimony.
7   Are you speaking for Mr. Richardson about how his views
8   colored the direction he gave you?
9             MR. HOCKMAN:  Object to the form.
10            THE WITNESS:  No, I'm speaking for myself.
11   BY MR. KOSLOWE
12        Q.   I suppose I wanted to know if he felt how his
13   views colored the direction I would ask him?
14            MR. HOCKMAN:  Objection, speculation,
15        legislative privilege.
16            THE WITNESS:  I suppose that you could if you
17        were allowed to.
18   BY MR. KOSLOWE
19        Q.   Is there anyone else I could ask about what a
20   Mr. Richardson's -- how Mr. Richardson's views impacted
21   the directions he gave in drafting what became a
22   resolution of the City of Miami Beach?
23            MR. HOCKMAN:  Objection, speculation.
24            THE WITNESS:  No, I'm not in a position to
25        answer that.
```

Rafael Paz
May 05, 2025

1   BY MR. KOSLOWE

2       Q.   How so are you not in a position to answer

3   that?

4       A.   I don't know.

5            MR. HOCKMAN:  Objection, speculation.

6            THE WITNESS:  I don't know how else to answer

7       your question.  I could give you my impression, my

8       view of the May resolution and if you had other

9       questions about that then I can only answer what I

10      can answer.

11  BY MR. KOSLOWE

12      Q.   Understood.  I asked a different question.  I

13  know you can answer about what you know.  There are only

14  two people who appear based on all the information we

15  saw who were involved in putting together those terms,

16  it was you at the direction of Commissioner Richardson.

17           If I would like to understand what the meaning

18  of certain terms are and where they came from and you've

19  testified they came from Commissioner Richardson then I

20  would ask him where they came from and what they mean if

21  I wanted to understand where they came from and what

22  they mean, right?

23           MR. HOCKMAN:  Objection, speculation.

24           THE WITNESS:  Yes.

25  ///

Rafael Paz
May 05, 2025

1    BY MR. KOSLOWE

2        Q.   Of course ultimately the RFP itself was

3    drafted by procurement so we would talk to those folks

4    about what those terms meant; right?

5        A.   Right.  The RFP governs.

6             MR. KOSLOWE:  Why don't we go off.

7             MR. HOCKMAN:  Agreed.

8             THE VIDEOGRAPHER:  We're off the record.  The

9        time is 5:54 p.m.

10            (Discussion held off the record.)

11            THE VIDEOGRAPHER:  We are on the record.  The

12       time is 5:56 p.m.

13   BY MR. KOSLOWE

14       Q.   You testified earlier the code of City of

15   Miami Beach allows for protest of an award pursuant to a

16   procurement; right?

17       A.   Yes.

18       Q.   One of the types of award is the award of the

19   contract; right?

20       A.   The award that the -- it's the award

21   recommendation of the manager.

22       Q.   I'm asking about something else, not the

23   recommendation of the manager but the actual award of

24   the RFP by the Commission or the award of the contract

25   by the commission.  Are those also protestable under the

Rafael Paz
May 05, 2025

1   code in your view?

2       A.   No.  I believe it's the award of the

3   procurement, the manager's recommendation and there are

4   guidelines for timeframes for submitting a protest after

5   that recommendation is issued and I'm not aware of the

6   subsequent opportunity after the Commission approves the

7   agenda item for there to be another protest not to say

8   that that can't be -- I think it would just be resolved

9   with a Court action.

10      Q.   Would it help if I showed you that provision

11  of the code?

12      A.   Yes.  It could.

13      Q.   Did we already admit --

14      A.   No, we didn't.

15          MR. HOCKMAN:  Technically we don't admit

16      anything here.  That's more of a rule of evidence.

17          MR. KOSLOWE:  All right, going to show you a

