IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 2023-016657-CA-01

PENROD BROTHERS INC.,
a Florida Corporation,

      Plaintiff,

v.

THE CITY OF MIAMI BEACH, FLORIDA,
a Florida municipal corporation,

      Defendant.

_____/

### DEFENDANT, CITY OF MIAMI BEACH'S MOTION TO DEEM PRIVILEGE NOT WAIVED AND TO COMPEL PLAINTIFF TO RETURN INADVERTENTLY DISCLOSED PRIVILEGED DOCUMENTS

### IN THE ALTERNATIVE, OBJECTION TO MAGISTRATE JUDGE'S ORDER DEEMING PRIVILEGE WAIVED

Defendant, City of Miami Beach ("City"), hereby moves the Court to deem the attorney-client privilege *not* waived as to 184 privileged documents inadvertently disclosed to Plaintiff, Penrod Brothers Inc.'s ("Penrod"), and to compel Penrod to return or destroy the 184 documents and not retain any copies.

In the alternative, and to the extent necessary, the City asks this Motion to be construed as an objection to the order of United States Magistrate Judge Panayotta Augustin-Birch (Fed. DE 179),[1] and/or a request to reconsider the issues decided therein. In support, the City states:

_____

[1] "Fed. DE" will refer to docket entries in the Southern District of Florida, Case No. 1:23-CV-23362, from where this action has been remanded. "A court may take judicial notice of . . . [r]ecords of any court of this state or of any court of record of the United States or of any state, territory, or jurisdiction of the United States," Fla. Stat. § 90.202(6), and must do so when a party requests it and otherwise complies with the requirements of section 90.203, Florida Statutes. See Fla. Stat. § 90.203. The City hereby requests the Court take judicial notice of the federal court filings cited

## Introduction and Background

1. **Subject Matter of Motion—Why this Issue is Before the State Court**.

This action was originally filed in state court, was removed in September 2023, and has just been remanded to this Court after a ruling that (1) Penrod's federal claims should be dismissed with prejudice and (2) the federal court would decline to exercise supplemental jurisdiction over Penrod's state-law claims, which the City has also moved to dismiss.

Many discovery issues were raised and decided before the federal court, which referred all non-dispositive discovery matters to the Magistrate Judge for decision. This motion concerns the Magistrate Judge's discovery ruling dated June 2, 2025, holding the City has **waived the attorney-client privilege** over 184 documents it inadvertently produced to Penrod. Fed. DE 179.

The Magistrate Judge's order was interlocutory. The City could have challenged it in federal court by serving objections to the District Court within 14 days. But Miami Beach was deprived of that opportunity when the District Court dismissed the case and terminated all deadlines on June 10, 2025 (Fed. DE 191), *amended by* (Fed. DE 197), *before* the 14-day period expired. The case has now been remanded to this Court. (Fed. DE 197 & 198).

Jurisdiction has now resumed here, in state court. *See, e.g., Ricci v. Ventures Tr. 2013-I-H-R by MCM Cap. Partners, LLC*, 276 So. 3d 5, 9 (Fla. 4th DCA 2019) ("[O]nce an order of remand is entered by the federal court, state court jurisdiction *resumes*."). All remaining claims are governed by Florida substantive and procedural law going forward.

---

in this motion, which will be separately filed under a notice of filing for the Court's ready reference.

A transcript of the relevant federal court hearing is attached hereto as "**Exhibit 1**", and cited herein as "TR."

Now that this action is back where it began, the City moves this Court to determine the City did *not* waive the attorney-client privilege over the at-issue documents and compel Penrod to return or destroy the documents and not retain any copies. To the extent necessary, Miami Beach is asking this court to regard this motion as an objection to the Magistrate Judge's non-final order and/or a request to reconsider the issues decided therein. In an abundance of caution, this motion is being filed within the 14-day period that the City would have had to object to the Magistrate Judge's non-final order under the federal rules.

## 2. Introduction to the Issues.

During discovery, it became apparent that the City's e-discovery vendor made errors concerning a tranche of documents to produce to Penrod, called "MB0002." The vendor's errors resulted in the over-production of documents, including some privileged documents that were not responsive to any search term agreed to between the parties.

*Later*, the City discovered it also inadvertently produced 182 privileged documents, which were ultimately determined to be caused by a *different* error in connection with a *separate* production by the same vendor, called "MB0001." As soon as the City realized this, it served a clawback letter to Penrod with respect to the 182 documents.

Penrod filed a motion to deem the City's privilege waived, including in its motion two additional documents the City clawed back during an intervening deposition.[2]

_____

[2] As reflected in the Magistrate Judge's Order, the record reflected the City might be withdrawing its privilege claim as to some of the at-issue documents. DE 179 at 3 n.1. And indeed the City's response specified it withdrew the privilege claim as to one document. DE 166 at 3 n.2. However, for lack of clarity the Magistrate Judge considered and ruled as to the 184 documents. DE 179 at 3 n.1. For that reason and for ease of discussion, the City will likewise direct this motion toward the 184 documents considered together. If necessary, any order entered upon this motion can exempt documents as to which the City has withdrawn or will withdraw its claim of privilege.

The Magistrate Judge ruled that the City should have known about the 184 documents produced as part of MB001 and sought to claw them back earlier, based on the City's earlier knowledge of production issues concerning the other production (MB0002).

The City submits that under Florida law, there was no waiver of privilege. To the extent it is necessary to argue this, there was likewise no waiver under federal law. The Magistrate Judge clearly erred and applied the incorrect law. Among other things and as more fully set forth below, the Magistrate Judge overlooked the distinction between the two separate production issues, relied on the disputed contents of an e-mail that the Magistrate Judge did *not* read and that the parties stipulated would not be part of the record, and measured the City's efforts to rectify the production error against the incorrect legal standard.

Based upon the facts and arguments discussed below, this Court should determine there was no waiver of privilege and compel Penrod to return and/or destroy the 184 privileged documents inadvertently disclosed to Penrod.

### Factual Background

1.  On March 20, 2024, the City produced a first tranche of approximately 57,000 documents to Penrod, in a production set called MB0001. *See* Fed. DE 140-6 ¶ 3; TR 37:21-25.

2.  Approximately 6 months later, on October 3, 2025, the City produced a second tranche of approximately 1.5 million documents to Penrod, in a production set called MB0002. Fed. DE 140-6 ¶¶ 3, 10; TR :24-25.

3.  Four months after that, on February 28, 2025, the Litigation Support Manager for Penrod's counsel e-mailed the City's outside counsel, raising a concern that the MB002 production did not appear to contain documents responsive to the agreed-upon search terms. Fed. DE 140-6 ¶ 4.

4.      In investigating this issue, the City's outside counsel discovered that the City's ESI vendor, Purpose Legal, committed a serious error in the course of producing MB0002. Specifically, "The project manager involved with applying the search terms did not apply the required search terms, which caused Purpose Legal to produce 1,573,511 documents by mistake," a much larger number than it should have had the search terms been applied. Fed. DE 140-7 ¶ 10.

5.      This over-production of more than 1.5 million documents as part of MB0002 resulted in the production of potentially privileged documents. Fed. DE 140-6 at 1-2.

6.      Critically, the City did not determine the nature and effect of the ESI vendor's error as to MB002 until March 12, 2025. Fed. DE 172-1 ¶ 4; *see also* Fed. DE 166 at 2 n.2 ("The City's Counsel identified the exact errors with MB002 on March 12, 2025."); TR 68:3-11.

7.      That same day, the City's outside counsel sent an e-mail to Penrod's Litigation Support Manager, fully explaining the vendor's error. Fed. DE 140-6 ¶ 6.

8.      As of sending that e-mail on March 12, the City's counsel did not know that there was anything privileged produced as part of MB0001, including the 184 documents. TR 68:12-16.

9.      By stipulation of the parties, that March 12, 2025, e-mail was not filed with the federal court. Fed. DE 179 at 4.

10.     Separately, on April 28, 2025, in preparing for the then-upcoming deposition of former City Attorney Rafael Paz, the City discovered that at least 182 privileged documents had been produced to Penrod. *See* Supplemental Declaration of Eric Hockman ("*Hockman Supp. Dec*"), attached hereto as **Exhibit 2**, at ¶ 2.[3]

---

[3] During the hearing on the Plaintiff's Motion to Determine Privilege, the federal court asked about specific dates and timing that the City was unable to recall. *Hockman Supp. Dec.* ¶ 1. The record before the District Court variously reflected April 30 or on or about the first week of May that the City first realized the 184 documents had been inadvertently produced or that privileged documents had been included in MB0001. *See* TR 40:9-14; 41:15-18; 63:22-64:2. The Hockman

11.     These 182 documents were *not* from the MB0002 production, which the parties had been discussing and about which the City was aware of potential privilege issues. TR 36:22-25.

12.     Rather, the 182 documents were from the MB0001 production. TR 36:22-25. At the time of discovering the production of the 182 documents, the City was not aware that they had been produced as part of MB0001. TR 40:19-20.

13.     On May 1, 2025, immediately after learning it had inadvertently produced the 182 privileged documents as part of MB0001, the City sent a letter to Penrod, asserting claims of privilege and/or work product and a claw back of the 182 documents identified by starting Bates stamp. Fed. DE 161-1.

14.     At no time before the City's May 1, 2025, letter did Penrod's counsel notify the City that it was in receipt of any of the 182 inadvertently disclosed, privileged documents.

15.     It was not until on or about May 14, 2025, after a call between the City's counsel and Penrod's counsel, that the City's counsel reviewed the documents identified in the May 1, 2025 letter and discovered that all 184 clawed-back documents originated from MB001 and also included the City's privileged search terms. *Hockman Supp. Dec.* ¶ 5.

16.     That occurred because Penrod's counsel had advised during the May 14 call that he had not received any documents from the managed review of the documents withheld from MB0001. *Id.* ¶ 4. Those documents *should* have been included in MB0002, which alerted the City's counsel to a potential problem that was not previously known. *Id.* ¶¶ 4-6.

17.     Suspecting a broader problem, the City's counsel reviewed the document database and found that the documents in the May 1, 2025 letter were part of MB0001 and had hit on

---

Supplemental Declaration is being filed with this Motion to clarify, *inter alia*, that it was specifically April 28, 2025, that the City first became aware the at-issue 184 documents had been inadvertently produced.

privileged terms, which should not have been possible, because "[t]hey all should have gone through managed review before production." *Id.*

18.     On May 14, 2025, following this realization, the City's counsel asked the vendor to research the database history and either confirm the City's counsel's understanding or provide an explanation for the privileged term hits on the 184 documents that were in MB001.  Fed. DE 172-1 ¶ 9; TR 70:9-14. On May 15, 2025, the vendor confirmed that the City's counsel was correct and that the review plan had not been followed correctly. *Hockman Supp. Dec.* ¶ 8.

19.     As the City learned upon further consultation with the vendor, as to MB0001, the privileged documents were produced due to a *different* error than the City had known about with respect to MB0002[4]: "[T]he vendor only applied privilege filters to the 'Email From' field— excluding TO, CC, BCC, and full extracted text fields that are routinely used in standard privilege screens." Fed. DE 172-1 ¶ 9.

## Procedural History

### A.  Penrod's Motion to Determine Waiver of Privilege; the City's Response and the Magistrate Judge's Ruling

20.     On May 9, 2025, Penrod filed a motion to determine waiver of privilege, Fed. DE 161, which was referred to the Magistrate Judge. The Magistrate Judge's procedures set strict briefing deadlines, (Fed. DE 41), so while the City's investigation was ongoing, the City had only limited time (two business days) to respond.

21.     On May 13, 2025, the City filed a response, followed by its operative, corrected response (Fed. DE 165).

---

[4] TR 65:25 ("MB-002 suffered from a different problem").

22.     At that time, the City still had not learned that there was a systemic problem with the production of MB0001, which was "a managed ESI review," meaning contract attorneys were involved, reviewing certain documents for potential privilege. Fed. DE 166 at 3. Rather, based on the information available to it at the time, the best the City could do was speculate "that a small fraction of reviewed, privileged documents – 182 – slipped passed the reviewers." Fed. DE 166 at 3.

23.     Penrod replied on May 14, 2025 (Fed. DE 168), the same day that the City first learned of the nature of the production error with MB0001 that caused the documents to be inadvertently produced.

24.     On May 20, 2025, the City filed an amended declaration (Fed. DE 172-1), explaining the nature of the error.

25.     On May 28, 2025, the Magistrate Judge held a hearing on Penrod's motion. *See* Exhibit 1.

26.     On June 2, 2025, the Magistrate Judge entered an Order Granting Plaintiff's Motion to Determine Waiver of Privilege. Fed. DE 179.[5]

27.     The Magistrate Judge acknowledged that the City "produced the 184 documents to Plaintiff in March 2024 as part of Defendant's first volume of production," called MB0001. Fed. DE 179 at 3-4.

28.     The Magistrate Judge also acknowledged it was undisputed "that Defendant's disclosure of the documents was inadvertent." Fed. DE 179 at 4.

---

[5] In full, it was the "Order Denying Plaintiff's Motion to Overrule Improper Deposition Instructions and Granting Plaintiff's Motion to Determine Waiver of Privilege." Fed. DE 179. The deposition-instructions issue is not relevant to this motion.

29.     However, the Magistrate Judge ruled that "Defendant has not demonstrated that it promptly took reasonable steps to rectify the error." Fed. DE 179 at 4.

30.     As grounds, the Magistrate Judge stated:

The disclosure of the 184 documents implicates errors that Defendant's electronically stored information ("ESI") vendor made. The Court is well-aware of the errors, as they have been the subject of motion briefing and of discussions during two court hearings. The errors include running searches for responsive documents while failing to apply the appropriate search terms and failing to search certain custodians' records. It is undisputed that, in an email sent on March 12, 2025, Defendant acknowledged to Plaintiff that the ESI vendor had made errors and that Defendant likely had produced privileged documents to Plaintiff that would need to be clawed back.

Fed. DE 179 at 4.

31.     The order did not identify the previous "motion briefing" and "discussions" to which it was referring when it said that problems with the City's ESI vendor had previously been before the court. The order did not state whether those previous motions and discussions concerned errors of the ESI vendor associated with MB0002 or whether they concerned the only recently discovered errors associated with MB0001. And the order did not discuss *what* those errors were, or whether there was a difference between the errors associated with MB001 and MB002.

32.     As for the March 12 e-mail, the Magistrate Judge acknowledged not reading it, because it was not in the record, by stipulation of the parties, and that its contents were disputed; but she nevertheless proceeded to make the following findings:

The Court cannot read for itself the March 12 email, as the email is not in the court record. The parties agreed not to file the March 12 email in the court record, given that it was a part of their meet-and-confer process. But even though the Court does not know precisely what the email said, it is sufficient to know that, by at least March 12, 2025, Defendant was aware that its ESI vendor had made massive errors in discovery productions for this case and that privileged documents ***likely*** had been produced to Plaintiff as part of the discovery and would need to be clawed back. Defendant was on notice of ***possible*** inadvertent disclosure.

Fed. DE 179 at 4-5 (emphasis added).

33. In a similar vein, while the Magistrate Judge found that "by at least March 12, 2025, Defendant was aware that its ESI vendor had made massive errors in discovery productions," the Magistrate did not say *which* productions, or whether they included the 184 documents that were at issue in Penrod's motion.

34. In fact, the Magistrate Judge made no findings at all concerning when the City's counsel first discovered that the 184 documents had been inadvertently produced, and made no findings as to when the City's counsel first discovered that there was a systemic problem associated with *MB0001*, the production from which it was undisputed that the 184 documents came.

35. Nevertheless, the Magistrate Judge concluded that by March 12, due to the City's knowledge of unspecified errors of its e-discovery vendor as to unspecified productions, "it was incumbent upon Defendant to promptly take reasonable steps to identify any purportedly privileged or protected documents that had been produced and to claw them back." Fed. DE 179 at 5.

36. She further concluded:

> . . . The Court does not believe that Defendant did so. In briefing in April 2025, Defendant represented to the Court that it may have inadvertently produced privileged documents. DE 140 at 4; DE 140-6 at 1–2. Defendant made the same representation during an April 25, 2025 discovery hearing. Defendant still had not clawed any documents back.
> Defendant did not send Plaintiff a claw back letter until May 1, 2025—seven weeks after Defendant had acknowledge[d] that it likely produced privileged documents.

Fed. DE 179 at 5.

37. The referenced filings, Fed. DE 140 at 4 and Fed. DE 140-6 at 1-2, *expressly discussed only MB0002, **not** MB0001* in which the at-issue 184 documents were produced.

38.    The Magistrate Judge made no findings as to the length of time between the claw-back letter and:

     a.  The City's knowledge of the inadvertent disclosure of the at-issue 184 documents; or

     b.  The City's knowledge of its ESI vendor's error as to the production of MB001.

**B. The City's Right to Appeal To Federal District Court is Cut Off; Case is Remanded**

39.    By operation of the Federal Rules, the City would have had the opportunity to challenge the Magistrate Judge's non-final order, by serving objections to the District Court within 14 days, or by the end of June 16, 2025. *See* 28 U.S.C. § 636; Fed. R. Civ. P. 72(a); Southern District of Florida Magistrate Judge Rule 4.