18      document we're going to put in as 38 to your

19      deposition.

20          (Plaintiff's Exhibit No. 38 was marked for

21      identification.)

22  BY MR. KOSLOWE

23      Q.   This is an article and provision of the City

24  code dealing with procurement and I'll direct your

25  attention please to section 2371A?

Rafael Paz
May 05, 2025

1    A.   Yes.

2    Q.   It says "bidder who has a substantial interest

3  in and agreed in connection with the solicitation

4  proposed or proposed award of a formal bid or

5  solicitation may protest to the City Manager or his or

6  her designee."  You see that?

7    A.   Yes.

8    Q.   Do you take that exclude protesting the award

9  by the Commission of the formal bid?

10   A.   The proposed award is the manager's

11 recommendation to award.  It is a proposed award.  The

12 actual award is the -- is an award not a proposed award.

13   Q.   So the proposed award is what's protestable

14 but the actual award is subject of a lawsuit?

15   A.   Yes.

16   Q.   But either way you can sue on it it's just a

17 question of whether you got to go through the protest

18 first?

19   A.   Well, you always got to go through the protest

20 first otherwise you could waive your -- hadn't gone

21 through the administrative process but yes, otherwise

22 you go to court.

23   Q.   You just said that if you don't like the

24 decision of the Commission to award the RFP or to award

25 the contract it's not subject of protest.  You can't

Rafael Paz
May 05, 2025

1    protest that?

2         A.   That's right.  It's not subject to

3    administrative review at this point but litigation.

4         Q.   So then you don't need to protest that under

5    any timeframe, you can just sue on it within the

6    timeframe provided by the rule of whatever court you're

7    in; is that right?

8              MR. HOCKMAN:  Objection to form.

9              THE WITNESS:  I don't know that that's right.

10   BY MR. KOSLOWE

11        Q.   If it's not protestable under the code then

12   you can't protest it and so you don't have to protest

13   under the code?

14        A.   The defense in that litigation could be the

15   failure to exhaust administrative remedies if the

16   challenge should have been made either as a protest to

17   the specs or as a protest to the contract award as

18   applicable.

19        Q.   So I guess what I'm asking is this.  We

20   already talked about this so I'll just frame it.  It's

21   your testimony that just because -- strike that.

22             I'm correct, am I not, that just because the

23   City decides to award an RFP to a particular bidder that

24   does not mean the City has to enter into a contract with

25   that one bidder; right?

Rafael Paz
May 05, 2025

1        A.   It doesn't have to -- it doesn't -- no, if

2   there was -- if there were subsequent negotiations that

3   were required and it doesn't necessarily have to bind

4   the City to entering into a contract.  For example, if

5   the Commission reserved the right of final approval of

6   the contract.

7        Q.   It never binds the City, in fact every

8   procurement that the City issues just because you win

9   this RFP doesn't mean we're going to enter into a

10  contract with you, right?

11            MR. HOCKMAN:  Object to form.

12            THE WITNESS:  I don't know exactly how it's

13       referred to but yes, just because there is a

14       procurement doesn't mean that there has to be an

15       award as a result of that.

16  BY MR. KOSLOWE

17       Q.   The terms of the specific contract that is

18  negotiated between the City and the winning bidder you

19  don't know that until they're negotiated; right?

20       A.   Generally that's correct.

21       Q.   Well, it's definitively by definition correct

22  because you can't know something until it exists, right?

23            MR. HOCKMAN:  Object to form.

24            THE WITNESS:  No, not necessarily if for

25       example if the terms were -- if there were specific

Rafael Paz
May 05, 2025