40.    However, on June 11, 2025, the court granted the City's long-pending motion to dismiss and dismissed Penrod's federal claims with prejudice. Fed. DE 191, *amended by* Fed. DE 197. In that same order, the District Court declined to exercise supplemental jurisdiction over Penrod's state-law claims and dismissed them without prejudice; denied all pending motions as moot; terminated all deadlines; and directed the Clerk to close the case. Fed. DE 191 at 17.

41.    Following subsequent briefing, the District Court acknowledged it should have remanded Penrod's state-law claims instead of dismissing them. Fed. DE 196. In all other respects, the corrected order remained the same in terms of denial of pending motions, termination of deadlines, and closure of the federal case. Fed. DE 197.

## Argument

**1. Under Florida law, this Court should determine there was no waiver of privilege and compel Penrod to return and/or destroy the 184 documents**.

"[W]aiver of attorney-client privilege is not favored under Florida law . . . ." *Nelson v. State*, 337 So. 3d 1246 (Fla. 3d DCA 2022). Finding a waiver is "inappropriate where 'the record

does not show *a clear, intentional waiver of the privilege*.'" *Petzold v. Castro*, 365 So. 3d 1199, 1202 (Fla. 2d DCA 2023) (emphasis added) (quoting *Markel Am. Ins. v. Baker*, 152 So. 3d 86, 92 (Fla. 5th DCA 2014)). Naturally, the Magistrate Judge did not apply or interpret Florida precedents in reaching her conclusions regarding waiver of the privilege.

More specifically, and as applicable here:

> Florida law recognizes that the waiver of a privilege "imports the intentional relinquishment of a known right." *Prieto v. Union Am. Ins. Co.,* 673 So.2d 521, 523 (Fla. 3d DCA 1996). "Inadvertent production is the antithesis of that concept." *Kusch,* 645 So.2d at 1039 (Stevenson, J., concurring in part, dissenting in part). Hence, one cannot be deemed to have waived a privilege upon the inadvertent production of documents. *Cf. Stevenson v. Stevenson,* 661 So.2d 367 (Fla. 4th DCA 1995) (secretary's confirmation to opposing counsel, pursuant to agreement, that documents were signed constitutes purposeful waiver of privilege); *Hamilton v. Hamilton Steel Corp.,* 409 So.2d 1111 (Fla. 4th DCA 1982) (privilege waived when counsel for codefendants announced settlement in court once clients dispute terms of settlement among themselves). Section 90.507, Florida Statutes (1995), codifies this precept by specifying that *voluntary disclosure* by the holder of the privilege will waive the privilege. The consideration underlying this statute is the well-settled notion that the privilege is held by the client and protects the client. *See Kusch,* 645 So.2d at 1040 (Stevenson, J., concurring in part, dissenting in part).

*Abamar Hous. & Dev., Inc. v. Lisa Daly Lady Decor, Inc.*, 698 So. 2d 276, 278 (Fla. 3d DCA 1997). Florida courts, including the Third District Court of Appeal, have adopted the "relevant circumstances test," where "a court determines whether an inadvertent production amounts to a waiver of the privilege by weighing the following factors:"

> (1) The reasonableness of the precautions taken to prevent inadvertent disclosure in view of the extent of the document production; (2) the number of inadvertent disclosures; (3) the extent of the disclosure; (4) any delay and measures taken to rectify the disclosures; and (5) whether the overriding interests of justice would be served by relieving a party of its error.

*Id.* at 278–79.

In *Abamar Housing*, the Third District found no waiver, given an inadvertent disclosure of privileged materials occurred within a voluminous production and where the disclosing party "acted promptly upon discovering the inadvertent disclosure to request return of the documents and restrict further dissemination of the documents." *Id.* 279. The court recognized that "'[m]istakes of this type are likely to occur in cases with voluminous discovery.'" *Id.* (quoting *United States v. Pepper's Steel & Alloys, Inc.*, 742 F.Supp. 641, 643 (S.D.Fla. 1990)).

The Third District further lamented the nature of the dispute, with a reminder that this sort of inadvertent disclosure should not result in the disclosing party having to fight an adversary to claw the documents back:

> Moreover, we remind counsel of the well-justified dictate that "[a]n attorney who receives confidential documents of an adversary as a result of an inadvertent release is ethically obligated to promptly notify the sender of the attorney's receipt of the documents." The Florida Bar Comm. on Professional Ethics, Op. 93-3 (Feb. 1, 1994). *Accord* ABA Comm. on Ethics and Professional Responsibility, Formal Op. 92-368 (1992). The scenario presented in this case is only one of the many situations lawyers face in the daily practice of law that should be "resolved through the exercise of sensitive professional and moral judgment...." ABA Comm. on Ethics and Professional Responsibility, Formal Op. 92-368 (1992). As the court noted in *Pepper's Steel & Alloys, Inc.,* "at best these situations are resolved amicably, by counsel returning documents which are obviously privileged and inadvertently produced. It is unfortunate that such could not be the case here and that the Court was forced to expend a great deal of time on this relatively minor matter." Pepper's Steel & Alloys, Inc., 742 F.Supp. at 645.

*Id.*

Here, the five factors clearly militate against waiver with respect to the 184 documents. As to the first factor, "the reasonableness of the precautions taken to prevent inadvertent disclosure in view of the extent of the document production," *Abamar Hous.*, 698 So. 2d at 279, it is undisputed that MB0001 was a managed ESI review, whereby the City's ESI vendor was given instructions to apply privilege search terms to a large volume of documents, but where the ESI vendor, through no fault of the City or its counsel, failed to follow those instructions, and mistakenly failed to apply

the privilege search terms to all of the metadata fields of the documents selected for review and production.

As to the second and third factors, "the number of inadvertent disclosures" and "the extent of the disclosure," likewise run in favor of the City. The City understands now that there were two sets of inadvertent disclosures, associated with MB0001 and MB0002, respectively, implicating a large number of potentially privileged documents, precisely because of the very voluminous discovery at issue and the ESI vendor's errors, over which the City and its counsel had no control. As the Third District has recognized where an attorney and paralegal inadvertently included privileged documents within a production, mistakes "'are likely to occur in cases with voluminous discovery.'" *Abamar Hous.*, 698 So. 2d at 279. How much more so should that be a mitigating factor for the City where its own ESI vendor, in a case involving millions of documents, made technical errors affecting the electronic discovery and failed to follow express City instructions.

As to the fourth factor, "any delay and measures taken to rectify the disclosures," this factor strongly militates against waiver. It is undisputed that the City did not know of the inadvertent disclosure of the *at-issue* 184 documents (as contrasted with the production issue in MB002) until April 28, 2025, when the City's counsel was preparing for the deposition of Rafael Paz. On *May 1*, within three days, the City's counsel sent the clawback letter to Penrod's counsel. By any measure, the City acted promptly and did not delay. *See Nova Se. Univ., Inc. v. Jacobson*, 25 So. 3d 82, 87 (Fla. 4th DCA 2009) ("Where the party who inadvertently produced the documents objects or demands return of the documents as soon as the disclosure is discovered, the party has not unduly delayed seeking measures to rectify the inadvertent disclosure."); *Gen. Motors Corp. v. McGee*, 837 So. 2d 1010, 1040 (Fla. 4th DCA 2002), *as modified on clarification* (Mar. 5, 2003) (under

the relevant circumstances test, disclosing party notified the receiving party "in a timely fashion, within days of its discovery that the document had been erroneously produced").

Notably, under Florida Rule of Civil Procedure 1.285, the party inadvertently disclosing privileged material must serve written notice of the assertion of privilege "within 10 days of *actually discovering* the inadvertent disclosure." Fla. R. Civ. P. 1.285(a) (emphasis added). It is undisputed that the City sent the May 1, 2025, letter within 10 days of "actually discovering" the inadvertent disclosure of the 184 documents.

Finally, the fifth factor is "whether the overriding interests of justice would be served by relieving a party of its error." The answer is clearly yes. It is undisputed that the disclosure was inadvertent and that finding a waiver based on inadvertent disclosure is strongly disfavored. Penrod has made no showing, or even argument, that the inadvertently disclosed privileged documents are needed, or even relevant, in the case. And critically, Penrod, itself, did not even realize that the City had inadvertently disclosed privileged materials—or if it did, then it should have, but failed to, notify the City. Florida courts have found this a relevant consideration when considering the interests of justice and weighing the five factors. *See also Nova Se. Univ., Inc.*, 25 So. 3d at 88 (noting that the receiving party's attorney "clearly had to know" that an inadvertently disclosed letter "was intended to be a confidential communication in that it provided legal analysis," and that "[t]he Rules of Professional Responsibility require that he notify the other attorney of this inadvertent disclosure"; but "[i]nstead of following the rule, this attorney held onto the letter for years. The interests of justice require that the Rules of Professional Responsibility be honored").

To be clear, the City is not accusing Penrod or its counsel of knowingly failing to notify the City that Penrod had received inadvertently produced privileged materials as part of the

MB0001 production, from which the at-issue 184 documents came. But Penrod never did so before the City's own discovery of the inadvertent disclosure. This tells us, at a minimum, that even Penrod was not aware of the inadvertent disclosure of the privileged documents until the City notified Penrod in the May 1, 2025, clawback letter.

Moreover, applying Florida Rule of Civil Procedure 1.285 to Penrod's challenge to the City's assertion of privilege, Penrod clearly cannot meet any of the grounds for challenging the assertion. There is no dispute that the materials in question are privileged; the City has standing to assert the privilege; the City served timely notice as to the 184 documents; and—as set forth under the "relevant circumstances" test argued above—the circumstances surrounding the production or disclosure of the materials do *not* warrant a finding that the City has waived its assertion that the material is protected by a privilege.

In all, under Florida standards, which strongly disfavor finding a waiver of the attorney-client privilege, there is no waiver here. The disclosure was indisputably inadvertent, of documents as to which no relevancy has been shown, owing to the fault of an ESI vendor as to which the City had no control and to which it gave specific instructions *not* to produce the privileged documents (but which instructions the vendor erroneously disregarded), and the City sent the clawback letter within three days of actually discovering the inadvertent production of the 182 documents (and contemporaneously clawed back the additional two during a deposition). The Court should conclude that there was no waiver and compel Penrod to return or destroy the 184 documents and retain no copies.

**2.   In an Abundance of Caution and to the Extent Necessary, the City Objects to the Magistrate's Non-Final Order as Clearly Erroneous and Contrary to Law, and Urges This Court to Reject It and/or to Reconsider the Issue**.

The City contends that the federal rules and statutes governing review of the federal Magistrate Judge's order no longer apply, now that the case has been remanded and jurisdiction "resumes" in this Court.

Nevertheless, in an abundance of caution, and anticipating Penrod will pursue any effort to contest the City's assertion of privilege, the City hereby sets forth its argument as to why the Magistrate Judge's order (Fed. DE 179) should be rejected.

Under federal law, the District Court "may reconsider any pretrial matter under this subparagraph (A)," such as the at-issue order, "where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(A). Notably, these standards are analogous to the standards a Florida state trial court would use to examine the rulings of a magistrate. *See Constr. Sys. of Am., Inc. v. Travelers Cas. & Sur. Co. of Am.*, 118 So. 3d 942, 943 (Fla. 3d DCA 2013) ("A trial court reviews exceptions to a magistrate's report to determine whether the factual findings and conclusions are supported by competent substantial evidence and to determine whether the magistrate misconceived the legal effect of the evidence or whether the conclusions are clearly erroneous.") (affirming trial court's order that rejected a magistrate's report and recommendations and granted a motion to compel return of inadvertently disclosed privilege documents).

Moreover, the Southern District of Florida Local Rules provide that "[t]he District Judge may also reconsider sua sponte any matter determined by a Magistrate Judge under this rule . . . ." Southern District of Florida Magistrate Judge Rule 4. This is consistent with a Florida trial court judge's power and authority to reconsider any interlocutory order before final judgment. *See, e.g.,*

*Bettez v. City of Miami*, 510 So. 2d 1242, 1243 (Fla. 3d DCA 1987) ("It is well settled in this state that a trial court has inherent authority to reconsider, as here, any of its interlocutory rulings prior to the entry of a final judgment or final order in the cause.").

Findings of fact are "'clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1246 (11th Cir. 2002); *see also Ramos v. U.S. Dep't of Agric.*, No. 22-CV-20312, 2022 WL 15640187, at *4 (S.D. Fla. Oct. 28, 2022) (sustaining objections to a magistrate's order where it "is not supported by the record in this case").

And elaborating on the "contrary to law" standard, one opinion from the Southern District has remarked:

> "A magistrate judge's order is contrary to law when it fails to apply or misapplies relevant statutes, case law, or rules of procedure." *Ellis*, 2016 WL 1658706, at *1 (quotations omitted). In the Eleventh Circuit, "the 'contrary to law' standard [is] more deferential than de novo review." *Id.* at *1 n.3 (citing *Merritt v. Int'l Bhd. of Boilermakers*, 649 F.2d 1013, 1016-17 (5th Cir. 1981)) ("[A] magistrate['s nondispositive orders] are reviewable under the 'clearly erroneous and contrary to law' standard; they are not subject to a de novo determination as are a magistrate's proposed findings and recommendations."); *see also Scuotto v. Lakeland Tours, LLC*, 2015 WL 1418718, at *1 n.4 (M.D. Fla. Mar. 27, 2015)**.** *However, "'application of an improper legal standard ... is never within a court's discretion.'" Dulaney v. Miami-Dade Cty.*, 2011 WL 382773, at *1 (S.D. Fla. Feb. 2, 2011) (quoting *Johnson & Johnson Vision Care, Inc., v. 1–800 Contacts, Inc.*, 299 F.3d 1242, 1246 (11th Cir. 2002)).

*Groover v. U.S. Corr., LLC*, No. 15-CV-61902, 2018 WL 11320715, at *3 (S.D. Fla. July 16, 2018) (emphasis added) (sustaining in part objections to a magistrate's order where the magistrate judge failed to factor in relevant facts in requiring the production of ESI for 1,382 custodians); *see also Ramos* 2022 WL 17367335, at *3 (sustaining objections to magistrate's order where it was founded on a privilege not recognized by the Eleventh Circuit).

Here, the Magistrate Judge's decision was both clearly erroneous and contrary to law. In deciding that the City had knowledge of disclosing privileged documents and failed to take reasonable steps to rectify the error, the Magistrate Judge (1) ignored that the City's knowledge did not include the 184 documents at issue; (2) relied for her conclusion, at least in part, on a non-record document that she admittedly did not read; (3) incorrectly measured the City's reasonable steps to rectify the error from when the Magistrate Judge felt the City "should have known" about the inadvertent disclosure instead of from when the City actually knew about the inadvertent disclosure; and (4) ignored the "relevant circumstances" test.

The Magistrate Judge's decision was governed by Federal Rule of Evidence 502(b), which provides that a disclosure of material covered by the attorney-client privilege or work-product protection does not operate as a waiver of the privilege or protection if: "(1) the disclosure is inadvertent; (2) the holder of the privilege or protection took reasonable steps to prevent disclosure; and (3) the holder promptly took reasonable steps to rectify the error, including (if applicable) following Federal Rule of Civil Procedure 26(b)(5)(B)."

As noted above, the following critical facts were undisputed:

(1) The City's counsel did not realize the 182 documents had been inadvertently produced until at or around April 30 or the first week of May, 2025, just before the May 5 deposition of Rafael Paz.[6]

---

[6] Again, for clarification, it was specifically April 28, 2025, that the City first became aware the at-issue 184 documents had been inadvertently produced. *Hockman Supp. Dec.* ¶ 1. While that date was not specifically before the Magistrate Judge, the record nevertheless reflected that the discovery was on or about April 30, or within the first week of May, leading up to the May 5, 2025, deposition of Mr. Paz. *See* TR 40:9-14; 41:15-18; 63:22-64:2.

(2) Immediately thereafter, within a day or days, on May 1, 2025, the City's counsel sent Plaintiff's counsel a claw-back letter concerning the 182 documents; and then contemporaneously clawed back the additional two documents during a deposition.

(3) The at-issue 184 documents came from MB0001.

(4) The error of the City's ESI vendor, of which the City's counsel had been aware up until that point, concerned MB0002 *only*.

(5) The errors committed by the City's ESI vendor as to MB0001 and MB0002 were *different* errors.

Despite these facts, which were not disputed, the Magistrate Judge made the following findings, which were not supported by the record, either because they lacked factual support or because they failed to recognize that the City's prior knowledge of disclosing privileged documents did not include the 184 documents at issue.

Specifically, the Magistrate Judge concluded that "The disclosure of the 184 documents implicates errors that Defendant's electronically stored information ("ESI") vendor made. *The Court is well-aware of the errors, as they have been the subject of motion briefing and of discussions during two court hearings*. The errors include running searches for responsive documents while failing to apply the appropriate search terms and failing to search certain custodians' records." Fed. DE 179 at 4 (emphasis added).

These findings are clearly erroneous as not sustained by the record, because the inadvertent disclosure of the 184 documents did *not* concern errors of the ESI vendor that had been the subject of prior briefings and discussion; rather, the prior briefings and discussion concerned errors associated with MB0002, a different production set, concerning different errors.