```
 1          terms in the solicitation that were going to be

 2          mandatory then you would know what those are.  So I

 3          can't say definitively that you wouldn't know what

 4          the terms were until they are in final form.

 5   BY MR. KOSLOWE

 6        Q.   So if there are terms that are not imposed by

 7   the RFP and not imposed by the bid in response to the

 8   RFP but are subject to the negotiation of the contract

 9   you wouldn't know those until the final form of the

10   contract is negotiated; right?

11          MR. HOCKMAN:  Objection to form.

12          THE WITNESS:  That's right.

13   BY MR. KOSLOWE

14        Q.   Then you couldn't protest that or take issue

15   with it whatever form or process you're supposed to

16   until you know what those terms are; right?

17          MR. HOCKMAN:  Object to the form.

18          THE WITNESS:  I don't know that there is a

19          right of protest to a particular term that's

20          developed in -- as part of negotiations.

21   BY MR. KOSLOWE

22        Q.   I guess what I'm saying is this.  Let's assume

23   that the City issued an RFP, had bidders respond, went

24   through their evaluation and awarded the RFP to Mr. X,

25   okay?
```

Rafael Paz
May 05, 2025

1        A.    Okay.

2        Q.    And then the City negotiates with Mr. X and

3    reaches terms for the contract; right?

4        A.    Okay.

5        Q.    Let's assume that the RFP said we're looking

6    for a contract of five years; right?

7        A.    Okay.

8        Q.    And then the City and Mr. X negotiate a

9    contract for seven years, okay?

10        A.    Okay.

11        Q.    Someone who took issue with that couldn't know

12    about that until the City publicized the terms and form

13    of the contract that it reached with Mr. X; right?

14             MR. HOCKMAN:  Objection, incomplete

15        hypothetical, speculation.

16             THE WITNESS:  So the administrative protest

17        procedure is to the solicitation specs and the

18        proposed award and if there is anything else that

19        comes up after that then that would be the subject

20        of a litigation subject to all rights and defenses

21        of both parties, whatever those rights and defenses

22        may be.

23    BY MR. KOSLOWE

24        Q.    But one of those rights or defenses would not

25    be that protesting the Commission's decision to enter

Rafael Paz
May 05, 2025

1    into the contract was required or not required because

2    it's not even permitted in your view under the code?

3              MS. MACK:  Object to form.

4              MR. HOCKMAN:  Objection to form.

5              THE WITNESS:  I don't know that I understand

6         the question.

7    BY MR. KOSLOWE

8         Q.   I believe you testified that the code doesn't

9    allow for and therefore it can't require protests,

10   administrative protests, of the decision to award a

11   contract; is that right?

12        A.   Of a Commission's approval of a contract, yes,

13   that's my testimony.

14        Q.   So if the City forms contract terms subsequent

15   to awarding an RFP then publicizes those contract terms

16   in connection with the Commission approving the contract

17   that's not subject of the requirement to protest prior

18   to or in connection with any subsequent litigation of

19   that; right?

20             MR. HOCKMAN:  Objection to form.

21             THE WITNESS:  If it was something not

22        contemplated and could not have been bid earlier as

23        part of those two categories then that's my

24        response.  That's my view of it.  Lucky for me I'm

25        no longer the City Attorney and my view is not

Rafael Paz
May 05, 2025

```
 1        relevant on this issue.

 2   BY MR. KOSLOWE

 3        Q.   Your view at the time would matter, right?

 4        A.   My view at the time would matter.

 5             MR. HOCKMAN:  Remember when I said never trust

 6        a lawyer who says he has two more questions.

 7             MR. KOSLOWE:  It's four questions on my list.

 8        Just trying to get the witness to --

 9             MR. HOCKMAN:  Give you the answer you want.

10             (Plaintiff's Exhibit No. 39 was marked for

11   identification.)

12   BY MR. KOSLOWE

13        Q.   It takes a little time.  I'm going to put in

14   what will be Exhibit 39 to your deposition.  This is

15   MB00046982 and, sir, I'm just going to direct your

16   attention to the second page of the document where

17   you're sending an e-mail on October 16th 2023 to

18   Ms. Mack, Mr. Hunnefeld, Mr. Dipico and a few others.

19        A.   Yes.

20        Q.   And what you're writing is "procurement was

21   awarded on September 27th.  Bid protest procedure and

22   the code no longer applies.  They can raise their

23   argument to the pending lawsuit and at the end we

24   reserve rights."

25        A.   That's remarkably consistent with the response
```

Rafael Paz
May 05, 2025

1   I just gave you as to my view of the code.

2          MR. KOSLOWE:  Terrific.  I think with that I'm

3      reserving rights in respect of the -- let me say

4      this.  The proper procedure is to certify to the

5      court reporter any questions as to which the

6      witness was admonished not to answer.  That's the

7      first thing I'll do.

8          The second is there may or may not be

9      documents outstanding that the City has or has not

10     produced, we don't know that yet.  If that's the

11     case I'll have to bring the witness back.  But

12     subject to those reservations and any redirect I am

13     done with my questioning today, sir.

14         MR. HOCKMAN:  Mr. Paz, there is zero chance

15     I'm going to ask you any questions today.  So I am

16     going to state on your behalf that you will read

17     and sign the transcript when available.  Are you

18     ordering?

19         MR. KOSLOWE:  Yes, we'll order standard but we

20     don't need the video until trial.

21         MR. HOCKMAN:  We'll take a copy of the

22     transcript.

23         THE VIDEOGRAPHER:  This concludes the

24     deposition.  We are off the record.  The time is

25     6:07 p.m.

Rafael Paz
May 05, 2025

```
1          THE COURT REPORTER:  Do you want a copy of the

2    transcript?