20

The Magistrate Judge's mistake on this point is made abundantly clear when later in the Order she stated, "In briefing in April 2025, Defendant represented to the Court that it may have inadvertently produced privileged documents. DE 140 at 4; DE 140-6 at 1–2." Fed. DE 179 at 5. Those two citations are of City statements referring expressly to MB0002, *not* MB0001, from which the at-issue 184 documents came. *See* Fed. DE 140 at 4 (referring expressly and only to "MB0002," stating that ESI vendor errors "resulted in the inadvertent over-production of documents including potentially privileged documents"); Fed. DE 140-6 at 1-2 (same).

The second clear error of the Magistrate Judge lies in her reliance on a March 12, 2025, e-mail, a document which she did not read and which was excluded from the record by stipulation of the parties. The Magistrate Judge remarked that, "even though the Court does not know precisely what the email said, it is sufficient to know that, by at least March 12, 2025, Defendant was aware that its ESI vendor had made massive errors in discovery productions for this case and that privileged documents likely had been produced to Plaintiff as part of the discovery and would need to be clawed back." Fed. DE 179 at 4-5. At best, implicit in this statement is a finding that the March 12, 2025, e-mail reflects the City's knowledge of massive errors in discovery productions *that were relevant to the issue at hand*, namely, which implicate the 184 documents at issue. But that conclusion cannot be supported by the record. Of course, the e-mail itself cannot support that conclusion because the Magistrate Judge did not read it, and it was not part of the record; but even beyond that, the implicit finding is contradicted by the fact that the City's counsel *did not know at the time of sending it* about the inadvertent disclosure of the 184 documents or about the systemic problem with the production of MB0001 from which those documents came. The record simply cannot sustain a conclusion, and certainly not from the non-record March 12 e-mail, that as of that date the City had knowledge of an inadvertent privilege disclosure *that had*

*anything to do with the 184 documents at issue*, or that should have triggered a clawback obligation as to those documents.

Third, the Magistrate Judge's ruling is contrary to law and/or clearly erroneous because it failed to apply the correct law, specifically, that the City's obligation to take reasonable steps to rectify the error was triggered by the City's actual knowledge of the error.

Federal Rule of Evidence 502 does not contain a "knew or should have known" standard against which the disclosing party's conduct is measured. To the contrary. Wright & Miller notes that in drafting the rule, the Advisory Committee specifically considered, but rejected, rule language that would have "started the clock running 'once the holder [of the privilege] knew or should have known of the disclosure.'" § 5445 Inadvertent Disclosure, 23A Fed. Prac. & Proc. Evid. § 5445 (1st ed.). After initially considering that language, "the Advisory Committee accepted arguments it had previously rejected and voted unanimously to delete the 'should have known' language from Rule 502(b)(3). *So, the duty to rectify only arises when the opposing party can prove actual knowledge of the disclosure*—-as when the opposing party informs the holder that privileged information appears to have been disclosed." § 5445 Inadvertent Disclosure, 23A Fed. Prac. & Proc. Evid. § 5445 (1st ed.) (emphasis added) (footnote omitted); *see Stuntz v. Ashland Elastomers, LLC*, No. 1:14-CV-00173-MAC, 2018 WL 11451292, at *3 (E.D. Tex. Oct. 23, 2018) ("The duty to promptly take reasonable steps arises when 'the opposing party can prove actual knowledge of the disclosure—as when the opposing party informs the holder that privileged information appears to have been disclosed.'").

Instead of applying the Rule 502 as written, the Magistrate Judge held the City to some unspecified standard, that the City failed to take steps from when (the Magistrate Judge concluded without evidence) the City *should* have known about the error, as opposed to measuring the City's

reasonable steps from when the City *actually* knew about the error. This misapplication of the law is reflected in the Magistrate Judge's reasoning, which fails to make any factual findings as to *when* the City actually knew about the 184 documents or about errors with MB0001 from which the 184 documents came. Instead, she concludes that the City should have taken reasonable steps based on the City's knowledge up until March 12, 2025, which the record reflects was only as to a different production, MB0002.

The Magistrate Judge's reasoning renders her conclusion clearly erroneous, even if it were correct on the law. Because, even if the reasonable steps were measured from when the City "should have known" about the error, there was no record basis for the Magistrate Judge to have concluded that the City should have known about the error *as to the 184 documents*, given that the City's knowledge up until just before May 1, 2025, concerned errors only as to MB0002. Without any factual findings as to what the differing errors were and what the City knew about the MB0002 production (as contrasted with the errors with the MB001 production), no such conclusion could possibly have been drawn that the City "should have known" about the 184 documents earlier than it indisputably *actually* knew.

Finally, the Magistrate Judge's order is contrary to law because it ignored the five-factor "relevant circumstances" test, endorsed by the Eleventh Circuit in *Koch Foods of Alabama, LLC v. Gen. Elec. Cap. Corp.*, 303 F. App'x 841, 846 (11th Cir. 2008), and used by federal courts in Florida. *See, e.g., Latele Television, C.A. v. Telemundo Commc'ns Grp., LLC*, No. 12-22539-CIV, 2014 WL 4449451, at *4 (S.D. Fla. Sept. 10, 2014) ("There is no hard and fast test for analyzing inadvertent disclosure issues, but, the 11th Circuit found no error in a district court's adoption of the so-called totality-of-the-circumstances test, in which a reviewing court considers five factors."); *United States v. HCA Holdings Inc.*, No. 12-20638-CIV, 2015 WL 11198933, at *5 (S.D.

Fla. July 21, 2015) ("Federal courts, including this District, have embraced a totality-of-the-circumstances approach to the inadvertent/involuntary-waiver evaluation.").

As set forth fully above, those factors run strongly in favor of the City. The Magistrate Judge ignored those factors, however. Particularly without any analysis or express consideration of the overriding issue of fairness, the Magistrate Judge's decision cannot stand.

For these reasons, and to the extent necessary, the City urges the Court to sustain the City's objections to the Magistrate Judge's order, and/or reconsider the issues briefed on the issue.

## Conclusion

After an unusual procedural posture, this case has found its way back where it began: state court. After the District Court at last concluded Penrod's federal claims were meritless, it is clear that Florida state privilege rules and governing caselaw should guide this matter moving forward.

It would be manifestly unjust to allow a Magistrate Judge's interlocutory (and unreviewed) discovery rule, under inapplicable standards and beset by factual and legal errors, to govern the parties going forward—particularly where, due to the unusual procedural circumstances, the City was deprived of the opportunity to object to the Magistrate Judge's order before the District Court.

Under governing Florida standards, the privilege clearly was not waived, and Penrod should be compelled to return or destroy the 184 documents and not retain any copies. Even if this were analyzed under federal standards, the same result should obtain.

Jurisdiction has "resumed" in this Court, and it should correct this injustice relating to the inadvertent disclosure of privileged materials, due to an e-discovery vendor error over which the City had no control and which the City acted promptly to rectify upon actually learning of the error.

WHEREFORE, the City respectfully requests this Court to enter an order:

(1) Deeming the City to have not waived the attorney-client privilege with respect to the at-issue 184 documents;

(2) Compelling Penrod to destroy or return the 184 documents and retain no copies;

(3) To the extent necessary, sustain the City's objections to the Magistrate Judge's order (Fed. DE 179);

(4) To the extent necessary, reconsider the decision of the Magistrate; and

(5) Enter any such other and further relief as this Court deems just and proper.

## Certificate of Service

The undersigned certifies that on June 16, 2025, a copy of this document is being served by e-mail via the Florida Courts E-Filing Portal upon all counsel and parties associated with the e-service list for this action.

Respectfully submitted,

**WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.**
2800 Ponce de Leon Blvd.
Suite 1200
Coral Gables, Florida 33134
Telephone: (305) 854-0800

By: */s/  Eric Hockman*
ERIC P. HOCKMAN
Florida Bar No. 64879
ehockman@wsh-law.com
ANNE R. FLANIGAN
Florida Bar No. 113889
Aflanigan@wsh-law.com
BRYAN C. SIDDIQUE
Florida Bar No. 1018191
bsiddique@wsh-law.com

**CITY OF MIAMI BEACH**
1700 Convention Center Drive
4th Floor – Legal Department
Miami Beach, FL 33139
Telephone: 305-673-7470
Facsimile: 305-673-7002

By: */s/ Freddi Mack*
    FREDDI MACK, ESQ.
    Florida Bar No. 111623
    freddimack@miamibeachfl.gov

***Attorneys for Defendant***



THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO.:   23-cv-23362-DSL

PENROD BROTHERS, INC.,        )
                              )
            Plaintiff,        )          May 28, 2025
                              )
v.                            )
                              )          Pages 1 - 84
CITY OF MIAMI BEACH,          )
                              )
            Defendant.        )
_____/


DISCOVERY PROCEEDINGS

BEFORE THE HONORABLE PANAYOTTA D. AUGUSTIN-BIRCH
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

Counsel on behalf of the Plaintiff:

                    STEARNS WEAVER MILLER, P.A.
                    150 West Flagler Street
                    Suite 2200,
                    Miami, FL 33130
                    BY:  JASON S. KOSLOWE, ESQ.

EXHIBIT "1"

1
    APPEARANCES CONTINUED:
2
    Counsel on behalf of the Defendant:
3
                        CITY ATTORNEY'S OFFICE OF MIAMI BEACH
4                       1700 Convention Center Drive
                        Miami Beach, FL 33139
5                       BY:  ERIC P. HOCKMAN, ESQ.
                        BY:  ANNE R. FLANIGAN, ESQ.
6                       BY:  BRYAN C. SIDDIQUE, ESQ.

7

8

9
    Transcribed By:
10
                        BONNIE JOY LEWIS, R.P.R.
11                      7001 SW 13 Street
                        Pembroke Pines, FL  33023
12                      954-985-8875
                        caselawreporting@gmail.com
13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  (Thereupon, the following proceeding was held:)

 2              THE COURTROOM DEPUTY:  Calling Case 23-cv-23362;

 3   Penrod Brothers Incorporated versus City of Miami Beach.

 4              Counsel, would you announce your names for the record

 5   beginning with the Plaintiff.

 6              MR. KOSLOWE:  Good morning, Your Honor.

 7              Jason Koslowe from Stearns Weaver Miller for the

 8   Plaintiff Penrod Brothers.

 9              THE COURT:  Good morning, Mr. Koslowe.

10              MR. HOCKMAN:  Good morning, Your Honor.

11              Eric Hockman on behalf of the City of Miami Beach and

12   with me is Anne Flanigan and Bryan Siddique.

13              THE COURT:  All right.  Good morning, Mr. Hockman,

14   good morning, Miss Flanigan, and good morning, Mr. Siddique.

15              MR. SIDDIQUE:  Good morning, Your Honor.

16              THE COURT:  We are here on two motions this morning.

17   The Plaintiff filed a motion to overrule improper deposition

18   instructions, which is briefed at Docket Entries 157, 162, and

19   167.