3          MR. TYLER:  Yes.

4                    (Witness excused.)

5            (Deposition was concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Rafael Paz
May 05, 2025

```
1
2                    CERTIFICATE OF REPORTER
3              THE STATE OF FLORIDA
4              COUNTY OF BROWARD
5
6         I, Rick Levy, Registered Professional Reporter
     and Notary Public in and for the State of Florida at
7    large, do hereby certify that I was authorized to
     and did report said deposition in stenotype of
8    RAFAEL PAZ; and that the foregoing pages, numbered
     from 1 to 360, inclusive, are a true and correct
9    transcription of my shorthand notes of said
     deposition.
10
          I further certify that said deposition was
11   taken at the time and place hereinabove set forth
     and that the taking of said deposition was commenced
12   and completed as hereinabove set out.
13        I further certify that I am not attorney or
     counsel of any of the parties, nor am I a relative
14   or employee of any attorney or counsel of party
     connected with the action, nor am I financially
15   interested in the action.
16        The foregoing certification of this transcript
     does not apply to any reproduction of the same by
17   any means unless under the direct control and/or
     direction of the certifying reporter.
18
          IN WITNESS WHEREOF, I have hereunto set my hand
19   this 21ST day of May, 2025.
20        _____
21
22        Rick Levy, RPR, FPR, Notary Public
          in and for the State of Florida
          My Commission Expires:  12/8/2027
23                  My Commission No.:  HH455618
24
25
```

Rafael Paz
May 05, 2025

1                        CERTIFICATE OF OATH

2     THE STATE OF FLORIDA

3              COUNTY OF BROWARD

4

5         I, Rick Levy, REGISTERED PROFESSIONAL REPORTER,

6     Notary Public, State of Florida, certify that RAFAEL

7     PAZ personally appeared before me on the 5th day of

8     May, 2025 and was duly sworn.

9

10             Signed this 21st day of May, 2025.

11

12

13

14        _____

15        Rick Levy, RPR, FPR
          Notary Public - State of Florida.
16        My Commission Expires:  12/8/2027
                   My Commission No.:  HH455618
17

18

19

20

21

22

23

24

25

Rafael Paz
May 05, 2025

```
1              E R R A T A   S H E E T

2    IN RE:  PENROD BROTHERS VS CITY OF MIAMI BEACH

3    DEPOSITION OF:  RAFAEL PAZ

4    TAKEN: 5TH day of May, 2025.

5        DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

6    PAGE #  LINE #   CHANGE              REASON

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   Please forward the original signed errata sheet to
     this office so that copies may be distributed to all
18   parties.

19   Under penalty of perjury, I declare that I have read
     my deposition and that it is true and correct
20   subject to  any changes in form or substance
     entered here.

21

22   DATE: _____

23

24   SIGNATURE OF
     DEPONENT:_____

25
```

Rafael Paz
May 05, 2025

```
1   DATE:     May 21, 2025

2   TO:  ERIC HOCKMAN, ESQUIRE
         WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.
3        2800 Ponce de Leon Boulevard
         Suite 1200
4        Coral Gables, Florida 33134


5
    IN RE:     PENROD BROTHERS VS CITY OF MIAMI BEACH
6

7   Dear Mr. Hockman:

8   Enclosed please find the original errata page with
    your copy of the transcript so RAFAEL PAZ may read
9   and sign their transcript.  Please have him/her make
    whatever changes are necessary on the errata page
10  and sign it.  Then place the original errata page
    back into the original transcript.  Please then
11  forward the original errata page back to our office
    @southeastproduction@uslegalsupport.com.

12
    We respectfully ask that the witness complete their
13  review within 30 days and return the errata sheet to
    our office email
14  @southeastproduction@uslegalsupport.com.
    If the errata page is not signed by the witness
15  within 30 days after this letter has been furnished,
    we will then process the transcript without a signed
16  errata page.  If your client wishes to waive their
    right to read and sign, please have him/her sign
17  their name at the bottom of this letter and send it
    back to the office.
18       Your prompt attention to this matter is
    appreciated.
19  Sincerely,

20  _____

    RICK E. LEVY, RPR
21

    I do hereby waive my signature:
22

    _____
23
    RAFAEL PAZ

24  cc via transcript:  Jason Koslowe, Esq.
                        Eric Hockman, Esq.
25  file copy
```