20              And the second motion is Plaintiff's motion to

21   determine waiver of privilege, which is briefed at Docket

22   Entries 161, 166, and 168.

23              So we will go ahead and start with the first motion;

24   the motion to overrule improper deposition instructions.  I

25   have reviewed all of the briefings in the case and I have also
```

4

1    reviewed the relevant portions of the depositions, which were

2    cited to.

3            I don't have any questions as it relates to that first

4    motion, but I will give each side an opportunity to provide any

5    additional arguments.  Again, I am familiar with what occurred

6    during the deposition and I have reviewed the briefings in this

7    case.

8            So, Mr. Koslowe, since this is your motion, you can go

9    ahead and provide any additional arguments.

10           MR. KOSLOWE:  Thank you, Your Honor.

11           I will take the opportunity to be brief.  We also

12   think the motion is straightforward and we appreciate Your

13   Honor's review of the material.

14           We believe the city has, frankly, conceded to improper

15   conduct.  The rule requires that if they believed that this was

16   the type of inquiry that would have permitted them to file a

17   motion, what they needed to do was stop the deposition, come in

18   before the Court under that provision of Rule 30, and arguing

19   that the questions were harassing.

20           They did not do so.  The law is clear.  They waive any

21   and all of those objections.  The relief provided by every

22   single case that we could find under the facts here is

23   re-opening the deposition.

24           We ask for additional relief in connection with Mr.

25   Dominguez, which is simply to deem the questions answered as we

1   have requested them.

2         THE COURT:  I mean, Mr. Koslowe, when I reviewed the

3   deposition it appeared to me that you asked the same question

4   several times.  The questions were answered several times.

5         So I am not sure what relief you are asking for.  I

6   was not present, but I did read those portions of the

7   transcript.

8         And you may have not liked the answer that you

9   received from the witness, but from my review the questions

10  were answered.  And it got to the point where, in my review of

11  the transcripts, it is all as if at some point you were

12  badgering the witnesses by repeatedly asking the same question

13  over and over and over and over again.

14        Especially during one of the depositions involving,

15  you know, whether it was at 3:00, 3:00 and one second, 3:00 and

16  two seconds, 3:00 and three seconds.

17        I mean, we went through this like over and over and

18  over and over again.  So, at one point Mr. Hockman said several

19  times asked and answered.  And finally he said you do not need

20  to answer that.  Move on to the next question.

21        So I am not really sure what you are looking for and

22  maybe you could clear that up for me.

23        MR. KOSLOWE:  Sure.  First of all, I would take issue

24  with Your Honor's characterization of what took place in the

25  room.  As Your Honor said, Your Honor was not present.

1            But let's assume that is correct.  Let's assume I had

2   asked the same question for seven hours straight.  All right.

3   And Mr. Hockman had posed an objection; this is asked and

4   answered and this is harassing.

5            If he believed that this was harassing to the point of

6   obtaining relief under Rule 30, the law is crystal clear that

7   his requirement was to shut down the deposition and immediately

8   seek relief.  That is what the case law says, right?

9            He cannot say don't answer the question and then leave

10  it to me to move the Court.  Every case that we cited says

11  that.

12           Now there are some cases that say, well, if the

13  question was not really important, or if you obtained an answer

14  by a different means, you do not need to re-open the

15  deposition.

16           But the case law is over-abundantly clear that if his

17  belief that these asked and answered objections, or the scope

18  objections, or the improper hypothetical objections, or any of

19  those objections were so well-taken that they require relief

20  under Rule 30, his obligation is to immediately move the Court.

21           If Your Honor is looking for the citations:

22           *Adare v. School Board,* 2021 Westlaw 5121973, *Buckley*

23  *Towers v. QBE*, 2008 Westlaw 2645680, *Onamada v. Raman,* 2021

24  Westlaw 5175657, *Quanticome* 109 FRD; it's a Federal District, I

25  believe, 697.

1         These are all Southern District of Florida cases and

2   the case law is clear that:

3         "An attorney who instructs a witness not to answer at

4   a deposition..."

5         This is quoting from one of the cases repeated over

6   and over.

7         "...waives any objection if counsel does not

8   immediately file a motion for a protective order."

9         So let's assume --

10         THE COURT:  Let me -- because I want to make sure that

11   I am clear what your position is.

12         Is it your position that the witness never answered

13   your question?  That you never received an answer to your

14   questions?

15         MR. KOSLOWE:  Yes, but I am starting from a first

16   principle.

17         THE COURT:  Okay.

18         MR. KOSLOWE:  Let's assume that I had asked a question

19   and I had received an I don't know answer.

20         THE COURT:  Okay.

21         MR. KOSLOWE:  Or an answer to which it was not

22   satisfactory to the questioner.

23         THE COURT:  Okay.

24         MR. KOSLOWE:  And then, he said do not answer that

25   again and they did not move for an order, the objection would

1   be waived and then I get the deposition to ask the question

2   again.

3           Now, Your Honor asked a practical question if you got

4   the answer what do you care?

5           THE COURT:  I guess now my next question is if you

6   asked a question and the witness says I don't know.

7           You asked the question again and the witness says I

8   don't know.  You ask the question for the third time and the

9   witness says I don't know.  You ask the question for the fourth

10  time and the witness says I do not know.

11          What about that scenario?

12          MR. KOSLOWE:  In that scenario, again, the case law is

13  clear that the obligation of the defending attorney, if the

14  defending attorney says this is harassing.

15          You cannot do this anymore.  Don't answer that again.

16  They then move for an order under Rule 30.  That is what the

17  case law says.  If you don't do that you waive the objection.

18          But I want to transition to Your Honor's point, which

19  is didn't you get the answers to the questions that you asked

20  anyway.  And I do not believe that is true and I will focus on

21  each one of these witnesses.

22          So with Mr. Dominguez -- and again we spread these out

23  much more clearly in the reply, but here is the context.  Mr.

24  Dominguez was one of the members -- in fact, the only member

25  left in the City from the Asset Management Group in charge of

1  what the City did after its April 2023 resolution.

2        Now, Mr. Dominguez testified, as the documents clearly

3  show.  We walked through them to understand what they were.

4  That the City undertook a series of actions immediately after

5  the instruction provided by the Commission in the April 2023

6  resolution, but the City's position is no one really did

7  anything after the April 2023 resolution.

8        So I needed to lock in Mr. Dominguez to say this stuff

9  you did, which appears to any observer to be directly

10  responsive to the direction from the Commission it was, in

11  fact, an effort by the City's administration to carry out what

12  the Commission directed them to do.

13        So I said this series of stuff you did.  Was it in

14  response?  Mr. Dominguez says I don't know.  I asked a couple

15  of times.  I don't know.  I am not understanding the question,

16  he says.  This is on Page 174 of the deposition, which is at

17  157-1.

18        I asked it a couple of times further.  Each time, by

19  the way, in order to clarify I asked:

20        "Q.  Mr. Dominguez, can I clarify the question by

21  breaking it into pieces?"

22        MR. KOSLOWE:  And as Your Honor will recognize, to do

23  so I am retreading ground that was already covered and getting

24  a slate of objections of asked and answered, asked and

25  answered, asked and answered, right?

1          Because I am asking questions that were already

2    answered to set them up, breaking them into chunks so that the

3    witness can understand it.

4          So through a slate of objections talking over the

5    witness, right, I am trying to break this into questions

6    because what I am trying to determine is this stuff you did was

7    it because of the City Commission directive.

8          And a couple of times we go through it and Mr.

9    Dominguez says I don't understand the question.

10         Again, on Page 176:

11         "Q.  Do you understand the question that I posed to

12    you?

13         "A.  No, I did not."

14         MR. KOSLOWE:  So I said:

15         "Q.  Let me ask it a different way.

16         Can you think of anything else, anything else this

17    could have been responsive to."

18         MR. KOSLOWE:  And that is when I get the instruction

19    not to answer the question, right?

20         I am entitled to an answer as to whether or not the

21    series of activities that this individual did, as head of Asset

22    Management of the City, was responsive to a direction from the

23    Commission, which he said he always responds to.

24         And these actions, if he cannot remember if they were

25    specifically directed by the Commission, can he think of

1  anything else plausible to which they could have been

2  responsive.

3        Then I close out a question that they have raised as a

4  factual issue, were these actions City administrative actions

5  responsive to a Commission directive?

6        I don't know, I don't understand, and I am not sure

7  are not appropriate answers.  I get to walk him through it to

8  lock him in so he could testify that there is nothing else that

9  there could be.

10        THE COURT:  If his answer is I don't know because they

11  don't know.

12        MR. KOSLOWE:  And so that is why I flipped the

13  question and I said, okay, you don't know if these things that

14  you did were responsive to this.

15        Based on your 20 years of experience working with the

16  City and the work you did and the e-mails you sought, can you

17  think of any other plausible explanation?

18        Do not answer that question.  Speculation.  Do not

19  answer that question and he did not answer the question, right?

20        So I am going to get to probe.  I should get to probe

21  every available opportunity to have the witness testify

22  everything about this particular set of facts.

23        Now, if he thought this was harassing, he had an

24  obligation to bring a motion.  And I want to mention something

25  else because it came out at the deposition, right?

1          At this point Mr. Hockman says, listen, this is not

2     fair.  This guy's daughter is in labor.  He has somewhere else

3     to be.

4          And I said on the record, quite frankly, that is quite

5     unfair because we rushed through the deposition.  We did not

6     take breaks.  We did not take lunch because we recognized that

7     the person had something else important to do, right?

8          I am not trying to hold the witness over for no

9     reason.  If they needed time to bring the guy back because he

10    had something else to do that is also appropriate.  We could

11    have worked on that.  Instead, he said do not answer the

12    question.

13         Do you know why?  They do not want the question

14    answered.  They want to come before the Court and say this is a

15    factual issue.

16         No one at the City really did anything in response to

17    the April resolution even though we have a series of actions

18    that he said he did and he always responds to the Commission.

19         Now, the question is, well, you don't remember exactly

20    why you did it?  Can you think of any other plausible

21    explanation given your decades of experience and the work that

22    you did at the time?

23         And his answer is going to be, no, I can't because

24    there isn't anything else to which it could have been

25    responsive.  I deserve that answer.  I deserve answers to that

1   question.

2              Now, I believe that the case law supports an

3   inference.  The Court just simply inferred the answer is, no, I

4   can't think of anything else, but in lieu of that we should get

5   to ask the questions.

6              I have not seen a case from them that says assuming

7   that I did was objectionable, that they are allowed to do

8   nothing and wait for me to bring a motion and then have the

9   objections preserved.  The objections are deemed waived by the

10  law.

11             In Your Honor's case is quite clear that -- and that

12  is the -- pardon me.  *Exist v. Starr Indemnity and Liability*

13  *Company.*  That is at 2024 Westlaw 4695888 that:

14             "The imposition of sanctions under Rule 30(d)(2) does

15  not require a finding of bad faith."

16             So the question is not if Mr. Hockman was acting

17  poorly.  No one is suggesting one way or the other.  I tend to

18  think that the City is trying to cover a witness and trying to

19  stop information from getting out that is harmful to them.

20             That is their job in protecting the witness.  I

21  understand that, right?  But this is not a bad faith question.

22  Your Honor has already written down the case and the case law

23  is clear.

24             They waived the objection.  We should be deposing them

25  again and they should pay for the cost of that.  That is for

1   Mr. Dominguez.

2          Mr. Denis is a different story.  That is for the

3   timing on the 3:00 if Your Honor permits me to move on to that,

4   that deposition.

5          THE COURT:  You may continue.

6          MR. KOSLOWE:  This question is critical to one of the

7   City's defenses here.

8          The City's theory of the case is that Penrod submitted

9   a late bid and that has implications for claims.  Implications

10  for defenses.  Implications for standing and so on.  That is

11  their view of the facts here.

12         Well, what is the deadline?  Now, obviously a writing

13  speaks for itself, but sometimes there is a question about what

14  a writing means.

15         And when that happens, there are rules of construction

16  and one of them is that you might look at parole evidence.  So

17  you want to figure out what the guy who wrote it thinks it

18  meant.

19         So one of the guys who wrote it was the head of

20  procurement at the City, Mr. Denis.  He was one of the people

21  responsible for drafting the RFP rules.  And the RFP rules say

22  that the deadline is on or before 3:00.

23         What does that mean?  We tend to think it means

24  something as a matter of law.  The City probably tends to think

25  it means something as a matter of law.

1        But if the Court believes there is a factual inquiry

2   involved, we get to ask the people who wrote it what it means.

3        I am entitled to ask a set of hypothetical questions

4   that are innocuous in order to understand what the words on or

5   before mean.  I am entitled to ask them in any context I feel

6   is appropriate and I did so.  And what I got was a slate of

7   harsh objections that did two things:

8        First, it signaled to the witness do not answer the

9   questions.  And we all know what happens in a deposition how

10  witnesses pick up on signals from lawyers, right?

11       So the objections I got were not simply, you know,

12  objection hypothetical -- let me find the exact language.  It

13  was a series of speaking objections:

14       "Relevance.  What is the point of this, Jason?  If you

15  are going to give him a hypothetical, give him a hypothetical.

16  Don't just walk him through it.  It is unintelligible.  Are you

17  kidding me?  What are you trying to do?  These aren't related

18  things."

19       MR. KOSLOWE:  Those are speaking objections that are

20  telling the witness do not answer the question.  You cannot

21  understand this.

22       So the witness then feigned a lack of understanding.

23  I don't know what it means when something takes place on

24  August 28th.  I do not know what it means when something takes

25  place on 12:00.  I can't understand the question, right?

1         So I did not get appropriate answers to the questions.

2    You're right.  At some point I got an answer of what he thought

3    as to between 3:00 and zero seconds and 3:00 and one second.  I

4    got that answer, but I am entitled to what on or before means

5    in every context.

6         And then, thus coached -- and again without ascribing

7    motive because I do not need to have bad faith here -- thus

8    coached that any question that he thinks is speculative -- the

9    witness thinks is speculative -- he then does not answer.

10        So we go on to Page 204 and further in the deposition

11   transcript, the witness begins to not answer the questions

12   posed.  He says I am not going to answer that.  I am not going

13   to answer it because I do not think that is what happened.  I

14   am not going to answer -- pardon me.

15        I am not going to answer a hypothetical question

16   because those were not the facts as I remember it.  So I am not

17   going to answer your hypothetical.  I am not going to answer

18   because I think it is speculative.  I am not going to answer.

19        Not I do not understand the question.  Not I do not

20   know what the answer is.  I am not going to answer .  And the

21   case law that we cited is clear that a witness cannot do that

22   also.

23        Just like the lawyer cannot instruct the witness not

24   to answer because of an objection.  The witness cannot refuse

25   to answer because of an objection.

1          The primary case that we have cited to that point was

2   the *Charlemagne v. Alibayof.*   And I apologize for probably

3   butchering that name.   It is 2021 Westlaw 8534230.

4          So the witness understood from the instructions given

5   by counsel that if he determined, the witness, that he did not

6   like the hypothetical and he thought it was speculative, he

7   just was not going to answer the question.

8          Now the witness can say I do not understand the

9   question or I do not know what the answer is because I cannot

10  hazard a guess.   That is an appropriate answer and then I would

11  be able to re-package the question until I got it.

12         But, instead, I got the answer I'm not going to answer

13  it.   I am not going to answer it.   By the way, the specific

14  questions were about core factual issues.

15         The City has not said this is not relevant.   The City

16  believes this is essentially relevant, right?   This is their

17  silver bullet.

18         They think if we did not submit on time the whole case

19  goes away.   This is centrally relevant.   So I will give you the

20  questions that I was asking where the witness refused to

21  answer.

22         There are a series of factual issues about what

23  happened on the periscope platform?   That is the web interface

24  for the City's bid submission.   And there are a series of

25  questions of what takes place on the website and what the user

1   did on the website.

2          And some of those questions involve, well, what

3   happens if you attempt to open up the bid submission before the

4   deadline, then the deadline passes, and then you attempt to

5   press submit.  So there are questions about that.

6          So I wanted to ask what the City people who inputted

7   the information understood the rule to be.  And he refused to

8   answer them because of an understanding of what he had about

9   what the facts were.

10         He is wrong.  We already deposed the guy from

11  periscope.  So we know what the program rules are.

12         So knowing that, I attempted to ask a series of

13  questions based on our knowledge about what the program rules

14  were and he refused to answer them, which is I don't know what

15  the City's writer of these rules believes the rules to have

16  been.

17         And that is not appropriate because they are going to

18  come up with a defense or -- not a counterclaim, but a position

19  in the case that X, Y, and Z is true about our claims because

20  A, B, and C happened.

21         And they are going to base that A, B, and C happened

22  without me being able to explore what the City's rule drafter

23  believes the rules to be and they have not argued that this is

24  not relevant.

25         So just to cap off the argument, if the City was

1  correct and these were improper questions that infringed upon

2  the basis under Rule 30, under Rule 30(d) for a motion, it was

3  their obligation to have filed that motion immediately.

4       The case law is like one or two days.  It is improper

5  to wait for me to file a motion.  If they do that they waive

6  the objections and I get to re-ask the questions.

7       Your Honor's practical question, did you get the

8  answers?  Some of those cases they ask those questions.

9       I did not.  We point out where we did not get the

10 answers to questions, which we deem to be relevant to the case.

11      Thank you.

12      THE COURT:  Now, Mr. Koslowe, in reference to Mr.

13 Dominguez, I am looking at the transcript of the deposition and

14 on Page 179 of the transcript --

15      MR. KOSLOWE:  Uh-huh.

16      THE COURT:  On specifically Line 14, you asked him

17 whether or not he understood the question:

18      Line 15:  "I understood the question."

19      THE COURT:  And then, when you go further down, he

20 said his answer.  So, one, you have confirmation that he

21 understood your question.

22      And the second part of your question is you want to

23 have the information and he states on Line 24:

24      "I don't want to speculate on anything else.  So I

25 don't know."

1        THE COURT:  So wouldn't that be an answer?  So, first,

2   he confirmed that he understood your question and then the

3   answer was I don't know.

4        MR. KOSLOWE:  Yes.  And then, the next question is, is

5   it a plausible explanation?

6        I turned the question next and I say:

7        Is this something that was you carrying this out?  I

8   said, well, is it plausible that it was you carrying it out?  I

9   am going to narrow the witness and I am going to back the

10  witness in.

11       And by the way, Your Honor, this is cards on the table

12  and everyone knows what I am trying to do here.  Mr. Hockman is

13  a skilled opposing counsel and he knew what I was trying to do.

14       Is it a plausible explanation?  Objection; asked and

15  answered; do not answer the question.  We are done with this.

16       "Based on your understanding of the work that you do,

17  is it a plausible explanation for these events?"

18       MR. KOSLOWE:  Yada, yada, yada.

19       "Objection, speculation, asked and answered; do not

20  answer the question."

21       MR. KOSLOWE:  Now, if I got an answer, yes, it is

22  plausible.  Okay.  So now that you know this is plausible, can

23  you think of anything else plausible?

24       Is it plausible it was this?  Is it plausible it was

25  that?  Was it plausible that it was this?

1          Until we get to the answer that there is nothing else

2    that could explain City administration undertaking a set of

3    specific tasks.  Other than they were directed to do so by the

4    City Commission two days before, which any casual observer

5    would understand, but I wanted to lock the witness into the

6    testimony.

7          That is my goal in this discovery to get crystal

8    clear, no factual dispute, the City administration was

9    conducting a series of tasks at City direction, at the City

10   Commission direction, responsive to a particular resolution and

11   I was prevented from doing so right there on the page.

12          THE COURT:  Thank you.

13          MR. KOSLOWE:  Thank you, Your Honor.

14          THE COURT:  Response, Mr. Hockman.

15          MR. HOCKMAN:  Thank you, Your Honor.  Good morning.

16          THE COURT:  Good morning.

17          MR. HOCKMAN:  In May of 2006, I will have been a

18   practicing attorney for 20 years, Your Honor.  Not including my

19   time as a law clerk in law firms when I went to law school.

20          In that time, I committed exactly two instructions not

21   to answer a question.  It did not have to do with privilege.

22   Both times were in this case and both times were in this

23   motion.  That is it; in 20 years.

24          It has never happened before and I hope I never feel

25   like I have to do that again to protect my witnesses.  We do

1  not have a Judge with us.  We do not have a special master with

2  us.

3         And I am not about to call you or any other Judge in

4  this court to deal with a question that has been asked and

5  answered multiple times.  What I am going to try to do is

6  persuade opposing counsel to move on.

7         In the past attorneys who receive answers to their

8  questions usually take one of three routes; they accept the

9  answer to their question that the witness does not know and

10 that should cut it off.

11        Particularly if that witness says he does not know.

12 What else are you going to get?  I do not know.  Ask somebody

13 else.

14        And in fact, Your Honor, he was asking the wrong

15 witness.  Mr. Dominguez was part of a team dealing with

16 directives from the Commission resolutions.

17        Mr. Mark Taxis was an assistant City Manager.  He was

18 part of that team and he was deposed and he said, yes, we

19 followed the direction at the City Commission.  He also

20 testified to exactly what they did.

21        Now there were other members of that team.  He did not

22 know because he was not part of all of that.  His job is

23 facilities management.  He manages the property in the contract

24 and that is it.  That is what that transcript shows.

25        Alternatively, sometimes they seek to confirm

1  understanding of the question if it was not what they expected.

2  That is also fair game.  I want to make sure that you

3  understood my questioning.

4       Mr. Koslowe did that and he got an answer.  Yes, I

5  don't understand your question.  I don't know.

6       Other times when witnesses say, well, I don't recall,

7  then what you do is you say, okay, let me show you a document

8  that might refresh your recollection.

9       And you try to see if that works or maybe you

10  represent facts to them and say, look, here's something that I

11  am going to represent to you.

12       You don't have to take my word for it, but if this

13  were true, wouldn't that be the case?  Does that clarify my

14  question for you?

15       None of those things were done.  Especially with Mr.

16  Dominguez.

17       I sat there, and as Your Honor pointed out, listening

18  to this questioning again and again and again and again and

19  again six times until I finally reacted to it.

20       And each time Mr. Koslowe twice set up his question

21  and each time Mr. Dominguez kept saying I don't know.

22       "Q.  Is it not your testimony that it was your office

23  involved at that time as part of this effort that was directed

24  by the Commission?"

25       "A.  I don't know."

24

```
 1              "Q.  You don't know.  All right.

 2          Can you think of any other explanation for that

 3   activity for those meetings, for those e-mails, for that

 4   information being gathered and passed along, other than the

 5   involvement of your division and those efforts that were

 6   directed by the Commission?"

 7              "Objection; speculation."

 8              "A.  I don't know."

 9              "Q.  You don't know or no?"

10              "A.  No, I don't know."

11          MR. HOCKMAN:  It is answered.  He does not know.  Move

12   on, but he doesn't.  Instead, he says:

13              "Q.  I will re-state the whole question."

14          MR. HOCKMAN:  This is Page 173, Line 5:

15              "Q.  Okay.  Can you think of any other explanation for

16   the series of activities, collection of information..."

17          MR. HOCKMAN:  And it goes on and he repeats exactly

18   what he just asked.  Same objection.

19              "A.  I don't know."

20          MR. HOCKMAN:  Next question:

21              "Q.  Can you think of any other explanation for those

22   events other than that?"

23              "Objection; asked and answered, form, and

24   speculation."

25              "A.  I don't know."
```

1          MR. HOCKMAN:  He is not going to change his answer.

2          You are not entitled to the answer you want.  You are

3    entitled to the answer you get and it is certainly not a basis

4    to re-open a deposition for one question.

5          What Mr. Koslowe wants is an inference.  He wants them

6    to agree to his argument.  If you read the entire transcript,

7    both the witnesses and other witnesses, it is a series of

8    leading questions all about the theory of the case.

9          They are not interested in what our witnesses know.

10   They are interested in what our witnesses will agree to.  Fine.

11   If you want to do it that way, do it that way, but accept the

12   answer when you get it.  Don't keep badgering the witness.

13         I had no choice.  He just wouldn't stop.  I tried and

14   I tried and I tried.  At some point I had to put an end to it

15   because I know, since we are only talking at this stage about

16   the April resolution that Mr. Koslowe has more questions that

17   he wants to ask this witness, whose daughter has gone into

18   labor.

19         And if he wants to stop the deposition and move on and

20   say we will take this up later, and the witness agreed, we

21   would also agree to that.  That is not what happened.  We tried

22   to get through it and we did get through it.

23         Mr. Denis, the same thing, Your Honor.  We are asking

24   the questions about ice cream and we are asking questions about

25   lunch.  We are not asking questions about the RFP.

1           And I said ask a question related to the RFP and not

2    ice cream, and not pizza, and not some other event on

3    deposition scheduling.  I schedule depositions and not the

4    witness.

5           I said ask him in the context of an RFP.  Why would I

6    object to that?  That is Page 150 of Mr. Denis' transcript.

7    And so I then let it go on and he asked a question and this is

8    on Page 151:

9           "Q.  So if I said, using this ice cream example again,

10   you and I are going to go for an ice cream on or before

11   April 28th of 2025.  What is the last day we can go and get

12   that ice cream and still comply with that rule?"

13          MR. HOCKMAN:  What has that got to do with this case?

14   But all I said was objection to form, vague and ambiguous.

15          MR. HOCKMAN:  The witness then answered:

16          "A.  So unless you are time limited, which the RFP

17   was, then April 28th."

18          MR. HOCKMAN:  He answered the question even though it

19   had nothing to do with anything.

20          So Mr. Koslowe then asks:

21          "Q.  So before April 28th is April 27th and on or

22   before includes April 28th, right?"

23          MR. HOCKMAN:  What is going on here?  So I am letting

24   it go.  Next Page 152:

25          "Q.  So assuming you and I are both located in the

1  same time zone and the rule is that to go and get this ice

2  cream, you and I must do so before noon on April 28th of 2025.

3       What is the last second that we can do thing and

4  comply with that rule?"

5       "Objection to form."

6       "A.  So the last second would be 11:59 and

7  60 seconds."

8       MR. HOCKMAN:  Mr. Koslowe:

9       "Q.  11:59 and 60 seconds is noon, sir, right?"

10      "A.  Yes."

11      "Q.  So that would be the last second."

12      MR. HOCKMAN:  That's an answer to an irrelevant

13  hypothetical, but he did not stop there.  We went on to talk

14  about 3:00 on Page 154:

15      "Q.  So who inputs into the periscope platform

16  specific deadline for this?  Who inputted this specific

17  deadline for this specific RFP?"

18      "A.  It is built into periscope.  All RFPs with the

19  City of Miami, I think the time is 3:00 p.m. or 2:00 p.m., but

20  whatever the time is, that is built into periscope."

21      MR. HOCKMAN:  Mr. Koslowe:

22      "Q.  If periscope testified that the particular time

23  had to be inputted for each RFP that would be contrary to your

24  recollection?"

25      "A.  It could be."

1  "Q.  So at some point someone from the City of Miami

2  Beach put into the periscope platform a particular time and

3  then just applied it for every RFP moving forward?"

4  "A.  Does it really matter if a contracted officer

5  inputs it or if it is built into the system?  The time is the

6  time."

7  MR. HOCKMAN:  He is getting answers to his questions.

8  He wants to know how the City of Miami construes 3:00 p.m.

9  Okay.  Fine.  Page 159:

10  "Q.  Do you have any knowledge if she..."

11  MR. HOCKMAN:  Referring to Miss Bada who is the

12  contracting officer.

13  "Q.  ... had any particular view of the drafting

14  language?"

15  "A:  I do not."

16  MR. HOCKMAN:  By the way, they got the testimony from

17  Miss Bada and she testified to what her view of the contracting

18  language is.

19  "Q.  Anyone else?  You said CO.  I am not sure who you

20  are referring to."

21  "A.  CO is a contracting officer.  That would have

22  been from the number of the RFP that ends in KB.  I would

23  assume it is Kristy Bada, but that does not necessarily mean it

24  was Kristy because she could have had someone on her team do it

25  and she would have just put it under her name for management."

1          "Q.   Did you have any role in crafting this addendum?"

2          MR. HOCKMAN:   Referring to the one that set the

3    deadline in this case, Your Honor, of August 31st of 2023 at

4    3:00 p.m.

5          And right before that on Page 162, Line 5, Mr. Koslowe

6    asks:

7          "Q.   Okay.   So before Thursday, August 31st, 2023, at

8    3:00 p.m. means 2:59 and 59 seconds, right?   That's before the

9    deadline, right?"

10          "A.   Say it again."

11          "Q.   Okay.   Did you have any role in crafting this

12    addendum, sir?"

13          "A.   I don't remember.   It's a time extension only.

14    Typically I did not even get involved in those."

15          MR. HOCKMAN:   On Page 163, Line 2:

16          "Q.   What does August 31st, 2023, at 3:00 p.m. mean?"

17          "A.   On August 2023 at 3:00.   I don't know how else

18    you want me to say that."

19          MR. HOCKMAN:   Where did he not get his answers?

20          Why did he keep asking, and asking, and asking, and

21    asking, and asking when the witness had told him multiple times

22    3:00 p.m. means 3:00 p.m.

23          We can go on deeper into the deposition.   Page 167,

24    the question on Line 22:

25          "Q.   So if a bid was submitted at 3:00 and zero

1  seconds it should have been accepted, right?"

2       "A.   No, the system would shut down at 3:00 and zero

3  seconds."

4       MR. HOCKMAN:  That is the answer.  Not good enough.

5  We are going to still pound away.

6       Question on Page 168:

7       "Q.   To me it sounds like you are saying two different

8  things and I am trying to reconcile the two.  I am trying to

9  understand it."

10      "A.   We can do this.  We can do this for the rest of

11 the day.  My answer is not going to change."

12      MR. HOCKMAN:  He has given the answer multiple times

13 and now the witness is frustrated.

14      At that point, Your Honor, I've got to find a way to

15 put an end to this.  Am I going to call the Court?  No.  I have

16 never done that in 20 years.

17      I have attended many CLEs.  I have spoken with many

18 Judges.  I have been part of various Federal Bench and Bars and

19 the message is always the same:

20      If you stop a deposition and call us for a ruling that

21 is a nuclear option.  I have never put my finger on that red

22 button and I never will.

23      What I try to do is let the witness talk.  Let the

24 attorney get his answer.  And once the attorney has gotten his

25 answer six or seven times, only then do I begin warning.

1        I have never had an attorney ask again after I say

2    that is enough.  You have asked the question six times and you

3    have gotten six answers.

4        Ask it one more time and I am going to stop it and ask

5    for more time and then he asks again.  And lo and behold, I

6    stop him.  That is the best I can do under the circumstances,

7    Your Honor, when we do not have a Judge and we do not have a

8    Special Magistrate.

9        Depositions are supposed to proceed as they do at

10   trial.  Would this have been allowed at trial?  I think not.  I

11   also think, Your Honor, that Mr. Koslowe knew exactly what he

12   was doing.

13       I will submit that this case is one of the most hotly

14   litigious cases that I have ever experienced.  With one

15   exception against a gentleman named John Ruiz who was somewhat

16   infamous for his ownership of the MSP Recovery law firm.

17       He filed no less than five lawsuits concerning the

18   same issue regarding an old baseball stadium in the City of

19   Homestead; five lawsuits.  That was the most litigious case

20   that I have ever been a part of and we ended up having to go to

21   a full trial and defeated him.

22       This one is right second.  I think that what happened

23   was that Mr. Koslowe knew what he was doing.  He repeated the

24   question six times to Mr. Dominguez.  He got his answer and

25   then persisted to provoke a reaction and he got his reaction

1   and now we are here.

2           This is litigation theatre.  And I hope, Your Honor,

3   that you see what was really going on.  I think you do.

4           The City complied with the rules, Your Honor.  There

5   was no motion to bring.  The question was asked.  The question

6   was answered.

7           This is not like the cases that they cited where the

8   witness was prevented from even providing the answer in the

9   first instance.  This is a case where the witness answered the

10  question and then got badgered.

11          That is not sanctionable.  That is not worth

12  re-opening a deposition to get the answer to one single

13  question.  The Court should deny the motion in full and decline

14  to reward this gamesmanship.

15          Thank you.

16          MR. KOSLOWE:  A brief reply, Your Honor, or are you

17  complete on that?

18          THE COURT:  A very, very brief reply since this is

19  your motion.

20          MR. KOSLOWE:  Very brief.

21          Your Honor, with respect to Mr. Hockman and how long

22  he has practiced and he is, as we have discussed many times, a

23  worthy adversary, but he is incorrect on the law and every case

24  says it.

25          "An attorney who instructs a witness not to answer a

1   deposition question, waives any objection to those questions if

2   counsel does not immediately file a motion for a protective

3   order over the objected to information."

4        He gave instructions.  The witness did not answer.  He

5   was required to file a motion in the next day or two to tell

6   the Court this is why I did this.  Unless he otherwise waives

7   the objections and we get to ask the questions again.

8        On the practical question, I think with Mr. Dominguez

9   we have covered the waterfront as to what questions I believe

10  were not answered with answers to which I deserve.

11       On Mr. Denis it is a little more nuanced.  I did get

12  answers.  I struggled through a series of long-speaking

13  objections that Mr. Hockman just repeated to you and I got some

14  answers on 3:00.

15       When it came to later in the deposition, the witness

16  thus coached, did not answer.  Page 207:

17       "A.  I am not going to answer that."

18       "Q.  Is there a reason you are not going to answer

19  that?"

20       "A.  I am not going to give an answer to an assumption

21  or something."

22       "Q.  Can you assume for a moment with me that it does

23  so, so you can answer the question?"

24       "A.  I'm sorry.  I am not."

25       MR. KOSLOWE:  That was Page 208 and on Page 210:

1          "Q.  What factors would the City consider?"

2          "A.  It is too hypothetical.  I can't answer that."

3          "Q.  Pardon me?"

4          "A.  That's too hypothetical.  I am not going to

5    answer it."

6          MR. KOSLOWE:  On Page 214:

7          "Q.  You told me what conditions make a deviation

8    material?"

9          "A.  I did.  I am not doing it."

10         "Q.  What are they?"

11         "A.  I already told you that."

12         "Q.  I am not hearing an objection from your counsel.

13   So you can go ahead and answer."

14         "Objection, you did.  He did answer the question."

15         "Q.  So in this deposition, I am going to find..."

16         MR. KOSLOWE:  Yada, yada, yada.

17         "Q.  Yes.  Okay.  You are refusing to answer this

18   question now that I posed to you?"

19         "A.  Yes."

20         MR. KOSLOWE:  So the witness understood the

21   instruction from counsel that if he decides he does not want to

22   answer a question because he thinks it was asked and answered,

23   or he thinks it is hypothetical, or he thinks that it is

24   speculative, or he thinks the form isn't good, and he does not

25   have to answer, that is not the law.

1          And if Mr. Hockman believed that was correct, his

2    obligation was to file a motion to preserve the objections if

3    he believed they were all taken.

4          He didn't so and they are waived and I should get

5    answers to those questions that weren't answered.

6          Thank you, Your Honor.

7          THE COURT:  Thank you.

8          I may as well turn to the motion to determine waiver

9    of privilege, which is briefed at Docket Entries 161, 166, and

10   168.  I do have some questions as it relates to the motion.

11         There are certain details that the Court wants to be

12   clear about.  First, there are a total of 184 documents at

13   issue that the parties are dispute whether Defendant waived

14   privilege or protection over.

15         Is that correct, 184 documents?

16         MR. KOSLOWE:  Yes, Your Honor.

17         THE COURT:  Page 184, Mr. Hockman?

18         MR. HOCKMAN:  The correct answer is, yes, but also no.

19         One of the things that has happened, Your Honor, as I

20   am going to explain during my piece is a lot of difficulty with

21   the ESI vendor, which I know you are already aware of that

22   plays a role here.

23         THE COURT:  Okay.

24         MR. HOCKMAN:  We are trying to solve that problem.

25         And with respect to the 182 plus 2 documents I think

1  the City Attorney and I agree that we should withdraw the

2  objections as to some of those and we have not had an

3  opportunity to do that.

4       So for now the Court could address whatever the

5  arguments are.  My understanding was he just wants to blanket

6  waiver everything and not so much about the 184.

7       And if the Court decides it wants to look at the 184

8  we can do that *in camera*.  So it is a little premature and that

9  is why I say it is also no.

10      THE COURT:  And the documents are listed by Bates

11 number in the letter that was filed at Docket Entry 161-1 and

12 two additional documents that were addressed during the Rafael

13 Paz deposition.

14      Is that correct?

15      MR. HOCKMAN:  That's correct, Your Honor.

16      MR. KOSLOWE:  Yes, Your Honor.

17      THE COURT:  Okay.  Are there Bates numbers for the two

18 documents addressed during Rafael Paz' deposition?

19      MR. KOSLOWE:  Yes, Your Honor.

20      And that is our Exhibit B, which is at 161-2.  We make

21 note of those there.

22      THE COURT:  Were all of the documents at issue first

23 produced to Plaintiff as part of production, volume MB-001?

24      MR. KOSLOWE:  Yes, Your Honor.

25      MR. HOCKMAN:  Yes, Your Honor.

1          MR. KOSLOWE:  Well, Your Honor, pardon me.

2          Yes and no.  There was a duplicate document that was

3  produced as part of a public records request.  If Your Honor

4  refers to 161-2, you will see a Bates number that has a Penrod

5  marker.

6          It is the last document that is Penrod 0139163.  It

7  has a Penrod marker because the City provided it in a public

8  records request.

9          And then they asked us to produce back to them all the

10  documents that we had gotten public records request and we did

11  so.  And that is why it has that marker, but the shorter answer

12  is yes.

13          THE COURT:  And what was the date -- I want to make

14  sure that I am clear.  What was of the date of production for

15  MB-001?

16          MR. KOSLOWE:  It was in March of 2024, Your Honor.

17          MR. HOCKMAN:  That's close enough, Your Honor.  I

18  don't remember the exact date, but it was March.

19          THE COURT:  March of 2024?

20          MR. KOSLOWE:  Yes, Your Honor.

21          THE COURT:  And approximately how many documents were

22  produced in that volume?

23          MR. KOSLOWE:  Approximately 57,000 documents, Your

24  Honor.

25          MR. HOCKMAN:  That's correct, Your Honor.

1          Plus or minus.  I can't remember the exact number.  I

2   believe it exceeded 57,000 by only a couple hundred.

3          THE COURT:  Okay.  Mr. Hockman, what date did

4   Defendant first realize that privilege or protected documents

5   might have been produced in MB-001?

6          MR. HOCKMAN:  The first week of January, Your Honor.

7          I do not have a precise date, but Mr. Koslowe called

8   me on a meet and confer to discuss the letter that I had sent.

9          THE COURT:  And that was 2024?

10         MR. HOCKMAN:  In 2025; May 1st of 2025, Your Honor.

11         Yes, that is the date of my letter.  It is

12   Document 161-1.

13         Mr. Paz' deposition was taken shortly after that.  And

14   then Mr. Koslowe and I spoke after Mr. Paz' deposition about

15   whether the City had essentially waived privilege for

16   everything because of the nature of the errors and other

17   problems that the Court has already heard about.

18         THE COURT:  And --

19         MR. KOSLOWE:  Your Honor, pardon me?

20         THE COURT:  Go ahead.

21         MR. KOSLOWE:  I assume we will --

22         THE COURT:  You will have time to --

23         MR. KOSLOWE:  Then I will be able to address it then.

24   Thank you.

25         THE COURT:  Okay.  What actions did Defendant then

1  take and when to determine whether privilege or protected

2  documents were produced, Mr. Hockman?

3        MR. HOCKMAN:  I immediately researched the issue

4  within our relativity database.

5        I reached out to our existing ESI vendor and said here

6  is what they are telling me.  I need you guys to go back to

7  MB-001 and explain to me what was done, when it was done, and

8  why.

9        At which point, I discovered that there was a major

10  problem with MB-001 as well as MB-002, even though in the first

11  week of March during my investigation into what happened with

12  MB-002, it was disclosed that there was a problem.

13        Can I walk you through this, Your Honor?  I realize

14  that I am into Mr. Koslowe's time.

15        MR. KOSLOWE:  Your Honor, as it is our motion, we have

16  a view of all of these facts and timeline, but Your Honor

17  will --

18        THE COURT:  Like I said, each side will have an

19  opportunity to present argument to the Court.  I am just trying

20  to get my --

21        MR. HOCKMAN:  And the answer to your question, Your

22  Honor, and I will basically summarize it and I will walk you

23  through that and I did investigate.

24        And at this point, I am in the process of terminating

25  the existing vendor and transitioning to a new one, which I

1   began on May 16th.  That was enough.

2         THE COURT:  So the first week of May is when you first

3   realized that documents might have been produced that were

4   protected and immediately thereafter within a week or so or am

5   I correct in saying that or --

6         MR. HOCKMAN:  It is a little more convoluted, Your

7   Honor.

8         THE COURT:  Okay.

9         MR. HOCKMAN:  We were preparing for Mr. Koslowe's

10  deposition and looking through our database of documents that

11  had been produced to the other side to see what they were going

12  to see.

13         And that is when we identified these 184 that appear

14  on -- 182 that appear on Document 161-1.

15         THE COURT:  Okay.

16         MR. HOCKMAN:  I then sent those to counsel and he

17  would have the letter that says I have to claw these back.

18  These appear to be attorney/client privilege.

19         I did not realize at the time that they had come from

20  MB-001.  I thought they had come from MB-002 or had been

21  inadvertently produced because of our managed review.  We did a

22  managed review with contract attorneys that don't work for my

23  firm.  I do not have staff to do that.

24         And with contract attorneys you never know what you

25  are going to get.  It is a little bit like a box of chocolates.

1    So I had thought, all right, it looks like some of them got

2    missed.  So I am going to put them on alert that these were

3    inadvertently produced.

4          And we went through the deposition and during the

5    deposition two more documents were shown to the witness that

6    were to me like they were clearly privileged and I clawed those

7    back in the middle of the deposition.  I hadn't seen them

8    before and they were not on my list.

9          Subsequent to that deposition, Mr. Koslowe spoke to me

10   and explained to me what he was looking at.  And I went back to

11   see exactly where all of these documents had come from and

12   discovered that it was not MB-002 and that it was MB-001.

13         And I said you've got to be kidding me.  Now I have a

14   problem with the first production?  How is that possible?

15         THE COURT:  So what was the date or at least the time

16   period when Defendant first realized that the privileged or

17   protected documents were produced in MB-001?

18         MR. HOCKMAN:  April 30th, I would say, Your Honor.

19         I created this letter -- well, you mean MB-001?  No,

20   that was not until -- when did we speak, Jason?  I forget.  It

21   was the day after Mr. Paz' deposition, which was like a day or

22   two after May 1st.  So I am going to say by May 5th, Your

23   Honor.

24         THE COURT:  Okay.  The briefing indicates that on

25   March 12th of 2025, Defendant made some sort of acknowledgment

1   that privilege or protected documents might have been produced.

2        Is that correct?  And what was communicated about

3   potentially privileged or protected documents and whether or

4   not it related to MB-001, MB-002, or both?

5        MR. HOCKMAN:  The March 12th communication, Your

6   Honor, was a summary of the information that I obtained from my

7   vendor concerning MB-002.

8        To refresh the Court's recollection of this, on

9   February 27th and 28th, I got an e-mail from one of Mr.

10  Koslowe's assistants advising me that they had been through

11  approximately 1.6 million documents and MB-002.

12       And it seemed like only 75 to 80 on the search terms,

13  which should have been impossible if things had gone the way

14  that I had expected them to as I will explain.  We, then, began

15  to research it.

16       And we discovered that our existing project manager,

17  according to my vendor, had suffered some kind of a mental

18  break health problem and this was not the only case that he had

19  made serious mistakes in.  I was simply a victim of

20  circumstance at that point.

21       Nobody was discussing MB-001 at that point except me

22  because I reached out to them and said, okay, we do not know

23  how long he has had this health issue.  I need you guys to go

24  back and check everything he did and make absolutely certain

25  that it was correct.

1           And by March 11th I was assured there were no problems

2   with MB-001 and we are okay there.  It was all MB-002.  And so

3   I sent the e-mail to Mr. Koslowe explaining what we discovered

4   with respect to MB-002.

5           And I did say that it looked like these guys had

6   produced things that supposedly hit on potentially privileged

7   terms suggesting that I may need to claw them back and that is

8   true and that was an accurate statement.

9           THE COURT:  Okay.  Thank you.

10          Mr. Koslowe, this is your motion.  So I will give you

11  an opportunity to make argument.

12          MR. KOSLOWE:  Thank you, Your Honor.

13          THE COURT:  And I have reviewed all of the briefing in

14  this case.

15          MR. KOSLOWE:  Okay.  Thank you, Your Honor.

16          This motion is to determine waiver of privilege by the

17  City.  There are two different bases for waiver here; one is

18  waiver by inadvertent disclosure.  The other is waiver by use

19  or act of disclosure.

20          And in both the burden is on the City as the party

21  claiming the privilege.  Under FRE 502 for inadvertent

22  disclosure the City must prove inadvertence.

23          It must prove precautions to avoid disclosure and it

24  must prove prompt rectification upon discovery.  That the

25  verbatim from the case law.

1           And then, finally, if waiver is not determined the
2    City must then prove the documents are privileged in the first
3    place.  That would be by *in camera* review.  That would happen
4    if Your Honor determines that there was not waiver by an
5    inadvertent disclosure.
6           The other path is that for 20 of the documents that is
7    at 161-2, those documents were actually used in deposition and
8    used in court.
9           So there was an additional waiver as to those 20
10   documents, which we do not believe are privileged in the first
11   place.  The City would need to prove it again both.
12          Now the City provides no response to waiver by use.
13   They do not tell you why the fact that the documents were used
14   in deposition and referred to and testified about used in court
15   that there should not be waiver, but we will deal with that
16   second, since the meat of the argument is waiver by inadvertent
17   disclosure.
18          And again, it is the City's burden to prove all four
19   of these elements.  We are going to focus on two and three and
20   we are not making an argument that this disclosure was
21   intentional.  By all indications it was inadvertent.
22          The question is can the City prove on its burden that
23   it took the precautions that are necessary to avoid disclosure
24   under the case law;
25          And two, can the City prove under the case law that it

1  took the actions for prompt rectification upon discovery and it

2  cannot.

3        And in order to explain that I think we have to walk

4  through some of the production process and the timeline in the

5  case and Your Honor will have seen some of this from prior

6  discussion.

7        What was supposed to happen?  The parties agreed that

8  the City would collect from certain agreed custodians and of

9  certain agreed date range.  There would then be a collection of

10 documents.

11       The City would then apply agreed search terms to limit

12 from that collection to the documents that were potentially

13 produced.  The City would then undertake a process to remove

14 potential privilege.  The City would then produce everything

15 else.

16       So what was the nature and scope of that agreement?

17 Plaintiff agreed that the City would collect from agreed

18 custodians and time.  Plaintiff agreed for responsiveness

19 search terms.

20       Plaintiff agreed that they would produce all hit

21 documents without reviewing for responsiveness.  Plaintiff did

22 not agree on the process that the City would apply to determine

23 the privilege.  That is on the City.  We have no idea what

24 process they used.

25       All we have are representations in a court filing that

1  a vendor applied certain search terms.  We asked, you know,

2  what were the search terms and how were they applied.

3       And the response was work product.  I am not taking

4  issue with that, but we have no idea what they did to determine

5  the privilege.  That is on them.

6       So what they were supposed to do was take this

7  collection, protect their privileged documents, and produce

8  everything else.  The agreement was they are not going to look

9  at the everything else to figure out if it is really relevant.

10 They are just going to produce it if it has search term hits.

11      Now when did this all take place?  What was the

12 timeline?  So what should have happened?  The City should have

13 developed a method to identify potentially privileged

14 documents.

15      The volume of potentially privileged documents should

16 have been a small fraction of the total responsive documents,

17 right?  These are e-mails.  These are files that city personnel

18 are working on.

19      Privileged documents, that is actual attorney/client

20 communications and work product, to be a very small portion of

21 that.  And even smaller because, again, here this is a

22 municipality with public records laws.

23      So the volume of privileged documents should have been

24 very small.  The City would then review those documents and if

25 any of them turn out not to be privileged, they would produce

1    them also.

2          What actually happened?  The City had a vendor, not

3    lawyers, that applied potential privileged search terms.  And

4    when they did that the vendor determined that 57,000 documents

5    were not potentially privileged and 50,000 were identified as

6    potentially privileged.  That is an absurd number.

7          The City then had managed review by contract attorneys

8    of those 50,000 and those managed reviewers said to the City,

9    hey, 47,000 of these 50,000 documents that you identified as

10   potentially privileged are not even responsive at all.

11         Then the City's reviewers said, well, 1,600 of these

12   documents are not privileged.  You should produce them.  But

13   you know what?  The City never produced them.

14         To date we have never gotten them.  We only found out

15   about this through conferral on this motion.  What is the

16   timeline here?

17         So Plaintiff requested documents in December of 2023.

18   The City collected the documents and had the vendor apply

19   privileged search terms in February or March of 2023.

20         And the first red flag pops up because when you have a

21   fifty percent return rate on potential privilege terms, you've

22   got to know something is wrong, right?

23         There is no way that the proper application of

24   potential privilege terms would result in fifty percent of the

25   collection being potentially privileged, but no one looked into

1    that at the time.

2           That is an absurd result and that told the City that

3    something is wrong with our privilege review that is being done

4    by a vendor and not by a lawyer.

5           The City then produced an MB-001; the 57,000

6    documents.  The City then engaged in managed review by contract

7    attorneys.  And those contract attorneys came back to the City

8    and said, hey, something is odd here because 95 percent of the

9    documents you told us to review for privilege do not even have

10   search term hits.

11          That is the second red flag to the City that something

12   was wrong with what the vendor was doing in the application of

13   the privileged terms to the file.

14          The City attorneys then told the vendor produce 1,600

15   documents, which the managed reviewers had said are not really

16   privileged, but that never happened.  That is red flag number

17   three.  Why is that red flag number three?

18          Because the way production happened, it does not just

19   come from the vendor or come from the managed contract

20   attorneys.  It comes from litigation counsel.

21          An e-mail or a letter goes out to litigation counsel

22   with documents.  They never produced those documents.  Red flag

23   number three something was amiss with privilege and production.

24          The City then produced MB-002 in October of 2024.

25   That is the 1.5 million documents.  In February of 2024,

1  Plaintiff identified to the City that there was a massive gap

2  in missing custodians.  We hadn't gotten anything from six or

3  seven custodians as custodians.

4         And this is a red flag because it is telling the City

5  something is wrong with the vendor.  But they said, no, we

6  solved this.  It was a one-off and we produced the documents.

7         In February, Plaintiff identifies to the City the fact

8  that MB-002 was a giant document dump.  No search term hits

9  there.

10        Meanwhile, documents that are produced in the normal

11 course in MB-001 are being used in the case.  They are filed on

12 the court docket.  They are used in depositions.  They are used

13 in arguments before the Court.

14        On March 12th of 2025, the City sends a letter

15 responding to the MB-002 problem.  Acknowledging that they

16 likely produced privileged material.  That is March 12th.

17        That is the five-alarm fire.  That is not just all the

18 other red flags that already should have told the City that

19 something was wrong with the production and something was wrong

20 with privilege.

21        THE COURT:  Now, when you received that letter on

22 March 12th of 2025, it referenced MB-002?

23        MR. KOSLOWE:  And 01, Your Honor.

24        THE COURT:  And 01?

25        MR. KOSLOWE:  Both; both, Your Honor, and I will get

1    to that in a moment.

2           But just to close the loop, they wait from there until

3    May 1st to send a claw-back letter.  For two to three months

4    the City does not do anything, right?

5           From March 12th when they say we probably produced

6    privileged material until May 1st, that is a gap from the

7    latest point in time when the City, not just should have known,

8    but acknowledged that they did know there was a problem with

9    the likely production of privileged material.

10          And Your Honor will recall in between that time we

11   were here in court and we were here in court arguing about

12   certification of production.

13          And one of the things Your Honor said was, hey, you

14   know this was not malice because they produced privileged

15   material, right?  And they say yes and we said yes.

16          So this was not just sort of hidden in the background

17   of the case.  It was in court being discussed the fact that

18   they knew that they had produced privilege material.

19          So what does this mean?  Again, two things the City

20   needs to prove; that they had reasonable precautions to avoid

21   disclosure and that they did the right thing right away

22   afterwards.

23          So, on the first, the City cannot prove that they took

24   reasonable precautions to avoid disclosure.

25          Under the case law when you do not have lawyer review

1   that is not reasonable.  Here they did not have lawyers look at

2   anything on the potential privilege side.  They applied through

3   the vendor search terms.  They have not provided any case law

4   in response to this.

5          Two, whatever the vendor did was obviously incompetent

6   and I say obviously because that is what they say.  In response

7   the City says we, the Plaintiff, should have known that the

8   material provided was privileged because it included for -- I

9   will give you a concrete example.

10          They say that it included invoices from the Weiss

11   Serota law firm.  Now, candidly, I have never seen those

12   because it would not have come up on the search that I was

13   doing to prepare for a deposition, right?

14          But if the search terms that were applied were so bad

15   that I should have known, and they were so bad that they were

16   not competent in the first place.  So that is not a reasonable

17   precaution to avoid a disclosure of the privilege.

18          Then they have two red flags of a vendor incompetence

19   about the privilege search term methods.  The first is that

20   fifty percent of the collection -- 50,000 out of 107,000

21   documents -- were marked as potentially privileged.

22          That is a red flag.  That cannot happen unless

23   something is wrong.  You cannot have half a collection be

24   potentially privileged.  Especially when you are a municipality

25   with public records disclosure requirements.

1          By the way, they are producing hundreds of thousands

2    of documents with City attorneys on them.  It is not like they

3    just mark and give me all the attorneys and put them aside.

4    They are producing City attorney material.  They know that is

5    not all privileged.

6          So when you get a search result of fifty percent,

7    50,000 documents that are potentially privileged, something is

8    wrong.  That is when they should have known that something was

9    wrong with the privilege review which, anyway, isn't proper

10   because it is all being done by a vendor and not by a lawyer.

11         And the second red flag of incompetence is that when

12   they did the manage review in June or July, the manage review

13   by the contract attorneys said, hey, you've got a problem here.

14         I am not sure they said it in that way.  I am not

15   privy to that conversation, but I did see the e-mail where they

16   said 95 percent of the documents marked as potentially

17   privileged are not even responsive.

18         So all the way back in March, and in June, and in July

19   of 2024 the City should have known that there was something

20   wrong with privilege review.

21         So contrary to what the City says in its response,

22   this is not where 184 documents slip through normal review by

23   lawyers.  No lawyers reviewed.  It was only incompetent vendor

24   search terms.  That is not reasonable steps under the law.

25         And with that really it is done.  There is waiver.

1   But the City also did not take prompt or proper steps after

2   discovery.  Here are the red flags:

3            Incompetent vendor, privilege review we sought in

4   February/March of 2024;

5            Failure to produce non privileged documents, July of

6   2024;

7            Failure to produce from agreed custodians, December of

8   2024;

9            Use of documents, which they thought upon review, were

10  privileged in part in depositions by February of 2025.

11           We then told them, hey, you've got a massive error in

12  February of 2025.

13           Then in March they admit error.  They admit they

14  produced privileged material and they admit the need to do a

15  claw-back.  And when I say they admit it, Your Honor asked was

16  it just about MB-001, or MB-002, or both.

17           And what they said was, hey, this log, we are focusing

18  on the privilege log of 400,000 documents, which they had said

19  they withheld as privileged, right?

20           We determined they already have nearly all of them,

21  but the vendor does not believe that you could have known that,

22  right, because of the problems with the production; 5,700 were

23  produced in MB-001, 360 were produced in '02 and 3,200 were not

24  produced.

25           So this problem occurred across the entirety of the

1   production and then they write, it turns out that the rough log

2   we provided was largely not withheld at all.  We need to

3   examine whether to claw that back.

4          March 12th the City knows.  We potentially produced

5   privileged documents.  We know about it.  Not that we should

6   have known about it from all the red flags, but we actually

7   know and we acknowledge it and we have to think about

8   claw-back.

9          What does the case law say?  The case law says

10  promptly; seven days, eight weeks, one month.

11         Fifteen months from the red flags about the vendor

12  incompetence;

13         Ten months from the red flags of the failure to

14  produce;

15         Five months from failure to produce agreed custodians;

16         Three months from when we used it in court and at

17  depositions;

18         Three months from when we were told about the vendor

19  error;

20         Two months after they admitted that they likely

21  produced privileged material and needed to claw-back.

22         The governing case law is over abundantly clear.

23  Quote, almost a two-month delay, that is waiver.  We are done.

24  They did not do what they were supposed to do to address

25  claw-back.

1              Now, it is not just that the City waits until May 1st

2      to attempt claw-back -- and by the way, when Your Honor looks

3      at 161-1 you will notice something curious.

4              In the claw-back letter the City refers to the Court's

5      confidentiality order and they say we are clawing back pursuant

6      to the Court's confidentiality order from February 3rd, ECF

7      110.   That document is not a claw-back order.

8              Experienced counsel knows what a claw-back order looks

9      like.   The parties negotiated that stipulated order and asked

10     the Court to enter it.

11             That is only about confidentiality and it provides

12     that if you inadvertently don't mark a document as

13     confidential, then you can mark it as confidential later.

14             It does not say anything about the privilege and they

15     know that.   Yet, they send it out, a letter, saying, hey, we've

16     got to claw this back under an order we know it does not cover.

17             Why?   Because under Rule 502(d) you could have an

18     agreement for how you deal with these things.   And now we are

19     governed under the default law that we are discussing here.

20             So they are trying to slip in under an order that does

21     not exist.   But, in any event, they don't just wait until

22     May 1st to attempt a claw-back.   They never undertake a

23     complete privilege review by lawyers.   Still, to date, we have

24     not seen that been done.

25             Instead, they wait until one or two days before a

1   deposition and in preparing for that deposition to figure out

2   if any of the documents to be discussed might be privileged.

3          And I just want to pause there for a second.  What

4   could the City have done, right?  What could the City have done

5   if they had determined on March 12th we may have produced

6   privileged documents?

7          Take the same search terms they created in the first

8   place and apply them against the 75,000 documents that have

9   been produced.  And anything that hits, say, we would like to

10   claw this back for the time being because we have a problem

11   here, or they could have had contract reviewers review them,

12   right?

13          I understand there are expenses involved, but the case

14   law says prompt rectification.  Right away do something about

15   it.  They did nothing.  They did not do the review.

16          They waited until the day before a deposition, two

17   days before a deposition while doing deposition preparation, to

18   say some of these documents, which may be with the witness, we

19   are going to claw them back now.

20          And even that process is facially incomplete because

21   the City was clawing back documents with the same exact

22   material in them during the deposition.  And they were allowing

23   selectively testimony about the same topics that were in the

24   documents they clawed back.

25          So that is not a proper process for determining and

1   protecting the privilege.  I would like to also pause for a

2   second.

3          Actually, I will address them in order because it is

4   not just that the City did not take prompt or proper steps

5   after acknowledging the disclosure of privileged material.

6          It is that their response is to accuse us of

7   misconduct.  That is what their response says, right?  That

8   they should not be punished for waiving the privilege because

9   we should have known that the privilege was waived.

10         Well, first of all, they do not cite a single case

11  saying that because there is none.  The case law they cite says

12  exactly the opposite.  There is no independent obligation on

13  the receiving party to search and identify records as

14  privileged.

15         Their accusations are also flagrantly unsupported.

16  What they say is, hey, all of these things are so plainly

17  privileged you should have realized, but you attempted to sneak

18  them in anyway.  That is not true.  We did not find anything

19  that we thought was privileged.

20         The documents that they say are plainly privileged are

21  obviously privileged, such as documents that say privilege in

22  the subject matter of the e-mail, or an invoice from a law

23  firm.

24         Those were not reviewed by our team because they did

25  not have content in them that mattered for preparation for case

1  material or for deposition.  So we did not use them, right?

2          The documents we did attempt to use were documents we

3  did not think were privileged in the first place.  So what we

4  did was review material in the normal course and then use them

5  in the case.

6          So taking a step back to where we started, it is the

7  City's obligation to prove three things in order to avoid

8  waiver by inadvertent disclosure.

9          They have to prove they took reasonable precautions.

10 We have proven they did not because they did not have a lawyer

11 review.  They had vendor review and there are red flags along

12 the whole way showing the process was defective.

13         Three, they needed to rectify the problem by

14 attempting claw-back right away.  Promptly is what the case law

15 says.  The case law is clear within a couple of weeks; within a

16 month.  Waiting two to three months to do anything, or waiting

17 for us to use the material, that is improper.  That is waiver.

18         If the Court is not inclined to find waiver, the

19 required process under Rule 26 is *in camera* review of the

20 balance of the documents.

21         We have not afforded the Court that opportunity yet

22 because we believe that waiver is the proper path.  If the

23 Court wants *in camera* review we will provide the Court

24 documents.  We would ask then to provide bullet point briefing

25 on the concepts the Court would apply.

1     We are at a disadvantage because when they signaled

2  claw-back, we sequestered the documents as we were supposed to.

3  So I have not looked at that material to determine -- aside

4  from the material that we already knew about and were already

5  using, which I now cannot look at because it is sequestered,

6  but I remember what it was.

7     I do not know the balance of the material if it is

8  actually privileged or not.  We would have to deal with that

9  *in camera* review.

10     Now, a totally separate basis for waiver is that these

11  documents were used in the case, right?  When I say used in the

12  case, I mean, introduced at deposition.  Testimony about the

13  content.  Follow the docket in the case.

14     We listed out 20 documents that were used in the case.

15  That is not inadvertent disclosure.  That is waiver by stopping

16  -- part of that is waiver by not acting to protect the

17  privilege when a privileged document is actively disclosed or

18  used.

19     We have seen no response to that.  So those documents

20  are additionally waived for that reason.

21     I believe in walking through that process, I have

22  answered all of the Court's questions about the timeline about

23  when the City knew or should have known about inadvertent

24  disclosure.  When it admitted it was inadvertent disclosure and

25  their timeline for doing something about it.

1              And the basic answer to the question is they should

2     have known back in early or mid 2024 that the process, which is

3     legally deficient to have no lawyers look at it, but just to

4     have a vendor apply terms, they should have known that process

5     was defective.

6              They knew about it and admitted it on March 12th of

7     2025 and they have never done anything, which is what they are

8     supposed to do is a complete review or some sort of process to

9     determine the waiver of the privilege.  And for sure they

10    waited two or three months until May 1st in order to assert

11    claw-back.

12             I believe that answers all of Your Honor's questions

13    and I will reserve some time for reply.

14             Thank you.

15             THE COURT:  Thank you.

16             Mr. Hockman, response.

17             MR. HOCKMAN:  Thank you very much, Your Honor.

18             With all due respect to Mr. Koslowe, I am neither

19    clairvoyant nor do I have the benefit of hindsight at the time

20    that these things were occurring.

21             I think that Mr. Koslowe missed a significant point by

22    starting in the middle of what happened.  We all served

23    discovery in December of 2023.

24             I immediately objected to their discovery because it

25    was so overbroad.  They basically wanted me to search every

1    employee, every department, every aspect of the City to find

2    documents responsive to pretty much anything that could

3    possibly include Nikki Beach or Boucher Brothers.

4              And I said there is no way I am doing that.  Let's

5    have a meet and confer.  So in January we had a meet and

6    confer.

7              And I said to his partner, Miss Fehretdinov, I cannot

8    do this.  You are asking for over 20 custodians and not to

9    mention every single department in the City.  You are going to

10   end up with millions and millions and millions and millions and

11   millions of documents and that is just simply not proportional

12   to the needs of this case.

13             And I thought that we had agreed on a set of eleven

14   custodians that I would go and pull these things off of because

15   they are going to be the leaders of the City and they will be

16   cc'd on everything and for the most part they are going to get

17   what they need.

18             And if they are missing something, great, we will go

19   back and we will followup with the other people and we will

20   collect from them later on.

21             Subsequent to that, I discovered that they did not

22   want that deal at all.  They wanted me to search all custodians

23   and all records and everything else.  So I had a discussion

24   with Mr. Koslowe and we decide on a particular plan.

25             If I may, Your Honor?  I would like to go over to the

1    board.  I realize that I may not be picked up by the

2    microphones.

3            THE COURT:  Well, that is going to be an issue if you

4    are not being picked up by the microphone.  So maybe you can

5    use the microphone at the table.

6            MR. HOCKMAN:  Maybe.  Let's try that.  I do not want

7    this to be -- does that microphone work, Your Honor?

8            THE COURT:  No, it does not.

9            MR. HOCKMAN:  The plan, Your Honor, was we are going

10   to collect from custodians from a particular date range.  That

11   date range was January 1st of 2021, I believe it was, up

12   through the date of the response.  That was done.  We did that.

13           The next thing that was going to happen is exactly

14   what Mr. Koslowe told you.  We would apply their agreed search

15   terms.  Now keep in mind that among those search terms were

16   Nikki Beach, Penrod Brothers, and the Boucher Brothers.  These

17   are all entities that have contracts with the City of varying

18   kinds.

19           You are going to pick up communications concerning the

20   concession agreements for other beach operations.  You are

21   going to pick up communications concerning Nikki Beach's

22   payments to the City over time in the form of rent because they

23   have a lease.

24           You are going to pick up communications concerning

25   modifications to these agreements.  You are going to pick up

1  all kinds of stuff.

2          And so we would then say, fine, we are then going to

3  apply the application of search terms.  I am going to keep

4  those.  You can have everything else.  That is exactly what

5  Mr. Koslowe said.

6          Why would I do something like that?  Because we are

7  under the Public Records Act in the City of Miami Beach.  It is

8  a major hurdle for litigation attorneys to overcome because

9  unless litigation is actually in place there is no privilege.

10 So I cannot hold those back.

11          So we said, all right, when is the litigation

12 anticipated, reasonably anticipated, and we just settled on a

13 date with the Court and the case was filed.  It was probably a

14 little bit sooner around May 5th of 2023.

15          So what we did was we said you can then have anything

16 that does not have those privilege search terms.  I am not

17 going to review those because I do not know if they are

18 responsive or not.

19          They said fine and the rest is going to go through

20 attorney review and search result.  Whatever comes out of that,

21 that is not privileged, you can have it.

22          This was 107,000 for MB-001 and 1.57 million for

23 MB-002.  That is a tremendous volume of information, Your

24 Honor; huge.

25          What I did not know, and did not know until we

1    discussed this at the end of the first week of May, was that my

2    vendor did not do it right.  Here's what they did.  Let's talk

3    about MB-001 first.

4          Collect from custodians from the date range 107,000

5    documents for the first eleven custodians because that is what

6    I thought I was supposed to be collecting for and not the whole

7    batch.

8          Application of agreed search terms 57,000 documents.

9    It went straight out because we thought they had applied the

10   privilege search terms to get to them.  They didn't.

11         Instead, they applied it to the 107,000.  We kicked

12   them out and then they separately applied the privilege search

13   terms to that and we ended up with 49,900.  That is how that

14   happened.

15         I had no clue.  All I know was that the discovery was

16   tremendously over broad.  This was not out of the realm of

17   possibility at all.

18         So what then happens is I pay for an attorney review

19   of nearly 50,000 documents that I did not need to pay for

20   believing in good faith that they had done exactly what I had

21   asked them to do.  They did not.

22         Was it a red flag in hindsight?  Yeah, it was.  Not at

23   the time.  It made perfect sense considering everything that

24   they were asking for.

25         So we ended up with 46,000 unresponsive documents.  He

 1  is not wrong about that.  I also did not fully realize that at

 2  the time.  I said, well, there is going to be a lot of garbage

 3  in there because we are not reviewing.

 4       We are just looking for all these hugely broad search

 5  terms that I do not want to fight about.  Here you go.  You can

 6  have it.  It is public record.  It is not a big deal.

 7       The rest there were about 1,600; a little more than

 8  1,600 that were flagged as responsive, not privileged.  So in

 9  July I did exactly what Mr. Koslowe said.  I told them, all

10  right, that needs to be produced to the other side.

11       They said, yes, we will take care of that.  They did

12  not.  I did not know that.  They never said to me we did not

13  get around to it.

14       All I knew was discovery was paused during this period

15  of time, Your Honor, which we also keep overlooking.  Nobody

16  was doing anything but me trying to get through all these

17  documents.

18       And so I did not know that they did not do what they

19  were supposed to do.  They were supposed to kick that out the

20  door.

21       Discovery then resumes in August and I say, okay,

22  let's process the rest of the custodians because we have been

23  collecting from them all this time; April, May, June, July.

24       And they do that and you know the story on MB-002,

25  Your Honor.  MB-002 suffered from a different problem.  This

1  time when we collected 1.6 million documents from the remaining

2  custodians -- again, 1.6 million in a case like this, that is

3  huge.

4          The reason for that is because of the agreed search

5  terms that was ridiculously overbroad, but I do not like

6  discovery disputes and I did not want to challenge it.  Fine,

7  if you want all that information and you want to go through all

8  of that, you can have it.  What do I care?

9          But, once again, my vendor did not do it right.  And

10 we had no idea that they did not do it right and neither did

11 they until they brought it to my attention in December and

12 said, hey, we are missing some key custodians.  Okay.  Maybe

13 it's just an oversight.

14         Part of the problem that I thought was occurring, Your

15 Honor, was this discovery pause that I mistakenly agreed to in

16 February/March to say let's give the Court an opportunity to

17 review on the motion to dismiss the fourth amended complaint.

18 We are now on the fifth amended complaint.

19         And the parties all agreed that before we spend a ton

20 of money, let's see if we can, you know, narrow the case

21 somehow.  If the Court will narrow the case, but that did not

22 happen.  So we ended up having to do all the production for

23 everything.

24         And in that process things get lost in translation.

25 We paused things.  At one point I even took all the data

1    completely off-line to stop paying the per gigabyte charge.

2          But when we fired it all back up, I said, okay, finish

3    processing MB-002.  I want you to apply the search terms.  I

4    want you to apply the privilege terms.  We are going to do

5    manage review of whatever comes out of the privilege terms and

6    we are going to give them the rest.  Same as we did in MB-001.

7          I then get told there is 397,000 and change of

8    documents in the privilege production.  I went, no way, there

9    is no way I can afford or make the City pay to review that much

10   volume.

11         And I had the discussion with them and, you know, this

12   is the time when they said, oh, well, we agreed that you did

13   not have to review all of it for responsiveness, but of course

14   you have to review all of it for privilege.

15         And I said how is that even remotely proportional to

16   the needs of this case that I should have to pay for managed

17   review by contract attorneys of 400,000 potentially privileged

18   documents not even realizing that there was a problem with what

19   they had done.

20         And so that discussion went on into November and it

21   got kind of dropped.  In December I get told, as you know, Your

22   Honor, that we had a problem with some of the custodians not

23   being processed and took care of that.  It became MB-003.

24         It was not until February 27th, just a few months ago,

25   that I get told, oh, by the way, it looks like there is a

1  problem with MB-002.  We are not finding anything.  There is

2  like 75 responsive documents.  Okay.  So what is going on?

3       So I get into the discussion with the vendor in the

4  very first week of March.  What happened?  And this is the

5  first time that they disclosed to me that the existing project

6  manager had a mental health problem and he has effected several

7  cases.

8       It turns out that mine is one of them.  They had not

9  told me this before.  I just didn't know.  They may have

10 mentioned it after the December issue, but by that time we did

11 not understand just how bad MB-002 was.

12      When I said 5,718 documents in that e-mail to Mr.

13 Koslowe, Your Honor, that was a typo.  I was referring to the

14 57,000 that we had produced as part of MB-001.  I did not know

15 that there was anything privileged produced as part of MB-001

16 at that time.

17      That typo, for some reason, has persisted throughout

18 this case.  And I keep saying why does it say 5700?  It is

19 57,000.  In fact, my vendor now tells me that there are

20 actually 11,000; more than 11,000 potentially privileged

21 documents in the 57,000 that we produced.

22      And I did not know that until the second week of May

23 and Mr. Koslowe knows that because I told him.

24      THE COURT:  And now just for clarification referencing

25 the March 12th, 2025, letter, do you acknowledge that privilege

1  or protected documents might have been produced as part of

2  MB-001, as well as 002?

3          MR. HOCKMAN:  No, Your Honor.

4          When I said MB-001 referring to that, I was unaware of

5  any issues with it at the time.  What I said was we gave you

6  57,180 is what the number should have been.

7          We were not discussing MB-001 at that time.  The only

8  thing that they had raised to me was MB-002 on February 27th or

9  28th.  I don't remember.

10         Yes, my e-mail probably says 5,718.  I looked at it.

11 That is what it says, but that is wrong.  It is 57,000.  We

12 never produced documents from the potentially privileged set,

13 as I explained, despite my instruction.

14         It should have been 1600.  I had been reviewing those

15 since, Your Honor, going through them myself because of all the

16 problems.

17         THE COURT:  I am just asking has this March 12th, 2025

18 communication been filed as part of any of the --

19         MR. HOCKMAN:  No, Your Honor.

20         THE COURT:  No?

21         MR. HOCKMAN:  It has been part of our meet and confer

22 and we agreed not to share that stuff.

23         THE COURT:  Okay.  Understood.

24         MR. HOCKMAN:  I do not mind that Mr. Koslowe quoted it

25 to you, but I should have an opportunity to correct that

1  representation because nobody had said there was a problem with

2  MB-001.

3           The first time we had a problem with MB-001 -- and I

4  put this in my declaration to the Court, Your Honor -- was when

5  they told me that the set had a missing from field.

6           And that was not until March or April.  I forget the

7  exact dates practice.  So we corrected that and we gave them

8  the overlay of file to fix that problem.

9           It later turned out -- and I did not find this out

10 until the second week of May and I told Mr. Koslowe this as

11 well -- that apparently the privilege terms in MB-001 had even

12 worse only been applied to the from field and not to the to,

13 not to the cc and not to the bcc.  None of it.  Epic fail; epic

14 fail.

15          And so, here I am, not only having to terminate this

16 vendor who I trusted, but the errors are being weaponized

17 against me.  That is what is happening.

18          I am scrambling.  The volume here is incredible.  I

19 understand that our deadline for discovery is coming up, but a

20 waiver of privilege?

21          Your Honor, I think we are a little bit off on what

22 the standard is here.  Now I think that when we entered into

23 our protective order, when we said confidential information the

24 intent was to cover everything.

25          Otherwise, if you read it that way it only applies to

them and it has nothing to do with the City.  We don't have any
confidential information except for privilege.

So how is that an order that works both ways?  If it
is their construction it does not, but who cares?  We still
have the Rule 502.

And I think, I am going to submit, Your Honor, that
the framework for analysis is *Absolute Activist Value Master
Fund Limited v. Devine.*  We cited this to you:

"The proper standard of review here is the
reasonableness of the precautions to prevent inadvertent
disclosure."

As I showed you, I tried to set up a system that would
balance the incredible amount of information they wanted
against my need to keep the costs low and proportional to the
case.

That is what was supposed to happen.  That was my
instruction.  Nobody disputes it.  Mr. Koslowe tells you this
is what was supposed to happen and it is exactly what I told
you.

The time taken to rectify the error.  Your Honor,
there are 2.2 million documents in my database; 2.2 million.
And they want me to review 400,000 documents for privilege when
it appears to me that not even one of them is responsive based
on what happened with MB-002.

That is the first question.  Are they even responsive

1  before I get to the privilege review.

2          The scope of discovery is insane.  I have done

3  everything in my power to limit it to try to avoid being in

4  front of you arguing over discovery.

5          I hate this process.  I don't understand why we cannot

6  just work it out and people can get what they need and move on,

7  but this case has not been like that at all.

8          The extent of the disclosure.  Your Honor, because of

9  the vastness of my vendor's mistakes -- and again, I am

10  replacing them.  I am done.  That is it.  They have lost my

11  trust.  I do not trust them and I think that that is a very

12  important point for me to make to you.

13          Because I do not trust them, how can I trust them to

14  re-do this entire case?  How can I trust them to re-review

15  MB-001 and get it right?  How can I trust them to review MB-002

16  and get it right?  I cannot.

17          In order to bring the new vendor on -- and I hired

18  them on May 16th, Your Honor.  I am not delaying.  I am moving,

19  but they still want discovery.

20          We are still trying to get devices from our elected

21  officials as you ordered.  That process has been challenging,

22  but we are doing it.

23          And I have to do it through them because if I have to

24  wait to get my new vendor on board, then I am just going to

25  delay.  We are not doing that.  They are still on this case.

1  They are still collecting documents and I am watching them like

2  a Hawk.

3          I do not really have the time and bandwidth to do

4  that, but that is what I am doing because I know what happened

5  and I know how serious it is and I am trying everything in my

6  power to fix it.  I really am.

7          But I cannot trust them and I can't and I won't.  And

8  so what I am trying to do is get something called an ARM.  I

9  forget exactly what that stands for.

10         But it basically means all the data, all the searches,

11 and all the everything that my previous vendor did onto the

12 hard-drives to my new vendor so they can backtrack and figure

13 out just how badly this got screwed up.  Just how bad the scope

14 is of this disclosure or not.

15         I just do not know, but I am trying.  I am trying.

16 And the reason why we are doing and I have every witness, Your

17 Honor, is because that is the most efficient way to say here

18 are the documents that have been disclosed that we want to claw

19 back in advance of the deposition without delaying the

20 deposition to say I've got to re-do MB-001 and I've got to

21 re-do MB-002.

22         And in my mind that is reasonable and it is fair and

23 that is the fifth part of the standard of *Absolute Activist*

24 *Value Master Fund Limited v. Devine;* the overriding issue of

25 fairness.

74

1          The City's document review is reasonable and

2     professional at least as I planned it.  There were millions of

3     documents.  I have been asked to produce incredibly overbroad

4     discovery and I have done so to avoid this kind of dispute.

5          My vendor screwed it up and I am dealing with the

6     consequences.  That is where we are.  This is not a case of

7     under production, Your Honor.  It is a case of over production.

8     Where is the prejudice?  What is it they feel that they don't

9     have that they wanted?

10          The Plaintiff has more than 65,000 documents to hit on

11     search terms.  That does not include whatever the City Clerk

12     gave them in response to 38 public records requests outside of

13     discovery.

14          Mistakes are going to happen.  He points to something

15     they produced in response to a public records request.  I don't

16     know what is in that.  How could I?  The City produced it and I

17     was not involved.  They have their own attorneys.

18          Conversely, Your Honor, I have about 7500 documents,

19     but without application, as to turns out, of the agreed terms.

20     We have met and conferred and it appears that we are going to

21     have a discussion about that with you shortly, but that is for

22     another day.

23          The demonstrative reinforces the City's accuracy and

24     diligence.  We tried, Your Honor, to do this the right way

25     without creating a discovery dispute.  There is no

1  gamesmanship, Your Honor.  This is just a technical correction

2  of an error.

3          The Plaintiff seems to think that I should have been

4  able to realize, in light of everything that I've got going on,

5  that the vendor made a mistake all the way back then, despite

6  the overbreadth of their discovery.  That is just not possible.

7  It is not possible.

8          Your Honor, I also want to talk about Exhibit B to

9  their motion because when I reviewed this to prepare for today,

10 I noticed that a lot of these things are actually attachments;

11 what we call panoply to the privileged communication.

12         So you may have, for example, somebody in these

13 procurement offices sending a draft of an RFP term to a City

14 attorney and asking for review.

15         Is the draft privileged?  No, it was created by the

16 procurement office.  Not by a lawyer.  It is not work product,

17 but asking an attorney for review is.

18         Do I care if he uses the draft in deposition?  No.  I

19 care if he uses the actual communication to and from the

20 attorney because that was seeking legal advice.

21         And the one that really drew my attention, right in

22 the middle of Mr. Paz' deposition, was a communication from

23 former Mayor Dan Gelber to Rafael Paz with a long list of

24 things that he wanted to do asking Mr. Paz' advice.

25         And the communication that Mr. Paz is being shown his

1  advice appeared.  How could they miss that?  How could they not

2  tell me that this may have been inadvertently produced?  How is

3  that possible?

4         So I clawed it back.  And he said but we used this

5  already.  We put this in a court file.  Okay.  Which one?  He

6  looks and says, oh, no, it is only the communication from the

7  Mayor to Mr. Paz that we used.

8         All right.  I won't claim privilege over that then

9  because it was used and I did not catch it.  Fine.  But I am

10  absolutely claiming privilege over the other one.  I have never

11  seen this before.

12         How did I not get a notice of inadvertent production

13  when they were preparing for Mr. Paz' deposition and looking at

14  documents like that?

15         I could have been put on notice sooner than I was.

16  Instead, I get surprised.  How is that fair?

17         Like I said, Your Honor, any other motion -- this case

18  is the most litigious I have ever fought.  And now my vendor's

19  errors, which are none of my own fault, are being weaponized

20  against me and the City.

21         The case is not about me.  The case is not about my

22  vendor.  The case about a dispute between Penrod and the City

23  and to find a waiver of attorney/client privilege and work

24  product?

25         Under these circumstances, I suggest that that would

1   be a nuclear option.

2          Thank you, Your Honor.

3          THE COURT:  Thank you.

4          MR. KOSLOWE:  May I, Your Honor?

5          THE COURT:  Very briefly.

6          MR. KOSLOWE:  A significant portion of the

7   presentation made by opposing counsel is inaccurate and

8   intentionally misrepresentative.

9          And I am saying that on purpose; inaccurate and

10  intentionally misrepresentative.

11         We have heard discussion here about millions and

12  millions of documents under review.  None of that is accurate.

13  The reason why they had a collection of two million documents

14  and 1.5 to produce was because of their error.

15         Not because of our search terms, right?  There are

16  only 75,000 documents that they provided to us in this case.

17  That is it.  That is a reasonable manageable number of

18  documents to review.

19         Everything about all of the discussion about the

20  numbers here is totally inaccurate and he knows it; they know

21  it, right?

22         He wasn't asked -- counsel wasn't asked -- the vendor

23  was not asked to review millions of documents.  Their errors

24  led them to believe that.  It is not about our search terms.

25  It is not about anything that we did.

1              The Court has a singular focus here, right?  Mistakes

2    happen.  Rule 502 says when mistakes happen here is what you

3    do.  Here is your burden to avoid waiver of the privilege.

4    You've got to do three things:

5              It has to be by mistake.  Fine.  Assuming it is

6    mistake.  You have to have reasonable steps and you have to

7    promptly rectify it and they have admitted that they did not do

8    any of that.

9              Because the case law says reasonable steps require

10   attorney input.  They admit they did not have that.  They felt

11   they did not need to have it because it was not reasonable

12   because the volume was too large, but the volume was not too

13   large.

14             They just did not do the review.  On the initial

15   review of 50,000 documents for managed review, right, that was

16   not too large a volume.

17             For 100,000 documents doing review was not too large a

18   volume.  They just did not have attorneys do it.  The reason

19   why we agreed for attorneys not to review for responsiveness

20   was to allow production without challenge.

21             Mr. Hockman is correct about that, Your Honor.  We

22   agreed that they would not have to review documents for

23   responsiveness.

24             So if there is an e-mail from a city employee saying

25   I'm going to Penrod tonight, or I am going to Nikki Beach, or

79

whatever, that might be tagged for production even though it is

not relevant.  And they are not going to review that and that

is on us to review, that has nothing to do with privilege

review.

There was no agreement on privilege search terms.

There was no agreement on privilege process.  There was no

agreement on who was going to review.  That is on them.  They

decided to have their vendor do it.

And then, two massive red flags go up and I do not

hear a response from the other side on how they could have

missed it.

They say, well, in retrospect fifty percent return, I

guess we should have seen something.  In retrospect when our

manage reviewer says 95 percent of the documents don't have

search term hits.

Not aren't responsive.  Not aren't relevant.  Don't

have search term hits.  How anyone could have thought that the

privilege review process is fine.

So the process -- and by the way, I am still getting

argument here saying that Mr. Koslowe was wrong.  His team was

wrong.  He should have known that these were privileged.

With all respect, if we should have known -- we the

receiving party -- if we should have known this was a

privileged document, then the process they ran to identify

potential privilege was necessarily incompetent and they are

1 admitting it was incompetent.

2          So they had a vendor and not lawyers do an incompetent

3 process that produced at least two red flags at the time.  That

4 is not a reasonable process with reasonable steps.

5          I have seen no competent argument to opposing that and

6 I have seen no case law opposing that.

7          In terms of prompt rectification, I will read to you

8 from that e-mail, Your Honor.  And again, we have not produced

9 that into the record because that, as it were, is a gentle

10 person's agreement to not producing, you know, meet and confer

11 e-mails.

12          But this is what they write about the rough privilege

13 log.  There are 398,984 documents identified as potential

14 review.  Breakdown of the 398,984.  Assuming a typo; 57,180

15 were produced in MB-001.

16          That representation is we gave you a log of

17 potentially privileged documents.  Documents ostensibly that

18 hit on potential privilege terms and 57,000 were produced in

19 MB-001.

20          And then they write, at the end of the e-mail, the

21 rough log we gave you was largely produced.  We have to do

22 claw-back.

23          So they have been given time and time again problems

24 with their production.  Problems with their privilege review.

25 And they are acknowledging -- March 12th they are acknowledging

1   we have a problem here, Your Honor.

2           MR. HOCKMAN:  Your Honor, I have to make an objection.

3           Mr. Koslowe is referring to the rough log in

4   connection with --

5           THE COURT:  I'm sorry.  Please speak into the

6   microphone.  I cannot hear you.

7           MR. HOCKMAN:  Mr. Koslowe is referring to the rough

8   log, which I produced as a courtesy to them in an effort to

9   resolve another issue.

10          That rough log was only for MB-001 and only as to the

11  400,000 after I objected to reviewing them.  It had nothing to

12  do with MB-001.  We did not produce a log and we did not have

13  to because it was all after litigation began.

14          THE COURT:  Just move on, please, Mr. Koslowe.

15          MR. KOSLOWE:  Yes, Your Honor.

16          Opposing counsel wrote a letter on March 12th and said

17  we acknowledge that we likely produced privileged material and

18  we have to claw back.

19          And then they came to this Court, Your Honor, and they

20  asked Your Honor to issue a ruling regarding certifying

21  completion of production to say trust us.  You do not need to

22  do any of that.

23          And one of the arguments that they made was we did not

24  do anything wrong because we produced privileged material and

25  Your Honor said that from the bench.

1       Your Honor said one of the reasons why we know they

2   did not do anything with malice, there was no bad faith.   It

3   was because they are acknowledging that they produced

4   privileged material.

5       So in March every one in this case knew they likely

6   produced privileged material.   The case law says do something

7   about it promptly.   Rectify the problem.   And they are telling

8   you that we did it.   We do not have to.   We are going to look

9   at it a day before a deposition.

10      They just told you today that we got 19,000 or 11,000

11  -- I don't know how many documents -- that are potentially

12  privileged and we are just sitting on it.   We are sitting on it

13  until when, right?

14      Mistakes happen and 502 says that when you get the

15  benefit of the mistake do not waive the privilege.   And that is

16  when you have reasonable steps.   They did not.

17      And when you right away correct it; right away, run a

18  privilege review.   Claw-back the documents.   Do not pretend

19  there is an order in place, which isn't, and then do nothing

20  about it until we are a day before a deposition.

21      When I said I knew I was going to use the documents it

22  is because I had identified 150, 200 documents that I thought

23  were important to potentially discuss with the witness.

24      I get the button that says sequester the claw-back and

25  30 went away.   So those documents I already knew existed.   So I

1  am in the middle of preparing for a deposition months after

2  they know about a problem and they are saying, well, the day

3  before the depo take it away.

4          That is not a proper process.  This is waiver 101,

5  right?  You find out about the fact that you have inadvertently

6  produced and you do something right away.

7          To date they have not even done anything.  To date

8  they have not done anything.  I mean, that is to say nothing

9  about the 20 documents which were used, which now they are

10  saying they do not mind if they were used because they were

11  attachments, but they still clawed them back.  So that is a

12  second basis for waiver.

13          In the end, Your Honor, there are two options:

14          There is either waiver or there is *in camera* review.

15  And if Your Honor is inclined -- I think the law on waiver here

16  is very clear.

17          But if Your Honor is inclined for an *in camera*, then

18  we will prepare for that process.

19          Thank you.

20          THE COURT:  Thank you.

21          I will take everything under advisement and I will get

22  an order out as soon as I can.

23          Is there anything else that needs to come before the

24  Court, Mr. Koslowe?

25          MR. KOSLOWE:  Not today, Your Honor.  Thank you so

1   much for the time.

2           THE COURT:  Thank you.

3            Mr. Hockman?

4           MR. HOCKMAN:  Not today, Your Honor.  Thank you again.

5           THE COURT:  All right.  Thank you.

6            We will be in recess.  Have a good afternoon everyone.

7           THE COURTROOM DEPUTY:  All rise.

8            (Thereupon, the proceedings concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1
2                            CERTIFICATE
3
4          I hereby certify that the foregoing transcript is an
5    accurate transcript of the audiotape recorded proceedings in
6    the above-entitled matter.
7
8
9
10
     06/11/25                        Bonnie Joy Lewis,
11                           Registered Professional Reporter
                                CASE LAW REPORTING, INC.
12                               7001 Southwest 13 Street,
                               Pembroke Pines, Florida 33023
13                                    954-985-8875
14
15
16
17
18
19
20
21
22
23
24
25
```

## SUPPLEMENTAL DECLARATION OF ERIC P. HOCKMAN

I, Eric P. Hockman, declare under penalty of perjury pursuant to Section 92.525, Florida Statutes, as follows:

1.      This supplemental declaration is a supplement to ECF No. 172-1 to provide additional information regarding the City of Miami Beach's efforts to claw back privileged materials and to clarify the circumstances under which privileged documents were produced in MB001.  During the hearing on the Plaintiff's Motion to Determine Privilege, the court asked me about specific dates and timing that I was unable to recall.

2.      On April 28, 2025, while preparing for the deposition of former City Attorney Rafael Paz, my team identified 182 documents that appeared to be privileged and had been inadvertently produced. These documents were later listed in Exhibit A to my May 1, 2025, clawback letter.

3.      During Mr. Paz's deposition on May 5, 2025, two additional privileged documents were identified and clawed back on the record.

4.      On May 14, 2025, I participated in a meet-and-confer call with Plaintiff's counsel, Jason Koslowe. During that call, Mr. Koslowe advised me that he had not received documents from a managed review of documents withheld from MB001.  The managed review took place in April and May of 2024.  That call caused me to question what had happened to the reviewed documents, which I believed had been produced as part of MB002, the City's second production of documents produced the first week of October, 2024 following an agreed discovery pause.

5.      The same day as the call with Mr. Koslowe, I reviewed the documents listed in Exhibit A to the May 1, 2025, clawback letter and discovered that all 182 clawed-back documents originated from MB001 and also included the City's privileged search terms. This finding raised

serious concerns, as MB001 was supposed to contain only documents that did not hit on privileged search terms.

6.     In other words, if my instructions to the vendor had been followed, it should have been impossible for documents that hit on privileged search terms to be within the production set identified as MB001.  They all should have gone through managed review before production.

7.     Accordingly, I sent an inquiry to the City's ESI vendor on May 14, 2025, explaining what I was seeing.  I specifically asked them to explain how documents that hit on privileged search terms could be in MB0001 if MB0001 only contained documents that did not hit on privileged search terms, as planned.

8.     The vendor responded to me on May 15, 2025 confirming that my instructions had not been followed.  They advised that they ran the search terms that I had agreed upon with the Plaintiff and then produced the entire result, over 57,000 documents, to the Plaintiff without running the privileged search terms against that set.

Eric P. Hockman

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

200 E. Broward Blvd., Suite 1900

Fort Lauderdale, FL 33301